MICHAEL F. HERTZ
Acting Assistant Attorney General
DOUGLAS N. LETTER
Terrorism Litigation Counsel
JOSEPH H. HUNT
Director, Federal Programs Branch
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
Special Litigation Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20001
Phone: (202) 514-4782
Fax:    (202) 616-8460

*Attorneys for the United States and
Government Defendants Sued in their
Official Capacities*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLYN JEWEL, et al. | No. 08-cv-4873-VRW |
| Plaintiffs, | **PUBLIC DECLARATION OF DEBORAH A. BONANNI, NATIONAL SECURITY AGENCY** |
| v. | |
| NATIONAL SECURITY AGENCY et al. | |
| Defendants. | Date: June 25, 2009<br>Time: 2:30 p.m.<br>Courtroom 6, 17th Floor<br><br>Chief Judge Vaughn R. Walker |

I, Deborah A. Bonanni, do hereby state and declare as follows:

## I. Introduction

1. I am the Chief of Staff for the National Security Agency (NSA), an intelligence agency within the Department of Defense. I have held this position since February 2006. As the Chief of Staff, under our internal regulations, and in the absence of the Deputy Director and the Director, I am responsible for directing the NSA, overseeing the operations undertaken to carry out its mission and, by specific charge of the President and the Director of National Intelligence, protecting NSA activities and intelligence sources and methods. I have been designated an original TOP SECRET classification authority under Executive Order No. 12958, 60 Fed. Reg. 19825 (1995), as amended on March 25, 2003, and Department of Defense Directive No. 5200.1-R, Information Security Program Regulation, 32 C.F.R. § 159a.12 (2000).

2. The purpose of this declaration is to support an assertion of the military and state secrets privilege (hereafter "state secrets privilege") by the Director of National Intelligence ("DNI") as the head of the intelligence community, as well as the DNI's assertion of a statutory privilege under the National Security Act, to protect information related to NSA activities described herein below. Lieutenant General Keith Alexander, the Director of the National Security Agency, has been sued in his official and individual capacity in the above captioned case and has recused himself from the decision of whether to assert the statutory privilege in his official capacity. As the Deputy Director is currently out of the office on temporary duty, by operation of our internal regulations and by specific delegation of the Director, I am authorized to review the materials associated with this litigation, prepare whatever declarations I determine are appropriate, and determine whether to assert the NSA's statutory privilege. Through this

Public Declaration of Deborah A. Bonanni, National Security Agency
*Carolyn Jewel, et al. v. National Security Agency, et al.* (No. 08-cv-4873-VRW)

2

declaration, I hereby invoke and assert the NSA's statutory privilege set forth in Section 6 of the National Security Agency Act of 1959, Public Law No. 86-36 (codified as a note to 50 U.S.C. § 402) ("NSA Act"), to protect the information related to NSA activities described herein below. The statements made herein are based on my personal knowledge of NSA activities and operations, and on information made available to me as the Chief of Staff of the NSA.

## II. Summary

3.      In the course of my official duties, I have been advised of this litigation and I have reviewed the allegations in the Complaint in this case. In sum, plaintiffs allege that, after the 9/11 attacks, the NSA received presidential authorization to engage in surveillance activities far broader than the publicly acknowledged "Terrorist Surveillance Program" ("TSP"), which involved the interception of specific international communications involving persons reasonably believed to be associated with al Qaeda and affiliated terrorist organizations. Plaintiffs allege that the NSA, with the assistance of telecommunication companies including AT&T, has indiscriminately intercepted the content and obtained the communications records of millions of ordinary Americans as part of an alleged presidentially-authorized "Program" after 9/11. *See* Complaint at ¶¶ 2-13; 39-97. I cannot disclose on the public record the nature of any NSA information implicated by the plaintiffs' allegations. However, as described further below, the disclosure of information related to the NSA's activities, sources and methods implicated by the plaintiffs' allegations reasonably could be expected to cause exceptionally grave damage to the national security of the United States and, for this reason, are encompassed by the DNI's state secrets and statutory privilege assertions, as well as by my assertion of the NSA statutory privilege, and should be protected from disclosure in this case. In addition, it is my judgment that sensitive state secrets are so central to the subject matter of the litigation that any attempt to proceed in the case risks the disclosure of the classified privileged national security information

described herein and exceptionally grave damage to the national security of the United States.

