widespread belief among senior IC and CIA officials that the process for
obtaining FISA authorization was too cumbersome and time consuming to
address the current threat. CIA officials stated that FISA required extensive
paperwork and high-level reviews and approvals by the DCI and the
Attorney General and the FISC did not always approve FISA applications in
a timely manner. Hayden and other senior IC officials also told the CIA OIG
that, at the time that the PSP operated, Congress had not updated FISA
since its 1978 enactment to reflect changes in communication technologies.

### 6.    ODNI Participation in the PSP

PSP-derived information was closely held within the ODNI and was
made available to a limited number of NCTC analysts for review or, if
appropriate, use in preparing NCTC analytical products. Generally, the
NCTC analysts approved for PSP access received PSP-derived information in
the form of NSA intelligence products. NCTC analysts told the ODNI OIG
that they generally obtained access to the PSP-derived information from a
secure IC database or directly from an NSA representative. NCTC analysts
told the ODNI OIG that the PSP-derived information was subject to stringent
security protections. The NCTC analysts said that they received training
regarding the proper handling of IC signals intelligence, and they reported
that they handled all such information, including PSP-derived information,
consistent with standard rules and procedures.

### C.    Impact of PSP-Derived Information on the FISA Process

Chapters Three and Six of the DOJ OIG report describe how DOJ and
the FISC addressed the impact PSP-derived information had on the FISA
process. The DOJ OIG concluded that it was foreseeable that such
information might impact the process and that the initial delay in reading
anyone from DOJ's Office of Intelligence Policy and Review (OIPR) or the
FISC into the PSP unnecessarily jeopardized DOJ's relationship with the
Court. In addition, overly restrictive limitations on the number of OIPR
attorneys and FISC judges who were read into the program created
significant and avoidable problems of workload imbalance in the functioning
both of OIPR and the FISC. The DOJ OIG concluded that once the PSP
began to affect the functioning of the FISA process, the number of OIPR staff
and FISC judges read into the PSP to manage the program's impact should
have increased.

### D.    Discovery Issues

The DOJ OIG reviewed DOJ's handling of PSP information with
respect to its discovery obligations in international terrorism prosecutions.
DOJ was aware as early as 2002 that information collected under the PSP
could have implications for DOJ's litigation responsibilities under Federal

Dockets.Justia.com

Rule of Criminal Procedure Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).

Analysis of this discovery issue was first assigned to OLC Deputy Assistant Attorney General Yoo in 2003. However, no DOJ attorneys with terrorism prosecution responsibilities were read into the PSP until mid-2004, and as a result DOJ continued to lack the advice of attorneys who were best equipped to identify and examine the discovery issues in connection with the PSP.

Since then, DOJ has taken steps to address discovery issues with respect to the PSP, which is discussed in the DOJ OIG classified report. Based upon its review of DOJ's handling of these issues, the DOJ OIG recommends that DOJ assess its discovery obligations regarding PSP-derived information, if any, in international terrorism prosecutions. The DOJ OIG also recommends that DOJ carefully consider whether it must re-examine past cases to see whether potentially discoverable but undisclosed Rule 16 or *Brady* material was collected under the PSP, and take appropriate steps to ensure that it has complied with its discovery obligations in such cases. In addition, the DOJ OIG recommends that DOJ implement a procedure to identify PSP-derived information, if any, that may be associated with international terrorism cases currently pending or likely to be brought in the future and evaluate whether such information should be disclosed in light of the government's discovery obligations under Rule 16 and *Brady*.

## IV.   LEGAL REASSESSMENT OF THE PRESIDENT'S SURVEILLANCE PROGRAM

Chapter Four of the DOJ OIG's report describes the period in late 2003 and early 2004 when DOJ determined that aspects of the PSP were not supported by law and advised the President that the program should be modified.

### A.   Justice Department Attorneys Become Concerned About the Legality of Some Activities under the PSP

As noted above, John Yoo was the sole OLC attorney who advised Attorney General Ashcroft and White House officials on the PSP from the program's inception in October 2001 through Yoo's resignation from DOJ in May 2003. Upon Yoo's departure, another DOJ official, Patrick Philbin, was selected by the White House to be read into the PSP to assume Yoo's role as advisor to the Attorney General concerning the program. In addition, Jack Goldsmith replaced Jay Bybee as the Assistant Attorney General for OLC on October 6, 2003. Even though Bybee had never been read into the PSP,

Philbin persuaded Counsel to the Vice President David Addington to read in Goldsmith, Bybee's replacement.

After being read into the PSP, Goldsmith and Philbin became concerned about the factual and legal basis for Yoo's legal memoranda supporting the program. For example, FISA prohibits persons from intentionally engaging in electronic surveillance "under color of law except as authorized by statute[.]" 50 U.S.C. § 1809(a). Yoo's analysis concluded that this provision did not implicate the legality of the PSP because FISA did not expressly apply to wartime operations. However, Yoo's memoranda omitted any reference to the FISA provision allowing the interception of electronic communications without a warrant for a period of 15 days following a congressional declaration of war. See 50 U.S.C. § 1811. Goldsmith and Philbin were concerned that this provision contradicted Yoo's assertion that Congress did not intend FISA to apply to wartime operations. They also were troubled by other aspects of Yoo's legal analysis and by the lack of an adequate factual description in his memoranda of how the PSP operated.

### B.    OLC Begins Developing a New Legal Analysis for the PSP

Goldsmith and Philbin began developing an analysis to more fully address the FISA statute with respect to the PSP. This new analysis relied on the legal argument that the Congressional Authorization for Use of Military Force Joint Resolution (AUMF), enacted shortly after the attacks of September 11, 2001, effectively exempted some of the activities under the PSP from FISA. However, Goldsmith and Philbin became concerned that this revised analysis would not be sufficient to support the legality of certain aspects of the Other Intelligence Activities that the President had authorized under the PSP.

