# Exhibit C

Dockets.Justia.com

| 95TH CONGRESS<br>*2d Session* } | HOUSE OF REPRESENTATIVES | { REPORT 95–<br>1283, Pt. I |
|---|---|---|

# FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978

JUNE 8, 1978.—Ordered to be printed

Mr. BOLAND, from the Permanent Select Committee on Intelligence, submitted the following

# REPORT

together with

## SUPPLEMENTAL, ADDITIONAL, AND DISSENTING VIEWS

[To accompany H.R. 7308 which on November 4, 1977, was referred jointly to the Committee on the Judiciary and the Permanent Select Committee on Intelligence]

The Permanent Select Committee on Intelligence, to whom was referred the bill (H.R. 7308) to amend title 18, United States Code, to authorize applications for a court order approving the use of electronic surveillance to obtain foreign intelligence information, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

## AMENDMENTS

Strike all after the enacting clause and insert in lieu thereof:

That this act may be cited as the "Foreign Intelligence Surveillance Act of 1978".

## TABLE OF CONTENTS

TITLE I—ELECTRONIC SURVEILLANCE WITHIN THE UNITED STATES FOR FOREIGN INTELLIGENCE PURPOSES

Sec. 101. Definitions.
Sec. 102. Authorization for electronic surveillance for foreign intelligence purposes.
Sec. 103. Special courts.
Sec. 104. Application for an order.
Sec. 105. Issuance of an order.
Sec. 106. Use of information.
Sec. 107. Report of electronic surveillance.
Sec. 108. Congressional oversight.
Sec. 109. Penalties.
Sec. 110. Civil liability.

TITLE II—CONFORMING AMENDMENTS

Sec. 201. Amendments to chapter 119 of title 18, United States Code.

TITLE III—EFFECTIVE DATE

Sec. 301. Effective date.

29–22S

HH33-3

The committee also recognizes that training in laboratory conditions may not be sufficient; field training in almost all areas of endeavor is considered necessary. Finally, communications acquired in the course of training personnel are barred from being retained or disseminated. There is no need for anyone other than the trainees and their instructor to have any knowledge of what might or might not have been intercepted.

The authorization in this subsection is a narrow one made necessary by the broad definition of "electronic surveillance." It is not intended to authorize electronic surveillances to gather foreign intelligence information generally. Thus the provision is phrased in terms of the purpose being "solely to test the capability of electronic equipment . . . , determine the existence and capability of electronic surveillance equipment being used by persons not authorized to conduct electronic surveillance . . . or training intelligence personnel in the use of electronic surveillance equipment." Where, for example, the existence and capability of unauthorized electronic surveillance equipment has been established, this provision does not authorize further surveillance to determine the targets of the surveillance or the information being acquired by the unauthorized surveillance.

All tests, "sweeps", and training conducted pursuant to this provision must be in the normal course of official business by the Government agent conducting the test, sweep, or training. The committee contemplates that such testing, "sweeps," and training will be approved by a senior official prior to the commencement of the activity.

Subsection (g) was not in H.R. 7308, as introduced. Its effect is self-explanatory. It's purpose is to assure accountability by requiring that applications and orders be maintained for 10 years. Under chapter 119 of title 18, U.S.C., there is a similar 10 year recordkeeping requirement.

*Section 106*

This section places additional constraints on Government use of information obtained from electronic surveillance and establishes detailed procedures under which such information may be received in evidence, suppressed, or discovered.

Subsection (a) requires that information concerning U.S. persons acquired from electronic surveillance pursuant to this title may be used and disclosed by Federal officers and employees, without the consent of the U.S. person, only in accordance with the minimization procedures defined in section 101 (h). This provision ensures that the use of such information is carefully restricted to actual foreign intelligence or law enforcement purposes.

This subsection also notes that no otherwise privileged communication obtained in accordance with or in violation of this chapter shall lose its privileged character. This provision is identical to 18 U.S.C. 2517(4) and is designed, like its title III predecessor, to change existing law as to the scope and existence of privileged communications only to the extent that it provides that otherwise privileged communications do not lose their privileged character because they are intercepted by a person not a party to the conversation.

