STUART F. DELERY
Acting Assistant Attorney General
JOSEPH H. HUNT
Director, Federal Programs Branch
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
Special Litigation Counsel
tony.coppolino@usdoj.gov
MARCIA BERMAN
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Rm. 6102
Washington, D.C. 20001
Phone: (202) 514-4782
Fax: (202) 616-8460
*Attorneys for the Government Defendants*
*Sued in their Official Capacity*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CAROLYN JEWEL, *et al.*, | Case No. 3:08-cv-04373-JSW |
| Plaintiffs, | **GOVERNMENT DEFENDANTS'** |
| | **OBJECTION TO PLAINTIFFS'** |
| v. | **EVIDENTIARY FILINGS** |
| | **IN CONNECTION WITH** |
| NATIONAL SECURITY AGENCY, *et al.*, | **CROSS-MOTIONS FOR SUMMARY** |
| | **JUDGMENT** |
| Defendants. | |
| | Date:  December 14, 2012 |
| | Time:  9:00 a.m. |
| | Courtroom:  11 – 19th Floor |
| | Judge Jeffrey S. White |

Pursuant to Federal Rule of Civil Procedure 56(c)(2), Government Defendants hereby lodge their objection to three evidentiary submissions plaintiffs make to support factual claims made in their combined Reply and Opposition regarding the parties' cross-motions for summary judgment.  *See* Pls.' Combined Reply in Supp. of Mot. for Partial Summ. J. & Opp'n to Gov't Defs.' Mot. for Summ. J. (Dkt. 112) (hereafter "Pls. Opp.").  Plaintiffs' (1) Federal Rule of Evidence Section 1006 Summary of Voluminous Evidence (Dkt 113), (2) exhibits attached to the

Declaration of Kurt Opsahl (Dkt. 116), and (3) Request for Judicial Notice (Dkt. 115) each comprise or contain evidence that is both plainly inadmissible and cannot be reduced to an admissible form. Accordingly, plaintiffs may not rely on such evidence in support of their motion or in opposition to the Government Defendants' motion. *See* Fed. R. Civ. P. 56(c)(1)(B); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002); *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987).

## I. Plaintiffs' Rule 1006 "Summary" is an Inadmissible Supplemental Brief.

In their Combined Reply and Opposition, plaintiffs purport to rely on a fifty-two page "summary" of 120 documents to establish "the existence of the government's dragnet, untargeted surveillance program" and their purported "injury-in-fact." Pls. Opp. at 19. They likewise apparently rely on the "summary" to support claims that information necessary to assess the legality of the purported alleged surveillance is not subject to the state secrets privilege. *See* Pls. Opp. at 25-26. Federal Rule of Evidence 1006 allows the admission of a summary of voluminous writings upon a showing, among others, that "the underlying materials on which the summary exhibit is based are admissible in evidence." *Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir. 1996); *see* Fed. R. Evid. 1006. Plaintiffs' summary, however, is inadmissible because it is neither a summary nor based on admissible evidence. Moreover, the Court should decline to consider the "summary" because it is a transparent evasion of the page limits for briefing the pending motions.

*First*, plaintiffs' summary is not a summary at all. Rather, it is an extended written argument. *Cf. United States v. Grajales-Montaya*, 117 F.3d 356, 361 (8th Cir. 1997) (lawyers' chronology was written argument improperly admitted under Rule 1006). The fifty-two page document is littered with subjective and argumentative statements (*e.g.*, SOE at 6 (describing purported "wholesale acquisition of communications")), inferences (*e.g.*, SOE at 16 ("[t]he inference from former DNI McConnell's statement . . .")), and accusations (*e.g.*, SOE at 44 ("the government has used carefully parsed statements and omissions that elide or obscure the actual surveillance activities it has undertaken")). The proposed summary is nothing more than plaintiffs' attorneys' factual argument, which is not evidence at all. *See EOTT Energy Operating*

*Ltd. P'ship v. Winterthur Swiss Ins. Co.*, 257 F.3d 992, 999 (9th Cir. 2001). Just as courts routinely instruct juries, lawyers' arguments are not to be taken as evidence by the finder of fact. *See United States v. Kellington*, 217 F.3d 1084, 1097 n.15 (9th Cir. 2000) (describing jury instruction on lawyer's arguments as "standard"). For the same reason, the Court should decline plaintiffs' suggestion that it take judicial notice of the purported summary. Judicial notice is appropriate for facts "not subject to reasonable dispute." Fed. R. Evid. 201(b). Plaintiffs "summary" of their own arguments and inferences is not a matter beyond dispute. It therefore must be disregarded on summary judgment.

