EXHIBIT A,
Part 3 of 5

## WORKING DRAFT

information/communications (e.g., gists). NSA would include in its search applicable disseminated foreign intelligence derived from the PSP.

(TS//SI) After the search is completed, NSA provides all information, including PSP-derived material, to a small number of appropriately cleared DoJ individuals in the National Security Division who review the information on behalf of the DoJ and file motions on behalf of the government and the United States Attorney.

### (U) Funding for NSA Activity Authorized by the PSP

(TS//SI//STLW//NF) NSA spent approximately $146,058,000 in CT supplemental funds for Program activities from FY02 through FY06. The funds were given annually to SID for Project MAINWAY hardware and contract support, analytic tools and contract analytic support, and collaborative partnerships with private sector companies. Funding requests were submitted annually to the PSP Program Manager and CT program budget officer. Each request had to justify why funds were needed and how the purchased item or service would support SID's PSP activities.

(TS//SI//STLW//NF) **Program Costs FY01 to FY06 ($ in thousands)**

| Category | Description | FY02 | FY03 | FY04 | FY05 | FY06 | Total |
|---|---|---|---|---|---|---|---|
| Data | Metadata and content (including one time set-up costs) | $25,668 | $14,050 | $15,500 | $21,150 | $25,900 | $102,268 |
| Tools and Systems | Processing, display and manipulations capabilities | $9,700 | $8,000 | $8,000 | $9,500 | $8,000 | $43,200 |
| Infrastructure | Facilities and equipment to support program | $590 | 0 | 0 | 0 | 0 | $590 |
| **TOTALS** | | $35,958 | $22,050 | $23,500 | $30,650 | $33,900 | $146,058 |

ST-09-0002
WORKING DRAFT

|  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |

# (U) THREE: ACCESS TO LEGAL REVIEWS, THE AUTHORIZATION, AND INFORMATION ABOUT THE PROGRAM

*(U//FOUO) NSA did not have access to the original OLC legal opinion, but did have access and provided input to an OLC opinion prepared in 2004. The original Authorization and renewals were kept in the NSA Director's safe, and access to the documents was tightly controlled. By January 2007, nearly 3,000 people had been briefed on the PSP, including members of Congress and the FISC.*

## (U) Access to Legal Reviews

(TS//SI//NF) The NSA did not have access to the early DoJ Office of Legal Counsel (OLC) opinions supporting the Attorney General's statement that the PSP was legal. General Hayden, NSA lawyers, and the NSA Inspector General agreed that it was not necessary for them to see the early opinions in order to execute the terms of the Authorization, but felt it would be helpful to do so. NSA was, however, given access and provided comments to the OLC opinion issued in 2004.

### (U) Access to OLC's Original Legal Review

(TS//SI//NF) Two NSA requests for access to the original OLC legal opinion were denied.

(TS//SI//NF) **First Request.** NSA General Counsel Robert Deitz stated that he asked the Vice President's Counsel if he could see the opinion. Even though Mr. Deitz's request was denied, the Vice President's Counsel read a few paragraphs of the opinion to him over the classified telephone line.

(TS//SI//NF) **Second Request.** At a 8 December 2003 meeting with the DoJ Associate Deputy Attorney General to discuss collection of metadata and an upcoming NSA OIG compliance audit, NSA's IG and Deputy GC requested to see the OLC legal opinion. The Counsel to the Vice President, who unexpectedly attended the meeting, denied the request and said that any request to see the opinion had to come directly from General Hayden.

(TS//SI//NF) General Hayden stated he never asked for or read the OLC legal opinion supporting the PSP. The Deputy GC stated that it was his

ST-09-0002
WORKING DRAFT

understanding that the opinion was not shared with NSA because it was considered confidential legal advice to the President.

(TS//SI//NF) The IG, GC, and Deputy GC agreed that their inability to read the OLC opinion did not prevent or impair them from executing and overseeing the Program. They were able to determine legality of the Program independently from DoJ (see Appendix D). However, the IG said that he found the secrecy surrounding the legal rationale to be "odd." Specifically, he said that it was "strange that NSA was told to execute a secret program that everyone knew presented legal questions, without being told the underpinning legal theory." The IG, GC, and Deputy GC all stated that they had yet to see the full text of the original OLC opinion.

### (U//FOUO) Access to the May 2004 Opinion

(U//FOUO) In 2003 and 2004, the DoJ Associate Deputy Attorney General and the OLC Assistant Attorney General visited NSA to receive briefings on the PSP. On 04 May 2004, NSA, at the request of the OLC Assistant Attorney General, provided comments on the OLC's draft opinion on the Legality of the PSP. The OLC Assistant Attorney General submitted his opinion on 06 May 2004.

