EXHIBIT A,
Part 4 of 5

## WORKING DRAFT

### (U//FOUO) NSA Letters to Private Sector

(TS//SI//NF) The Director sent letters to private sector companies requesting their assistance with the PSP. NSA OGC drafted the letters for the Director, tracked each renewal of the President's authorization and modified the letters accordingly, and ensured the letters were delivered to the companies. Between 16 October 2001 and 14 December 2006, NSA sent 147 request-for-assistance letters to private sector partners.

- COMPANY A:     44 Letters
- COMPANY B:     44 Letters
- COMPANY C:     46 Letters
- COMPANY D:   11 Letters
- COMPANY E:      2 Letters

(TS//SI-ECI//NF) **2001.** In his first PSP-related letter on 16 October 2001 to COMPANIES A, B and C, General Hayden stated that the National Security Agency and the Federal Bureau of Investigation required their assistance "to collect intelligence vital to the national security arising from the events of 11 September 2001," and specifically requested that they "provide survey, tasking and collection against international traffic, some of which terminates in the United States; provide aggregated call record information; and supply computer to computer data which can be used to determine the communicants." Their assistance was "needed to identify members of international terrorist cells in the United States and prevent future terrorist attacks against the United States." These first letters also stated that the requested assistance was authorized by the President with the legal concurrence of the Attorney General, pursuant to Article II of the Constitution.

(TS//SI-ECI//NF) **2002:** Subsequent letters were sent to COMPANIES A, B, and C by General Hayden (or his deputy) each time the President reauthorized the PSP. Throughout 2002, these written requests for assistance referenced the 16 October letter; repeated the need to provide the Presidentially-authorized assistance; emphasized that such assistance was necessary to counter a future terrorist attack; and stated that such assistance was reviewed by the Attorney General and had been determined to be a lawful exercise of the President's powers as Commander-in-Chief. Starting in mid-2003, the wording of the letters was revised but in substance remained the same.

(TS//SI-ECI//NF) Two request letters for assistance were sent to private sector COMPANY E. The first letter was sent on 26 February 2002, and

the last letter was sent on 14 March 2002. All letters were signed by General Hayden.

(TS//SI-ECI//NF) In addition to the letters sent to COMPANY A, COMPANY B, COMPANY C and COMPANY E, eleven request letters for assistance were prepared for internet provider COMPANY D. The first letter was on 9 October 2002 and the last letter was 11 September 2003. All letters were signed by General Hayden or his designee.

(TS//SI-ECI//NF) **2003:** In June 2003, COMPANY C's General Counsel and Chief of Staff requested a written Attorney General opinion on the legality and lawfulness of the PSP, to include a directive to comply. COMPANY C cited corporate liability concerns as their reason. On 8 August 2003, the Attorney General sent COMPANY C a letter stating that the request for support was a lawful exercise of authorities assigned to the President under Article II of the Constitution. Additionally, the Attorney General directed COMPANY C to comply with NSA's request.

(TS//SI-ECI//NF) **2004:** On 26 March 2004, the President amended his 11 March 2004 authorization after deciding to discontinue bulk collection of Internet metadata. Before 11 March 2004, all authorizations covering Internet metadata collection (as well as content collection and telephony metadata collection) were approved for form and legality by the Attorney General. Accordingly, NSA's 12 March 2004 letters to the companies stated that the most recent authorization had been approved for form and legality by the Counsel to the President, not the Attorney General as with previous authorizations.

(TS//SI//ECI//NF) **2005:** Beginning 19 September 2005 through 14 December 2006, new NSA/CSS Director General Alexander, or his designee, signed the request letters to the companies.

(TS//SI-ECI//NF) **2006 Attorney General Letters.** On 24 January 2006, the Attorney General sent letters to COMPANIES A, B, and C, certifying under 18 U.S.C. 2511(2)(a)(ii)(B) that "no warrant or court order was or is required by law for the assistance, that all statutory requirements have been met, and that the assistance has been and is required."

(TS//SI-ECI//NF) **2006 DNI Letters.** On 13 April 2006, the Director of National Intelligence (DNI) sent letters to Companies A, B, and C to underscore the continuing critical importance of their assistance. The DNI letter also stated that the "intelligence obtained from their assistance has been and continues to be indispensable to protecting the country and the American people from terrorist attacks."

*TOP SECRET//STLW//COMINT/ORCON/NOFORN*

## WORKING DRAFT

(TS//SI-ECI//NF) Letters for COMPANIES A, B, C, and E were couriered to the companies' local facility. COMPANY B sometimes picked up its letters at NSA Headquarters. Letters for COMPANY D were stored at NSA since no one at the company had the proper clearance to store them.

