**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CAROLYN JEWEL, ET AL.,

        Plaintiffs,                    No. C 08-04373 JSW

 v.

NATIONAL SECURITY AGENCY, ET AL.,

        Defendants.

_____

VIRGINIA SHUBERT, ET AL.,                     No. C 07-00693 JSW

        Plaintiffs,                    **AMENDED ORDER**

 v.

BARACK OBAMA, ET AL.,

        Defendants.

_____/

      In response to the parties' request for clarification, the Court issues this amended order. This matter comes before the Court upon consideration of the motion for partial summary judgment filed by Plaintiffs Carolyn Jewel, Tash Hepting, Young Boon Hicks, Erik Knutzen and Joice Walton, on behalf of themselves and all others similarly situated (collectively "*Jewel* Plaintiffs" or "Plaintiffs") and the cross motion to dismiss and for summary judgment filed by Defendants National Security Agency; Keith B. Alexander, Director of National Security Agency, in his official capacity; United States of America; Barack Obama, President of the United States, in his official capacity; the Department of Justice; Eric Holder, the Attorney General, in his official capacity; and James R. Clapper, Director of National Intelligence, in his official capacity (collectively "*Jewel* Defendants" or "Defendants").

This matter also comes before the Court in a related case upon consideration of the motion to dismiss and for summary judgment filed by Defendants Barack Obama, President of the United States, in his official capacity; Keith B. Alexander, Director of the National Security Agency, in his official capacity; the United States of America; and Eric Holder, the Attorney General, in his official capacity ("*Shubert* Defendants" or "Defendants") against Plaintiffs Virginia Shubert, Noha Arafa, Sarah Dranoff, and Hilary Botein, on behalf of themselves and all others similarly situated (collectively "*Shubert* Plaintiffs" or "Plaintiffs").

The *Jewel* Plaintiffs move for partial summary adjudication seeking to have the Court reject the Defendants' state secret defense by arguing that Congress has displaced the state secrets privilege in this action by the statutory procedure prescribed by 50 U.S.C. § 1806(f) of the Foreign Intelligence Surveillance Act ("FISA").

The *Shubert* Plaintiffs filed an amended complaint upon remand of the case and the *Shubert* Defendants move to dismiss for lack of subject matter jurisdiction on the basis that Congress did not waive sovereign immunity as to the FISA claim.  The *Shubert* Plaintiffs incorporate by reference the arguments made in the *Jewel* Defendants' motion.

Defendants in both related cases move to dismiss all of Plaintiffs' statutory claims for lack of subject matter jurisdiction on the basis that Congress did not waive sovereign immunity as to the statutory claims.  Defendants also move for summary judgment on all counts on the grounds that Plaintiffs' claims would risk or require the disclosure of certain information that is properly protected by the statutory protections and the state secrets privilege asserted in this action by the Director of National Intelligence and by the National Security Agency.

Having thoroughly considered the parties' papers, Defendants' public and classified declarations, the relevant legal authority and the parties' arguments, the Court GRANTS the *Jewel* Plaintiffs' motion for partial summary adjudication by rejecting the state secrets defense as having been displaced by the statutory procedure prescribed in 50 U.S.C. § 1806(f) of FISA. In both related cases, the Court GRANTS Defendants' motions to dismiss Plaintiffs' statutory claims for damages as to FISA and claims for injunctive relief as to all statutory claims on the basis of sovereign immunity.  The Court further finds that the parties have not addressed the

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

viability of the *Jewel* Plaintiffs' constitutional claims under the Fourth and First Amendments and the claim for violation of separation of powers and the *Shubert* Plaintiffs' fourth cause of action for violation of the Fourth Amendment. Accordingly, the Court RESERVES ruling on Defendants' motion for summary judgment on those remaining, non-statutory claims.

The Court shall require that the parties submit further briefing on the course of this litigation going forward.[1]

## BACKGROUND

These cases are two in a series of many lawsuits arising from claims that the federal government, with the assistance of major telecommunications companies, conducted widespread warrantless dragnet communications surveillance of United States citizens following the attacks of September 11, 2001. Plaintiffs filed these putative class actions on behalf of themselves and a class of similarly situated persons described as "millions of ordinary Americans . . . who use[] the phone system or the Internet" and "a class comprised of all present and future United States persons who have been or will be subject to electronic surveillance by the National Security Agency without a search warrant or court order since September 12, 2001." (*Jewel* Complaint at ¶¶ 1, 7, and 9; *see also Shubert* Complaint at ¶ 1, 2, 20.)[2]

According to the allegations in the *Jewel* Complaint, a program of dragnet surveillance (the "Program") was first authorized by Executive Order of the President on October 4, 2001. (*Jewel* Complaint at ¶¶ 3, 39.) Plaintiffs allege that, in addition to eavesdropping on or reading specific communications, Defendants have "indiscriminately intercepted the communications content and obtained the communications records of millions of ordinary Americans as part of the Program authorized by the President." (*Id.* at ¶ 7.) The core component of the Program is a

---

[1] The Court DENIES Defendants' request for a stay of this decision. The subject matter and legal questions presented by this lawsuit are timely. To the extent recent events involving the public disclosure of relevant, and previously classified, information bear on the future course of the litigation, the Court shall require that the parties submit further briefing to address these issues.

[2] For the remaining facts, the Court refers to the *Jewel* Complaint as it is more inclusive. The facts pertinent to the Court's analysis are also similarly alleged in the related *Shubert* Complaint which was originally filed May 17, 2006, as part of a multi-district litigation action also remanded to this Court.

United States District Court

For the Northern District of California

1   nationwide network of sophisticated communications surveillance devices attached to the key

2   facilities of various telecommunications companies that carry Americans' Internet and

3   telephone communications.  (*Id.* at ¶¶ 8, 42.)  Plaintiffs allege that Defendants have unlawfully

4   solicited and obtained the private telephone and internal transactional records of millions of

5   customers of the telecommunications companies, including records indicating who the

6   customers communicated with, when those communications took place and for how long,

7   among other sensitive information.  Plaintiffs allege these records include both domestic and

8   international communications.  (*Id.* at ¶ 10.)  Plaintiffs sue Defendants "to enjoin their unlawful

9   acquisition of the communications and records of Plaintiffs and class members, to require the

10  inventory and destruction of those that have already been seized, and to obtain appropriate

11  statutory, actual, and punitive damages to deter future illegal surveillance."  (*Id.* at ¶ 14.)