### III. Background Information

**A.  The National Security Agency**

4.  The NSA was established by Presidential Directive in 1952 as a separately organized agency within the Department of Defense. The NSA's foreign intelligence mission includes the responsibility to collect, process, analyze, produce, and disseminate signals intelligence (SIGINT) information, of which communications intelligence ("COMINT") is a significant subset, for (a) national foreign intelligence purposes, (b) counterintelligence purposes, and (c) the support of military operations. *See* Executive Order 12333, § 1.7(c), as amended.[1]

5.  There are two primary reasons for gathering and analyzing foreign intelligence information. The first, and most important, is to gain information required to direct U.S. resources as necessary to counter external threats and in support of military operations. The second reason is to obtain information necessary to the formulation of U.S. foreign policy. Foreign intelligence information provided by the NSA is thus relevant to a wide range of important issues, including military order of battle; threat warnings and readiness; arms proliferation; international terrorism; counter-intelligence; and foreign aspects of international narcotics trafficking.

**B.  September 11, 2001 and the al Qaeda Threat.**

6.  On September 11, 2001, the al Qaeda terrorist network launched a set of coordinated attacks along the East Coast of the United States. Four commercial jetliners, each carefully selected to be fully loaded with fuel for a transcontinental flight, were hijacked by al

---

[1] Section 1.7(c) of E.O. 12333, as amended, specifically authorizes the NSA to "Collect (including through clandestine means), process, analyze, produce, and disseminate signals intelligence information for foreign intelligence and counterintelligence purposes to support national and departmental missions."

Public Declaration of Deborah A. Bonanni, National Security Agency
*Carolyn Jewel, et al. v. National Security Agency, et al.* (No. 08-cv-4873-VRW)

4

Qaeda operatives. Those operatives targeted the Nation's financial center in New York with two of the jetliners, which they deliberately flew into the Twin Towers of the World Trade Center. Al Qaeda targeted the headquarters of the Nation's Armed Forces, the Pentagon, with the third jetliner. Al Qaeda operatives were apparently headed toward Washington, D.C. with the fourth jetliner when passengers struggled with the hijackers and the plane crashed in Shanksville, Pennsylvania. The intended target of this fourth jetliner was most evidently the White House or the Capitol, strongly suggesting that al Qaeda's intended mission was to strike a decapitation blow to the Government of the United States—to kill the President, the Vice President, or Members of Congress. The attacks of September 11 resulted in approximately 3,000 deaths—the highest single-day death toll from hostile foreign attacks in the Nation's history. In addition, these attacks shut down air travel in the United States, disrupted the Nation's financial markets and government operations, and caused billions of dollars of damage to the economy.

7. On September 14, 2001, a national emergency was declared "by reason of the terrorist attacks at the World Trade Center, New York, New York, and the Pentagon, and the continuing and immediate threat of further attacks on the United States." Presidential Proclamation No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001). The United States also immediately began plans for a military response directed at al Qaeda's training grounds and havens in Afghanistan. On September 14, 2001, both Houses of Congress passed a Joint Resolution authorizing the President of the United States "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11. Authorization for Use of Military Force, Pub. L. No. 107-40 § 21(a), 115 Stat. 224, 224 (Sept. 18, 2001) ("Cong. Auth."). Congress also expressly acknowledged that the attacks rendered it "necessary and appropriate" for the United States to exercise its right "to protect United States citizens both at home and

Public Declaration of Deborah A. Bonanni, National Security Agency
*Carolyn Jewel, et al. v. National Security Agency, et al.* (No. 08-cv-4873-VRW)

5

abroad," and acknowledged in particular that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." *Id.* pmbl.

8. Also after the 9/11 attacks, a Military Order was issued stating that the attacks of September 11 "created a state of armed conflict," *see* Military Order by the President § 1(a), 66 Fed. Reg. 57833, 57833 (Nov. 13, 2001), and that al Qaeda terrorists "possess both the capability and the intention to undertake further terrorist attacks against the United States that, if not detected and prevented, will cause mass deaths, mass injuries, and massive destruction of property, and may place at risk the continuity of the operations of the United States Government," and concluding that "an extraordinary emergency exists for national defense purposes." Military Order, § 1(c), (g), 66 Fed. Reg. at 57833-34. Indeed, shortly after the attacks, on October 2, 2001, NATO took the unprecedented step of invoking Article 5 of the North Atlantic Treaty, which provides that an "armed attack against one or more of [the parties] shall be considered an attack against them all." North Atlantic Treaty, Apr. 4, 1949, art. 5, 63 Stat. 2241, 2244, 34 U.N.T.S. 243, 246.