Beginning in August 2003, Philbin and later Goldsmith brought their concerns about the OLC legal opinions to Attorney General Ashcroft. With Ashcroft's approval, Philbin began preparing a new OLC memorandum assessing the legality of the PSP. During this period in late 2003, Goldsmith and Philbin advised Ashcroft to continue to certify as to form and legality the Presidential Authorizations for the PSP pending completion of the new legal analysis.

### C.    DOJ Officials Convey Concerns to the White House

In December 2003, Goldsmith and Philbin met with Counsel to the Vice President Addington and White House Counsel Gonzales at the White House to express their growing concerns about the legal underpinnings of the program. Goldsmith said he told them that OLC was not sure the program could survive in its current form. According to Goldsmith's

contemporaneous notes of these events, these discussions did not contemplate an interruption of the program, although the White House officials represented that they would "agree to pull the plug" if the problems with the program were found to be sufficiently serious.

In late January 2004, at Goldsmith's request, the White House agreed to allow Deputy Attorney General James Comey to be read into the PSP following Comey's confirmation as the Deputy Attorney General in December 2003. After being briefed, Comey agreed that the concerns about Yoo's legal analysis were well-founded.[14] Comey told the DOJ OIG that of particular concern to him and Goldsmith was the notion that Yoo's legal analysis entailed ignoring an act of Congress, and doing so without full congressional notification.

### D.    Conflict Between DOJ and the White House

Comey told the DOJ OIG that he met with Attorney General Ashcroft on March 4, 2004, to discuss the PSP and that Ashcroft agreed with Comey and the other DOJ officials' assessment of the potential legal problems with the PSP. Later that day, Ashcroft was struck with severe gallstone pancreatitis and was admitted to the George Washington University Hospital in Washington, D.C.[15]

On March 5, 2004, Goldsmith advised Comey by memorandum that under the circumstances of Ashcroft's medical condition and hospitalization, a "clear basis" existed for Comey to determine that "this is a case of 'absence or disability' of the Attorney General" within the meaning of 28 U.S.C. § 508(a). The "cc" line of Goldsmith's memorandum to Comey indicated that a copy of the memorandum was also sent to White House Counsel Gonzales.

Later on March 5, Gonzales called Goldsmith to request a letter from OLC stating that Yoo's prior OLC opinions "covered the program," meaning the PSP. Philbin told the DOJ OIG that Gonzales was not requesting a new opinion that the program itself was legal, but only that the prior opinions had concluded that it was. As a result of Gonzales's request, Goldsmith, Philbin, and Comey re-examined Yoo's memoranda with a view toward determining whether they adequately described the actual intelligence activities of the NSA under the Authorizations. Goldsmith, Philbin, and

---

[14] Comey also discussed DOJ's concerns about the legality of the program with FBI Director Mueller on March 1, 2004. Mueller told the DOJ OIG that this was the first time he had been made aware of DOJ's concerns.

[15] Ashcroft's doctors did not clear Ashcroft to resume his duties as Attorney General until March 31, 2004.

Comey concluded that Yoo's memoranda did not accurately describe some of the Other Intelligence Activities that were being conducted under the Presidential Authorizations implementing the PSP, and that the memoranda therefore did not provide a basis for finding that these activities were legal.

On Saturday, March 6, Goldsmith and Philbin, with Comey's concurrence, met with Addington and Gonzales at the White House to convey their conclusions that certain activities in the PSP should cease. According to Goldsmith's notes, Addington and Gonzales "reacted calmly and said they would get back with us."

On Sunday, March 7, 2004, Goldsmith and Philbin met again with Addington and Gonzales at the White House. According to Goldsmith, the White House officials informed Goldsmith and Philbin that they disagreed with their interpretation of Yoo's memoranda and on the need to change any of the NSA's intelligence activities under the PSP.

On March 9 Gonzales called Goldsmith to the White House in an effort to persuade him that his criticisms of Yoo's memoranda were incorrect and that Yoo's analysis provided sufficient legal support for the program. After Goldsmith disagreed, Gonzales next argued for a "30-day bridge" to get past the expiration of the current Presidential Authorization on March 11, 2004. Gonzales reasoned that Ashcroft, who was still hospitalized, was not in any condition to sign a renewal of the Authorization, and that a "30-day bridge" would move the situation to a point where Ashcroft would be well enough to approve the program. Goldsmith told Gonzales he could not agree to recommend an extension because aspects of the program lacked legal support.

At noon that day, another meeting was held in the White House office of Andrew Card, the President's Chief of Staff. According to Director Mueller's notes, Mueller, Card, Vice President Cheney, CIA Deputy Director McLaughlin, Hayden, Gonzales, and other unspecified officials were present. Comey, Goldsmith, and Philbin were not invited to this meeting. After a presentation on the value of the PSP by NSA and CIA officials, it was then explained to the group that Comey "has problems" with some activities authorized under the program. Mueller's notes state that Vice President Cheney suggested that "the President may have to reauthorize without [the] blessing of DOJ," to which Mueller responded, "I could have a problem with that," and that the FBI would "have to review legality of continued participation in the program."

Another meeting at the White House was held on March 9, this time with Comey, Goldsmith, and Philbin present. Gonzales told the DOJ OIG that the meeting was held to make sure that Comey understood what was at stake with the PSP and to demonstrate the program's value. Comey said

Vice President Cheney stressed that the PSP was "critically important" and warned that Comey would risk "thousands" of lives if Comey did not agree to recertify the program. Comey said he stated at the meeting that he, as Acting Attorney General, could not support reauthorizing certain intelligence activities unless they were modified. According to Comey, the White House officials said they could not agree to that modification.