Subsection (a) further states that no information (whether or not it concerns a U.S. person) acquired from an electronic surveillance

88

pursuant to this title may be used or disclosed except for lawful purposes. This provision did not appear in H.R. 7308, as introduced. It was added by the committee to insure that information concerning foreign visitors and other non-U.S. persons, the use of which is not restricted to foreign intelligence or law enforcement purposes, is not used for illegal purposes.

There is no specific restriction in the bill regarding to whom Federal officers may disclose information concerning U.S. persons acquired pursuant to this title although specific minimization procedures might require specific restrictions in particular cases. First, the committee believes that dissemination should be permitted to State and local law enforcement officials. If Federal agents monitoring a foreign intelligence surveillance authorized under this title were to overhear information relating to a violation of State criminal law, such as homicide, the agents could hardly be expected to conceal such information from the appropriate local officials. Second, the committee can conceive of situations where disclosure should be made outside of Government channels. For example, Federal agents may learn of a terrorist plot to kidnap a business executive. Certainly in such cases they should be permitted to disclose such information to the executive and his company in order to provide for the executive's security.

Finally, the committee believes that foreign intelligence information relating to crimes, espionage activities, or the acts and intentions of foreign powers may, in some circumstances, be appropriately disseminated to cooperating intelligence services of other nations. So long as all the procedures of this title are followed by the Federal officers, including minimization and the limitations on dissemination, this cooperative relationship should not be terminated by a blanket prohibition on dissemination to foreign intelligence services. The committee wishes to stress, however, that any such dissemination be reviewed carefully to ensure that there is a sufficient reason why disclosure of information to foreign intelligence services is in the interests of the United States.

Disclosure, in compelling circumstances, to local officials for the purpose of enforcing the criminal law, to the targets of clandestine intelligence activity or planned violence, and to foreign intelligence services under the circumstances described above are generally the only exceptions to the rule that dissemination should be limited to Federal officials.

It is recognized that these strict requirements only apply to information known to concern U.S. persons. Where the information in the communication is encoded or otherwise not known to concern U.S. persons, only the requirement that the information be disclosed for lawful purposes applies. There is no requirement that before disclosure can be made information be decoded or otherwise processed to determine whether information concerning U.S. persons is indeed present. Of course, the restrictions on use and disclosure still apply, so that if any Government agency received coded information from the intercepting agency, were it to break the code, the limitations on use and disclosure would apply to it.

Subsection (b) requires that disclosure of information for law enforcement purposes must be accompanied by a statement that such

evidence, or any information derived therefrom, may be used in a criminal proceeding only with the advance authorization of the Attorney General. This provision is designed to eliminate circumstances in which a local prosecutor has no knowledge that evidence was obtained through foreign intelligence electronic surveillance. In granting approval of the use of evidence the Attorney General would alert the prosecutor to the surveillance and he, in turn, could alert the court in accordance with subsection (c) or (d).

Subsections (c) through (i) set forth the procedures under which information acquired by means of electronic surveillance may be received in evidence or otherwise used or disclosed in any trial, hearing or other Federal or State proceeding. Although the primary purpose of electronic surveillance conducted pursuant to this chapter is not likely to be the gathering of criminal evidence, it is contemplated that such evidence will be acquired and these subsections establish the procedural mechanisms by which such information may be used in formal proceedings.

At the outset the committee recognizes that nothing in these subsections abrogates the rights afforded a criminal defendant under *Brady* v. *Maryland*,[43] and the Jencks Act.[44] These legal principles inhere in any such proceeding and are wholly consistent with the procedures detailed here. Furthermore, nothing contained in this section is intended to alter the traditional principle that the Government cannot use material at trial against a criminal defendant, and then withhold from him such material at trial.[45]

Subsection (c) states that no information acquired from an electronic surveillance (or any fruits thereof) may be used against an aggrieved person, as defined, unless prior to the trial, hearing, or other proceeding, or at a reasonable time prior to an effort to disclose the information or submit it in evidence, the United States notifies the court or other authority and the aggrieved person of its intent.

Subsection (d) places the same requirements upon the states and their political subdivisions, and also requires notice to the Attorney General.