*Second,* the purported summary relies on dozens of plainly inadmissible documents. As further explained below, many of the documents consist of newspaper articles and other publications, which are classic hearsay. *See Twardowski v. Am. Airlines*, 535 F.3d 952, 961 (9th Cir. 2008). When a proposed Rule 1006 summary relies even in part on inadmissible evidence, the entire summary is inadmissible unless it can be segregated into admissible and inadmissible portions. *See Paddack v. Dave Chistensen, Inc.*, 745 F.2d 1254, 1260 (9th Cir. 1984) (" . . .it is clear that a summary of both inadmissible and admissible hearsay should not be admitted under Rule 1006."). Plaintiffs' proposed evidence summary cannot be segregated in this fashion: it is not a chart for which one column can be removed. Rather, it is an extended essay—longer, indeed, than plaintiffs' combined Reply and Opposition—on what Plaintiffs claim they have can glean from a hodge-podge of public sources of varying degrees of reliability.

*Third*, the Court should disregard plaintiffs' proposed summary because it is a plain evasion of this Court's rules. Plaintiffs have filed a combined opposition and reply. The local rules provide twenty-five pages for an opposition and fifteen pages for a reply. *See* L.R. 7-3. Combined, these filings should be no more than forty pages. Plaintiffs have filed not just a forty page brief, but another fifty-two pages of argument about the facts as plaintiffs see them.[1] Plaintiffs may not grant themselves an enlargement of the page limits provided by the local rules

---

[1] Even if plaintiffs' filing is taken as an attempt to file a separate statement of undisputed facts (as is sometimes allowed in other jurisdictions), such a document is prohibited in this district absent an order to the contrary. *See* L.R. 56-2.

**Government Defendants' Objection to Plaintiffs' Evidentiary Filings**
*Jewel v. National Security Agency* **(08-cv-4373-JSW)**

and this Court should not countenance their presumption to do so.

## II. Plaintiffs' Exhibits are Unauthenticated Hearsay.

Apart from their improper summary, plaintiffs use a declaration from trial counsel to add 120 exhibits to the record. *See* Declaration of Kurt Opsahl (Dkt. 116). It is Plaintiffs' burden to "cit[e] particular parts of materials in the record" to support their claims that material are either undisputed or are genuinely disputed. Fed. R. Civ. P. 56(c)(1)(A). Plaintiffs fail this burden as their combined Reply and Opposition does not cite to particular portions of any of the exhibits. Instead, Plaintiffs simply cite to long strings of pages in their inadmissible summary, suggesting that the Court find the exhibit citations in that document. *See* Pls. Opp. at 19 n.6. Putting aside the impropriety of plaintiffs' attempt to enlarge their filing in this fashion, plaintiffs still fail to properly cite to specific portions of most of the exhibits submitted with the Opsahl Declaration. Of the 120 exhibits attached to the Opsahl Declaration, only seventy-seven are cited on the pages referenced in Plaintiffs' Reply and Opposition. *Compare* Pls. Opp. at 19-21, 25-26 (referencing pages 1-28, 34-38, and 44-49 of the purported summary of evidence) *with* SOE at 1-28, 34-38, and 44-49 (citing Exhs. 1-3, 5, 7-10, 14-20, 22-28, 30, 33, 35-37, 42, 45-46, 53, 56, 59-64, 66-73, 75, 77, 79--92, 94-95, 98, 101-102, 104-108, 115-118, 120). Accordingly, the Court should disregard the other forty-three exhibits attached to the Opsahl Declaration that are not specifically referenced in their papers. *See United States v. Real Property Located at 475 Martin Lane*, 298 F. App'x 545, 550 (9th Cir. 2008) (citing *Orr*, 285 F.3d at 774-75).

The documents actually cited by plaintiffs (albeit in a roundabout fashion) are a potpourri of documents shot through with inadmissible hearsay. Nearly half of these seventy-seven documents consist of book excerpts, newspaper articles, and transcripts of televised news programs. *See* Opsahl Decl. Exhs. 1, 8-14, 16, 18, 23, 25-27, 30, 36, 46, 60, 66-69, 72, 79-81, 83-84, 86-87, 89, 91-95, 107. Such documents are classic hearsay twice over: they are out-of-court statements that are later repeated in whole or in part by a reporter or author in another out-of-court statement. *See Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991). The Ninth Circuit has held that the *only* hearsay exception that arguably could apply to such materials is the "residual exception." *See id.* (citing former Fed. R. Evid. 803(24) now codified as Fed. R.