### (U//FOUO) Access to the Presidential Authorization

(TS//SI//NF) As directed by the White House, access to the original Presidential authorization and subsequent renewals was tightly controlled.

(C) The Vice President's Counsel drafted the Authorizations and personally delivered them to NSA. On a few occasions, NSA picked up the Authorization at the White House.

(C) The first Authorization and subsequent renewals were kept in a safe in the Director's office. Initially, access was limited to General Hayden and a few others, including three OGC attorneys, Program Managers, and certain operational personnel. Those with access were not allowed to disseminate the Authorizations.

(TS//SI//NF) Importantly, most NSA operations personnel, including the Chief of the CT Product Line, who approved tasking for content collection, were not allowed to see the actual authorization. Rather, OGC answered targeting, information sharing, and implementation legal questions on an "on call" basis for operators. When the Authorization changed, OGC

*WORKING DRAFT*

summarized those changes in emails distributed to key program executives or communicated changes in due diligence meetings.

(TS//SI//OC/NF) Such limited access to the Authorization was documented in an IG investigation as a primary cause of two early violations of the Authorization. At the IG's recommendation, in March 2003, General Hayden began issuing Delegation of Authority letters that explained the Authorization as it applied to executing the Program. A new Delegation of Authority was promulgated with each renewal of the Authorization. The Delegation of Authority letters were sent to the Program Manager and the two managers of the SID CT Product Line and not further disseminated. (See Section Six.)

## (U) Access to Program Information

(TS//SI//STLW//NF) Between 4 October 2001 and 17 January 2007, NSA cleared over 3,000 people for the PSP. The majority worked at NSA. Others were from the CIA, the FBI, the Department of Justice, Congress, the FISC, the ODNI, the White House, and the DoD.

(TS//SI//STLW//NF) **PSP Clearance Totals**

| Agency | Number of Cleared Personnel |
|---|---|
| NSA | 1,936 |
| CIA | 460 |
| FBI | 467 |
| DOJ | 64 |
| Congress | 60 |

*ST-09-0002*
*WORKING DRAFT*

|  |  |
|---|---|
| **FISC** | 14 |
| **ODNI** | 13 |
| **White House** | 14 |
| **DOD** (excluding NSA) | 5 |
| **Total** | 3,033 |

(TS//SI//STLW//NF) Within the first 30 days of the Program, over 190 people were cleared into the Program. This number included Senators Robert Graham and Richard Shelby, Congresswoman Nancy Pelosi, President George W. Bush, Vice President Richard Cheney, Counsel to the Vice President David Addington, and Presidential Assistant I. Lewis "Scooter" Libby. By 31 January 2002, FISC Judge Royce Lamberth was cleared. By June 2002, over 500 people had been cleared, including two additional members of Congress, Senator Daniel Inouye and former Senator Theodore Stevens, as well as FISC Judge Colleen Kollar-Kotelly. See Appendix G for a list, by date, of the number of people briefed into the Program.

### *(U) Non-Operational Personnel*

(TS//SI-ECI//NF) Knowledge of the PSP was strictly limited at the express direction of the White House. General Hayden, over time, delegated his PSP clearance approval authority for NSA, FBI, and CIA operational personnel working the mission to the NSA PSP Program Manager. For members of Congress, FISC, outside counsel for providers, and the NSA IG, General Hayden had to obtain approval from the White House.

(U//FOUO) From the start, General Hayden and NSA leadership pushed to keep members of the legislative and judicial branches of government informed. General Hayden said he told the Vice President that he had no

*WORKING DRAFT*

concerns about the lawfulness of the Authorization but worried about the politics. After some hesitancy, the White House gave General Hayden permission to brief certain members of Congress. In addition, the Chief Judge of the FISC was first cleared in January 2002 (see Section ____).

(TS//SI//NF) **Interactions with Members of Congress.** Between 25 October 2001 and 17 January 2007, General Hayden, sometimes supported by operational target experts from the CT Product Line and SSO office, conducted over 49 briefings to members of Congress or their staff. (See Appedix __ for a complete list of briefings.)

(TS//SI//NF) General Hayden first briefed the following members of Congress on 25 October 2001:

- Chair - House Permanent Select Committee on Intelligence
- Ranking Minority Member of the House Permanent Select Committee on Intelligence
- Chair – Senate Select Committee on Intelligence
- Vice Chair – Senate Select Committee on Intelligence

(TS//SI//NF) In addition, NSA received and responded to a variety of Program-related inquiries from members of Congress, including Senators Inouye, Stevens, Pelosi, and Rockefeller.

(U//FOUO) General Hayden always believed that the PSP was legal. He said that during the many PSP-related briefings he gave to members of Congress, no one ever said that NSA should stop what it was doing. He emphasized that he did not just "flip through slides" during the briefings. They lasted as long as attendees desired.