### (U//FOUO) PSP Authorized Support to NSA

(TS//SI-ECI//NF) Private sector companies provided assistance to NSA under the PSP in three categories: telephone and Internet Protocol content, Metadata from Call Detail Records, and Internet Protocol Metadata.

(TS//ECI//NF) The PSP allowed content to be collected if the selected communication was one-end foreign or the location of the communicants could not be determined. Selectors (email addresses and telephone numbers) were provided by NSA's Office of Counterterrorism.

(TS//SI-ECI//NF) **Content: Telephony.** Under the PSP, companies provided the content of one-end-foreign international telephone calls (telephony content) and the content of electronic communications (email content) of al Qaeda and its affiliates. COMPANIES A, B, and C provided telephony content from communications links they owned and operated. They had been providing telephony content to NSA before 2001 under FISA and E.O. 12333 authorities. NSA began to receive telephony content from COMPANIES A and B on 6 October 2001 and COMPANY C on 7 October 2001. This support ended on 17 January 2007.

(TS//SI-ECI//NF) **Content: Internet Email**. COMPANIES A, B, and C provided access to the content of Al Qaeda and Al Qaeda-affiliate email from communication links they owned and operated. NSA received email content from COMPANY A as early as October 2001 until 17 January 2007, from Company B beginning February-March 2002 through 17 January 2007, and from COMPANY C from April 2005 until 17 January 2007. From April 2003 through November 2003, COMPANY D provided a limited amount of email content under the PSP. It did not provide PSP-related support after November 2003, but it did provide support under FISA.

(TS//SI-ECI//NF) **Metadata from Call Detail Records**. COMPANIES A and B provided Call Detail Records to NSA. The records were used by NSA Counter-Terrorism metadata analysts to perform call chaining and network reconstruction between known al Qaeda and al Qaeda-affiliate telephone numbers and previously unknown telephone numbers with which they had been in contact. Providers generated Call Detail Records as a normal course of doing business (e.g., billing purposes and traffic

ST-09-0002
*WORKING DRAFT*

engineering). Records included all call events from the companies' long distance and international communication networks. The Call Detail Records were aggregated as large files by TS/SCI-cleared groups at COMPANY A and COMPANY B and forwarded, on an hourly or daily basis, across classified communications circuits to a PSP-restricted NSA data repository.
COMPANY A provided PSP-authorized CDRs as early as November 2001, and COMPANY B began to provide CDRs in February 2002. Both continued to provide this support through the end of the PSP, and support continues today under the FISC Business Records Order. COMPANY C provided select PSP-authorized CDRs from December 2002 through March 2003.

(TS//SI-ECI//NF) **Internet Metadata**. The last category of private sector assistance was access to Internet Protocol (IP) metadata associated with communications of al Qaeda (and affiliates) from data links owned or operated by COMPANIES A, B, and C. In order to be a candidate for PSP IP metadata collection, data links were first vetted to ensure that the preponderance of communications was from foreign sources, and that there was a high probability of collecting al Qaeda (and affiliate) communications. NSA took great care to ensure that metadata was produced against foreign, not domestic, communications.

(TS//SI-ECI//NF) COMPANY A began providing PSP IP metadata collection as early as November 2001. Although COMPANY B began providing CD-ROMs of PSP IP metadata in October 2001, an automated transfer of data was not available until February-March 2002. The Presidential authority to collect IP metadata was terminated in March 2004. COMPANY A and COMPANY B IP metadata collection resumed after the FISC Pen Register/Trap & Trace (PR/TT) Order authorizing this activity was signed on 15 July 2004. COMPANY C provided IP metadata beginning in April 2005.

*WORKING DRAFT*

This page intentionally left blank.

# (U) FIVE: NSA'S INTERACTION WITH THE FISC AND TRANSITION TO COURT ORDERS

(TS//SI//NF) Until 2006, NSA's PSP-related interaction with members of the FISC was limited to informational briefings to the Chief Judge. Chief Judge Royce Lamberth, Judge Colleen Kollar-Kotelly, who replaced Judge Lamberth as Chief Judge in May 2002, and one law clerk were the only members of the FISC that NSA had briefed on the PSP. In the spring of 2004, NSA's interaction with Judge Kollar-Kotelly increased as NSA and DoJ began transitioning PSP-authorized activities to FISC orders in 2004. It was not until after parts of the PSP were publicly revealed in December 2005 that all members of the FISC were briefed on the Program.