12    The *Jewel* Plaintiffs allege seventeen counts against Defendants for: violation of the

13  Fourth Amendment (counts 1 and 2); violation of the First Amendment (counts 3 and 4);

14  violation of FISA, 50 U.S.C. §§ 1809, 1810 (counts 5 and 6); violation of the Wiretap Act, 18

15  U.S.C. § 2511(1)(a), (b), and (d) (counts 7 through 9); violation of the Electronic

16  Communications Privacy Act or the Stored Communications Act, 18 U.S.C. § 2703(a), (b), and

17  (c) (counts 10 through 15); violation of the Administrative Procedure Act, 5 U.S.C. § 701 *et*

18  *seq.* (count 16); and violation of separation of powers (count 17).  The *Shubert* Plaintiffs allege

19  four causes of action for violations of FISA, the Wiretap Act, the Stored Communications Act,

20  and the Fourth Amendment.

21    The *Jewel* Complaint was originally filed on September 18, 2008.  Defendants moved to

22  dismiss and alternatively sought summary judgment as to all claims.  Defendants contended that

23  the Court lacked jurisdiction over the statutory claims because the government had not waived

24  its sovereign immunity.  Defendants moved for summary judgment on the remaining claims

25  based on the argument that the information necessary to litigate the claims was properly subject

26  to the state secrets privilege.  The district court dismissed the claims without leave to amend

27  based on its finding that Plaintiffs failed to make out the *prima facie* allegations necessary to

28  establish standing.

On appeal, the Ninth Circuit Court of Appeals reversed the district court's dismissal of the *Jewel* Complaint on standing grounds. The Ninth Circuit Court of Appeals remanded "with instructions to consider, among other claims and defenses, whether the government's assertion that the state secrets privilege bars this litigation." *Jewel v. National Security Agency*, 673 F.3d 902, 913-14 (9th Cir. 2011). Upon remand, Plaintiffs filed their motion for partial summary adjudication urging the Court to reject Defendants' state secret defense. Defendants cross-moved to dismiss on the basis of sovereign immunity for the statutory claims and for summary judgment on the assertion of the state secrets privilege.

The Court will address additional facts as necessary in the remainder of this Order.

**ANALYSIS**

**A.     Applicable Legal Standards.**

**1.     Motion to Dismiss.**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. The Court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Pursuant to *Twombly*, a plaintiff must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

United States District Court

For the Northern District of California

5

**2.     Motion for Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact"); *see also* Fed. R. Civ. P. 56(e). If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(e)(3).

**B.     State Secrets Privilege.**

The state secrets privilege is a common law privilege that permits the government to bar the disclosure of information if "there is a reasonable danger" that disclosure will "expose

military matters which, in the interest of national security, should not be divulged." *United States v. Reynolds*, 345 U.S. 1, 10 (1953). The state secrets privilege strikes a delicate balance "between fundamental principles of our liberty, including justice, transparency, accountability and national security." *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1073 (9th Cir. 2010).

The state secrets privilege has two applications: as a rule of evidentiary privilege, barring only the secret evidence from exposure during litigation, and as a rule of non-justiciability, when the subject matter of the lawsuit is itself a state secret, necessitating dismissal. *See ACLU v. National Security Agency*, 493 F.3d 644, 650 n.2 (6th Cir. 2007). The first application of evidentiary withholding can serve to remove only certain specific pieces of evidence or can be applied to compel the removal of a sufficiently broad swath of evidence which then has the consequence of requiring dismissal of the entire suit. Such a dismissal may be necessitated by the instances in which the removal of evidence disables a plaintiff from the ability to establish the *prima facie* elements of a claim without resort to privileged information or instances in which the removed evidence bars the defendant from establishing a defense. *See Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998).

The analysis of whether the state secrets privilege applies involves three distinct steps. First, the Court must ascertain whether the procedural requirements for invoking the privilege have been satisfied. Second, the Court must make an independent determination whether the information is privileged. In determining whether the privilege attaches, the Court may consider a party's need for access to the allegedly privileged materials. *See Reynolds*, 345 U.S. at 11. Lastly, the "ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim." *El-Masri v. United States*, 479 F.3d 296, 304 (4th Cir. 2007).

With regard to the first step, to ascertain whether the procedural requirements have been met, the assertion of the privilege belongs exclusively to the government. The head of the department which has control over the matter must properly assert a formal and timely claim of privilege, after actual personal consideration by that officer. *See Reynolds*, 345 U.S. at 7-8. Such an invocation must be made only after "serious, considered judgment, not simply [as] an

administrative formality." *United States v. W.R. Grace*, 526 F.3d 499, 507-08 (9th Cir. 2008) (en banc). "The formal claim must reflect the certifying official's personal judgment ... [and] must be presented in sufficient detail for the court to make an independent determination of the validity of the claim of privilege and the scope of the evidence subject to the privilege." *Jeppesen*, 614 F.3d at 1080.

Second, the reviewing court must "make an independent determination whether the information is privileged." *Al-Haramain*, 507 F.3d at 1202. The court must "sustain a claim of privilege when it is satisfied, 'from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged.'" *Jeppesen*, 614 F.3d at 1081 (quoting *Reynolds*, 345 U.S. at 10). In making this determination, the Court must strike the appropriate balance "between protecting national security matters and preserving an open court system." *Al-Haramain*, 507 F.3d at 1203. "This inquiry is a difficult one, for it pits the judiciary's search for truth against the Executive's duty to maintain the nation's security." *El-Masri*, 479 F.3d at 304. In evaluating the need for secrecy, the court must defer to the Executive on matters of foreign policy and national security. *See Jeppesen*, 614 F.3d at 1081-82. However, the assertion of the state secrets doctrine does not "represent a complete surrender of judicial control over access to the courts." *El-Masri*, 479 F.3d at 312. Rather, in order to ensure that the doctrine is not asserted more frequently and sweepingly than necessary, "it is essential that the courts continue critically to examine instances of its invocation." *Ellsberg v. Mitchell*, 709 F.2d 51, 58 (D.C. Cir. 1983). However, should the court find that the materials must not be divulged, "the evidence is absolutely privileged, irrespective of the plaintiffs' countervailing need for it." *See Jeppeson*, 614 F.3d at 1081 (citing *Reynolds*, 345 U.S. at 11).