9. As a result of the unprecedented attacks of September 11, 2001, the United States found itself immediately propelled into a worldwide war against a network of terrorist groups, centered on and affiliated with al Qaeda, that possesses the evolving capability and intention of inflicting further catastrophic attacks on the United States. That war is continuing today, at home as well as abroad. Moreover, the war against al Qaeda and its allies is a different kind of war, against a very different enemy, than any other war or enemy the Nation has previously faced. Al Qaeda and its supporters operate not as a traditional nation-state but as a diffuse, decentralized global network of individuals, cells, and loosely associated, often disparate groups, that act sometimes in concert, sometimes independently, and sometimes in the United States, but

Public Declaration of Deborah A. Bonanni, National Security Agency
*Carolyn Jewel, et al. v. National Security Agency, et al.* (No. 08-cv-4873-VRW)

6

always in secret—and their mission is to destroy lives and to disrupt a way of life through terrorist acts. Al Qaeda works in the shadows; secrecy is essential to al Qaeda's success in plotting and executing its terrorist attacks.

### IV. Information Protected by Privilege

10. In general and unclassified terms, the following categories of information are subject to the DNI's assertion of the state secrets privilege and statutory privilege under the National Security Act, as well as my assertion of the NSA statutory privilege:

> A. Information that may tend to confirm or deny whether the plaintiffs have been subject to any alleged NSA intelligence activity that may be at issue in this matter; and
>
> B. Any information concerning NSA intelligence activities, sources, or methods that may relate to or be necessary to adjudicate plaintiffs' allegations, including allegations that the NSA, with the assistance of telecommunications carriers such as AT&T, indiscriminately intercepts the content of communications and also collects the communication records of millions of Americans as part of an alleged presidentially authorized "Program" after 9/11. *See, e.g.*, Complaint at ¶¶ 2-13; 39-97.
>
> The scope of this assertion includes but is not limited to:
>
> (i) Information concerning the scope and operation of the now inoperative "Terrorist Surveillance Program" ("TSP") regarding the interception of the content of certain one-end international communications reasonably believed to involve a member or agent of al-Qaeda or an affiliated terrorist organization, and any other information related to demonstrating that the NSA does not otherwise engage in the content surveillance dragnet that the plaintiffs allege; and
>
> (ii) Information concerning whether or not the NSA obtained from telecommunications companies such as AT&T communication transactional records as alleged in the Complaint; *see, e.g.*, Complaint ¶¶ 10; 82-97; and
>
> (iii) Information that may tend to confirm or deny whether AT&T (and to the extent relevant or necessary, any other telecommunications carrier), has provided

assistance to the NSA in connection with any alleged activity.

## VI. Description of Information Subject to Privilege and the Harm of Disclosure

### A. Information That May Tend to Confirm or Deny Whether the Plaintiffs Have Been Subject to Any Alleged NSA Activities.

11. The first major category of information as to which I am supporting the DNI's assertion of privilege, and asserting the NSA's own statutory privilege, concerns information as to whether particular individuals, including the named plaintiffs in this lawsuit, have been subject to alleged NSA intelligence activities. As set forth below, disclosure of such information would cause exceptionally grave harm to the national security.

12. As a matter of course, the NSA cannot publicly confirm or deny whether any individual is subject to surveillance activities because to do so would tend to reveal actual targets. For example, if the NSA were to confirm in this case and others that specific individuals are not targets of surveillance, but later refuse to comment (as it would have to) in a case involving an actual target, an actual or potential adversary of the United States could easily deduce by comparing such responses that the person in the latter case is a target. There can be great harm in revealing targets of foreign intelligence surveillance. If an individual knows or suspects he is a target of U.S. intelligence activities, he would naturally tend to alter his behavior to take new precautions against surveillance. In addition, revealing who is not a target would indicate who has avoided surveillance and reveal the limitations of NSA's capabilities. Such information could lead an actual or potential adversary, secure in the knowledge that he is not under surveillance, to convey information; alternatively, such a person may be unwittingly utilized or even forced to convey information through a secure channel to a hostile foreign adversary. In short, revealing which channels are free from surveillance and which are not would also reveal sensitive intelligence methods and thereby could help any adversary evade

Public Declaration of Deborah A. Bonanni, National Security Agency
*Carolyn Jewel, et al. v. National Security Agency, et al.* (No. 08-cv-4873-VRW)

8

detection and capitalize on limitations in NSA's capabilities.