Goldsmith, Philbin, and Comey met in the early afternoon of March 10, 2004, to discuss the meeting at the White House the day before and how DOJ should proceed. Goldsmith and Philbin confirmed their position to Comey that some of the Other Intelligence Activities under the PSP could not be legally supported and would have to be changed or shut down.

Gonzales told the DOJ OIG that after President Bush was advised of the results of the March 9, 2004, meeting, the President instructed Vice President Cheney on the morning of Wednesday, March 10, to call a meeting with congressional leaders to advise them of the impasse with DOJ. On the afternoon of March 10, at approximately 4:00 or 5:00 p.m., Gonzales and other White House and intelligence agency officials, including Vice President Cheney, Card, Hayden, McLaughlin, and Tenet, convened an "emergency meeting" with congressional leaders in the White House Situation Room. The congressional leaders in attendance were Senate Majority and Minority Leaders William H. "Bill" Frist and Thomas A. Daschle; Senate Select Committee on Intelligence Chairman Pat Roberts and Vice Chairman Jay Rockefeller; Speaker of the House Dennis Hastert and House Minority Leader Nancy Pelosi; and House Permanent Select Committee on Intelligence Chair Porter Goss and Ranking Member Jane Harman. This congressional group was known informally as the "Gang of Eight." No officials from DOJ were asked to attend the meeting.

According to Gonzales's notes of the meeting, individual congressional leaders expressed thoughts and concerns related to the program. However, Gonzales told the DOJ OIG that the consensus of the congressional leaders was that the program should continue.[16]

---

[16] When Gonzales testified before the Senate Judiciary Committee on July 24, 2007, he essentially described the congressional leaders' reactions to the March 10, 2004, "Gang of Eight" briefing as he did in his handwritten notes of the briefing, stating, "The consensus in the room from the congressional leadership is that we should continue the activities, at least for now." However, after Gonzales testified Representative Pelosi, Senator Rockefeller, and Senator Daschle issued statements sharply disputing Gonzales's characterization of their statements at the March 10, 2004, meeting, stating that there was no consensus at the meeting that the program should proceed. Pelosi's office also issued a statement that she "made clear my disagreement with what the White House was asking" concerning the program. The DOJ OIG did not attempt to interview the congressional

(Cont'd.)

Gonzales told the DOJ OIG that following the meeting with the congressional leaders on March 10, President Bush instructed him and Card to go to the George Washington University Hospital to speak to Ashcroft, who was in the intensive care unit recovering from surgery.

According to notes from Ashcroft's FBI security detail, at 6:20 p.m. that evening Card called the hospital and spoke with an agent in Ashcroft's security detail, advising him that President Bush would be calling shortly to speak with Ashcroft. Ashcroft's wife told the agent that Ashcroft would not accept the call. Ten minutes later, the agent called Ashcroft's Chief of Staff David Ayres at DOJ to request that Ayres speak with Card about the President's intention to call Ashcroft. The agent conveyed to Ayres Mrs. Ashcroft's desire that no calls be made to Ashcroft for another day or two. However, at 6:45 p.m., Card and the President called the hospital and, according to the agent's notes, "insisted on speaking [with Attorney General Ashcroft]." According to the agent's notes, Mrs. Ashcroft took the call from Card and the President and was informed that Gonzales and Card were coming to the hospital to see Ashcroft regarding a matter involving national security.

At approximately 7:00 p.m., after learning that Gonzales and Card were on their way to the hospital, Ayres relayed this information to Comey. According to Comey's May 2007 testimony before the Senate Judiciary Committee, Comey called his Chief of Staff and directed him to "get as many of my people as possible to the hospital immediately." Comey next called FBI Director Mueller and told him that Gonzales and Card were on their way to the hospital to see Ashcroft, and that Ashcroft was in no condition to receive guests, much less make a decision about whether to recertify the PSP. According to Mueller's notes, Comey asked Mueller to come to the hospital to "witness [the] condition of AG." Mueller told Comey he would go to the hospital right away.

Philbin said he was leaving work that evening when he received a call from Comey, who told Philbin that he needed to get to the hospital right away because Gonzales and Card were on their way there "to get Ashcroft to sign something." Comey also directed Philbin to call Goldsmith and tell him what was happening.

Comey arrived at the hospital between 7:10 and 7:30 p.m. In his congressional testimony, Comey said he ran up the stairs with his security detail to Ashcroft's floor, and he entered Ashcroft's room, which he described as darkened, and found Ashcroft lying in bed and his wife

---

leaders and obtain their recollections as to what was said at this meeting because this was beyond the scope of its review.

standing by his side. Comey said he began speaking to Ashcroft, and that it was not clear that Ashcroft could focus and that he "seemed pretty bad off[.]"

Goldsmith and Philbin arrived at the hospital within a few minutes of each other. Comey, Goldsmith, and Philbin met briefly in an FBI "command post" that had been set up in a room adjacent to Ashcroft's room. Moments later, the command post was notified that Card and Gonzales had arrived at the hospital and were on their way upstairs to see Ashcroft. Comey, Goldsmith, and Philbin entered Ashcroft's room and, according to Goldsmith's notes, Comey and the others advised Ashcroft "not to sign anything."

Gonzales and Card entered Ashcroft's hospital room at 7:35 p.m., according to the FBI agent's notes. The two stood across from Mrs. Ashcroft at the head of the bed, with Comey, Goldsmith, and Philbin behind them. Gonzales told the DOJ OIG that he carried with him in a manila envelope the March 11, 2004, Presidential Authorization for Ashcroft to sign. According to Philbin, Gonzales first asked Ashcroft how he was feeling and Ashcroft replied, "Not well." Gonzales then said words to the effect, "You know, there's a reauthorization that has to be renewed . . .." Gonzales told us that he may also have told Ashcroft that White House officials had met with congressional leaders "to pursue a legislative fix."