Subsection (e) provides a separate statutory vehicle by which an aggrieved person against whom evidence derived or obtained from an electronic surveillance is to be or has been introduced or otherwise used or disclosed in any trial, hearing or proceeding may move to suppress the information acquired by electronic surveillance or evidence derived therefrom. The grounds for such a motion would be that (1) the information was unlawfully acquired, or (2) the surveillance was not made in conformity with the order of authorization or approval.

A motion under this subsection must be made before the trial, hearing, or proceeding unless there was no opportunity to make such a motion or the movant was not aware of the grounds for the motion.

It should be noted that the term "aggrieved person", as defined in section 101(k) does not include those who are mentioned in an intercepted communication. The committee wishes to make it clear that

---

[43] 373 U.S. 83 (1963).
[44] 18 U.S.C. 3500 et seq.
[45] *United States* v. *Andolschek*, 142 F.2d 503 (2nd Cir. 1944).

90

such persons do not have standing to file a motion under section 106 or under any other provision. The minimization procedures do apply to such persons and, to the extent that such persons lack standing, the committee recognizes that it has created a right without a remedy. However, it is felt that the Attorney General's regulations concerning the minimization procedures, judicial review of such procedures, and criminal penalties for intentional violation of them, will provide sufficient protection.

Section (f) sets out special judicial procedures to be followed when the Government concedes that it intends to use or has used evidence obtained or derived from electronic surveillance. Where, in any trial or proceeding, the Government concedes, either pursuant to the notification [46] requirements of subsection (c) and (d) or after a motion is filed by the defendant pursuant to subsection (e), that it intends to use or has used evidence obtained or derived from electronic surveillance, it may make a motion before the special court to determine the lawfulness of the surveillance. The special court must then determine whether the surveillance was lawful or not. In so doing, no judge who granted an order or extension involving the surveillance at issue could make the determination, unless all the judges of the special court would be so disqualified.

The determination would be made in camera if the Attorney General certifies under oath that disclosure would harm the national security or compromise foreign intelligence sources and methods.[47] However, when the special court determines that there is a reasonable question as to the legality of the surveillance and disclosure would likely promote a more accurate determination thereof (or when the court determines that disclosure would not harm the national security) the defendant should be provided relevant portions of the application, order, or other materials. Whenever there is a reasonable question of legality, it is hoped that disclosure, with an in camera adversary hearing, will be the usual practice. The committee considered requiring an adversary hearing in all cases, but was persuaded by the Department of Justice that in those instances where there is no reasonable question as to the legality of the surveillance security considerations should prevail. In ordering disclosure, the special court must provide for appropriate security procedures and protective orders.

Subsection (f), outlined above, deals with those rare situations in which the Government states it will use evidence obtained or derived from an electronic surveillance.

Subsection (g) states in detail the procedures to be followed when, in any court or other authority of the United States or a state, a motion or request is made to discover or obtain applications or orders, or other materials relating to surveillance under this title, or to dis-

[46] It should be emphasized that notification by the Government triggers the special court procedures whether or not the defense has filed a suppression or discovery motion. Thus, if before the filing of such motions, the Government concedes use of evidence obtained from electronic surveillance, and the Court determines that the surveillance was lawful, a discovery or suppression motion would be moot because of the requirements of subsection (h).

[47] In many, if not most cases, the Attorney General's affidavit will have to be based on information supplied to him by other Executive officers. It is perfectly proper for the Attorney General in making his affidavit to rely on conclusions and beliefs held by others in the Executive Branch who are responsible for national security or intelligence sources and methods.

91

cover, obtain or suppress any information obtained from electronic surveillance, and the Government certifies that no information obtained or derived from an electronic surveillance has been or is about to be used by the Government before that court or other authority.

When such a motion or request is made, it will be heard by the Special Court of Appeals if:

The court or other authority in which the motion is filed determines that the moving party is an aggrieved person, as defined;

The Attorney General certifies to the Special Court of Appeals that an adversary hearing would harm the national security or compromise intelligence sources or methods; and

The Attorney General certifies to the Special Court of Appeals that no information obtained or derived from an electronic surveillance has been or is to be used.

If the above findings and certifications are made, the special court of appeals will stay the proceedings before the court or other authority and conduct an ex parte, in camera inspection of the application, order or other relevant material to determine whether the surveillance was lawfully authorized and conducted.