Evid. 807).

Applying that exception here is inappropriate because Plaintiffs cannot make the showing that the statements have the requisite guarantees of reliability. *See id.* For example, many of the exhibits quote anonymous sources or, in fact, no source at all. *See, e.g.*, Opsahl Decl. Ex. 1 at 0003.004 (quoting unnamed "NSA aides"), Ex. 8 at 0387.042 (attributing statement to a "high-ranking advisor"), Ex. 26 (citing "information obtained by NEWSWEEK" and "[a]n official familiar with NSA procedures"). Such anonymously-sourced news is not subject to verification that the source is reliable and knowledgeable. *Cf. Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 807 (E.D. Va. 2007) ("if an anonymous source remains anonymous, there appears to be no way to verify the reliability of the information.").

Indeed, plaintiffs' evidentiary foundation is so shaky that they repeatedly cite a key article that was subsequently retracted in part because its claims could not be substantiated. Specifically, plaintiffs cite a USA Today report dated May 11, 2006, titled *NSA Has Massive Database of Americans' Phone Records*, alleging that the NSA collected a database of communication records. *See* SOE at 18-22; Opsahl Decl. ¶ 34, citing Pls. Exh. 30. Plaintiffs' challenge to this alleged records collection activity in this lawsuit is based on allegations set forth in this story, as well as on reactions to that story by Executive Branch officials and Members of Congress, cited in their summary of evidence. *See* SOE at 18-22. However, on June 30, 2006, USA Today issued a partial retraction of their May 11, 2006 story, which noted that certain telecommunications carriers (BellSouth and Verizon) had denied providing this assistance to the NSA and concluded that USA Today could not confirm that these carriers had assisted the NSA. *See Note to Our Readers*, USA Today (June 30, 2006). Exhibit 1 hereto. This retraction was published alongside a separate article concerning alleged NSA activities, also published on June 30, 2006 by USA Today, that plaintiffs have cited in their summary of evidence and included as an exhibit. *See* Opsahl Decl. ¶ 93 (citing Pls. Exh. 89, *Lawmakers: NSA Database Incomplete,* USA Today (June 30, 2006). Notably, however, while purporting to submit a "true and correct copy" of USA Today's June 30, 2006 report, plaintiffs selectively omit the *Notice to Our Readers"* which was published directly alongside and which still appears

on the USA Today website.  *Compare* Pls. Exh. 89 *with* Exhibit 1 hereto; *see also* http://usatoday30.usatoday.com/money/industries/telecom/2006-06-30-nsa_x.htm.  USA Today's partial retraction of its original story on the records collection allegation cast further doubt (if more was needed) on the use of such "evidence." And plaintiffs' failure to note the retraction, and include it in their exhibits or summary evidence, when it concerned the same subject and appeared alongside another article they do cite, is misleading.  This further underscores that selectively identifying media reports cannot serve as admissible evidence, nor satisfy the requirements of judicial notice, whether to demonstrate a prima facie case as to the existence of alleged classified activities or to justify further discovery.  Because plaintiffs' evidence is unreliable, it should not be admitted under an exception to the hearsay rule.

Likewise, twenty-six documents appear to be committee prints of Congressional Hearings, government reports, or documents retrieved from government websites.  *See* Opsahl Decl. Exhs. 2, 5-7, 15, 17, 19-20, 22, 28, 33, 37,42, 45, 56, 59, 61-63, 82, 88, 90, 98, 100, 105-106, 108.  Even though the reports themselves might be admissible under the public records exception to the hearsay rule, *see* Fed. R. Evid. 803(8), statements within the documents attributed to other sources remain hearsay not subject to any relevant exception.  *See, e.g.*, *In re September 11 Litigation*, 621 F. Supp. 2d 131, 157 (S.D.N.Y. 2009) (excluding statements attributed to witnesses in 9/11 Commission Report).

Finally, Plaintiffs' hodge-podge collection of documents includes at least three documents that appear to be letters or reports written by entities outside the government.  *See* Opsahl Decl. Exhs. 70-71, 101.  Plaintiffs have attached these letters to a lawyer's declaration that provides no information that would authenticate the documents.  They are therefore inadmissible at summary judgment.  *See Orr*, 285 F.3d at 777-78.