(TS//SI//NF) **Interactions with the FISC.** On 31 January 2002, Chief Judge Royce Lamberth was briefed on the PSP and on 17 May 2002, his successor, Colleen Kollar-Kotelly, was briefed. A law clerk was also briefed in April 2004. (See Section Five.)

### *(U//FOUO) The Clearance Process*

(TS//SI-ECI//NF) NSA managed the NSA clearance process. Clearance requests were submitted to the PSP Program Office for Program Manager approval or disapproval. Access was granted only to those who needed it

to perform assigned job duties. The Program Manager questioned access requests with unclear justifications. Approved requests were forwarded to the Program security officer, who performed a security check. If the security check yielded nothing to impede access, individuals were instructed to go to the security office to read the "Security Pre-Brief Agreement" and sign a "Sensitive Compartmented Information Nondisclosure Agreement" form. NSA's General Counsel also had the authority to read in Attorneys from other agencies.

(TS//SI//NF) On 20 May 2005, the Program Manager changed the PSP clearance request and re-certification process. The Project Security Officer assigned to Special Source Operations in the SIGINT Directorate assumed responsibility for the PSP clearance process. (Special Source Operations managed all PSP-related collection for NSA.) Additionally, the Program Manager initiated monthly PSP clearance briefings.

(TS//SI//NF) From 4 October 2001 until 23 May 2005, a two-level PSP clearance structure was used. One level was limited to the "fact of" Program existence. A second level included access to PSP targeting data through a "must know" principle. Access lists were maintained in the SSO Security Director's office on an internal SSO compartmented LAN.

(TS//SI-ECI//NF) Regular zero-based reviews were conducted by the SSO Security Director's office quarterly to validate that cleared individuals had a continuing need for access to PSP information. The clearance did not automatically transfer with individuals who moved to new assignments. The clearance had to be re-justified for the new position, or the individual would be debriefed from the Program.

*WORKING DRAFT*

## (U) FOUR: NSA PRIVATE SECTOR RELATIONSHIPS

*(TS//SI//NF) To conduct foreign intelligence-gathering activities under the PSP, NSA required the assistance of private companies, which provided access to international communications chokepoints in United States. Immediately after 11 September 2001, some private companies contacted NSA to offer support. Subsequent to PSP authorization, NSA sent request letters to companies stating that their assistance was authorized by the President with legal concurrence of the Attorney General.*

### (U) Need for Private Sector Cooperation

(TS//SI//NF) The United States carries out foreign intelligence activities through a variety of means. One of the most effective means is to partner with commercial entities to obtain access to information that would not otherwise be available.

### *(U//FOUO) Telephony*

(TS//SI//NF) Most international telephone calls are routed through a small number of switches or "chokepoints" in the international telephone switching system en route to their final destination. The United States is a major crossroads for international switched telephone traffic. For example, in 2003, circuit switches worldwide carried approximately 180 billion minutes of telephone communications. Twenty percent of this amount, over 37 billion minutes, either originated or terminated in the United States, and another thirteen percent, over 23 billion minutes, transited the United States (neither originating nor terminating here). [NSA is authorized under Executive Order 12333 to acquire transiting telephone calls.]

(TS//SI//NF) NSA determined that under the Authorization it could gain access to approximately 81% of the international calls into and out of the United States through three corporate partners: COMPANY A had access to 39%, COMPANY B 28%, and COMPANY C 14%. NSA did not seek assistance from local exchange carriers, because that would have given NSA access primarily to domestic calls.

ST-09-0002
*WORKING DRAFT*

### *(U//FOUO) Internet Communications*

(TS//SI//NF) Al Qaeda and associated terrorist organizations have made extensive use of the Internet. It is their preferred method of communication. Terrorists use Internet communications, particularly web-based services, because they are ubiquitous, anonymous, and usually free of charge. They can access Web-based email accounts and similar services from any origination point around the world.

(TS//SI//NF) The United States is a major Internet communications hub. The industry standard for characterization of the volume of Internet communications is bandwidth, which measures the amount of digital data transmitted in one second – bits per second or bps. For example, data available from 2002 shows that at that time, worldwide international bandwidth was slightly more than 290 Gbps[7]. Of that total, less than 2.5 Gbps was between two regions that did not include the United States.

(TS//SI//NF) The United States is also home to computer servers providing Internet communications services often used by terrorists. The majority of known terrorist email addresses that NSA has tracked are hosted on U.S.-based providers or foreign-managed providers hosted on servers in the United States. (e.g. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).