## (U) NSA's Interaction with the FISC

(TS//SI//NF) General Hayden stated that from the start of the PSP, he and other NSA leaders recognized the importance of keeping all three branches of the Government informed of the Program and pressed the White House to do so.

(TS//SI//NF) In all of its interactions, neither NSA nor DoJ presented before the FISC the factual and legal issues arising from the PSP in any case or controversy. Therefore, the FISC did not express any view or comment on the legality or illegality of the PSP.

### (U//FOUO) NSA Briefings on the PSP to Members of the FISC

(TS//SI//NF) The White House first permitted NSA to brief the Chief Judge of the FISC in January 2002. General Hayden stated that on 31 January 2002, he provided Judge Lamberth a very detailed PSP briefing, and the Deputy Assistant Attorney General in the DoJ OLC explained the Program's legality. General Hayden stated that this briefing was prompted by a concern expressed by DOJ that PSP-derived information would be used in FISA applications

(TS//SI//NF) On 17 May 2002, General Hayden briefed incoming Chief Judge Kollar-Kotelly, with Judge Lamberth in attendance, on the PSP. In a

*WORKING DRAFT*

letter to the Counsel for Intelligence Policy dated 12 January 2005, Judge Kollar-Kotelly stated that, on that date, she was also shown a short legal memorandum, prepared by the Deputy Assistant Attorney General in the DoJ, OLC, that set out a broad overview of the legal authority for conducting the PSP. Judge Kollar-Kotelly added that she was allowed to read the memorandum but not to retain it for study.

(TS//SI//NF) NSA records show that Judge Kollar-Kotelly was briefed again on 12 August 2002 at the White House. Although we found no documentation of the purpose of the meeting or topics discussed, Judge Kollar-Kotelly stated in the January 2005 letter to the Counsel for Intelligence Policy that, at her request, she was permitted to review the Authorization of the PSP on that date.

(TS//SI//NF) In response to a *New York Times* "warrantless wiretapping" story published in December 2005, General Alexander briefed all FISC members on the PSP on 9 January 2006.[9]

## (U) Transition of PSP Authorities to FISC Orders

(TS//SI//NF) The transition of PSP-authorized activities to FISC orders was precipitated by preliminary results of DoJ OLC legal review of the components of the Program. In March 2004, OLC found three of the four types of collection authorized under the PSP to be legally supportable. However, it determined that, given the method of collection, bulk Internet metadata was prohibited by the terms of FISA and Title III.[10] Consequently, the White House Counsel rather than the Attorney General signed the 11 March 2004 Authorization.

**(TS//SI//NF) NSA Implements Controversial 11 March 2004 Authorization**

---

[9] (TS//STLW//SI//OR/NF) Judge Scullin did not attend this briefing, but was later briefed on 31 January 2006. Judge Bates, a new judge, was briefed on 21 March 2006.
[10] (TS//STLW//SI//OR/NF) OLC ultimately issued three opinions: 15 March 2004, 6 May 2004, and 16 July 2004.

ST-09-0002
*WORKING DRAFT*

> (TS//SI//NF) Until March 2004, NSA considered its collection of bulk Internet metadata under the PSP to be legal and appropriate. Specifically, NSA leadership, including OGC lawyers and the IG, interpreted the terms of the Authorization to allow NSA to obtain bulk Internet metadata for analysis because NSA did not actually "acquire" communications until specific communications were selected. In other words, because the Authorization permitted NSA to conduct metadata analysis on selectors that met certain criteria, it implicitly authorized NSA to obtain the bulk data that was needed to conduct the metadata analysis.
>
> (TS//SI//NF) On 11 March 2004, General Hayden had to decide whether NSA would execute the Authorization without the Attorney General's signature (IV-A/32-11). General Hayden described a conversation in which David Addington asked, "Will you do it (IV-A/32-11)?" At that time, General Hayden also said that he asked Daniel Levin, Counsel to the Attorney General, in March 2004 if he needed to stop anything he was doing. Mr. Levin said that he did not need to stop anything (IV-A/32-7 and IV-A/32a-7&8). After conferring with NSA operational and legal personnel, General Hayden stated that he decided to continue the PSP because 1) the members of Congress he briefed the previous day, 10 March, were supportive of continuing the Program, 2) he knew the value of the Program, and 3) NSA lawyers had determined the Program was legal.