Lastly, the third step in the analysis requires that the court determine how the matter should proceed once it has sustained a claim of privilege. "The court must assess whether it is feasible for the litigation to proceed without the protected evidence and, if so, how." *Jeppesen*, 614 F.3d at 1082. When the government successfully invokes the state secrets privilege, "the evidence is completely removed from the case." *Kasza*, 133 F.3d at 1166. The court is then

United States District Court

For the Northern District of California

1    tasked with disentangling the nonsensitive information from the privileged evidence. Often,

2    after the privileged evidence is excluded, "the case will proceed accordingly, with no

3    consequences save those resulting from the loss of evidence." *Al-Haramain*, 507 F.3d at 1204

4    (quoting *Ellsberg*, 709 F.3d at 64). However, there "will be occasions when, as a practical

5    matter, secret and nonsecret information cannot be separated. In some cases, therefore, 'it is

6    appropriate that the courts restrict the parties' access not only to evidence which itself risks the

7    disclosure of a state secret, but also those pieces of evidence or areas of questioning which press

8    so closely upon highly sensitive material that they create a high risk of inadvertent or indirect

9    disclosures.'" *Jeppesen*, 614 F.3d at 1082 (quoting *Bareford v. Gen. Dynamics Corp.*, 973 F.2d

10   1138, 1143-44 (5th Cir. 1992); *see also Kasza*, 133 F.3d at 1166 ("[I]f seemingly innocuous

11   information is part of a . . . mosaic, the state secrets privilege may be invoked to bar its

12   disclosure and the court cannot order the government to disentangle this information from other

13   [*i.e.*, secret] information.")

14        Thereafter, the case may proceed with the omission of the secret or closely entangled

15   evidence. Alternatively, if application of the state secrets bars too much, the court may be

16   required to dismiss the action in its entirety. Such instances include when, without the secret

17   evidence, a plaintiff is unable to prove the *prima facie* elements of a claim with nonprivileged

18   evidence. *See Kasza*, 133 F.3d at 1166. Or the privilege may apply to bar information that

19   would otherwise give the defendant a valid defense to the claim, thus requiring dismissal. *See*

20   *id.* Lastly, the court may be compelled to dismiss when, although the claims and defenses may

21   be stated without reference to privileged evidence, "it may be impossible to proceed with the

22   litigation because – privileged evidence being inseparable from nonprivileged information that

23   will be necessary to the claims or defenses – litigating the case to a judgment on the merits

24   would present an unacceptable risk of disclosing state secrets." *Jeppesen*, 614 F.3d at 1083

25   (citations omitted); *see also Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 279-80 (4th Cir.

26   1980) (en banc) (per curiam) (Phillips, J., specially concurring and dissenting) (concluding that

27   "litigation should be entirely foreclosed at the outset by dismissal of the action" if it appears

28   that "the danger of inadvertent compromise of the protected state secrets outweighs the public

and private interests in attempting formally to resolve the dispute while honoring the privilege").

Alternatively, the state secrets privilege may be invoked to bar litigation of the matter in its entirety where "the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." *Totten v. United States*, 92 U.S. 105, 107 (1875). Where the very subject matter of the lawsuit is a matter of state secret, the action must be dismissed without reaching the question of evidence. *See Al-Haramain*, 507 F.3d at 1197 (citations omitted); *see also Sterling v. Tenet*, 416 F.3d 338, 345 (4th Cir. 2005) (holding that dismissal is proper where "sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters.")

Here, having reviewed the materials submitted for review and having considered the claims alleged and the record as a whole, the Court finds that Defendants have timely invoked the state secrets doctrine. Defendants contend that Plaintiffs' lawsuits should be dismissed as a result of the application of the privilege because the state secrets information is so central to the subject matter of the suit that permitting further proceedings would jeopardize national security. Given the multiple public disclosures of information regarding the surveillance program, the Court does not find that the very subject matter of the suits constitutes a state secret. Just as in *Al-Haramain*, and based significantly on the same set of facts in the record here, the Court finds that although there are certainly details that the government has not yet disclosed,

> because of the voluntary disclosures made by various officials since December 2005, the nature and purpose of the [Terrorist Surveillance Program], the 'type' of persons it targeted, and even some of its procedures are not state secrets. In other words, the government's many attempts to assuage citizens' fears that they have not been surveilled now doom the government's assertion that the very subject matter of this litigation, the existence of a warrantless surveillance program, is barred by the state secrets privilege.

507 F.3d at 1200; *see also Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974, 986-88, 991 (N.D. Cal. 2006) (holding that the existence of a program of monitoring the contents of certain telephone communications was no longer a state secret as a result of the public statements made by the President and the Attorney General). Accordingly, the Court does not find dismissal

appropriate based on the subject matter of the suits being a state secret. *See Totten*, 92 U.S. at 107.

However, here, the Court finds there would be significant evidence that would be properly excluded should the case proceed. The Court has thoroughly and critically reviewed Defendants' public and classified declarations and is persuaded that the evidence submitted thus far that the government seeks to protect from disclosure contain valid state secrets "which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 10; *see also Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899, 917 (N.D. Ill. 2006) (finding state secrets privilege applies because requiring the telephone company to confirm or deny whether it had disclosed large quantities of telephone records to the federal government could give adversaries valuable insight into the government's intelligence programs and "requiring such disclosures would therefore adversely affect our national security" and "are barred by the state secrets privilege"). The Court finds the state secrets privilege would apply to bar disclosure of significant materials relating to the alleged Program. However, it may not set out precisely which matters the privilege covers lest the Court jeopardize the secrets it is bound to protect. *See Jeppesen*, 614 F.3d at 1086 (citing *Black v. United States*, 62 F.3d 1115, 1119 (8th Cir. 1995) ("Care in protecting state secrets is necessary not only during a court's review of the evidence, but in its subsequent treatment of the question in any holding; a properly phrased opinion should not strip the veil from state secrets even if ambiguity results in a loss of focus and clarity.")).