B. **Information Related to NSA Activities, Sources, or Methods Implicated by the Plaintiffs' Allegations and the Harm to National Security of Its Disclosure.**

1. **Plaintiffs' Allegations of a Communications Dragnet.**

13. I am also supporting the DNI's assertion of privilege and asserting the NSA's statutory privilege over any other facts concerning NSA intelligence activities, sources, or methods that may relate to or be necessary to litigate the plaintiffs' claims and allegations, including that (i) the NSA is indiscriminately intercepting the content of communications of millions of ordinary Americans, *see, e.g.*, Complaint ¶¶ 7, 9, 10, and (ii) that the NSA is collecting the private telephone and Internet transaction records of millions of AT&T customers, again including information concerning the plaintiffs' telephone and Internet communications. *See e.g.*, Complaint ¶¶ 7, 9, 10, 13, 82-97. As described above, the scope of the government's privilege assertion includes but is not limited to: (1) facts concerning the operation of the now inoperative Terrorist Surveillance Program and any other NSA activities needed to demonstrate that the TSP was limited to the interception of the content of one-end international communications reasonably believed to involve a member or agent of al Qaeda or an affiliated terrorist organization and that the NSA does not otherwise conduct the content surveillance dragnet that the plaintiffs allege; and (2) information concerning whether or not the NSA obtains transactional communication records from telecommunications companies such as AT&T as plaintiffs allege. As set forth below, the disclosure of such information would cause exceptionally grave harm to national security.

(a) **Information Related to the Terrorist Surveillance Program.**

14. After the existence of the TSP was officially acknowledged in December 2005,

Public Declaration of Deborah A. Bonanni, National Security Agency
*Carolyn Jewel, et al. v. National Security Agency, et al.* (No. 08-cv-4873-VRW)

9

the Government stated that the NSA's collection of the content of communications under the TSP was directed at international communications in which a participant was reasonably believed to be associated with al Qaeda or an affiliated organization. Plaintiffs' allegation that the NSA has undertaken indiscriminate surveillance of the content of millions of communications sent or received by people inside the United States after 9/11 under the TSP is therefore false, again as the Government has previously stated.[2] But to the extent the NSA must demonstrate that content surveillance under the TSP was so limited, and was not plaintiffs' alleged content dragnet, or demonstrate that the NSA has not otherwise engaged in the alleged content dragnet, highly classified NSA intelligence sources and methods about the operation of the TSP and NSA intelligence activities would be subject to disclosure or the risk of disclosure. The disclosure of whether and to what extent the NSA utilizes certain intelligence sources and methods would reveal to foreign adversaries the NSA's capabilities, or lack thereof, enabling them to either evade particular channels of communications that are being monitored, or exploit channels of communications that are not subject to NSA activities---in either case risking exceptionally grave harm to national security.

### (b) Plaintiffs' Allegations Concerning the Collection of Communication Records.

15. As noted above, plaintiffs also allege that the NSA is collecting the private telephone and Internet transaction records of millions of AT&T customers, again including information concerning the plaintiffs' telephone and Internet communications. *See, e.g.*, Complaint ¶¶ 7, 9, 10, 13, 82-97. Confirmation or denial of any information concerning whether the NSA collects communication records would also disclose information about whether or not

---

[2] *See, e.g.*, Public Declaration of NSA Director Alexander in the *Shubert* action (07-cv-693-VRW) at ¶ 16.

the NSA utilizes particular intelligence sources and methods and, thus, the NSA's capabilities or lack thereof, and would cause exceptionally grave harm to national security.

### 3. Plaintiffs' Allegations that AT&T Provided Assistance to the NSA with the Alleged Activities.

16. The third major category of NSA intelligence sources and methods as to which I am supporting the DNI's assertion of privilege, and asserting the NSA's statutory privilege, concerns information that may tend to confirm or deny whether or not AT&T (or to the extent necessary whether or not any other telecommunications provider) has assisted the NSA with alleged intelligence activities. Plaintiffs allege that they are customers of AT&T, and that AT&T participated in the alleged surveillance activities that the plaintiffs seek to challenge. As set forth below, confirmation or denial of a relationship between the NSA and AT&T (or other carriers) on alleged intelligence activities would cause exceptionally grave harm to national security.

### VII. Conclusion

17. In sum, I support the DNI's assertion of the state secrets privilege and statutory privilege to prevent the disclosure of the information described herein and detailed herein. I also assert a statutory privilege under Section 6 of the National Security Act with respect to the information described herein which concerns the functions of the NSA. Moreover, because proceedings in this case risk disclosure of privileged and classified intelligence-related information, I respectfully request that the Court not only protect that information from disclosure but also dismiss this case to prevent exceptional harm to the national security of the United States.

Public Declaration of Deborah A. Bonanni, National Security Agency
*Carolyn Jewel, et al. v. National Security Agency, et al.* (No. 08-cv-4873-VRW)

11

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 3 April 2009

DEBORAH A. BONANNI
Chief of Staff
National Security Agency

Public Declaration of Deborah A. Bonanni, National Security Agency
*Carolyn Jewel, et al. v. National Security Agency, et al.* (No. 08-cv-4873-VRW)

12