Comey testified to the Senate Judiciary Committee that at this point Ashcroft told Gonzales and Card "in very strong terms" about his legal concerns with the PSP, which Comey testified Ashcroft drew from his meeting with Comey about the program a week earlier. Comey testified that Ashcroft next stated:

> "But that doesn't matter, because I'm not the Attorney General. There is the Attorney General," and he pointed to me – I was just to his left. The two men [Gonzales and Card] did not acknowledge me; they turned and walked from the room.

Records kept by the Attorney General's security detail indicate that Gonzales and Card left Ashcroft's room at 7:40 p.m. Moments after Gonzales and Card departed, Mueller arrived at the hospital. At approximately 8:00 p.m., Mueller went into Ashcroft's room for 5 to 10 minutes. Mueller wrote in his notes: "AG in chair; is feeble, barely articulate, clearly stressed."

Before leaving the hospital, Comey received a call from White House Chief of Staff Card. Comey testified that Card was very upset and demanded that Comey come to the White House immediately. Comey told Card that he would meet with him, but not without a witness, and that he

intended that witness to be DOJ Solicitor General Ted Olson. Comey and Olson subsequently went to the White House at about 11:00 p.m. that evening and met with Gonzales and Card. Gonzales told the DOJ OIG that little more was achieved at this meeting other than a general acknowledgement that a "situation" continued to exist because of the disagreement between DOJ and the White House regarding legal authorization for the program.

### E. White House Counsel Certifies Presidential Authorization Without Department of Justice Concurrence

On the morning of March 11, 2004, with the Presidential Authorization set to expire, President Bush signed a new Authorization for the PSP. In a departure from the past practice of having the Attorney General certify the Authorization as to form and legality, the March 11 Authorization was certified by White House Counsel Gonzales. The March 11 Authorization also differed markedly from prior Authorizations in three other respects. It explicitly asserted that the President's exercise of his Article II Commander-in-Chief authority displaced any contrary provisions of law, including FISA. It clarified the description of certain Other Intelligence Activities being conducted under the PSP to address questions regarding whether such activities had actually been authorized explicitly in prior Authorizations. It also stated that in approving the prior Presidential Authorizations as to form and legality, the Attorney General previously had authorized the same activities now being approved under the March 11 Authorization.[17]

White House Chief of Staff Card informed Comey by telephone on the morning of March 11, 2004, that the President had signed the new Authorization that morning. At approximately noon, Gonzales called Goldsmith to inform him that the President, in issuing the Authorization, had made an interpretation of law concerning his authorities and that DOJ should not act in contradiction of the President's determinations.

Also at noon on March 11, Director Mueller met with Card at the White House. According to Mueller's notes, Card told Mueller that if no "legislative fix" could be found by May 6, 2004, when the March 11 Authorization was set to expire, the program would be discontinued.

---

[17] The DOJ OIG determined that this statement subsequently was removed from future Authorizations after Ashcroft complained to Gonzales that the statement was "inappropriate." In a May 20, 2004 memorandum, Ashcroft wrote that it was not until Philbin and later Goldsmith explained to him that aspects of the NSA's Other Intelligence Activities were not accurately described in the prior Authorizations that he realized that he had been certifying the Authorizations prior to March 2004 based on a misimpression of those activities.

Mueller wrote that he told Card that the failure to have DOJ representation at the congressional briefing and the attempt to have Ashcroft certify the Authorization without going through Comey "gave the strong perception that the [White House] was trying to do an end run around the Acting [Attorney General] whom they knew to have serious concerns as to the legality of portions of the program." Card responded that he and Gonzales were unaware at the time of the hospital visit that Comey was the Acting Attorney General, and that they had only been following the directions of the President.

### F.    Department of Justice and FBI Officials Consider Resigning

Several senior DOJ and FBI officials considered resigning after the Presidential Authorization was signed without DOJ's concurrence. Comey told the DOJ OIG that he drafted a letter of resignation because he believed it was impossible for him to remain with DOJ if the President would do something DOJ said was not legally supportable. Comey also testified that Ashcroft's Chief of Staff David Ayres believed Ashcroft also was likely to resign and thus Ayres urged Comey to wait until Ashcroft was well enough to resign with him.[18]

Goldsmith told the DOJ OIG he drafted a resignation letter at around the same time as Comey. According to his contemporaneous notes, Goldsmith cited the "shoddiness" of the prior OLC legal review, the "over-secrecy" of the PSP, and the "shameful" incident at the hospital as among his grievances.

At approximately 1:30 a.m. on March 12, 2004, FBI Director Mueller drafted by hand a letter stating, in part: "[A]fter reviewing the plain language of the FISA statute, and the order issued yesterday by the President . . . and in the absence of further clarification of the legality of the program from the Attorney General, I am forced to withdraw the FBI from participation in the program. Further, should the President order the continuation of the FBI's participation in the program, and in the absence of further legal advice from the AG, I would be constrained to resign as Director of the FBI." Mueller told the DOJ OIG that he planned on having the letter typed and then tendering it, but that based on subsequent events his resignation was not necessary.

---

[18] In written responses to Senator Charles Schumer following his testimony, Comey wrote that he believed that several senior DOJ officials, including Chuck Rosenberg, Daniel Levin, James Baker, David Ayres, and Deputy Chief of Staff to the Attorney General David Israelite, were also prepared to resign. Comey wrote that he believed that "a large portion" of his staff also would have resigned if he had.