The subsection further provides that in making such a determination, the court may order disclosed to the person against whom the evidence is to be introduced the court order or accompanying application, or portions thereof, or other materials relating to the surveillance, only if it finds that such disclosure is necessary to afford due process to the aggrieved person.

It is to be emphasized that, although a number of different procedures might be used to attack the legality of the surveillance, it is the procedures set out in subsections (f) and (g) "notwithstanding any other law" that must be used to resolve the question. The committee wishes to make very clear that these procedures apply whatever the underlying rule or statute referred to in the motion. This is necessary to prevent these carefully drawn procedures from being bypassed by the inventive litigant using a new statute, rule or judicial construction.

Subsections (f) and (g) effect substantial changes from H.R. 7308, as introduced. The committee has adopted a suggestion of the General Counsel of the Administrative Office of the U.S. Courts in providing that judicial determinations with respect to challenges to the legality of foreign intelligence surveillances and motions for discovery concerning such surveillances, where the Government believes that adversary hearings or disclosure would harm the national security, will be made by the special court or the special court of appeals. Given the sensitive nature of the information involved and the fact any judge might otherwise be involved in situations where there would be no mandated security procedures, the committee feels it appropriate for such matters to be considered solely by the special courts.

Moreover, judges of the special courts are likely to be able to put claims of national security in a better perspective and to have greater confidence in interpreting this bill than judges who do not have occasion to deal with the surveillances under this bill, and the Government is likely to be less fearful of disclosing information even to the judge where is knows there are special security procedures and the judge already is cognizant of other foreign intelligence surveillances. These

92

considerations, it is believed, suggest that—given the in camera procedure—the private party will be more thoroughly protected by having the special courts determine the legality of the surveillances under the bill.

The most significant change is contained in the subsection (f) provision authorizing disclosure and an adversary hearing in certain circumstances. This provision has been adopted only after lengthy discussion within the committee and a careful consideration of the suggested risk to security involved. The narrow reach of the provision should be emphasized; the adversary hearing procedures can arise only in those instances where the Government concedes that it intends to use evidence obtained or derived from an electronic surveillance (which the Government had not done in the last 10 years until the case of *U.S.* v. *Humphrey*, crim. no. 78–25–A, E.D. Va.).

Furthermore, the decision to remove a proceeding to one of the special courts (under subsection (f) or (g)) is entirely up to the Government in the first instance, as, of course, is the decision to prosecute. With these limitations, the committee believes that the adversary hearing provision is fully protective of those legitimate security interests which the Congress, no less than the executive branch, has a duty to safeguard.

The Congress has an equally compelling duty to insure that trials are conducted according to traditional American concepts of fair play and substantial justice. In this context, the committee believes that when the Government intends to use information against a criminal defendant obtained or derived from an electronic surveillance, and there is a reasonable question as to the legality of a surveillance, simple justice dictates that the defendant not be denied the use of our traditional means for reaching the truth—the adversary process.[49]

Where the Government states under oath that it does not intend to use evidence or information obtained or derived from electronic surveillance, the case for an adversary hearing is less persuasive and the bill does not provide for it. In such cases, however, in order to provide additional protection to the defendant, the bill (if the case is removed from the trial court) states that the matter be heard by three judges of the special court of appeals, rather than by a single judge of the special court.

It should be emphasized that in determining the legality of a surveillance under subsection (f) or (g), the judges of the special courts (or the trial judge if the matter is not removed to the special courts) are not to make determinations which the issuing judge is not authorized to make. Where the bill specifies the scope or nature of judicial review in the consideration of an application, any review under these subsections is similarly constrained. For example, when reviewing the certifications required by section 104(a) (7), unless there is a prima facie

---

[49] The committee is aware that the Supreme Court has never decided that an adversary hearing is constitutionally required to determine the legality of a surveillance. See *Alderman* v. *United States*, 394 U.S. 165 (1969); *United States* v. *Butenko*, 494 F.2d 593 (3d. Cir. 1974) (en banc), cert. denied sub nom. *Ivanov* v. *United States*, 419 U.S. 881 (1974); *Giordano* v. *United States*, 394 U.S. 310, 314 (1968) (concurring opinion of Justice Stewart.) This fact does not lessen the importance of an adversary hearing in searching for the truth and assuring a fair trial, and if the court should so decide, the procedures for an adversary hearing would already be in place. It should also be noted that in neither *Alderman* nor *Butenko* did the Government concede use of information obtained or derived from a surveillance.

showing of a fraudulent statement by a certifying officer, procedural regularity is the only determination to be made if a non-U.S. person is the target, and the "clearly erroneous" standard is to be used where a U.S. person is targeted. Of course, the judge is also free to review the constitutionality of the law itself.