**III.    Plaintiffs' Request for Judicial Notice of a Hearing Transcript Presents the Transcript in an Inadmissible Form and Violates the Rule of Completeness.**

Finally, Plaintiffs ask the Court to take judicial notice of a badly mischaracterized statement by Government counsel at oral argument in the *Hepting* action in 2006.  *See* Request for Judicial Notice of Transcript ("RJN") (Dkt. 115).  In their Request, Plaintiffs ask the Court to

take judicial notice of what they say is "an admission by then-Assistant Attorney General Peter Keisler that subjects addressed in the Klein Decl. (Dkt. # 85) and Marcus Decl. (Dkt. # 89) are not state secrets." *Id.*

Even presuming that plaintiffs may present a single page of an unauthenticated transcript for judicial notice, *but see Orr*, 285 F.3d at 776 (finding that unauthenticated and uncertified trial transcripts are not admissible), the scope of the Court's judicial notice, as noted above, must be limited to "a fact that is not subject to reasonable dispute." Fed. R. Evid. 201(b). Thus, if the Court takes judicial notice of what Government Counsel said, it should take notice of his *exact words*, not plaintiffs' characterization of them. Government Counsel in that case did not say that the "*subjects* addressed" in the Klein and Marcus declarations are not state secrets as plaintiffs assert. *See* RJN at 2. Rather, he said that certain "*documents*" that belonged to AT&T (concerning their communication systems) did not implicate the privilege. *See* Transcript accompanying RJN (Dkt. 115). He also said that the Government had not asserted privilege over information in the Klein and Marcus declarations because "they don't know anything. And that's clear from the face of the declarations." *See id.*

Further, if the Court opts to take judicial notice of the statements proffered by plaintiffs, it should admit the rest of the discussion between Government counsel and the Court regarding the Klein and Marcus declarations because, in fairness, the entirety of the colloquy between Government counsel and the court should be considered at the same time. *See* Fed. R. Evid. 106. That discussion, which is submitted at Exhibit 2 hereto, contains counsel's explanation of the Government's position with respect to the cited Klein and Marcus Declarations. *See* Exhibit 2, Transcript at 77-78:

> The plaintiffs rely on Mr. Klein's declaration of the asserted connection between AT&T and the NSA. Absolutely every assertion he makes in his declaration about that relationship is hearsay. It's one person told me that a third person who briefly visited the AT&T offices was from the NSA.

**Government Defendants' Objection to Plaintiffs' Evidentiary Filings**
*Jewel v. National Security Agency* **(08-cv-4373-JSW)**
-7-

…

And saying to my knowledge no one was permitted in a particular AT&T room who was not cleared by the NSA without giving any basis, not even a hearsay basis, for that claim of knowledge, would not be an element even of a prima facie case.

And with respect to Mr. Marcus, he acknowledges that he doesn't actually know even what equipment is in any room at AT&T. He's reading from a document, and all he testifies to as to what he understands are the capabilities of that equipment to be, and he says those capabilities are consistent with what he's read in the newspapers. But he doesn't know whether those pieces of equipment, if they're there, are actually used for those capabilities. And he acknowledges that that equipment also has what he calls other legitimate possible uses. So the notion that this mixture of hearsay and speculation could be a prima facie case sufficient to sustain a judgment in the absence of rebuttal we think is just wrong.

## CONCLUSION

For the foregoing reasons, the Court should reject plaintiffs' summary of evidence and request for judicial notice, and should not rely on plaintiffs summary or exhibits for any purpose.

October 19, 2012             Respectfully Submitted,

STUART F. DELERY
Acting Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Branch Director

   *s/ Anthony J. Coppolino*
ANTHONY J. COPPOLINO
Special Litigation Counsel
tony.coppolino@usdoj.gov

   *s/ Marcia Berman*
MARCIA BERMAN
Senior Trial Counsel
marcia.berman@usdoj.gov

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Rm. 6102
Washington, D.C. 20001

Phone: (202) 514-4782
Fax: (202) 616-8460

*Attorneys for the Government Defendants
Sued in their Official Capacities*

**Government Defendants' Objection to Plaintiffs' Evidentiary Filings**
*Jewel v. National Security Agency* **(08-cv-4373-JSW)**
**-9-**

*Jewel v. National Security Agency*
(08-cv-04373-JSW)

# Exhibit 1 to Government Defendants' Objection to Plaintiffs' Evidentiary Filings

Search  Enter search  How do I find it?    Subscribe to paper
USA TODAY  ■Home ■News ■Travel ■Money ■Sports ■L
Money  Inside Money
GET A QUOTE:  Enter symbol(s) or Keywords  GO  ■ DJIA 13,398.88 ▼ -150.06  ■ NASDAQ 3,020.35 ▼ -52.52   as of 12:00 PM ET



# Lawmakers: NSA database incomplete

Updated 6/30/2006 8:51 AM ET                                             E-mail | Print | RSS



### ■ A NOTE TO OUR READERS

On May 11, USA TODAY reported that the National Security Agency, with the cooperation of several of America's leading telecommunications companies, had compiled a database of domestic phone call records in an effort to monitor terrorist activity.