## *(U//FOUO) Evolution of NSA Partnerships with Private Sector*

### *(U) History of NSA Partnerships with Private Sector*

(TS//SI//NF) As far back as World War II, NSA has had classified relationships with carefully vetted U.S. companies that assist with essential foreign intelligence-gathering activities. NSA maintains relationships with over 100 U.S. companies. Without their cooperation, NSA would not be able respond to intelligence requirements on a variety of topics important to the United States.

(TS//SI//NF) Two of the most productive SIGINT collection partnerships that NSA has with the private sector are with COMPANY A and COMPANY B. These two relationships enable NSA to access large volumes of foreign-to-foreign communications transiting the United States

---

[7](U) Gpbs is an abbreviation for Gigabits per second, which can also be described as one billion bits per second or 1,000,000,000 bps.

## WORKING DRAFT

through fiber-optic cables, gateway switches, and data networks. They also provide foreign intelligence authorized under the FISA.

(TS//SI//NF) According to General Alexander, General Hayden's replacement as Director of NSA/CSS, if the relationships with these companies were ever terminated, the U.S. SIGINT system would be irrevocably damaged, because NSA would have sacrificed America's home field advantage as the primary hub for worldwide telecommunications.

### (U) Partnerships after 11 September 2001

(TS//SI//NF) According to the former Deputy Chief of SSO, between 11 September 2001 and the 4 October 2001 Authorization, COMPANY A and COMPANY B contacted NSA and asked "what can we do to help?" COMPANY B personnel approached NSA SSO personnel through an existing program. They said they noticed odd patterns in domestic calling records surrounding the events of 11 September and offered call records and analysis. With no appropriate authority under which to accept the call records, NSA suggested the company contact the FBI.

### (U//FOUO) Partnerships Supporting the PSP

(TS//SI//NF) Once the Authorization was signed on 4 October 2001, NSA began a process of identifying and visiting commercial entities requesting their support. While requesting help from corporate entities to support the PSP, NSA personnel made it clear that the PSP was a cooperative program and participation was voluntary. NSA knew that the PSP was an extraordinary program and understood if companies viewed it as too much of a liability.

### (TS//SI//NF) NSA Approaches to Private Sector Companies

(TS//SI//NF) **2001:** On Columbus Day, 8 October 2001, NSA Special Source Operations (SSO) personnel responsible for the access relationships with corporate partners COMPANY A, COMPANY B, and COMPANY C were called in to work and informed that the President had authorized the PSP on 4 October 2001. The SSO personnel were tasked with initiating a dialog with the respective TS/SCI-cleared officials from COMPANIES A, B, and C to seek their cooperation under the new Authorization. Over the next few business days, SSO personnel met separately with officials from the three companies. Each company agreed to cooperate.

ST-09-0002
*WORKING DRAFT*

(TS//SI//NF) Upon confirmation that formal NSA letters requesting their assistance were forthcoming, the providers, acting independently and officially unaware of the cooperating agreements with other companies, initiated collection to support the PSP.

(TS//SI//NF) **2002:** In early 2002, NSA SSO personnel met with the Senior Vice President of Government Systems and other employees from COMPANY E. Under the authority of the PSP, NSA asked COMPANY E to provide call detail records (CDR) in support of security for the 2002 Olympics in Salt Lake City. On 11 February 2002, the company's CEO agreed to cooperate with NSA. On 19 February 2002, COMPANY E submitted a written proposal that discussed methods it could use to regularly replicate call record information stored in a COMPANY E facility and potentially forward the same information to NSA. Discussions with COMPANY E continued in 2003. However, the COMPANY E General Counsel ultimately decided not to support NSA.

(TS//SI//NF) On 5 September 2002, NSA legal and operational personnel met with internet provider COMPANY D's General Counsel to discuss the PSP and ask for the company's support. COMPANY D provided support, but it was minimal. (For a description of COMPANY D's support, see page __, "What Providers Furnished.").

(TS//SI//NF) On 29 October 2002, NSA legal and operational personnel met with internet provider COMPANY F's Legal and Corporate Affairs personnel, and a former NSA OGC employee hired by COMPANY F as independent counsel. NSA requested COMPANY F's support under the PSP for email content. At the meeting, COMPANY F requested a letter from the Attorney General certifying the legality of the PSP. In December 2002, NSA's Commercial Technologies Group was informed that the company's CEO agreed to support the PSP. According to NSA's General Counsel, COMPANY F did not participate in the PSP because of corporate liability concerns.

(TS//SI//NF) **2003:** In April 2003, NSA legal and operational personnel met with the President and Chief Operating Officer, General Counsel, and other personnel from private sector COMPANY G. After the meeting, the company's General Counsel wanted to seek the opinion of outside counsel. NSA determined the risk associated with additional disclosure outweighed what COMPANY G would have provided. NSA decided to not pursue a partnership with this company.