(TS//SI//NF) Eight days later on 19 March 2004, the President rescinded the authority to collect bulk Internet metadata and gave NSA one week to stop collection and block access to previously collected bulk Internet metadata. NSA did so on 26 March 2004. To close the resulting collection gap, DoJ and NSA immediately began efforts to recreate this authority in what became the PR/TT order. By January 2007, the remaining three authorities had also been replicated in FISC orders: the Business Records (BR) Order, the Foreign Content Order, and the

## WORKING DRAFT

Domestic Content Order. On 1 February 2007, the final Authorization was allowed to expire and was not renewed.

### (TS//SI//NF) Transition of Internet Metadata Collection to Pen Register/Trap and Trace Order Authority

(TS//SI//NF) According to NSA personnel, the decision to transition Internet metadata collection to a FISC order was driven by DoJ. At a meeting on 26 March 2007, DoJ directed NSA representatives from OGC and SID to find a legal basis, using a FISC order, to recreate NSA's PSP authority to collect bulk Internet metadata.

(TS//SI//NF) After extensive coordination, DoJ and NSA devised the PR/TT theory to which the Chief Judge of the FISC seemed amenable. DoJ and NSA worked closely over the following months, exchanging drafts of the application, preparing declarations, and responding to questions from court advisers. NSA representatives explained the capabilities that were needed to recreate the Authority, and DoJ personnel devised a workable legal basis to meet those needs. In April 2004, NSA briefed Judge Kollar-Kotelly and a law clerk because Judge Kollar-Kotelly was researching the impact of using PSP-derived information in FISA applications. In May 2004, NSA personnel provided a technical briefing on NSA collection of bulk Internet metadata to Judge Kollar-Kotelly. In addition, General Hayden said he met with Judge Kollar-Kotelly on two successive Saturdays during the summer of 2004 to discuss the on-going efforts.

(TS//SI//NF) The FISC signed the first PR/TT order on 14 July 2004. Although NSA lost access to the bulk metadata from 26 March 2004 until the order was signed, the order essentially gave NSA the same authority to collect bulk Internet metadata that it had under the PSP, except that it specified the datalinks from which NSA could collect, and it limited the number of people that could access the data. The FISC continues to renew the PR/TT approximately every 90 days.

### (TS//SI//NF) Transition of Telephony Metadata Collection to the Business Records Order

(TS//SI//NF) According to NSA General Counsel Vito Potenza, the decision to transition telephony metadata to the Business Records Order was driven by a private sector company. After the *New York Times* article was published in December 2005, Mr. Potenza stated that one of the PSP providers expressed concern about providing telephony metadata to NSA under Presidential Authority without being compelled. Although OLC's

ST-09-0002
*WORKING DRAFT*

May 2004 opinion states that NSA collection of telephony metadata as business records under the Authorization was legally supportable, the provider preferred to be compelled to do so by a court order.[11]

(TS//SI//NF) As with the PR/TT Order, DoJ and NSA collaboratively designed the application, prepared declarations, and responded to questions from court advisers. Their previous experience in drafting the PRTT Order made this process more efficient.

(TS//SI//NF) The FISC signed the first Business Records Order on 24 May 2006. The order essentially gave NSA the same authority to collect bulk telephony metadata from business records that it had under the PSP. And, unlike the PRTT, there was no break in collection at transition. The order did, however, limit the number of people that could access the data and required more stringent oversight by and reporting to DOJ. The FISC continues to renew the Business Records Order every 90 days or so. (See Appendix H.)

### (TS//SI//NF) Transition of Internet and Telephony Content Collection to the Foreign and Domestic Content Orders

(TS//SI//NF) According to NSA OGC, the transition of PSP content collection to FISC orders was driven by DoJ. DoJ had contemplated a transition in July 2004 when the FISC's signing of the PR/TT order indicated its willingness to authorize PSP activities under court order. Given this precedent, DoJ concluded the FISC might also accept content collection. However, little progress was made until June 2005 when the DoJ OIPR with NSA OGC and SID representatives began researching the feasibility of collecting PSP content under court order. In essence, DOJ and NSA needed to find a legal theory that would allow NSA to add and drop thousands of foreign targets for content collection. Because the law was more restrictive for content than metadata, NSA had serious reservations about whether it would be possible to find a workable solution using a FISC order at that time, especially given the large number of selectors to be tasked and the complexity from legal and operational perspectives. For example:

---

[11](TS//STLW//SI//OR/NF) In addition to the telephony metdata that NSA was receiving from private sector companies as business records, it was also obtaining "live" telephony metadata from its own SIGINT collection sources. It continued until mid-2005. (***We will include a reference to the corresponding notification here.***)