Having concluded that Defendants have successfully invoked the state secrets privilege with regard to significant evidence tending to confirm or negate the factual allegations in Plaintiffs' complaints, the question the Court must address is how to proceed. If the state secrets defense applies to bar disclosure altogether of much of the evidence sought in this suit, Plaintiffs may neither be able to establish standing to sue nor state a *prima facie* case. Defendants would similarly be without accessible evidence to establish a defense without disclosure of the evidence subject to the privilege. *See Kasza*, 133 F.3d at 1166. However, the Court finds that, as a matter of law, the FISA procedural mechanism prescribed under 50 U.S.C. § 1806(f) preempts application of the state secrets privilege.

11

**C.     FISA and Preemption.**

On remand, the Court of Appeals has required this Court to consider "the government's assertion that the state secrets privilege bars this litigation." *Jewel*, 673 F.3d at 913-14.  The Ninth Circuit, in a previous matter relating to the Program, also remanded to the district court to consider "whether FISA preempts the state secrets privilege and for any proceedings collateral to that determination." *Al-Haramain*, 507 F.3d at 1206.  In its opinion on remand in the *Al-Haramain* matter, this district court found that "FISA preempts the state secrets privilege in connection with electronic surveillance for intelligence purposes . . . ." *In re National Security Agency Telecommunications Records Litigation* ("*In re N.S.A. Telecommunication Records Litig.*"), 564 F. Supp. 2d 1109, 1111 (N.D. Cal. 2008).  The undersigned agrees and finds that the *in camera* review procedure in FISA applies and preempts the determination of evidentiary preclusion under the state secrets doctrine.  Section 1806(f) of FISA displaces the state secrets privilege in cases in which electronic surveillance yields potentially sensitive evidence by providing secure procedures under which courts can consider national security evidence that the application of the state secrets privilege would otherwise summarily exclude.

**1.     FISA.**

Congress enacted FISA to curb the problem of unchecked domestic surveillance and intelligence-gathering abuses undertaken by the executive branch in the post-World War II era. *See* S. Rep. No. 95-604, at 8 (Congress enacted FISA in response to "revelations that warrantless surveillance in the name of national security ha[d] been seriously abused.").  The misconduct was exposed by a Congressional task force known as the Church Committee, which produced a series of investigative reports documenting unlawful surveillance pursued in the name of national security.  The Church Committee concluded that "the massive record of intelligence abuses over the years" had "undermined the constitutional rights of citizens . . . primarily because checks and balances designed by the framers of the Constitution to assure accountability have not been applied." *Book II: Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-755, at 291.  Accordingly, the Committee urged "fundamental

United States District Court
For the Northern District of California

reform," that would "cover[] the field by . . . provid[ing] the exclusive legal authority for domestic security activities," including "warrantless electronic surveillance." *Id.* at 299.

Under FISA, before engaging in domestic surveillance, the Executive branch must seek authorization from a special court charged with finding probable cause that the target is an agent of a foreign power as defined by the statute. *See* 50 U.S.C. §§ 1804-05. FISA also establishes a system of review of Executive conduct by setting out specific procedures courts must follow to evaluate evidence where disclosure could endanger national security. *See* 50 U.S.C. § 1806(f).

Section 1806(f) reads in pertinent part:

> . . . whenever any motion or request is made by an aggrieved person pursuant to any other statute or rule of the United States or any State . . . to discovery or obtain applications or orders or other materials relating to electronic surveillance . . . the United States district court ... shall, notwithstanding any other law, if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted.

*Id.*

Section 1806(f) of FISA applies "notwithstanding any other law" and is the "exclusive" procedure for reviewing sensitive surveillance materials gathered by the Executive under FISA and other surveillance statutes. *See id.*; *see also* 18 U.S.C. § 2712(b)(4) (designating Section 1806(f) as "the exclusive means by which materials [designated as sensitive by the government] shall be reviewed" in suits against the United States under FISA, the Wiretap Act, and the Electronic Privacy Protection Act). Once invoked, the review procedure requires courts to review the potentially sensitive surveillance materials *ex parte* and *in camera*. 50 U.S.C. § 1806(f).

The purpose of this provision is to permit courts to determine whether any particular surveillance was lawfully authorized and executed. The provision, which permits courts to review the potentially sensitive materials, strikes a balance between executive action and judicial oversight. The legislative history makes clear that Congress intended to formulate a balanced legislative solution to the national security problems raised in litigation over possibly

United States District Court

For the Northern District of California

unlawful executive surveillance programs.  The Senate Judiciary Committee explained that litigants were not to evade the provision by invoking other laws or jurisprudential doctrines:

> The Committee wishes to make clear that the procedures set in [subsection 1806(f)] apply whatever the underlying rule or statute referred to in [a party's] motion.  This is necessary to prevent the carefully drawn procedures in [section 1806(f)] from being bypassed by the inventive litigant using a new statute, rule or judicial construction.

S. Rep. No. 95-604, at 57; *see also* S. Rep. No. 95-701, at 63 ("When the procedure is so triggered, however, the Government must make available to the court a copy of the court order and accompanying declaration upon which the surveillance was based."); *see also* H. Rep. No. 95-1283(I), at 91 (when the legality of surveillance is at issue, "it is this procedure 'notwithstanding any other law' that must be used to resolve the question").

## 2.     Preemption.

Based on the legislative history and the plain language of FISA, this Court finds that FISA preempts the common law doctrine of the state secrets privilege.  Federal common law applies "[u]ntil the field has been made the subject of comprehensive legislation." *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 314 (1981).  When it passed FISA, Congress expressly indicated its intention to replace judge-made federal common law rules:

> [T]he development of the law regulating electronic surveillance for national security purposes has been uneven and inconclusive.  This is to be expected where the development is left to the judicial branch in an area where cases do not regularly come before it.  Moreover, the development of standards and restrictions by the judiciary with respect to electronic surveillance for foreign intelligence purposes accomplished through case law threatens both civil liberties and the national security because the development occurs generally in ignorance of the facts, circumstances, and techniques of foreign intelligence electronic surveillance not present in the particular case before the court . . . .  [T]he tiny window to this area which a particular case affords provides inadequate light by which judges may be relied upon to develop case law which adequately balances the rights of privacy and national security.