On the morning of March 12, 2004, Comey and Mueller attended the regular daily threat briefing with the President in the Oval Office. Comey said that following the briefing President Bush called him into the President's private study for an "unscheduled meeting." Comey told the President of DOJ's legal concerns regarding the PSP. According to Comey, the President's response indicated that he had not been fully informed of these concerns. Comey told the President that the President's staff had been advised of these issues "for weeks." According to Comey, the President said that he just needed until May 6 (the date of the next Authorization), and that if he could not get Congress to fix FISA by then he would shut down the program. The President emphasized the importance of the program and that it "saves lives."

The President next met with Mueller. According to Mueller's notes, Mueller told the President of his concerns regarding the FBI's continued participation in the program without an opinion from the Attorney General as to its legality, and that he was considering resigning if the FBI were directed to continue to participate without the concurrence of the Attorney General. Mueller wrote that he explained to the President that he had an "independent obligation to the FBI and to DOJ to assure the legality of actions we undertook, and that a presidential order alone could not do that." According to Mueller's notes, the President then directed Mueller to meet with Comey and other PSP principals to address the legal concerns so that the FBI could continue participating in the program "as appropriate under the law."

On the morning of March 12, 2004, Comey decided not to direct the FBI to cease cooperating with the NSA in conjunction with the program. Comey's decision is documented in a one-page memorandum from Goldsmith to Comey in which Goldsmith explained that the President, as Commander in Chief and Chief Executive with the constitutional duty to "take care that the laws are faithfully executed," made a determination that the PSP, as practiced, was lawful. Goldsmith concluded that this determination was binding on the entire Executive Branch, including Comey in his exercise of the powers of the Attorney General.

On March 12, 2004 an interagency working group led by OLC was convened to continue reanalyzing the legality of the PSP. In the days that followed, Goldsmith continued to express doubt that a viable legal rationale could be found for some of the Other Intelligence Activities being conducted under the PSP.

On March 16, 2004 Comey drafted a memorandum to White House Counsel Gonzales setting out his advice to the President. According to the memorandum, Comey advised that DOJ remained unable to find a legal basis to support certain Other Intelligence Activities that had been

28

authorized as part of the program and that such activities should be discontinued immediately. Comey cautioned that he believed some ongoing activities under the program raised "serious issues" about congressional notification, "particularly where the legal basis for the program is the President's decision to assert his authority to override an otherwise applicable Act of Congress."

Gonzales replied by letter on the evening of March 16. The letter stated, in part:

> Your memorandum appears to have been based on a misunderstanding of the President's expectations regarding the conduct of the Department of Justice. While the President was, and remains, interested in any thoughts the Department of Justice may have on alternative ways to achieve effectively the goals of the activities authorized by the Presidential Authorization of March 11, 2004, the President has addressed definitively for the Executive Branch in the Presidential Authorization the interpretation of the law.

### G.    White House Agrees to Modify the PSP

Notwithstanding Gonzales's letter, on March 17, 2004 the President decided to modify certain PSP intelligence-gathering activities and to discontinue certain Other Intelligence Activities that DOJ believed were legally unsupported. The President's directive was expressed in two modifications to the March 11, 2004 Presidential Authorization.

On May 6, 2004 Goldsmith and Philbin completed an OLC legal memorandum assessing the legality of the PSP as it was operating at that time. The 108-page memorandum traced the history of the program and analyzed the legality of all of the intelligence activities conducted under the program in light of applicable statutes, Executive Orders, cases, and constitutional provisions. Much of the legal reasoning in the May 6, 2004 OLC memorandum was publicly released by DOJ in a "White Paper" issued after one aspect of the program was revealed in The New York Times and publicly confirmed by the President in December 2005 as the Terrorist Surveillance Program. The OLC memorandum stated that the Authorization for Use of Military Force (AUMF) passed by Congress shortly after the attacks of September 11, 2001 gave the President authority to use both domestically and abroad "all necessary and appropriate force," including signals intelligence capabilities, to prevent future acts of international terrorism against the United States. According to the memorandum, the AUMF was properly read as an express authorization to conduct targeted electronic surveillance against al-Qa'ida and its affiliates, the entities

responsible for attacking the United States, thereby supporting the President's directives to conduct these activities under the PSP.

## H.   Department of Justice OIG Conclusions

The DOJ OIG concluded that it was extraordinary and inappropriate that a single DOJ attorney, John Yoo, was relied upon to conduct the initial legal assessment of the PSP, and that the lack of oversight and review of Yoo's work, as customarily is the practice of OLC, contributed to a legal analysis of the PSP that at a minimum was factually flawed. Deficiencies in the legal memoranda became apparent once additional DOJ attorneys were read into the program in 2003 and when those attorneys sought a greater understanding of the PSP's operation. The DOJ OIG concluded that the White House's strict controls over DOJ access to the PSP undermined DOJ's ability to perform its critical legal function during the PSP's early phase of operation.

The DOJ OIG also concluded that the circumstances plainly called for additional DOJ resources to be applied to the legal review of the program and that it was the Attorney General's responsibility to be aware of this need and to take steps to address it. Ashcroft's request during this period that his chief of staff David Ayres and Deputy Attorney General Larry Thompson be read into the program was not approved. However, the DOJ OIG could not determine whether Attorney General Ashcroft aggressively sought additional read-ins to assist with DOJ's legal review of the program during this period because Ashcroft did not agree to be interviewed.

## V.   TRANSITION OF CERTAIN PROGRAM ACTIVITIES TO FOREIGN INTELLIGENCE SURVEILLANCE COURT ORDERS

Certain activities that were originally authorized as part of the PSP have subsequently been authorized under orders issued by the Foreign Intelligence Surveillance Court (FISC). The activities transitioned in this manner included the interception of certain international communications that the President publicly described as the "Terrorist Surveillance Program."