Subsection (h) states what procedures the special courts are to follow after a determination of legality or illegality is made pursuant to subsection (f) or (g). The committee wishes to emphasize that its intent in this provision is not to legislate new procedures or in any other manner alter existing procedures with respect to what should be ordered after a finding of illegality is made. In such circumstances, the judge is directed to suppress the evidence or otherwise grant the motion "in accordance with the requirements of law." Existing case law requires the Government, in the case of an illegal surveillance, to surrender to the defendant all the information illegally acquired in order for the defendant to make an intelligent motion on the question of taint. The Supreme Court in *Alderman* v. *United States, supra,* held that once a defendant claiming evidence against him was the fruit of unconstitutional electronic surveillance has established the illegality of such surveillance (and his "standing" to object), he must be given those materials illegally acquired in the Government's files to assist him in establishing the existence of "taint." The Court rejected the Government's contention that the trial court could be permitted to screen the files in camera and give the defendant only material which was "arguably relevant" to his claim, saying such screening would be sufficiently subject to error to interfere with the effectiveness of adversary litigation of the question of "taint." The Supreme Court has refused to reconsider the *Alderman* rule and, in fact reasserted its validity in its *Keith* decision. (*United States* v. *U.S. District Court, supra,* at 393).

As the language of the bill makes clear, only that evidence which was obtained unlawfully or derived from information obtained unlawfully would be suppressed. If, for example, some information should have been minimized but was not, only that information should be suppressed; the other information obtained lawfully should not be suppressed.

A decision of illegality may not always arise in the context of suppression; rather it may, for example, arise incident to a discovery motion in a civil trial. Here, again, the bill does not specify what the court should order. Again, the court should grant the motion only "in accordance with requirements of law." Here, however, the requirements of law would be those respecting civil discovery. In other words, once the surveillance is determined to be unlawful, the intent of this section is to leave to otherwise existing law the resolution of what, if anything, is to be disclosed. For instance, under the Freedom of Information Act, other defenses against disclosure may be able to be made.

Where the court determines pursuant to subsections (f) or (g) that the surveillance was lawfully authorized and conducted, it would, of course, deny any motion to suppress. In addition, once a judicial determination is made that the surveillance was lawful, any motion or request to discover or obtain materials relating to a surveillance must

H. Rept. 1283, pt. 1 95–2——7

94

be denied unless disclosure or discovery is required by due process.[50]

Subsection (i) states for purposes of appeal that orders or decisions of the special courts granting or denying motions, deciding the lawfulness of a surveillance or ordering or denying disclosure shall be final orders, and shall be binding upon all courts of the United States and the States except the special court of appeals and the Supreme Court. As final orders they will be immediately appealable, by the private party or the government. The committee recognizes that the usual practice is to consider such orders interlocutory and not immediately appealable.

In the particular circumstances of cases handled pursuant to subsections (c)–(i), however, the committee believes that substantial considerations militate in favor of immediate appeal. Requirements to disclose certain information, whether before or after a finding of illegality, might force the Government to dismiss the case (or concede the case, if it were a civil suit against it) to avoid disclosure it thought not required. This is not the situation in normal cases, and therefore it is appropriate here to allow immediate appeal of such an order. Similarly, given the in camera and to a greater or lesser extent ex parte proceedings under subsections (f) and (g), it is appropriate to afford a more expeditious form of appeal for the private litigant. Because cases under these subsections are not expected to occur often, there is no meaningful added burden placed on the courts by allowing such interlocutory orders.