Several days later, BellSouth and Verizon specifically denied that they were among the companies that had contracted with the NSA to provide bulk calling records.

The denial was unexpected. USA TODAY had spoken with BellSouth and Verizon for several weeks about the substance of the report. The day before the article was published, the reporter read the sections of the article concerning BellSouth and Verizon to representatives of the companies and asked for a denial before publication.

At the time, BellSouth did not deny participation in the program, but it issued a statement saying the company "does not provide any confidential customer information to the NSA or any government agency without proper legal authority." Verizon said that it would not comment on national security matters and that it acts "in full compliance with the law" and with respect for customers' privacy.

On May 15, BellSouth said it could not categorically deny participation in the program until it had conducted a detailed investigation. BellSouth said that internal review concluded that the company did not contract with the NSA or turn over calling records.

USA TODAY continued to pursue details of the database, speaking with dozens of sources in the telecommunications, intelligence and legislative communities, including interviews with members of Congress who have been briefed by senior intelligence officials on the domestic calls program.

In the adjoining article, USA TODAY reports that five members of the congressional intelligence committees said they had been told in secret briefings that BellSouth did not turn over call records to the NSA, three lawmakers said they had been told that Verizon had not participated in the NSA database, and four said that Verizon's subsidiary MCI did turn over records to the NSA.

USA TODAY also spoke again with the sources who had originally provided information about the scope and contents of the domestic calls database. All said the published report accurately reflected their knowledge and understanding of the NSA program, but none could document a contractual relationship between BellSouth or Verizon and the NSA, or that the companies turned over bulk calling records to the NSA.

Based on its reporting after the May 11 article, USA TODAY has now concluded that while the NSA has built a massive domestic calls record database involving the domestic call records of telecommunications companies, the newspaper cannot confirm that BellSouth or Verizon contracted with the NSA to provide bulk calling records to that database.

USA TODAY will continue to report on the contents and scope of the database as part of its ongoing coverage of national security and domestic surveillance.

### ■ HOW PHONE COMPANIES MOVE CALLS AROUND THE COUNTRY

WASHINGTON — Members of the House and Senate intelligence committees confirm that the National Security Agency has compiled a massive database of domestic phone call records. But some lawmakers also say that cooperation by the nation's telecommunication companies was not as extensive as first reported by USA TODAY on May 11.

Several lawmakers, briefed in secret by intelligence officials about the program after the story was published, described a call records database that is enormous but incomplete. Most asked that they not be identified by name, and many offered only limited responses to questions, citing national security concerns.

In the May 11 article that revealed the database, USA TODAY reported that its sources said AT&T, BellSouth and Verizon had agreed to provide the NSA with call records.

AT&T, which is the nation's largest telecommunications company, providing service to tens of millions of Americans, hasn't confirmed or denied its participation with the database. BellSouth and Verizon have denied that they contracted with the NSA to turn over phone records. On May 12, an attorney for former Qwest CEO Joseph Nacchio confirmed the USA TODAY report that Qwest had declined to participate in the NSA program.

Most members of the intelligence committees wouldn't discuss which companies cooperated with the NSA. However, several did offer more information about the program's breadth and scope, confirming some elements of USA TODAY's report and contradicting others:

• Nineteen lawmakers who had been briefed on the program verified that the NSA has built a database that includes records of Americans' domestic phone calls. The program collected records of the numbers dialed and the length of calls, sources have said, but did not involve listening to the calls or recording their content.

• Five members of the intelligence committees said they were told by senior intelligence officials that AT&T participated in the NSA domestic calls program.

AT&T, asked to comment, issued a written statement Thursday. "The U.S. Department of Justice has stated that AT&T may neither confirm nor deny AT&T's participation in the alleged NSA program because doing so would cause 'exceptionally grave harm to national security' and would violate both civil and criminal statutes," it said. "Under these circumstances, AT&T is not able to respond to such allegations."

• Five members of the intelligence committees said they were told that BellSouth did not turn over domestic call records to the NSA.

Asked about BellSouth's denial, Sen. Saxby Chambliss, R-Ga., a member of the Senate Intelligence Committee, said, "What they said appears to be accurate."