H. Rep. No. 95-1283, at 21.

It is clear Congress intended for FISA to displace federal common law rules such as the state secrets privilege with regard to matters within FISA's purview.  The legislative history indicates that Congress intended to "occupy the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency." *Milwaukee*, 452 U.S. at 317.  Through explicit provisions of FISA, Congress "established a

United States District Court

For the Northern District of California

comprehensive, detailed program to regulate foreign intelligence surveillance in the domestic context." *In re N.S.A. Telecommunications Records Litig.*, 564 F. Supp. 2d at 1118.  In particular, § 1806(f) "is Congress's specific and detailed description for how courts should handle claims by the government that the disclosure of material relating to or derived from electronic surveillance would harm national security."  *Id.* at 1119.  The specific description leaves no room for application of the state secrets privilege and is, in effect, a "codification of the state secrets privilege for purposes of relevant cases under FISA, as modified to reflect Congress's precise directive to the federal courts for the handling of materials and information with purported national security implications."  *Id.*  The Court agrees that "FISA preempts or displaces the state secrets privilege, but only in cases within the reach of its provisions."  *Id.* at 1124.  As in *In re National Security Agency Telecommunications Records Litigation*, Plaintiffs' allegations here of warrantless wiretapping and surveillance programs similarly fall within those provisions.

However, because the Court finds that Defendants have not waived sovereign immunity for its statutory claim, Plaintiffs' claims for violation of FISA fail.

**D.    Waiver of Sovereign Immunity for Plaintiffs' Statutory Claims.**

Defendants also move to dismiss Plaintiffs' statutory claims on the grounds that sovereign immunity has not been waived.  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").  Plaintiffs bear the burden to establish a waiver of sovereign immunity.  *Prescott v. United States*, 973 F.2d 696, 701 (9th Cir. 1992)

**1.    Statutory Claims for Damages.**

Plaintiffs bring statutory claims for damages under FISA, the Wiretap Act, and the Stored Communications Act ("SCA").  Section 223 of the Patriot Act amended the SCA and added the following provision which waives sovereign immunity for three specific provisions of FISA and more generally for violations of the SCA and the Wiretap Act.

United States District Court

For the Northern District of California

> Any person who is aggrieved by any willful violation of this chapter or of chapter 119 of this title or of sections 106(a), 305(a), or 405(a) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 *et seq*.) may commence an action in United States District Court against the United States to recover money damages.

18 U.S.C. § 2712.  *See* Pub. L. No. 107-56 § 223, 115 Stat. 272 (2001).

Plaintiffs do not bring any claims under these three enumerated provisions of FISA. Plaintiffs sue Defendants for violating 50 U.S.C. § 1809, and they rely on 50 U.S.C. § 1810 to provide a waiver of sovereign immunity in order to sue for damages.  However, as Plaintiffs concede, the Ninth Circuit has explicitly rejected the proposition that § 1810 may be construed as a waiver of sovereign immunity to sue for damages.  *See Al-Haramain v. Obama*, 690 F.3d 1089 (9th Cir. 2012) (holding that 50 U.S.C. § 1810 does not waive sovereign immunity against the United States for damages).  Therefore, Plaintiffs' claim for damages under FISA against the United States and against the individual federal defendants in their official capacity is barred.

However, the waiver of sovereign immunity for damages claims against the United States contained with Section 2712 for claims under the SCA and the Wiretap Act is much broader.  While the waiver in Section 2712 is limited to three specific provisions of FISA, the waiver for claims under the SCA and the Wiretap Act is not similarly restricted to individual provisions within those statutes.  Nevertheless, Defendants contend that the waiver is limited to claims under the SCA and the Wiretap Act for the use and disclosure of information obtained from electronic surveillance, not just its collection.  Defendants argue that plain language and the legislative history of Section 223 of the Patriot Act supports this limitation.  The Court finds this argument unpersuasive.

In construing the provisions of a statute, courts must "first look to the language of the statute to determine whether it has a plain meaning."  *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009); *see also United States v. Chaney*, 581 F.3d 1123, 1126 (9th Cir. 2009) ("It is well settled that statutory interpretation begins with the plain language of the statute.") (internal quotation marks and citation omitted).  "The preeminent canon of statutory interpretation requires us to presume that [the] legislature says in a statute what it means and

United States District Court

For the Northern District of California

1    means in a statute what it says there.  Thus, our inquiry begins with the statutory text, and ends

2    there as well if the text is unambiguous."  *McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir.

3    2008) (quoting *BedRoc Ltd., LLC v. United States,* 541 U.S. 176, 183 (2004)) (internal

4    quotation marks omitted).

5           The plain language of Section 2712(a) does not limit the waiver of sovereign immunity

6    for damage claims under the SCA and the Wiretap Act to claims for the use and disclosure of

7    information.  In Section 2712(a), Congress specifically limited the waiver for damage claims to

8    three specific sections of FISA and easily could have done the same with respect to the Wiretap

9    Act and the SCA.  The fact that Congress did not similarly limit the waiver to specific sections

10   within the Wiretap Act and the SCA has significance.  To ignore this distinction would be to

11   ignore the plain language and structure of the statute.  *Cf. TRW Inc. v. Andrews,* 534 U.S. 19, 31

12   (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole,

13   to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous,

14   void, or insignificant.") (internal quotation marks and citation omitted); *United States v. Novak*,

15   476 F.3d 1041, 1048 (9th Cir. 2007) ("We avoid whenever possible statutory interpretations

16   that result in superfluous language.").