As a result of this transition, the President decided not to reauthorize these activities and the final Presidential Authorization expired on February 1, 2007. The White House stated that work on the transition of authority over a two-year period addressed Administration concerns about preserving the speed and agility that the Terrorist Surveillance Program provided.

The transition of certain PSP-authorized activities to FISC orders is described in detail in Section 5 of the classified report and Chapter Five of

the DOJ OIG Report. Further details regarding this transition are classified and therefore cannot be addressed in this unclassified report.

In August 2007, the Protect America Act was enacted, amending FISA to address the government's ability to conduct electronic surveillance in the United States of persons reasonably believed to be located outside the United States. This legislation expired in early 2008, and in July 2008 the FISA Amendments Act of 2008 was enacted. This latter law authorized the government to intercept inside the United States any communications of non-U.S. persons reasonably believed to be located outside the United States, provided a significant purpose of the acquisition pertains to foreign intelligence. This legislation gave the government even broader authority to intercept international communications than did the provisions of the Presidential Authorizations governing the activities that the President acknowledged in December 2005 as the Terrorist Surveillance Program.

The DOJ OIG review concluded that several considerations favored initiating the process of transitioning the PSP to FISA authority earlier than had been done, especially as the program became less a temporary response to the September 11 terrorist attacks and more a permanent surveillance tool. These considerations included the PSP's effect on privacy interests of U.S. persons, the instability of the legal reasoning on which the program rested for several years, and the substantial restrictions placed on FBI agents' access to and use of program-derived information due to the highly classified status of the PSP.

## VI.  IMPACT OF THE PRESIDENT'S SURVEILLANCE PROGRAM ON INTELLIGENCE COMMUNITY COUNTERTERRORISM EFFORTS

### A.  NSA's Assessment of the PSP

The NSA OIG reported that Hayden, referring to portions of the PSP in 2005, said there had probably been no communications more important to NSA efforts to defend the nation than those involving al-Qa'ida. NSA collected communications when one end was inside the United States and one end was associated with al-Qa'ida or terrorist groups associated with al Qa'ida in order to detect and prevent attacks inside the United States. Hayden stated that "the program in this regard has been successful." During the May 2006 Senate hearing on his nomination to be CIA Director, Hayden said that, had the PSP been in place before the September 2001 attacks, hijackers Khalid Almihdhar and Nawaf Alhazmi almost certainly would have been identified and located.

In May 2009, Hayden told NSA OIG that the value of the Program was in knowing that NSA signals intelligence activities under the PSP covered an important "quadrant" of terrorist communications. NSA's Deputy Director

echoed Hayden's comment when he said that the value of the PSP was in the confidence it provided that someone was looking at the seam between the foreign and domestic intelligence domains.

**B.   DOJ OIG's Assessment of the PSP**

In 2004 and 2006, the FBI's Office of General Counsel (OGC) attempted to assess the value of PSP information on FBI counterterrorism efforts. Neither of these efforts represented a comprehensive assessment of the PSP's value. The FBI conducted a more comprehensive survey of the impact of PSP-derived information, also in 2006. The results of these surveys are summarized in the DOJ OIG Report. Based in part on the results of one study, FBI management, including Director Mueller and Deputy Director John Pistole, concluded that the PSP was "of value."

The DOJ OIG sought as part of its review to assess the role of PSP-derived information and its value to the FBI's overall counterterrorism efforts. Director Mueller told the DOJ OIG that he believes the PSP was useful. Mueller said that the FBI must follow every lead it receives in order to prevent future terrorist attacks and that to the extent such information can be gathered and used legally it must be exploited. Mueller also stated that he "would not dismiss the potency of a program based on the percentage of hits."

The DOJ OIG interviewed FBI officials, agents, and analysts responsible for handling PSP information about their experiences with the program. These assessments, more fully described in Chapter Six of the DOJ OIG's report, generally were supportive of the program as "one tool of many" in the FBI's anti-terrorism efforts that "could help move cases forward." Even though most PSP leads were determined not to have any connection to terrorism, many of the FBI witnesses believed the mere possibility of the leads producing useful information made investigating the leads worthwhile.

However, the DOJ OIG also found that the exceptionally compartmented nature of the program created some frustration for FBI personnel. Some agents and analysts criticized the PSP-derived information they received for providing insufficient details, and the agents who managed counterterrorism programs at the FBI field offices the DOJ OIG visited said the FBI's process for disseminating PSP-derived information failed to adequately prioritize the information for investigation.

The DOJ OIG also examined several cases that have frequently been cited as examples of the PSP's contribution to the IC's counterterrorism efforts. These assessments, more fully described in Chapter Six of the DOJ

OIG's report, generally were supportive of the program as "one tool of many" in the FBI's anti-terrorism efforts.

In sum, the DOJ OIG found it difficult to assess or quantify the overall effectiveness of the PSP program as it relates to the FBI's counterterrorism activities. However, based on the interviews conducted and documents reviewed, the DOJ OIG concluded that although PSP-derived information had value in some counterterrorism investigations, it generally played a limited role in the FBI's overall counterterrorism efforts. The reasons for this conclusion are classified and are described in the classified report and Chapter Six of the DOJ OIG report.

As noted above, certain activities that were originally authorized as part of the PSP have subsequently been authorized under orders issued by the FISC. The DOJ OIG believes that DOJ and other IC agencies should continue to assess the value of information derived from such activities to the government's counterterrorism efforts.

### C. CIA OIG's Assessment of the PSP

The CIA OIG reviewed the impact of the PSP on the CIA's counterterrorism efforts.