New subsection (j) has been added to the bill for the purpose of restricting the use of unintentionally acquired private domestic radio communications. The new subsection is needed because "electronic surveillance" as defined in 101 (f) (3) covers only the intentional acquisition of the contents of private domestic radio communications. Such communications may include telephone calls and other wire communications transmitted by radio microwaves. Concern has been expressed that unless the use of such unintentionally acquired communications is restricted, there would be a potential for abuse if the Government acquired those kinds of domestic communications, even without intentionally targeting any particular communication. The amendment forecloses this possibility by restricting the use of any information acquired in this manner.

In circumstances involving the unintentional acquisition, by an electronic, mechanical, or other surveillance device of the contents of any radio communication, where a persons has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and where both the sender and all intended recipients are located within the United States, the contents must be destroyed upon recognition. The only exception is with the approval of the Attorney General where the contents indicate a threat of death or serious bodily harm to any person. This restriction is not intended to prevent the Government from maintaining a record of the radio frequency of the communication for later collection avoidance purposes.

---

[50] The committee recognizes that this provision alters existing law and is a limitation on existing discovery practice. It is felt that where the special court has determined that the surveillance is lawful, security considerations should preclude any disclosure unless due process requires disclosure.

96

trol Act of 1968, it is contemplated that few electronic surveillances conducted pursuant to this title will result in criminal prosecution.

For these reasons, the committee has added a new section to the bill dealing with the information to be furnished to the appropriate congressional committees. Section 108 requires the Attorney General to inform fully the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence concerning all electronic surveillance under this title. He must do so at least semiannually.

As interpreted by the committee, the word "fully" means that the committee must be given enough information to understand the activities of, but does not mean that the Attorney General must set forth each and every detailed item of information relating to, all electronic surveillances. For example, the committee would not ordinarily wish to know the identities of particular individuals. The committee and the Department of Justice have had lengthy discussions concerning this provision and are in general agreement as to what information will be provided. To preserve the Intelligence Committees' right to seek further information, when necessary, section 108 makes clear that nothing in this title shall be deemed to limit the authority of those committees to obtain such additional information as they may need to carry out their respective functions and duties. In the case of the House Permanent Select Committee on Intelligence, that authority is set forth in House Resolution 658, 95th Congress, 1st session.

*Section 109*

Section 109(a)(1) carries forward the criminal provisions of chapter 119 and makes it a criminal offense for officers or employees of the United States to intentionally engage in electronic surveillance under color of law except as specifically authorized in chapter 119 of title III and this title. Since certain technical activities—such as the use of a pen register—fall within the definition of electronic surveillance under this title, but not within the definition of wire or oral communications under chapter 119, the bill provides an affirmative defense to a law enforcement or investigative officer who engages in such an activity for law enforcement purposes in the course of his official duties, pursuant to a search warrant or court order.[51] Section 109(a)(2), is a new provision (not found in chapter 119 or H.R. 7308 as introduced) which makes it a criminal offense for any officer or employee of the United States to intentionally violate any order issued pursuant to this title or to intentionally violate the sections specified, knowing that his conduct violates such order or title. The sections covered are generally those pertaining to the use and disclosure of information obtained from electronic.

Section 109(a)(2) generated considerable debate within the committee and was adopted only after full consideration was given to its suggested deleterious effect on the morale of intelligence personnel.

One of the important purposes of the bill is to afford security to intelligence personnel so that if they act in accordance with the statute and the court order, they will be insulated from liability; it is not to afford them immunity when they intentionally violate the law.

---

[51] See *U.S.* v. *New York Telephone Company*, —— U.S. —— (1977), 46 LW 4033.

97

Absent this criminal provision, intelligence agency personnel—agents and supervisors alike—could intentionally and totally ignore the minimization procedures and be immune from criminal or civil liability. Moreover, they could intentionally destroy records required by the bill to be retained for oversight purposes without fear of liability. While chapter 119, dealing with law enforcement surveillances, does contain a penalty for violations of use and disclosure restrictions on information lawfully obtained, the committee feels that the strict probable cause standard for a chapter 119 surveillance lessens the importance of minimization and restrictions on disclosure as a safeguard against abuse. On the other hand, the lesser showing required for a foreign intelligence surveillance warrant makes the minimization and other procedures dealing with disclosure of information extremely important, and thus sanctions should apply to intentional violations of such provisions.