Still, BellSouth customers' call records could end up in the NSA database, he said. "Obviously, a BellSouth customer can contract with AT&T (for long-distance phone service). There is a possibility that numbers are available from other phone companies."

• Three lawmakers said that they had been told that Verizon did not turn over call records to the NSA. However, those three and another lawmaker said MCI, the long-distance carrier that Verizon acquired in January, did provide call records to the government.

While Verizon has denied providing call records to the NSA, it has declined to comment on whether MCI participated in the calls database program.

"The President has referred to an NSA program, which he authorized, directed against al-Qaeda," Verizon said in a written statement May 12. "Because that program is highly classified, Verizon cannot comment on that program, nor can we confirm



**What local and long-distance companies do**

- **LOCAL**
A local call is relayed to the local phone company's switching center and then sent to the person being called in the local area.

- **LONG-DISTANCE**



A long-distance call goes first to the local phone company's switching center in the neighborhood.

**What is a long-distance call?**
Long-distance carriers handle calls that cross two or more local calling areas, sometimes even when the calling areas fall within the same local phone company's service territory. Types of calls phone customers might make that would be handled by their long-distance carrier:

- In-state (same area code) — **Example:** Great Falls, Mont., to Billings, Mont. Both are in the 406 area code, but they're in different local calling areas.
- In-state (different area code)
- Across state lines
- Outside the USA
- Cellphone

Sources: Yankee Group, Telegeography, Bell Labs
By Ron Coddington, Marcy E. Mullins and Julie Snider, USA TODAY

or deny whether we have had any relationship to it." The statement also said the company was now "ensuring that Verizon's policies are implemented at that entity (MCI) and that all its activities fully comply with law."

In the weeks since the database was revealed, congressional and intelligence sources have offered other new details about its scope and effectiveness.

"It was not cross-city calls. It was not mom-and-pop calls," said Sen. Ted Stevens, R-Alaska, who receives briefings as chairman of the Senate Appropriations Defense subcommittee. "It was long-distance. It was targeted on (geographic) areas of interest, places to which calls were believed to have come from al-Qaeda affiliates and from which calls were made to al-Qaeda affiliates."

Other lawmakers who were briefed about the program expressed concerns that gaps in the database could undercut its usefulness in identifying terrorist cells.

"It's difficult to say you're covering all terrorist activity in the United States if you don't have all the (phone) numbers," Chambliss said. "It probably would be better to have records of every telephone company."

"The database is not complete," said another lawmaker who was briefed on the program, speaking on condition of anonymity because the information is classified. "We don't know if this works yet."

Other publications have characterized the breadth of the database and how it is used.

*The New York Times* reported on May 12, for instance, that a senior government official had confirmed that the NSA had access to records of most telephone calls in the USA but said the records are used in a limited way to track "known bad guys."

*The Washington Post* reported on May 12 that "sources with knowledge of the program" said that the Bush administration had been collecting the domestic telephone records in "gargantuan databases" and that the "companies cooperating with the NSA dominate the U.S. telecommunications market and connect hundreds of billions of telephone calls each year."

President Bush and his top aides have defended the legality of the program, although they haven't directly confirmed its existence.

Three days after the USA TODAY story was published, national security adviser Stephen Hadley said on CBS' *Face the Nation* that he couldn't "confirm or deny the claims that are in the USA TODAY story."

He went on: "But it's very interesting what that story does not claim. It does not claim that the government was listening on domestic phone calls. It does not claim that names were passed, that addresses were passed, that content was passed. It's really about calling records, if you read the story. ... There are a variety of ways in which those records lawfully can be provided to the government."

At a news conference two weeks later, Attorney General Alberto Gonzales made a similar point. "There has been no confirmation about any details relating to the USA TODAY story," he said. "I will say that what was in the USA TODAY story did relate to business records." Citing a 1979 Supreme Court decision, he said, "There is no reasonable expectation of privacy in those kinds of records."

Lawmakers who were briefed about the program disagree about whether it's legal.

"It was within the president's inherent powers," said Sen. Orrin Hatch, R-Utah, a member of the Senate Intelligence Committee.

Rep. Anna Eshoo, D-Calif., a member of the House Intelligence Committee, said there was a "schizophrenia in the presentation" by the administration. Officials say, " 'It's legal,' " she said. "But in the same breath they say, 'Perhaps we should take another look at FISA.' " FISA refers to the 1978 Foreign Intelligence Surveillance Act, which established a secret court that can grant warrants for eavesdropping.

Rep. Rush Holt, D-N.J., another member of the House Intelligence Committee, said, "I find it interesting that it seems the government is asking telephone companies to do things that their customers and shareholders would find totally unpalatable."