17          Defendants argue that reading Section 223 of the Patriot Act as a whole demonstrates

18   that the waiver of sovereign immunity by Section 2712(a) is limited to claims regarding the use

19   and disclosure of information.  In support of this argument, Defendants rely upon the fact that

20   Section 223 was titled "Civil Liability for Certain Unauthorized Disclosures" and upon the fact

21   that other provisions of Section 223 specifically addressed claims for the use and disclosure of

22   information.  However, the Court finds this argument unpersuasive.  Neither the title of the

23   Section 223, nor the fact that Section 223 includes additional provisions that address claims

24   regarding the use and disclosure of information, alters the clear and unambiguous statutory

25   language.  Again, the Court emphasizes that Section 2712 explicitly limits the waiver to specific

26   provisions of FISA and does not limit the waiver to specific provisions within the Wiretap Act

27   or the SCA.  If Congress intended to limit the waiver to claims regarding the use and disclosure

28   claims within all three statutes, it could have done so.  The Court cannot ignore the fact that

United States District Court

For the Northern District of California

1    Congress chose to do so with respect to one of these statutes and did not with respect to the

2    other two.  *See Botosan v. Paul McNally Realty*, 216 F.3d 827, 832 (9th Cir. 2000) ("The

3    incorporation of one statutory provision to the exclusion of another must be presumed

4    intentional under the statutory canon of *expressio unius*.")

5           Next, Defendants invite the Court to read limitations into the waiver of sovereign

6    immunity from the legislative history of this statutory provision.  "[E]ven where the plain

7    language appears to settle the question, we may nonetheless look to the legislative history to

8    determine whether there is clearly expressed legislative intention contrary to that language that

9    overcomes the strong presumption that Congress has expressed its intent in the language it

10   chose." *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services, Inc.*,

11   435 F.3d 1140, 1146 (9th Cir. 2006).  In addition, the Ninth Circuit has stated that the "plain

12   meaning rule . . . does not require a court to operate under an artificially induced sense of

13   amnesia about the purpose of legislation, or to turn a blind eye towards significant evidence of

14   Congressional intent in the legislative history." *Amalgamated Transit Union Local 1309, AFL-*

15   *CIO v. Laidlaw Transit Services, Inc.*, 448 F.3d 1092, 1093 (9th Cir. 2006) (quoting *Heppner v.*

16   *Aleyeska Pipeline Serv. Co.*, 665 F.2d 868, 871 (9th Cir. 1981)).  Upon review of the legislative

17   history, the Court does not find "clearly expressed legislative intention contrary to that language

18   that overcomes the strong presumption that Congress has expressed its intent in the language it

19   chose." *Amalgamated Transit Union*, 435 F.3d at 1146.  Accordingly, the Court finds that

20   Section 2712 waives sovereign immunity for Plaintiffs' claims for damages under the Wiretap

21   Act and the SCA.

22           **2.       Statutory Claims for Injunctive Relief.**

23           Section 2712 is inapplicable to Plaintiffs' claims for injunctive relief.  Section 2712 only

24   applies to claims for damages.  Therefore, Plaintiffs must turn elsewhere to establish a waiver of

25   sovereign immunity.  To do so, Plaintiffs rely on Section 702 of the Administrative Procedure

26   Act ("APA") and on the common law *ultra vires* exception set forth in *Larson v. Domestic &*

27   *Foreign Commerce Corporation*, 337 U.S. 682 (1949).

28

United States District Court

For the Northern District of California

### a.   The Administrative Procedures Act.

Section 702 of the APA provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party . . . .  Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C § 702.  Defendants contend that Section 702 is inapplicable because it does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  *See id.*  Defendants argue that Section 223 of the Patriot Act is such a statute.

"'[W]hen Congress has dealt in particularity with a claim and [has] intended a specified remedy' – including its exceptions – to be exclusive, that is the end of the matter; the APA does not undo the judgment."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, --- U.S. ---, 132 S. Ct. 2199, 2205 (2012) (quoting *Block v. North Dakota ex rel. Board of Univ. and School Lands,* 461 U.S. 273, 286, n.22 (1976)) ("*Pottawatomi Indians*").  Section 223 of the Patriot Act amended the Wiretap Act, the SCA, and FISA to allow suits against the United States for damages.  The question presented here is whether, by granting authority to sue the United States for damages, the Patriot Act impliedly limited the authority to sue the United States for other types of relief, such as injunctive or declaratory relief.  The Court finds that it does.

With respect to the SCA and the Wiretap Act, Section 223 of the Patriot Act not only granted consent to sue the United States for damages, but it also explicitly deleted the United States from the provisions that permit an aggrieved person to sue for recovery and obtain relief, including "preliminary and other equitable or declaratory relief."  *See* Pub. L. No. 107–56 § 223, 115 Stat. 272 (2001) (amending 18 U.S.C. § 2520(a) and 18 U.S.C. § 2707(a) to insert

19

"other than the United States").  Therefore, the Court finds the intent of Congress in passing

Section 223 of the Patriot Act was to forbid injunctive and declaratory relief against the United

States under the SCA and the Wiretap Act.

Although the additional evidence on Congressional intent regarding the SCA and the

Wiretap Act noted above is lacking, the Court finds that the Patriot Act must still be read to

restrict the authority to sue the United States to suits for damages for the three specific statutory

provisions listed in § 2712.  Significantly, any ambiguities must be read in favor of the United

States' immunity from suit.  *See Federal Aviation Administration v. Cooper*, --- U.S. ---, 132 S.

Ct. 1441, 1448 (2012) ("Any ambiguities in the statutory language are to be construed in favor

of immunity . . . .").  Moreover, the Court notes that the Patriot Act's grant of authority to sue

under FISA is more restricted than the grant of authority to sue under the Wiretap Act and the

SCA.  Thus, it would be inconsistent to hold that the waiver of sovereign immunity is broader

with respect to FISA than to the Wiretap Act and the SCA.