The CIA OIG reported that senior administration officials considered the PSP to be a valuable counterterrorism tool. In his December 2005 press conference, President Bush also said that there was an on-going debate in Washington, D.C. that criticized his, and previous, administrations for not "connecting the dots" prior to the attacks of September 11, 2001. He went on to say that the USA PATRIOT Act and the NSA program (the PSP) are helping to connect the dots as best as his administration possibly can. During a December 2005 press briefing, Hayden said that information had been obtained through this program that would not otherwise have been available. Senior CIA officials also told the CIA OIG that they had received PSP reporting with information that was previously unavailable. One senior official told the CIA OIG that the program eliminated some of the impediments that the CIA had encountered in accessing and analyzing communications between foreign and domestic locations. Another said that the PSP was a key resource, and without it there would have been a missing piece of the picture.

The CIA OIG determined that the CIA did not implement procedures to assess the usefulness of the product of the PSP and did not routinely document whether particular PSP reporting had contributed to successful counterterrorism operations. CIA officials, including Hayden, told the CIA OIG that PSP reporting was used in conjunction with reporting from other intelligence sources; consequently, it is difficult to attribute the success of

33

particular counterterrorism case exclusively to the PSP. In a May 2006 briefing to the Senate Select Committee on Intelligence, a senior CIA official said that PSP reporting was rarely the sole basis for an intelligence success, but that it frequently played a supporting role. He went on to state that the program was an additional resource to enhance the CIA's understanding of terrorist networks and to help identify potential threats to the U.S. homeland. Other officials told the CIA OIG that the PSP was one of many tools available to them, and that the tools were often used in combination.

NSA disseminated PSP-derived information in its normal reporting channels when it could be done without revealing the source of the information. As such, CIA officers, even those read into the program, would have been unaware of the full extent of PSP reporting. In the course of this review, the CIA OIG learned of numerous PSP reports that provided leads. However, because there is no means to comprehensively track how PSP information was incorporated into CIA analysis, officials were able to provide only limited information on how program reporting contributed to successful operations, and the CIA OIG was unable to independently draw any conclusion on the overall effectiveness of the program to the CIA.

The CIA OIG determined that several factors hindered the CIA in making full use of the product of the PSP. Many CIA officials stated that too few CIA personnel at the working level were read into the PSP. At the program's inception, a disproportionate number of the CIA personnel who were read into the PSP were senior CIA managers. According to one CIA manager, the tight control over access to the PSP prevented some officers who could have made effective use of the program reporting from being read in. Another official stated that the disparity between the number of senior CIA managers read into PSP and the number of working-level CIA personnel resulted in too few CIA personnel to fully utilize PSP information for targeting and analysis.

Officials also told the CIA OIG that working-level CIA analysts and targeting officers who were read into the PSP had too many competing priorities, and too many other information sources and analytic tools available to them, to fully utilize PSP reporting. Officials also stated that much of the PSP reporting was vague or without context, which led analysts and targeting officers to rely more heavily on other information sources and analytic tools, which were more easily accessed and timely than the PSP.

CIA officers also told the CIA OIG that the PSP would have been more fully utilized if analysts and targeting officers had obtained a better understanding of the program's capabilities. There was no formal training on the use of the PSP beyond the initial read-in to the program. Many CIA officers stated that the instruction provided in the read-in briefing was not sufficient and that they were surprised and frustrated by the lack of

additional guidance. Some officers told the CIA OIG that there was insufficient legal guidance on the use of PSP-derived information.

The CIA OIG concluded that the factors that hindered the CIA in making full use of the PSP might have been mitigated if the CIA had designated an individual at an appropriate level of managerial authority who possessed knowledge of both the PSP and CIA counterterrorism activities to be responsible and accountable for overseeing CIA involvement in the program.

### D.   ODNI's Assessment of the PSP

Hayden told the PSP IG Group that during his tenure as Director of the NSA, he sought to disseminate PSP information within the IC while also protecting the PSP as the source of the information. Hayden said this policy likely resulted in IC analysts not having a full appreciation of the PSP's value because they likely did not realize that some NSA reporting was derived from the PSP. NCTC analysts confirmed that they often did not know if the NSA intelligence available to them was derived from the PSP. The NCTC analysts said they understood that NSA marked PSP information in a manner that protected the source of the information.

On those occasions when the NCTC analysts knew that a particular NSA intelligence product was derived from the PSP, the analysts said they reviewed the PSP information in the same manner as other NSA intelligence products and, if appropriate, incorporated the PSP information into analytical products being prepared for the DNI and other senior intelligence officials. NCTC analysts with access to PSP information told the ODNI OIG that they had broad access to a wide variety of high-quality and fully evaluated terrorism related intelligence, including some of the most sensitive and valuable terrorism intelligence available to the IC. In this context, NCTC analysts characterized the PSP information as being a useful tool, but noted that the information was only one of several valuable sources of information available to them. During ODNI OIG interviews, some NCTC analysts and ODNI personnel described the PSP information as "one tool in the tool box" or used equivalent descriptions to explain their view that the PSP information was not of greater value than other sources of intelligence. The NCTC analysts noted that the NSA policy protecting the source of the PSP information would have resulted in them not fully understanding the value of the PSP information.

Hayden said the PSP information allowed IC leaders to make valuable judgments regarding the allocation of national security resources. Hayden described the PSP as an "early warning system" for terrorist threats. Hayden told the ODNI OIG that the PSP was extremely valuable in protecting the United States from an al-Qa'ida terrorist attack. He cited

35

several examples of where he said the PSP information was used to disrupt al-Qa'ida operatives or assist in terrorism investigations.