The word "intentionally" was carefully chosen. It is intended to reflect the most strict standard for criminal culpability. What is proscribed is an intentional violation of an order or one of the specified provisions, not just intentional conduct. The Government would have to provide beyond a reasonable doubt both that the conduct engaged in was in fact a violation, and that it was engaged in with "a conscious objective or desire" [52] to commit a violation. The phrase "knowing his conduct violates such an order or this title" is intended to emphasize this point. To further insure that intelligence personnel are protected in the proper performance of legitimate duties, the bill provides a "good faith" defense.

Theoretically, because the definition of electronic surveillance in this title includes most activities encompassed within the term "interception of wire or oral communication" in chapter 119, a single offense could violate both 109(a)(1) and the criminal provision of chapter 119. The committee intends that in such cases the Government proceed under only one of the provisions, not both.

In addition to making an intentional violation of the disclosure and minimization provisions a criminal offense the reported bill differs from H.R. 7308 (as introduced) by including the criminal (and civil) liability provisions in the body of this title rather than amending chapter 119. The purpose of this change is to minimize the multiplicity of cross references to chapter 119 and to alleviate the confusion caused by having chapter 119's criminal provisions apply to this title and to minimize the effects of this title on chapter 119 law enforcement surveillances. For example, under H.R. 7308, as introduced, it would have been a federal crime for a State law enforcement officer to use a pen register without a warrant. While such action may be unconstitutional, it is not made a criminal offense by chapter 119 and should not be by this title.

(For the same reasons, section 110 makes the civil liability provisions a part of this title.)

The methodology of the criminal provision of section 109 reflects the committee's efforts to conform to the methodology of the pending criminal code reform legislation (H.R. 6869/S. 1437).

---

[52] The phrase "conscious objective or desire" is taken from the definition of "intentional" contained in section 302 of S. 1437 (the Criminal Code Reform Act of 1978) as passed by the Senate on January 30, 1978.

98

*Section 110*

This section imposes civil liability for violations of section 109(a)(1) and section 109(a)(2), and authorizes an "aggrieved person", as defined in section 101(k), to recover actual damages, punitive damages, and reasonable attorney's fees and costs. Since the civil cause of action only arises in connection with a violation of the criminal provision, the statutory good faith defense, though applicable, does not have to be restated. Although included in the definition of "aggrieved person", foreign powers and non-U.S. persons who act in the United States as officers or employees of foreign powers would be prohibited from bringing actions under section 110.

The agent of a foreign power exclusion of section 110 is narrower than the corresponding provision of H.R. 7308, as introduced. The exclusion only applies to those who come within the definition of agent of a foreign power because they act in the United States as an officer, member or employee of a foreign power, see section 110(b)(1)(A). The foreign visitors covered by the second part of the definition, see section 110(b)(1)(B) would have a cause of action under the provision. The original bill excluded both of these classes of agents of a foreign power. The committee believes that the lesser exclusion is more appropriate. As regards the first category those barred from the civil remedy will be primarily those persons who are themselves immune from criminal or civil liability because of their diplomatic status. In regard to the second category it is difficult to see what would be gained by denying the civil remedy in practical terms. In proving that the exclusion applied the Government would more than likely be forced to make the same showing that it would make in proving that the surveillance was lawful.

### TITLE II

Title II contains the conforming amendments necessary to integrate the Foreign Intelligence Surveillance Act into the existing provisions of chapter 119 of title 18. In adopting its other amendments, one of the committee's purposes has been to produce legislation that can be read and understood (and thus complied with) easily, without excessive cross reference to other statutes. Thus, for example, the committee has expanded the definition section and provided the bill with its own criminal and civil liability and testing and counter-measures provisions. As a result, most of the conforming amendments contained in H.R. 7308, as introduced, have been eliminated.

*Section 201(a)*

This provision rewrites existing section 2511(2)(a)(ii) of title 18, United States Code, which states that "it shall not be unlawful under this chapter" for a communications common carrier to assist law enforcement and investigative officers in performing surveillance activities pursuant to title 18. Section 201(a) would restate this provision in terms of an authorization, rather than an exemption from criminality, and would include "landlords, custodians, or other persons" in the authorization, extend its scope to cover foreign intelligence electronic surveillance, require the Government to provide a copy of the