Debate over the database continues in several areas:

• In federal courts, at least 20 class-action lawsuits have been filed alleging that the government and phone companies have violated the rights of people whose calls have been reviewed by the NSA. The Justice Department signaled its intention in a court filing in Chicago this month to assert the "military and state secrets privilege" in all of them. That privilege allows the government to seek the dismissal of lawsuits if pursuing them would imperil national security.

• In New Jersey, the state attorney general is investigating whether telephone companies released confidential information without the consent of their customers. The federal government asked a court this month to quash subpoenas the state had issued to phone companies seeking information.

• At the Federal Communications Commission, the American Civil Liberties Union requested this month that approval of AT&T's acquisition of BellSouth be withheld until the commission reviews the companies' dealings with the NSA. However, FCC Chairman Kevin Martin said last month that the commission couldn't investigate complaints about the phone companies and the NSA because the reported activities were classified.

• On Capitol Hill, Vice President Cheney held private talks this month with Republicans on the Senate Judiciary Committee. Cheney discouraged them from supporting Judiciary Chairman Arlen Specter's vow to call telecommunications executives before the panel to answer questions about the database. Specter, R-Pa., protested to Cheney in an angry public letter.

The White House then agreed to talks with Specter on legislation he has drafted that would give the administration the option of putting the NSA's warrantless-surveillance program — which includes domestic wiretapping without a court warrant when one participant in a conversation is overseas — under the scrutiny of the FISA court.

"I'm prepared to defer, on a temporary basis, calling in the telephone companies," Specter said. If the discussions on his legislation fall through, however, he said, he will move again to demand testimony from the telephone executives about the database.

*This story was reported by Leslie Cauley, John Diamond, Jim Drinkard, Peter Eisler, Thomas Frank, Kevin Johnson and Susan Page. It was written by Page.*

Posted 6/30/2006 5:03 AM ET

Updated 6/30/2006 8:51 AM ET                                                             E-mail | Print | RSS

**Newspaper Home Delivery - Subscribe Today**

Home • News • Travel • Money • Sports • Life • Tech • Weather

**About USATODAY.com:** Site Map | FAQ | Contact Us | Jobs with Us | Terms of Service
Privacy Policy/Your California Privacy Right | Advertise | Press Room | Developer | Media Lounge | Reprints and Permissions

**News Your Way:** Mobile News | Email News | Add USATODAY.com RSS feeds | Twitter | Podcasts | Widgets

**Partners:** USA WEEKEND | Sports Weekly | Education | Space.com | Travel Tips

Copyright 2011 USA TODAY, a division of Gannett Co. Inc.

*Jewel v. National Security Agency*
(08-cv-04373-JSW)