Relying on *Pottawatomi Indians*, Plaintiffs argue that the exception to the waiver of

sovereign immunity in Section 702 does not bar their FISA claim for injunctive relief because

they are "bringing a different claim, seeking different relief" from the specific FISA provisions

listed in § 2712(a).  132 S. Ct. at 2209.  Plaintiffs' reliance on this case is misplaced.  In

*Pottawatomi Indians*, the Court held that the ban on bringing suit under the Quiet Title Act

("QTA") did not apply because the plaintiff was not bringing a claim under that statute.  *Id*. at

2208 (finding that the plaintiff was "not bringing a QTA suit at all").  Here, Plaintiffs

indisputably bring claims under FISA.  Thus, the issue is whether FISA, by allowing suits

against the United States only for damages based on three provisions of that statute, impliedly

bans suits against the United States that seek injunctive relief under any provision of FISA.  The

Court finds that it does.  Accordingly, Plaintiffs cannot rely on Section 702 of the APA for a

waiver of sovereign immunity.

**b.    The *Ultra Vires* Doctrine.**

Next, Plaintiffs seek to invoke the *ultra vires* exception to sovereign immunity of federal

officials as set forth in *Larson*.  Under this doctrine, "[i]f an employee of the United States acts

United States District Court

For the Northern District of California

completely outside of his governmental authority, he has no immunity." *United States v. Yakima Tribal Court* ("*Yakima Tribal Court*"), 806 F.2d 853, 859 (9th Cir. 1986); *see also Larson*, 337 U.S. at 689-90.

There is some question as to whether this doctrine survived the 1976 amendments to the APA. The Ninth Circuit has commented that "Congress observed that before the amendment to Section 702 [of the APA], litigants seeking . . . non-monetary relief were forced to resort to the 'legal fiction' of naming individual officers, rather than the government, as defendants, . . . an approach that was 'illogical' and 'becloud[ed] the real issue whether a particular governmental activity should be subject to judicial review, and, if so, what form of relief is appropriate.'" *See The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 524 (9th Cir. 1989) (quoting H. Rep. No. 1656, at 5, *reprinted in* 1976 U.S. Code Cong. & Admin. News 6121, 6125, 6128-29). The Ninth Circuit found it "significant that Congress referred disapprovingly to the *Ex parte Young* fiction, which permitted a plaintiff to name a government official as the defendant in equitable actions to redress government misconduct, on the pretense that the suit was not actually against the government." *Id*. at 525-26 (citing *Larson*, 337 U.S. at 689-91). The Circuit Court stated that "Congress' plain intent in amending Section 702 was to waive sovereign immunity for all such suits, thereby eliminating the need to invoke the *Young* fiction." *Id.* at 526; *see also Equal Employment Opportunity Commission v. Peabody Western Coal Co.*, 610 F.3d 1070, 1085 (9th Cir. 2010) (noting that in *Presbyterian Church (U.S.A.)*, the Circuit Court "explained that after § 702 was amended in 1976, it replaced the *Ex parte Young* fiction as the doctrinal basis for a claim for prospective relief[]" and that "since 1976 federal courts have looked to § 702 of the [APA] to serve the purposes of the *Ex parte Young* fiction in suits against federal officers.")

Nevertheless, there is case law in the Ninth Circuit, post-dating the amendments to the APA in 1976, that applies the *ultra vires* doctrine or at least suggests its continued existence. *See, e.g., Yakima Tribal Court*, 806 F.2d at 859 ("If an employee of the United States acts completely outside his governmental authority, he has no immunity.") (citing *Larson*, 337 U.S. at 689); *De Lao v. Califano*, 560 F.2d 1384, 1391 (9th Cir. 1977) (noting that courts have

United States District Court

For the Northern District of California

recognized two exceptions to sovereign immunity when suits are brought against government officials, including the *ultra vires* doctrine).  The Ninth Circuit has declined to address whether the *ultra vires* doctrine set forth in *Larson* exists in light of the wavier provided by Section 702 of the APA and has noted that the decisions in this area are "hopelessly inconsistent."  *Beller v. Middendorf*, 632 F.2d 788, 797 (9th Cir. 1980), *overruled on other grounds* by *Bowers v. Hardwick,* 478 U.S. 186 (1986).  While noting the confusion, the Ninth Circuit declined to attempt a reconciliation.  *Id.*  In the absence of clear authority holding that the *ultra vires* doctrine is no longer viable, the Court will not dismiss Plaintiffs' statutory claims for injunctive relief to the extent they are premised on the *ultra vires* doctrine because the 1976 amendments to the APA invalidated this doctrine.

However, to the extent the *ultra vires* doctrine survives, its scope is quite narrow.  First, the Court notes that an *ultra vires* claim may only be asserted against officers in their individual or personal capacity.  *See Larson*, 337 U.S. at 687-89.   Moreover, a claim that an officer was acting *ultra vires* "is different from the situation where an employee acting as a government agent, commits an act that is arguably a mistake of fact or law."  *Yakima Tribal Court*, 806 F.2d at 859.  An "[u]ltra vires claim[] rest[s] on the official's lack of delegated authority."  *Id*. at 860.  As the Supreme Court explained in the context of addressing the viability of the *ultra vires* doctrine against state officials, the *ultra vires* exception to sovereign immunity is "very narrow."  *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 114 n.25 (1984).  An officer "may be said to act *ultra vires* only when he acts 'without any authority whatever.'"  *Id*. at 102 n.11 (quoting *Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697, 716 (1982)) (White, J., concurring in judgment in part and dissenting in part) (finding that the test is whether there was no "colorable basis for the exercise of authority by state officials").  "[A]n *ultra vires* claim rests on 'the officer's lack of delegated power.  A claim of error in the exercise of that power is therefore not sufficient.'"  *Id*. (quoting *Larson,* 337 U.S. at 690).

In *Pennhurst*, the trial court's undisputed findings were that the residents of the state facility were "often physically abused or drugged by staff members . . . ."  *Pennhurst*, 465 U.S. at 92.  The Supreme Court held that the "[p]etitioners' actions in operating [the] mental health

22

United States District Court

For the Northern District of California

1    institution plainly were not beyond their delegated authority" and that the "essence" of the

2    respondents' claims was that the petitioners failed to provide services adequately.  *Id*. at 102

3    n.11.