### E.   Intelligence Community Activities Supported by the PSP

Most IC officials interviewed by the PSP IG Group had difficulty citing specific instances where PSP reporting had directly contributed to counterterrorism successes. Although it was difficult for a variety of reasons already discussed to independently identify instances where PSP reporting contributed to successful counterterrorism efforts, there are several cases identified by IC officials and in IC documentation where PSP reporting may have contributed to a counterterrorism success. These cases cannot be discussed in this unclassified report, but are described in the classified report and accompanying individual OIG reports.

## VII.   PUBLIC STATEMENTS ABOUT THE PRESIDENT'S SURVEILLANCE PROGRAM

As noted above, aspects of the PSP were first disclosed publicly in a series of articles in The New York Times in December 2005. Subsequently, Attorney General Gonzales was questioned about NSA surveillance activities in two public hearings before the Senate Judiciary Committee in February 2006 and July 2007. As part of its review, the DOJ OIG examined whether Attorney General Gonzales made false, inaccurate, or misleading statements to Congress related to the PSP in those hearings.

Through media accounts and former Deputy Attorney General Comey's Senate Judiciary Committee testimony in May 2007, it was publicly revealed that DOJ and the White House had a major disagreement related to the PSP in March 2004. As discussed in Section IV of this unclassified report, this dispute – which resulted in the visit to Attorney General Ashcroft's hospital room by Gonzales and Card and brought several senior DOJ and FBI officials to the brink of resignation – concerned certain of the Other Intelligence Activities that were different from the communication interception activities that the President later publicly acknowledged as the Terrorist Surveillance Program, but that had been implemented through the same Presidential Authorizations.

In testimony before the Senate Judiciary Committee, Gonzales stated that the dispute at issue between DOJ and the White House did not relate to the Terrorist Surveillance Program that the President had confirmed, but rather pertained to other intelligence activities. The DOJ OIG concluded that this testimony created the misimpression that the dispute concerned activities entirely unrelated to the Terrorist Surveillance Program, which was not accurate. As previously noted, both activities had been authorized by the President in a single Presidential Authorization.

In addition, the DOJ OIG concluded that Gonzales's testimony that DOJ attorneys did not have "reservations" or "concerns" about the program the "President has confirmed" (the Terrorist Surveillance Program) was incomplete and confusing. As detailed in Chapter Four of the DOJ OIG report, there also was a dispute about this portion of the program. Although this dispute was not the subject of the hospital room confrontation or the threatened resignations, DOJ's concerns over this issue were communicated to the White House in several meetings over a period of months prior to and including March 2004 before the issue was resolved.

The DOJ OIG recognized that Attorney General Gonzales was in the difficult position of testifying before the Senate Judiciary Committee about a highly classified program in an open forum. However, the DOJ OIG concluded that Gonzales, as a participant in the March 2004 dispute between the White House and DOJ and, more importantly, as the nation's chief law enforcement officer, had a duty to balance his obligation not to disclose classified information with the need not to be misleading in his testimony about the events that nearly led to resignations of several senior officials at DOJ and the FBI. The DOJ OIG concluded that Gonzales did not intend to mislead Congress, but it found that his testimony was confusing, inaccurate, and had the effect of misleading those who were not knowledgeable about the program.

## VIII. CONCLUSION

Pursuant to the FISA Amendments Act of 2008, the Inspectors General of the DOJ, DoD, ODNI, NSA, and CIA conducted reviews of the PSP. In this report, the classified report, and the accompanying individual reports of the participating IGs, we describe how, following the terrorist attacks of September 11, 2001, the President directed that the NSA's signals intelligence collection capabilities be used to detect and prevent acts of terrorism within the United States.

Pursuant to this authority the NSA conducted new intelligence activities, including the collection of the content of communications into and out of the United States, where one party to the communication was reasonably believed to be a member of al-Qa'ida or its affiliates. The NSA analyzed this information for dissemination as leads to the IC, principally to the CIA and the FBI. As described in the IG reports, the scope of this collection authority changed over the course of the PSP.

The IG reports describe the role of each of the participating agencies in the PSP, including the NSA's management and oversight of the collection and analysis process, the CIA's and FBI's use of the PSP-derived intelligence in their counterterrorism efforts, the ODNI's involvement in the program by

providing periodic threat assessments and using the program intelligence to produce analytical products, and DOJ's role in analyzing and certifying the legality of the PSP. With the exception of the NSA, the DoD had limited involvement in the PSP.

The IG reports also describe the conflicting views surrounding the legality of aspects of the PSP during 2004, the confrontation between officials from DOJ and the White House about the legal basis for parts of the program, as well as the resolution of that conflict. The ensuing transition of the PSP from presidential authority to statutory authority under FISA is also described in the IG reports.

The IGs also examined the impact of PSP information on counterterrorism efforts. Many senior IC officials believe that the PSP filled a gap in intelligence collection thought to exist under the FISA statute shortly after the al-Qa'ida terrorist attacks against the United States. Others within the IC, including FBI agents, CIA analysts and officers, and other officials had difficulty evaluating the precise contribution of the PSP to counterterrorism efforts because it was most often viewed as one source among many available analytic and intelligence-gathering tools in these efforts. The IG reports describe several examples of how PSP-derived information factored into specific investigations and operations.

Finally, the collection activities pursued under the PSP, and under FISA following the PSP's transition to that authority, involved unprecedented collection activities. We believe the retention and use by IC organizations of information collected under the PSP and FISA should be carefully monitored.

PREPARED BY THE
OFFICES OF INSPECTORS GENERAL
OF THE
DEPARTMENT OF DEFENSE
DEPARTMENT OF JUSTICE
CENTRAL INTELLIGENCE AGENCY
NATIONAL SECURITY AGENCY
OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

(U) UNCLASSIFIED REPORT ON THE
PRESIDENT'S SURVEILLANCE PROGRAM

REPORT NO. 2009-0013-AS