# Exhibit 2 to Government Defendants' Objection to Plaintiffs' Evidentiary Filings

```
                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

              BEFORE THE HONORABLE VAUGHN R. WALKER, JUDGE
--------------------------------x
TASH HEPTING, et al.,

        Plaintiffs,

   v.                    06 C 0672 VRW

AT&T Corp., et al.,

        Defendants.
--------------------------------x
                                 San Francisco, CA
                                 June 23, 2006
                                 9:40 a.m.
                                            Pages 1 - 121

                      TRANSCRIPT OF PROCEEDINGS


APPEARANCES:

HELLER, EHRMAN, LLP
      Attorneys for Plaintiffs
BY:   ROBERT D. FRAM
      NATHAN E. SHAFROTH
      ELENA DiMUZIO

ELECTRONIC FRONTIER FOUNDATION
   Attorneys for Plaintiffs
BY: CINDY COHN
    KEVIN S. BANKSTON
    KURT OPSAHL
    LEE TIEN

LERACH, COUGHLIN, STOIA, GELLER,
RUDMAN & ROBBINS, LLP
   Attorneys for Plaintiffs
BY: JEFF D. FRIEDMAN
      MARIA V. MORRIS
    REED R. KATHREIN

RICHARD R. WIEBE
   Attorney for Plaintiffs
```

```
 1  APPEARANCES (cont.):

 2  THE UNITED STATES OF AMERICA, DOJ
        The Office of the Attorney General
 3  BY: PETER D. KEISLER, Assistant Attorney General
        CARL J. NICHOLS, Deputy Assistant Attorney General
 4      JOSEPH HUNT

 5  PILLSBURY, WINTHROP, SHAW & PITTMAN, LLP
        Attorneys for Defendants AT&T Corp., et al.
 6  BY: BRUCE A. ERICSON
        DAVID L. ANDERSON
 7      JACOB R. SORENSEN

 8  SIDLEY, AUSTIN, LLP
        Attorneys for Defendants AT&T Corp., et al.
 9  BY: BRADFORD A. BERENSON

10  LEVY, RAM & OLSON, LLP
        Attorneys for Intervenors The San Francisco Chronicle,
11      LA Times, San Jose Mercury News, Bloomberg News,
        Associated Press
12  BY: KARL OLSON

13  QUINN EMANUEL
        Attorneys for Intervenors Lycos and Wired News
14  BY: TIMOTHY L. ALGER

15

16

17

18

19

20

21

22

23

24  Reported By:   Connie Kuhl, RMR, CRR
                  Official Court Reporter
25
```

```
 1   one and two.  I don't know if you want that now or reserve
 2   that --
 3              THE COURT:  Why don't we use that in any wrap-up we
 4   have, any wrap-up discussion.  All right?
 5              MR. FRAM:  Thank you, your Honor.
 6              THE COURT:  Thank you, Mr. Fram.
 7              Very quickly, Mr. Keisler?  It is Keisler?
 8              MR. KEISLER:  It is, your Honor.
 9              First of all, with respect to the suggestion that the
10   plaintiffs already put forward a prima facie case.  They note
11   correctly that we haven't said any documents are classified.
12   They say we can't now unring that bell.  We don't want to
13   unring that bell.  None of the documents they have submitted to
14   accompany these declarations implicate any privileged matters.
15              THE COURT:  Including the Klein documents.
16              MR. KEISLER:  We have not asserted any privilege over
17   the information that is in the Klein and Marcus declarations.
18              THE COURT:  Either in the declaration or its exhibits?
19              MR. KEISLER:  We have not asserted a privilege over
20   either of those.  Mr. Klein and Marcus never had access to any
21   of the relevant classified information here, and with all
22   respect to them, through no fault or failure of their own, they
23   don't know anything.  And that's clear from the face of the
24   declarations.  And since Mr. Fram talked about them some, I may
25   respond on that.
```

1           The plaintiffs rely on Mr. Klein's declaration of the
2   asserted connection between AT&T and the NSA. Absolutely every
3   assertion he makes in his declaration about that relationship
4   is hearsay. It's one person told me that a third person who
5   briefly visited the AT&T offices was from the NSA. And the
6   statement that Mr. Fram quoted --
7           THE COURT: It has to be admissible in the summary
8   judgment stage; we're not there yet.
9           MR. KEISLER: I'm just addressing whether they have a
10  prima facie case, which I understand would be a case if the
11  Court could issue a judgment, if it were unrebutted.
12          THE COURT: The absence of a rebuttal.
13          MR. KEISLER: And saying to my knowledge no one was
14  permitted in a particular AT&T room who was not cleared by the
15  NSA without giving any basis, not even a hearsay basis, for
16  that claim of knowledge, would not be an element even of a
17  prima facie case.
18          And with respect to Mr. Marcus, he acknowledges that
19  he doesn't actually know even what equipment is in any room at
20  AT&T. He's reading from a document, and all he testifies to as
21  to what he understands are the capabilities of that equipment
22  to be, and he says those capabilities are consistent with what
23  he's read in the newspapers. But he doesn't know whether those
24  pieces of equipment, if they're there, are actually used for
25  those capabilities. And he acknowledges that that equipment

also has what he calls other legitimate possible uses. So the notion that this mixture of hearsay and speculation could be a prima facie case sufficient to sustain a judgment in the absence of rebuttal we think is just wrong.

But even if they had a more robust case, even if they had a real prima facie case, your Honor would run exactly into the portion of *Kasza* which your Honor quoted which is that even if plaintiffs can bring forward some non privileged evidence, if the very subject of the action is a state secret or if state secrets would prevent the defendant from producing important information in its defense, then judgment can be entered.

THE COURT: Isn't this case different, though? Different from the *Kasza* case? After all, *Kasza* dealt with a situation in which the whole program of disposing of these materials at the Grooms Lake facility, or wherever it was, was involved and could not litigate the case without getting into that entire program disposal, and indeed it was the program of disposal that was the state secret. So the state secret was coextensive with all the evidence necessary for a plaintiff to proceed in that case, and it's not our case here, is it.

MR. KEISLER: We think it's exactly the case. The *Kasza* case said, no procedures can be at suit because classified information is an essential element of every one of the claims. We think that is precisely the case here.

Obviously they can't prove liability against AT&T