4         Here, it is undisputed that Defendants have authority to conduct electronic surveillance.

5    In their claims for declaratory, injunctive and other equitable relief, Plaintiffs contend that

6    Defendants conducted electronic surveillance improperly, without following the proper

7    procedures, and in violation of FISA, the Wiretap Act and the SCA.  In essence, Plaintiffs

8    contend that the individual defendants erred in their exercise of their authority to conduct

9    electronic surveillance.  Such a claim does not fit within the narrow exception to sovereign

10   immunity under the *ultra vires* doctrine.

11        The fact that Plaintiffs are challenging a government-wide "program" bolsters the

12   Court's conclusion that Plaintiffs may not proceed under the narrow *ultra vires* exception.

13   "[T]he key question in addressing the sovereign immunity of the United States is 'whether the

14   relief sought in a suit nominally addressed to the officer is relief against the sovereign.'"

15   *Aminoil U.S.A., Inc. v. California State Water Resources Control Board*, 674 F.2d 1227, 1234

16   (9th Cir. 1982) (quoting *Larson*, 337 U.S. at 687).  Here, Plaintiffs seek to obtain relief from the

17   sovereign itself, under the guise of suing officials individually.  Plaintiffs allege that beginning

18   in early October 2011, then-President Bush, in concert with the other individual defendants,

19   authorized "a range of surveillance activities inside of the United States without any statutory

20   authorization or court approval."  (*Jewel* Complaint at ¶ 39.)  Plaintiffs label this alleged

21   activity as "the Program."  (*Id*.; *see also Jewel* Complaint at ¶ 42 ("The Program of domestic

22   surveillance authorized by the President and conducted by Defendants . . . .").  Plaintiffs seek to

23   halt this alleged governmental "Program."   Plaintiffs cannot obtain effective relief from "the

24   Program" by suing Defendants individually.[3]

25

26        [3] The Court's conclusion that Defendants are essentially seeking relief from the
     Government is further bolstered by the fact that Plaintiffs have not substituted in the current
27   officials whom they seek to sue in their official capacity.  Pursuant to Federal Rule of Civil
     Procedure 25, an action against an officer in her or her official capacity does not abate when
28   that officer ceases to hold office while the action is pending.  Instead, "[t]he officer's
     successor is automatically substituted as a party."  *See* Fed. R. Civ. P. 25(d).  Although the

United States District Court

For the Northern District of California

1    The Court concludes that Plaintiffs' statutory claims for injunctive relief may not

2  proceed under the *ultra vires* doctrine.  Therefore, the Court finds that sovereign immunity has

3  not been waived and grants Defendants' motion to dismiss on Plaintiffs' statutory claims for

4  injunctive relief.

5                                    **CONCLUSION**

6         For the foregoing reasons, the Court GRANTS Plaintiffs' motion for partial summary

7  adjudication by rejecting the state secrets defense as having been displaced by the statutory

8  procedure prescribed in 50 U.S.C. § 1806(f) of FISA.  The Court GRANTS Defendants'

9  motions to dismiss Plaintiffs' claims for damages under FISA and all statutory claims for

10  injunctive relief on the basis of sovereign immunity.  The Court RESERVES ruling on the

11  Defendants' motions for summary judgment on remaining non-statutory claims (counts 1-4 of

12  the *Jewel* Complaint and the fourth cause of action in the *Shubert* Complaint).

13         The Court shall require that the parties submit briefing on both the scope of FISA

14  preemption on the Plaintiffs' constitutional claims, specifically, whether the scope of the

15  preemption only provides a procedural mechanism for the review of submitted evidentiary

16  materials or whether the scope of FISA preemption is broader to foreclose altogether the

17  substantive constitutional claims.  Should the Court permit the constitutional claims to proceed

18  and find that § 1806(f) merely provides the mechanism for review of submitted materials,

19  Plaintiffs shall be tasked with the burden to establish standing to sue without resulting in

20  impermissible damage to ongoing national security efforts.  *See Clapper v. Amnesty*

21  *International USA*, 133 S. Ct. 1138, 1149 n.4 (2013) (noting that, pursuant to hypothetical *in*

22  *camera* proceedings permitted under § 1806(f), "the court's postdisclosure decision about

23  _____

24  text of Rule 25 applies only to actions against officers in their official capacity, Plaintiffs rely
     on the notes to the amendment to Rule 25 in 1961.  The notes provide that "[t]he amended
25  rule will apply to all actions brought by public officers for the government..." and to "actions
     to prevent officers from acting in excess of their authority or under authority not validly
26  conferred...."  *See* Fed. R. Civ. P. 25. Advisory Committee's Notes (citing *Ex parte Young*,
     209 U.S. 123).  The advisory committee explain that the Rule "will apply whenever effective
27  relief would call for corrective behavior by the one then having official status and power,
     rather than one who has lost that status and power through ceasing to hold office."  *Id*. (citing
28  *Larson*, 337 U.S. at 682).  Because the notes do provide that the officers' successors will be
     substituted in automatically when they are sued under the *ultra vires* doctrine as set forth in
     *Ex parte Young* and *Larson*, the Court substitutes in the current office holders.

1   whether to dismiss the suit for lack of standing would surely signal to the terrorist whether his

2   name was on the list of surveillance targets.")  Although the Court finds, at this procedural

3   posture, that Plaintiffs here do not allege the attenuated facts of future harm which barred

4   standing in *Clapper*, the potential risk to national security may still be too great to pursue

5   confirmation of the existence or facts relating to the scope of the alleged governmental

6   Program.

7          Further, the Court shall require briefing on the impact on the Defendants' assertion of

8   such a risk following the recent disclosure of the government's continuing surveillance

9   activities and the statement by the Director of National Intelligence that certain information

10  related to the "business records" provision of FISA should be declassified and immediately

11  released to the public.

12         In order to facilitate this process and set the schedule for such further briefing, the Court

13  shall conduct a case management conference on August 23, 2013 at 1:30 p.m.  The parties shall

14  submit a joint case management statement by no later than August 16, 2013.

15         **IT IS SO ORDERED.**

16

17  Dated:   July 23, 2013                                   _____
                                                            JEFFREY S. WHITE
18                                                          UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28

*United States District Court*
For the Northern District of California