TOP SECRET//TSP/SI ███████ //HCS//ORCON/NOFORN

STUART F. DELERY
Acting Assistant Attorney General
JOSEPH H. HUNT
Director, Federal Programs Branch
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
Special Litigation Counsel
MARCIA BERMAN
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20001
Phone: (202) 514-4782
Fax:    (202) 616-8460
*Attorneys for the United States and
Government Defendants Sued in their
Official Capacities*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CAROLYN JEWEL, *et al.* | ) No. 08-cv-4873-JSW |
| Plaintiffs, | ) **CLASSIFIED DECLARATION** |
| | ) **OF JAMES R. CLAPPER** |
| | ) **DIRECTOR OF NATIONAL** |
| v. | ) **INTELLIGENCE** |
| | ) |
| NATIONAL SECURITY AGENCY, *et al.* | ) **EX PARTE, IN CAMERA** |
| | ) **SUBMISSION** |
| Defendants. | ) |

Date: November 2, 2012
Time: 9:00 a.m.
Courtroom: 11 - 19th Floor
Judge Jeffrey S. White

I, James R. Clapper, do hereby state and declare as follows:

### (U) INTRODUCTION

1.    (U) I am the Director of National Intelligence (DNI) of the United States. I have

TOP SECRET//TSP/SI ███████ //HCS//ORCON/NOFORN

TOP SECRET//TSP/SI█████████//HCS//ORCON/NOFORN

held this position since August 9, 2010. In my capacity as the DNI, I oversee the United States Intelligence Community and serve as the principal intelligence adviser to the President. Prior to serving as the DNI, I served as the Director of the Defense Intelligence Agency from 1992 to 1995, the Director of the National Geospatial-Intelligence Agency from 2001 to 2006, and the Under Secretary of Defense for Intelligence from 2007 to 2010, where I served as the principal staff assistant and advisor to the Secretary and Deputy Secretary of Defense on intelligence, counterintelligence, and security matters for the Department of Defense. In my capacity as the Under Secretary of Defense for Intelligence, I simultaneously served as the Director of Defense Intelligence for the DNI.

2.      (U) The purpose of this declaration is to formally assert, in my capacity as the Director of National Intelligence and head of the United States Intelligence Community, the state secrets privilege and a statutory privilege under the National Security Act, *see* 50 U.S.C. § 403-1(i)(1), in order to protect intelligence sources and methods that are at risk of disclosure in the above-captioned case as well as in *Shubert v. Obama* (07-cv-00693) (M: 06-cv-1791). The statements made herein are based on my personal knowledge as well as on information provided to me in my official capacity as the Director of National Intelligence.

## (U) SUMMARY

3.      (U) In the course of my official duties, I have been advised of this lawsuit and the allegations at issue in the plaintiffs' complaints in the *Jewel* and *Shubert* actions. In personally considering this matter, I have executed a separate unclassified declaration dated September 12, 2012. Moreover, I have read and personally considered the information contained in the Public and the *In Camera, Ex Parte* Declaration of Frances J. Fleisch, National Security Agency (NSA), executed on September 11, 2012 (hereafter "Classified NSA Declaration"). Disclosure of the

TOP SECRET//TSP/SI█████████//HCS//ORCON/NOFORN                2

TOP SECRET//TSP/SI███████//HCS//ORCON/NOFORN

information covered by my and NSA's privilege assertions reasonably could be expected to cause exceptionally grave damage to the national security of the United States and, therefore, the information should be excluded from any use in this case. In addition, it is my judgment that sensitive state secrets concerning NSA's sources, methods and activities are so central to the subject matter of the litigation that any attempt to proceed in this case will substantially risk the disclosure of the classified privileged national security information described herein and will therefore risk exceptionally grave damage to the national security of the United States.

4.    (TS//TSP/SI███████//OC/NF)  As the NSA states, the allegations in this lawsuit put at risk of disclosure information concerning several highly classified and critically important NSA intelligence activities that commenced after the 9/11 terrorist attacks, which were subsequently transitioned to the authority of the Foreign Intelligence Surveillance Act ("FISA"), and continue to be utilized by the NSA. *See* Classified NSA Declaration ¶¶ 5-11; 27-51.

5.    (TS//TSP/SI███████//OC/NF)  In order to address plaintiffs' allegation that the NSA, with the assistance of telecommunication companies including AT&T and Verizon, has indiscriminately intercepted the content and obtained the communications records of millions of ordinary Americans as part of an alleged presidentially authorized "Program" after 9/11, *see, e.g., Jewel* Complaint at ¶¶ 2-13; 39-97; *Shubert* Second Amended Complaint (SAC) ¶¶ 1-7, 62-91, further litigation risks the disclosure of information concerning several classified NSA intelligence activities, sources and methods, ███████████████████ ███████████████████ in connection with NSA's (1) targeted content surveillance aimed at al-Qa'ida and affiliated terrorist organizations, pursuant to the Terrorist Surveillance Program ("TSP") and later pursuant to FISA authority; (2) the bulk collection and targeted analysis of non-content information about telephone and Internet

TOP SECRET//TSP/SI███████//HCS//ORCON/NOFORN    3

TOP SECRET//TSP/S█████████//HCS//ORCON/NOFORN

communications—critically important and highly sensitive activities that have also been conducted pursuant to Foreign Intelligence Surveillance Court ("FISC") orders, or other authority, and that enable the NSA to uncover the contacts ██████████████

████████████████████████████████████████; and (3) ████████████

███████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████. This lawsuit therefore puts at risk of disclosure information concerning essential foreign intelligence-gathering activities utilized to meet the extremely serious threat of another terrorist attack on the U.S. Homeland, a threat which I describe further below.

6. (TS//TSP/SI█████████//OC/NF) Accordingly, as set forth further below, I am asserting the state secrets privilege and the DNI's authority to protect intelligence sources and methods pursuant to 50 U.S.C. § 403-1(i)(1) to protect against the disclosure of the highly classified intelligence sources and methods put at issue in this case and vital to the national security of the United States, including: (1) any information that would tend to confirm or deny whether particular individuals, including the named plaintiffs, have been subject to the alleged NSA intelligence activities; (2) information concerning NSA intelligence sources and methods, including facts demonstrating that the content collection under the TSP was limited to specific al-Qa'ida and associated terrorist-related international communications and that the NSA did not and does not otherwise conduct a dragnet of content surveillance as plaintiffs allege; (3) facts that would tend to confirm or deny other intelligence activities authorized by the President after 9/11 and later transitioned to the authority of the FISA – that is, the existence of the NSA's bulk non-content (i.e., meta data) collection, and any information about those activities; and (4) █

TOP SECRET//TSP/SI█████████//HCS//ORCON/NOFORN    4

Classified *In Camera*, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI ██ ██ ██████ /HCS//ORCON/NOFORN

██████████████ I specifically concur with the NSA that public speculation about alleged NSA activities does not diminish the need to protect intelligence sources and methods from further exposure, and that official confirmation and disclosure of the classified privileged national security information described herein would cause exceptionally grave damage to the national security. For these reasons, as set forth further below, I request that the Court uphold the state secrets and statutory privilege assertions that I make herein, as well as the statutory privilege assertion made by the NSA pursuant to Section 6 of the National Security Agency Act, see 50 U.S.C. § 402 (note), and protect the information described in this declaration from disclosure.

## (U) CLASSIFICATION OF DECLARATION

7.    (S//SI//NF) Pursuant to the standards in Executive Order 13526, this declaration is classified as: TOP SECRET//TSP/SI ██ ██ /HCS//ORCON/NOFORN. The details concerning these classification markings are set forth in the Classified NSA Declaration at ¶¶ 12-15 and are briefly summarized here. Under Executive Order 13526, information is classified "TOP SECRET" if unauthorized disclosure of the information reasonably could be expected to cause exceptionally grave damage to the national security of the United States; "SECRET" if unauthorized disclosure of the information reasonably could be expected to cause serious damage to national security; and "CONFIDENTIAL" if unauthorized disclosure of the information reasonably could be expected to cause identifiable damage to national security. At the beginning of each paragraph of this declaration, the letters "U," "C," "S," and "TS" indicate respectively that the information is either UNCLASSIFIED, or is classified CONFIDENTIAL, SECRET, or TOP SECRET.

TOP SECRET//TSP/SI ██████ /HCS//ORCON/NOFORN    5

Classified *In Camera, Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI~~ ████████ ~~//HCS//ORCON/NOFORN

8.    • (S//SI//NF) Additionally, this declaration also contains Sensitive Compartmented Information (SCI), which is subject to special access and handling requirements because it involves or derives from particularly sensitive intelligence sources and methods. This declaration references communications intelligence, also referred to as special intelligence (SI), which is a subcategory of SCI that identifies information that was derived from exploiting cryptographic systems or other protected sources by applying methods or techniques, or from intercepted foreign communications. This declaration also references human intelligence (HCS), another subcategory of SCI that identifies information derived from individuals who provide intelligence information. ████████████████████

████████████████████████████

████

9.    (TS//TSP/SI~~ ████ ~~//OC/NF) This declaration also contains information about the Terrorist Surveillance Program (TSP), a controlled access signals intelligence program under presidential authorization in response to the attacks of September 11, 2001. Information pertaining to this program is denoted with the special marking "TSP." ████████████

████████████████████████

████████████████████████

██████████████

10.    (S//SI//NF) Finally, information labeled "NOFORN" may not be released to foreign governments, foreign nationals, or non-U.S. citizens without permission of the originator and in accordance with DNI policy. The "ORCON" designator means that the originator of the information controls to whom it is released.

TOP SECRET//TSP/S~~ ████ ~~//HCS//ORCON/NOFORN    6

Classified *In Camera, Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI-████████//HCS//ORCON/NOFORN

## (U) BACKGROUND ON DIRECTOR OF NATIONAL INTELLIGENCE

11.     (U) The position of Director of National Intelligence was created by Congress in the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. 108-458, §§ 1011(a) and 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004) (amending sections 102 through 104 of Title I of the National Security Act of 1947). Subject to the authority, direction, and control of the President, the Director of National Intelligence serves as the head of the U.S. Intelligence Community and as the principal adviser to the President, the National Security Council, and the Homeland Security Council for intelligence matters related to the national security. *See* 50 U.S.C. § 403(b)(1), (2).

12.     (U) The United States "Intelligence Community" includes the Office of the Director of National Intelligence; the Central Intelligence Agency; the National Security Agency; the Defense Intelligence Agency; the National Geospatial-Intelligence Agency; the National Reconnaissance Office; other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs; the intelligence elements of the military services, the Federal Bureau of Investigation, the Department of the Treasury, the Department of Energy, the Drug Enforcement Administration, and the Coast Guard; the Bureau of Intelligence and Research of the Department of State; the elements of the Department of Homeland Security concerned with the analysis of intelligence information; and such other elements of any other department or agency as may be designated by the President, or jointly designated by the DNI and heads of the department or agency concerned, as an element of the Intelligence Community. *See* 50 U.S.C. § 401a(4).

13.     (U) The responsibilities and authorities of the Director of National Intelligence are set forth in the National Security Act of 1947, as amended. *See* 50 U.S.C. § 403-1. These

TOP SECRET//TSP/SI-████████//HCS//ORCON/NOFORN

7

TOP SECRET//TSP/SI-████████████//HCS//ORCON/NOFORN

responsibilities include ensuring that national intelligence is provided to the President, the heads of the departments and agencies of the Executive Branch, the Chairman of the Joint Chiefs of Staff and senior military commanders, and the Senate and House of Representatives and committees thereof. *See* 50 U.S.C. § 403-1(a)(1). The DNI is also charged with establishing the objectives of, determining the requirements and priorities for, and managing and directing the tasking, collection, analysis, production, and dissemination of national intelligence by elements of the Intelligence Community. *Id.* § 403-1(f)(1)(A)(i) and (ii). The DNI is also responsible for developing and determining, based on proposals submitted by the heads of agencies and departments within the Intelligence Community, an annual consolidated budget for the National Intelligence Program for presentation to the President, for ensuring the effective execution of the annual budget for intelligence and intelligence-related activities, and for managing and allotting appropriations for the National Intelligence Program. *Id.* § 403-1(c)(1)-(5).

14. (U) In addition, the National Security Act of 1947, as amended, provides that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1). Consistent with this responsibility, the DNI establishes and implements guidelines for the Intelligence Community for the classification of information under applicable law, Executive orders, or other Presidential directives and access to and dissemination of intelligence. *Id.* § 403-1(i)(2)(A), (B). In particular, the DNI is responsible for the establishment of uniform standards and procedures for the grant of access to Sensitive Compartmented Information ("SCI") to any officer or employee of any agency or department of the United States, and for ensuring the consistent implementation of those standards throughout such departments and agencies. *Id.* § 403-1(j)(1), (2).

15. (U) By virtue of my position as the Director of National Intelligence, and unless

TOP SECRET//TSP/SI-████████████//HCS//ORCON/NOFORN   8

Classified *In Camera, Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI ███████ //HCS//ORCON/NOFORN

otherwise directed by the President, I have access to all intelligence related to the national security that is collected by any department, agency, or other entity of the United States. *See* 50 U.S.C. § 403-1(b); Executive Order 12333 § 1.3(a), as amended. Pursuant to Executive Order 13526, the President has authorized me to exercise original TOP SECRET classification authority.

## (U) ASSERTION OF STATE SECRETS PRIVILEGE

16. (U) After careful and actual personal consideration of the matter, based upon my own knowledge and information obtained in the course of my official duties, including the information contained in the Public and Classified *In Camera, Ex Parte* Declaration of Frances J. Fleisch, National Security Agency, I have determined that the disclosure of certain information—as set forth herein and described in more detail in the Classified NSA Declaration—would cause exceptionally grave damage to the national security of the United States and, therefore, must be protected from disclosure and excluded from this case. Thus, as to this information, I formally assert the state secrets privilege. In addition, it is my judgment that sensitive state secrets concerning NSA's sources, methods and activities are so central to the subject matter of the litigation that any attempt to proceed in the case will substantially risk the disclosure of the privileged information described herein and in more detail in the classified declarations, and will therefore risk exceptionally grave damage to the national security of the United States.

## (U) ASSERTION OF STATUTORY PRIVILEGE UNDER NATIONAL SECURITY ACT

17. (U) Through this declaration, I also hereby invoke and assert a statutory privilege held by the Director of National Intelligence under the National Security Act to protect the information described herein, *see* 50 U.S.C. § 403-1(i)(1). My assertion of this statutory

TOP SECRET//TSP/SI ███████ //HCS//ORCON/NOFORN   9

TOP SECRET//TSP/SI- ███████ //HCS//ORCON/NOFORN

privilege for intelligence sources and methods is coextensive with my state secrets privilege assertion.

## (U) INFORMATION SUBJECT TO ASSERTIONS OF PRIVILEGE

18.    (U)   In general and unclassified terms, the following categories of information are subject to my state secrets and statutory privilege assertions:

A.    (U) Information concerning the specific nature of the terrorist threat posed by al-Qa'ida and its affiliates and other threats to the United States; and

B.    (U) Information that may tend to confirm or deny whether the plaintiffs have been subject to any alleged NSA intelligence activity that may be at issue in this matter; and

C.    (U) Any information concerning NSA intelligence activities, sources, or methods that may relate to or be necessary to adjudicate plaintiffs' allegations, including allegations that the NSA, with the assistance of telecommunications carriers such as AT&T and Verizon, indiscriminately intercepts the content of communications and also collects the communication records of millions of Americans as part of an alleged "Program" authorized by the President after 9/11. *See, e.g., Jewel* Complaint ¶¶ 2-13; 39-97; *Shubert* SAC ¶¶ 1-9; 57-58; 62-91.

(U) The scope of this assertion includes but is not limited to:

(i) (U) Information concerning the scope and operation of the now inoperative "Terrorist Surveillance Program" ("TSP") regarding the interception of the content of certain one-end international communications reasonably believed to involve a member or agent of al-Qa'ida or an affiliated terrorist organization, and any other information related to demonstrating that the NSA does not otherwise engage in the content surveillance dragnet that the plaintiffs allege; and

(ii) (U) Information concerning whether or not the NSA obtained from telecommunications companies such as AT&T and Verizon communication transactional records as alleged in the Complaint; *see, e.g., Jewel* Complaint ¶¶ 10; 82-97; *Shubert* SAC ¶ 102; and

TOP SECRET//TSP/SI ███████ //HCS//ORCON/NOFORN        10

TOP SECRET//TSP/SI███████████//HCS//ORCON/NOFORN

(iii) (U) Information that may tend to confirm or deny whether AT&T or Verizon (and to the extent relevant or necessary, any other telecommunications carrier), provided assistance to the NSA in connection with any alleged activity, *see, e.g., Jewel* Complaint ¶¶ 2, 7-8, 10, 13, 50-97; *Shubert* SAC ¶¶ 6, 10-13; 66-68.

## (U) DESCRIPTION OF INFORMATION SUBJECT TO PRIVILEGE AND HARM OF DISCLOSURE

### A. (U) Information Concerning the al-Qa'ida Terrorist Threat

19.  (U) The intelligence activities, sources, and methods that are implicated by this lawsuit, and put at risk of disclosure in further proceedings, must be viewed and understood in the context of the threat faced by the United States. In unclassified terms, more than a decade after the September 11th attacks, we remain in a global conflict with al-Qa'ida and we face an evolving threat from its affiliates and adherents. America's campaign against terrorism did not end with the mission at Bin Ladin's compound. Indeed, the threats we face have become more diverse. As al-Qa'ida's core leadership struggles to remain relevant, the group has turned to its affiliates and adherents to carry out attacks and to advance its ideology. These groups are from an array of countries, including Yemen, Somalia, Nigeria, and Iraq. To varying degrees, these groups coordinate their activities and follow the direction of al-Qa'ida leaders in Pakistan. Many of the extremist groups themselves are multidimensional, blurring the lines between terrorist groups, insurgency, and criminal gangs.

20.  (U) For example, al-Qa'ida in the Arabian Peninsula (AQAP) remains of particular concern to the United States. The National Counterterrorism Center (NCTC) assesses that this is the most likely entity to attempt attacks in the west. Even in the wake of Anwar al-Aulaqi's death, this group maintains the intent and capability to conduct anti-US attacks with little to no warning. In its three attempted attacks against the US Homeland — the airliner plot of

TOP SECRET//TSP/SI███████████//HCS//ORCON/NOFORN    11

Classified *In Camera, Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI- ██████████ //HCS//ORCON/NOFORN

December 2009, an attempted attack against US-bound cargo planes in October 2010, and an airliner plot in May 2012 similar to the 2009 attempt -- AQAP has shown an awareness of the capabilities of Western security procedures and demonstrated its efforts to adapt. We remain concerned about AQAP's efforts to exploit the security vacuum associated with the Arab unrest, even though the group has suffered recent setbacks in these efforts. The death of al-Aulaqi probably temporarily slowed AQAP's external plotting efforts but did not deter the group from attempting another aviation attack in May 2012.

21.     (U) AQAP has attempted to continue publishing the English-language *Inspire* magazine—previously spearheaded by al-Aulaqi and now-deceased Samir Khan—in order to mobilize Western-based individuals for violent action. While the deaths of al-Aulaqi and Khan have affected the quality of the magazine, the publication endures and continues to reach a wide global audience of extremists.

22.     (U) Similarly, since the withdrawal of US forces from Iraq in 2011, al-Qa'ida in Iraq (AQI) has conducted nearly monthly simultaneous coordinated country-wide attacks against government, security, and Shia civilian targets in Iraq. During the past two years its media statements have reaffirmed the group's commitment to al-Qa'ida's global ideology and have encouraged attacks in the West. In July 2012, AQI's leader, Abu Du'a, a.k.a. Abu Bakr al-Baghdadi, issued his first public audio statement since taking over the group in 2010 in which he threatened to attack the US Homeland, praised the US defeat in Iraq, and applauded the actions of the Syrian population in rising up against the Asad regime. The statement included the phrase, "We say to those that have fallen out of communication, oh sleeping people wake up. Oh sitting people rise," which possibly is a call to Iraqi populations in and outside the region to become more involved in AQI activities.

TOP SECRET//TSP/SI- ██████████ //HCS//ORCON/NOFORN         12

Classified *In* Camera, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI-███████████//HCS//ORCON/NOFORN

23.    (U) AQI's propaganda statements have cited its support for uprisings against secular governments in the Middle East and North Africa, and in a June statement, the group expressed solidarity with the Syrian Sunni population. In January 2011, it published an explosives training video that called for lone wolf attacks in the West and against so-called apostate regimes in the Middle East.

24.    (U) During the past two years, American and Canadian authorities have arrested several North America-based AQI associates, highlighting the potential threat posed to the United States. In May 2011, the FBI arrested Kentucky-based Iraqi nationals Waad Alwan and Shareef Hamadi for attempting to send weapons and explosives from Kentucky to Iraq and conspiring to commit terrorism while in Iraq. Alwan pled guilty to supporting terrorism in December. In January 2010, Canadian authorities arrested dual Iraqi-Canadian citizen Faruq 'Isa who is accused of vetting individuals on the internet for suicide operations in Iraq.

25.    (U) We continue to monitor al-Shabaab and its foreign fighter cadre as a potential threat to the US Homeland, although the group is mainly focused on combating the ongoing Kenyan and Ethiopian incursions into Somalia which have eroded its territorial safehaven since late last year. The group, which formally merged with al-Qa'ida in February 2012, also remains intent on conducting attacks against regional and Western targets in East Africa, especially in countries supporting the Transitional Federal Government (TFG) and allied forces in Somalia. Probable al-Shabaab sympathizers recently conducted several low-level attacks in Kenya. Al-Shabaab leaders in the past have publicly called for transnational attacks, including threatening to avenge the January 2012 death of British national and al-Shabaab senior foreign fighter Bilal Berjawi.

26.    (U) Al-Qa'ida in the Lands of the Islamic Maghreb (AQIM) and Boko Haram

TOP SECRET//TSP/SI-███████████//HCS//ORCON/NOFORN        13

Classified In Camera, Ex Parte Declaration of James R. Clapper, Director of National Intelligence
Jewel et al. v. National Security Agency et al. (08-cv-4873-JSW)

TOP SECRET//TSP//SI-███████████//HCS//ORCON/NOFORN

have shown minimal interest in targeting the US Homeland and remain focused on local and regional attack plotting, including targeting Western interests including through kidnap-for-ransom operations. AQIM is actively working with local extremists in northern Mali to establish a safehaven from which to advance future operational activities. Boko Haram probably has an emerging awareness of US persons or entities in the US with connections to Nigeria. The group's spokesman in April publicly threatened to find a way to attack a US-based news organization if its coverage of Islam did not change.

27. (U) In addition, while most Pakistani and Afghan militant groups pose a more direct threat to U.S. interests and our allies in that region, the Intelligence Community continues to watch for indicators that any of these groups, networks, or individuals are actively pursuing or have decided to incorporate operations outside of South Asia as a strategy to achieve their objectives. Tehrik-e Taliban Pakistan (TTP) leaders have repeatedly threatened attacks against the U.S., including after the death of Bin Ladin in May 2011. NCTC assesses that TTP's claim of responsibility for the failed Times Square bombing in May 2010 demonstrates its willingness to act on this intent.

28. (U) To the extent classified information about the al-Qa'ida threat, from September 11, 2001 to the present, or the many other threats facing the United States, would be at issue in attempting to litigate this case, such information could not be disclosed without revealing intelligence sources, methods, and information of the United States and thereby causing exceptionally grave damage to the national security. Therefore, I assert the state secrets and DNI statutory privilege to protect such information from disclosure. Some of the classified threat information is described further below.

29. (S//OC/NF) The NCTC's current classified threat assessment underscores the

TOP SECRET//TSP//SI-███████████//HCS//ORCON/NOFORN    14

Classified In Camera, Ex Parte Declaration of James R. Clapper, Director of National Intelligence
Jewel et al. v. National Security Agency et al. (08-cv-4873-JSW)

TOP SECRET//TSP/SI████████//HCS//ORCON/NOFORN

continuing threat posed by al-Qa'ida and its affiliates. While NCTC assess that "core" al-Qa'ida is probably currently unable to carry out complex, coordinated, large-scale attacks in the West, the terrorist threat to the United States has diversified to include groups affiliated or allied with al-Qa'ida. For example, the NCTC assesses that Pakistan-based al-Qa'ida remains intent on conducting terrorist attacks inside the United States. Although the group's operational capabilities have been severely degraded by leadership losses and setbacks in recent years, the threat has not been eliminated. NCTC assesses that these terrorist adversaries remain determined to strike, including via smaller and simpler plots that may be more difficult to detect. Preventing attacks remains the Intelligence Community's highest priority. In this evolving threat landscape, the Intelligence Community continues to work together to disrupt terrorist plots against the US at home and overseas, to significantly degrade al-Qa'ida through relentless counterterrorism (CT) pressure in key global safe havens, and to share key information with domestic and international partners.

(1) (S//NF) Counterterrorism Successes Against al-Qa'ida

30. (S//NF) Major counterterrorism successes and momentous global events in recent years have altered the terrorist threat landscape in a way that lessens the direct threat of a large-scale, operationally complex, mass-casualty attack against the U.S. Homeland in the near-term.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

31. (S//NF) The deaths of Pakistan-based al-Qa'ida leader Usama Bin Ladin and

TOP SECRET//TSP/SI████████//HCS//ORCON/NOFORN    15

Classified *In Camera, Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI █████████//HCS//ORCON/NOFORN

AQAP planner Anwar al-Aulaqi in 2011 removed two of the most influential drivers of the terrorist threat against the Homeland. These two leaders provided strategic oversight and operational guidance for the majority of the most notable large-scale attacks and attempted attacks against the United States since 2001. Additionally, they were responsible for providing inspiration to a global audience of al-Qa'ida members, allies, and adherents about the necessity of attacking the "far" enemy in order to achieve the longstanding goal of the global jihad. In the

33. (S//NF) Al-Qa'ida has not conducted a successful attack in the West since 2005,

TOP SECRET//TSP/SI █████████//HCS//ORCON/NOFORN 16

Classified In Camera, Ex Parte Declaration of James R. Clapper, Director of National Intelligence
Jewel et al. v. National Security Agency et al. (08-cv-4873-JSW)

TOP SECRET//TSP/SI █████████ //HCS//ORCON/NOFORN

and last trained and deployed operatives to the United States for attacks in 2009. ██



(2)  (S//NF) The Continuing Threat of al-Qa'ida and its Global Affiliates.

34.  (TS//HCS██//OC/NF)  Notwithstanding the successes described above, al-Qa'ida and its global affiliates continue to pose a threat to the Nation's security. Pakistan-based al-Qa'ida continues to demonstrate some intent to conduct attacks against the US. Intelligence reporting indicates that al-Qa'ida leader Ayman al-Zawahiri is maintaining Bin Ladin's desire to strike the United States, and looking to leverage the group's affiliates as a means to overcome their own operational constraints. NCTC assesses that the group almost certainly would attempt to attack the United States if resources, including viable operatives, were available. Zawahiri

██ Al-Qa'ida's prospects for rebounding from its weakened state are low and depend on its ability to protect its Pakistan-based cadre and global influence, while addressing deficiencies in leadership and operational capabilities. Despite its shrinking leadership cadre, persistent unrest in places such as Yemen, Libya, Syria, and Egypt, and the impending withdrawal of U.S. forces from Afghanistan, may provide core al-Qa'ida an opportunity to al-Qa'ida a propaganda

TOP SECRET//TSP/SI █████████ //HCS//ORCON/NOFORN          17

Classified *In Camera, Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI ███ █████████ //HCS//ORCON/NOFORN

opportunity to claim victories over the US and reinvigorate its image as the leader of the global movement.

35.   (TS//HCS/ ██ /OC/NF) ████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

36.   (S//NF) In addition, against this backdrop of a weakened core al-Qaʻida, NCTC assesses that in the coming years the U.S. will be facing a more interdependent and diverse terrorist threat than we have experienced to date, which will likely be more difficult to detect. An expanded set of terrorist adversaries ██████████████████████ ██████ in recent years have carried on al-Qaʻida's mantle and attempted to strike in and against the U.S. Homeland. Al-Qaʻida's affiliate groups are likely to remain committed to al-Qaʻida's ideology and to seek opportunities to strike US interests in their operating areas or in the West. The intent and capability of each affiliate to conduct transnational attacks varies widely, however, in large part because of their focus on achieving local and regional goals. However, increasing collaboration between al-Qaʻida's affiliates will further shift the focal point of the global jihad away from South Asia, in particular as the groups share expertise, advice and inspiration in ways that improve their attack capabilities and/or understanding of our counterterrorism capabilities and tactics.

37. (TS//HCS/ ██ /OC/NF) AQAP continues its efforts to conduct attacks against in the region and in the West. AQAP remains committed to its regional agenda ███████████

TOP SECRET//TSP/SI ███ █████████ //HCS//ORCON/NOFORN       18

Classified *In Camera, Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)



TOP SECRET//TSP/SI████████//HCS//ORCON/NOFORN

████████ Additionally, periodic reporting reveals AQAP intentions to conduct attacks in neighboring Gulf States ████████. AQAP is bolstering its ability to target the West by investigating diverse tactics, identifying potential targets, and seeking operatives suitable for operations in the West.

38. (TS//HCS████//OC/NF) AQAP as of ████ 2012 was pursuing multiple plots against ████ diplomatic officials in Sanaa,

39. (TS//HCS████//OC/NF)

Classified *In Camera*, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI████████████//HCS//ORCON/NOFORN

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

█ ██ ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████

█ ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████.

    (3)    (S//NF)  **Al-Qa'ida's Weapons and Tactics**

42.    (S//NF) The continuing al-Qa'ida threat can also be seen in the type of weapons

TOP SECRET//TSP/SI████████████//HCS//ORCON/NOFORN    20

Classified *In Camera, Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI ██████████████ //HCS//ORCON/NOFORN

and tactics it may employ. ████████████████████████████████

████████████████████████████████████████

██████████████████████ In its propaganda al-Qa'ida has encouraged "lone-wolf" extremists to conduct Homeland small arms attacks because firearms are easy to acquire and use effectively in the US, an assertion borne out by a number of homegrown violent extremists' small-arms attacks and disrupted plots over the past 3 years. ████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ Al-Qa'ida-inspired extremists will attempt to exploit emerging consumer technologies for building, concealing and triggering IEDs, and leverage online resources to provide the know-how for new attack methods ████████████

████████████████████

43.   (S//NF) ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████ ██ ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

TOP SECRET//TSP/SI ██████████████ //HCS//ORCON/NOFORN     21

Classified *In Camera, Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI ███████████ //HCS//ORCON/NOFORN

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

    (4)  (S//NF) ██████████████████

44.  (TS//HCS//OC//NF) ████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

45.  (S//NF) ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

TOP SECRET//TSP/S ███████████ //HCS//ORCON/NOFORN

Classified *In Camera*, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI████████//HCS//ORCON/NOFORN



46.   (U) In sum, a variety of entities continue to pose a significant threat to the nation's security. The Government is utilizing all lawful intelligence gathering capabilities, including those set forth in the Classified NSA Declaration, to meet these threats and to protect the American people. I set forth this information not only to provide the Court with background information necessary to understand why the intelligence activities implicated by or directly at issue in this case are being undertaken, but also to assert a claim of privilege over classified threat information. The Government cannot disclose classified threat information in addressing plaintiffs' allegations or other issues in this case, or even in publicly supporting its assertion of privilege, because to do so would disclose to our adversaries what we know of their plans and how we may be obtaining information about them. Such disclosures would lead our adversaries

TOP SECRET//TSP/SI████████//HCS//ORCON/NOFORN                23

Classified *In* Camera, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI███████████//HCS//ORCON/NOFORN

not only to alter their plans, but also to implement greater security for their communications, thereby increasing the risk of non-detection. In addition, disclosure of threat information might reveal human sources for the United States, compromise those sources, and put lives in danger. Accordingly, although I believe that classified threat information is crucial to understanding the importance to our national security of the NSA intelligence activities, sources, and methods implicated by the plaintiffs' allegations, I must assert the state secrets privilege and the DNI's statutory privilege over this classified threat information because of the exceptionally grave danger to national security that could reasonably be expected to result from its disclosure.

**B.    (U) Information That May Tend to Confirm or Deny Whether the Plaintiffs Have Been Subject to the Alleged NSA Intelligence Activities.**

47.    (U) Next, I am also asserting privilege over information that would reveal whether particular individuals, including the named plaintiffs in this lawsuit, have been subject to the alleged NSA intelligence activities. Disclosure of such information would cause exceptionally grave damage to the national security.

48.    (TS//TSP/SI//OC/NF) ███████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████. Accordingly, I assert the state secrets and DNI statutory privilege as to this information.

TOP SECRET//TSP/SI███████████//HCS//ORCON/NOFORN    24

Classified *In Camera*, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI-████████████//HCS//ORCON/NOFORN

49.    (U) The NSA cannot publicly confirm or deny whether any particular individual is subject to surveillance activities. If the NSA were to reveal that an individual is the target of surveillance, the collection capability relating to that individual would certainly be compromised. On the other hand, if the NSA were to reveal that an individual is not the target of surveillance, adversaries would know that a particular individual has avoided surveillance and is a secure source for communicating. Moreover, providing assurances to those individuals who are not being targeted quickly becomes unworkable when faced with a case in which an individual has in fact been targeted. If the NSA were to confirm that any specific individual is not the target of surveillance, but later refuse to confirm or deny that information in a case involving an actual target, it would be apparent that surveillance was occurring in the latter case. The only recourse for the NSA is to neither confirm nor deny whether someone has been targeted or subject to NSA activities, regardless of whether the individual has been targeted or not. To say otherwise when challenged in litigation would result in the frequent, routine exposure of NSA information, sources, and methods, and would severely undermine surveillance activities in general.

C.    (U) Information Concerning NSA Activities, Sources, or Methods.

50.    (U) Furthermore, I am asserting privilege over any other facts concerning NSA intelligence activities, sources, or methods that may relate to or be necessary to adjudicate the plaintiffs' claims, including allegations that the NSA, with the assistance of telecommunications companies including AT&T and Verizon, has indiscriminately intercepted the content and obtained the communications records of millions of ordinary Americans as part of an alleged presidentially authorized "Program" after 9/11. *See, e.g., Jewel* Comp. ¶¶ 2-13; 39-97; *Shubert* SAC ¶¶ 1-9; 62-91 As noted above, my privilege assertion encompasses (1) facts concerning the operation of the now-defunct Terrorist Surveillance Program, including any facts needed to

TOP SECRET//TSP/SI-████████████//HCS//ORCON/NOFORN          25

TOP SECRET//TSP/SI ██████████ //HCS//ORCON/NOFORN

demonstrate that the TSP was limited to the interception of the content[1] of one-end foreign communications reasonably believed to involve a member or agent of al-Qa'ida or an affiliated terrorist organization, and that the NSA does not otherwise conduct a dragnet of content surveillance as the plaintiffs allege; and (2) information concerning whether or not the NSA obtains transactional communication records from telecommunications companies such as AT&T and Verizon as plaintiffs allege.

51.  (U) As the NSA indicates, *see* Public NSA Declaration ¶ 11, the NSA's collection of the content of communications under the TSP was directed at international communications in which a participant was reasonably believed to be associated with al-Qa'ida or an affiliated organization.  Thus, as the Government has previously stated, plaintiffs' allegation that the NSA has indiscriminately collected the content of millions of communications sent or received by people inside the United States after 9/11 under the TSP is false.  I concur with the NSA that to the extent it must demonstrate in this case that the TSP was not the content dragnet plaintiffs allege, or demonstrate that the NSA has not otherwise engaged in the alleged content dragnet, highly classified NSA intelligence sources and methods about the operation of the TSP and other NSA intelligence activities would be disclosed which would cause exceptional harm to national security.[2]

---

[1] (U) The term "content" is used herein to refer to the substance, meaning, or purport of a communication, as defined in 18 U.S.C.§ 2510(8).

[2] (U) The Government has publicly confirmed that, in addition to the "Terrorist Surveillance Program," other intelligence activities were authorized by the President after the 9/11 attacks in a single authorization that was periodically reauthorized. *See* Unclassified Inspector General Report on the President's Surveillance Program (10 July 2009) ("IG Rept.") at 5, available at www.dni.gov/files/documents/Newsroom/Reports and Pubs/report_071309.htm. However, those other intelligence activities remain highly classified, *see* Public IG Rept. at 5, and subject to the DNI privilege assertions. As the IG report also indicates, activities that were originally authorized by the President along with the TSP were subsequently authorized under orders issued by the FISC. *See* Public IG Rept. at 30. As a result of this transition, the final

TOP SECRET//TSP/SI ██████████ //HCS//ORCON/NOFORN    26

Classified *In* Camera, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI-███████████//HCS//ORCON/NOFORN

52.    (U) I am also asserting privilege over information concerning whether or not the NSA obtained from telecommunications companies such as AT&T and Verizon the complete and allegedly ongoing disclosure of private telephone and Internet transactional records of those companies' millions of customers. I concur with the NSA that confirmation or denial of any information concerning this allegation would cause exceptionally grave harm to national security, including by risking disclosure of whether or not the NSA utilizes particular intelligence sources and methods and, thus, the NSA's capabilities or lack thereof.

53.    (TS//TSP/SI//OC/NF) In particular, as set forth in the Classified NSA Declaration, the United States faced urgent and immediate intelligence challenges after the September 11 attacks, and undertook signals intelligence activities pursuant to presidential authorization that were designed to meet those challenges and to detect and prevent future terrorist attacks by al-Qa'ida and its affiliates. Those activities include the TSP and similar sources and methods of content surveillance that later became subject to FISA authority, as well as the bulk collection of telephony and Internet non-content meta data that was also later transitioned to FISA authority and used to discover contacts ████████████ ████████████ *See* Classified NSA Declaration ¶¶ 27-51.

54.    (U) Based on my personal consideration and judgment as to the harm disclosure would cause to national security, my privilege assertion includes, but is not limited to, the following activities discussed in the Classified NSA Declaration.

55.    (TS//TSP/SI//OC/NF) First, I assert privilege over facts concerning the operation of the TSP and any other NSA intelligence activities needed to demonstrate that the TSP was

presidential authorization for the Presidential Surveillance Program activities authorized after the 9/11 attacks expired on February 1, 2007. *Id.* at 30. To the extent plaintiffs' allegations seek to put at issue the nature of these other classified activities, they are encompassed by my privilege assertion in this litigation as well.

Classified *In Camera, Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI ███████████ //HCS//ORCON/NOFORN

limited to the interception of one-end foreign communications reasonably believed to involve a member or agent of al-Qa'ida or an affiliated terrorist organization, and that the NSA does not otherwise conduct a dragnet of content surveillance as the plaintiffs allege. Such facts include those concerning (1) how targets were selected under the TSP; (2) how specific methods were used under the TSP to intercept telephone and Internet communications and to minimize the risk of collecting non-target communications and purely domestic communications; (3) the nature and identity of the targets under the TSP, ███████████████; (4) and additional classified details about the operation of the TSP that would be necessary to litigate the plaintiffs' allegations (to the extent relevant) including facts concerning the operational swiftness and agility of the TSP, particularly in conjunction with meta data analysis; ███████████ ███████████████████; and the effectiveness and success of the TSP; and (5) other NSA surveillance activities that may be needed to address and disprove the content dragnet allegations, ███████████████████████

████████ *See* Classified NSA Declaration ¶¶ 63-73. In my judgment, revealing or risking disclosure of the foregoing NSA intelligence activities, sources, and methods in order to show that the NSA is not conducting the "dragnet" on the content of communications that plaintiffs allege would cause exceptional harm to national security by disclosing to our adversaries the ability of the United States to monitor and track their activities and communications.

56. (TS//TSP/SI//OC/NF) Second, I also assert privilege over facts that would disclose or describe the NSA's meta data collection activities. *See* Classified NSA Declaration ¶¶ 74-83. In my judgment, the NSA is unable to disclose any information about the existence or operation of the NSA's bulk collection or targeted analysis of Internet or telephony metadata

TOP SECRET//TSP/SI ███████ ███████ //HCS//ORCON/NOFORN    28

Classified *In* Camera, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI ███████████ //HCS//ORCON/NOFORN

without causing exceptionally grave harm to national security. These are among the most important intelligence tools the NSA uses, and they have never been officially confirmed or denied by the United States. Disclosing or confirming these activities would seriously undermine an essential tool for tracking possible terrorist plots and would help foreign adversaries evade detection. Such a disclosure would also undermine ongoing intelligence operations authorized by the FISC.

57.    (TS//TSP/SI//OC/NF) Finally, I also assert privilege over information concerning NSA activities conducted pursuant to FISA authority and Executive Order 12333, as described by the NSA. *See* Classified NSA Declaration ¶¶ 37-51; 84. In my judgment, disclosure of current surveillance activities under these authorities, either directly or indirectly, would seriously compromise, if not destroy, vital ongoing intelligence operations. My privilege assertion extends to the existence of any information concerning the (i) FISC Pen Register Order, as subsequently reauthorized until its expiration in December, 2011, *see id.* ¶¶ 48-51; (ii) FISC Telephone Business Records Order, as subsequently reauthorized, *see id.* ¶ 47; ███████ ████████████████████████ (iv) FISC Foreign Telephone and Email Order, *see id.* ¶¶ 38-40; (v) particular NSA sources and methods utilized under authority of the Protect America Act and the FISA Amendments Act of 2008, including directives issued to particular telecommunication carriers under those Acts, *see id.* ¶¶ 41-45; and (vi) NSA's use of similar sources and methods pursuant to Executive Order 12333, see id. ¶ 82.

58.    (TS//TSP/SI//OC/NF) I concur with the NSA that the activities discussed herein and described further by the NSA--in particular the meta data collection activities--are among the most important intelligence tools available to the United States for protecting the Homeland from another catastrophic terrorist attack. I also concur that ████████████████████████

TOP SECRET//TSP/SI ███████████ /HCS//ORCON/NOFORN        29

Classified *In* Camera, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI ███████████ //HCS//ORCON/NOFORN

███████████████████████████████████████

███████████████████████████████████████

████████ ██████████████████████ s. In my judgment, after personal consideration of the matter, disclosing the information described herein and by the NSA would compromise these critical activities, sources, and methods, thereby helping our adversaries evade detection and causing exceptionally grave damage to the national security of the United States.

**D.    (U) Plaintiffs' Allegations that Certain Telecommunications Carriers Provided Assistance to the NSA with the Alleged Activities.**

59.    (U) In addition, I am asserting privilege over information that may tend to confirm or deny whether or not AT&T, Verizon, or to the extent necessary, any other particular telecommunications provider, has assisted the NSA with alleged intelligence activities. The disclosure of any information that would tend to confirm or deny allegations of such assistance would cause exceptionally grave harm to the national security. Confirming or denying such allegations, again, would reveal to foreign adversaries whether or not the NSA utilizes particular intelligence sources and methods and, thus, either compromise actual sources and methods or disclose that the NSA does not utilize a particular source or method. Such confirmation or denial would also replace speculation with certainty for hostile foreign adversaries who are balancing the risk that a particular channel of communication may not be secure against the need to communicate efficiently.

60.    (TS//TSP/SI ███████ //OC/NF) ███████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████

██████████████████████████████████

TOP SECRET//TSP/SI ███████████ //HCS//ORCON/NOFORN          30

TOP SECRET//TSP/SI█████████//HCS//ORCON/NOFORN

[3] (TS//TSP/SI████████//OC/NF) In addition, I have reviewed the classified certification of then-Attorney General Mukasey submitted to the Court pursuant to Section 802 of the FISA Act Amendments Act of 2008 and assert privilege over specific information described therein,████████████████████

TOP SECRET//TSP/SI████████//HCS//ORCON/NOFORN    31

Classified *In Camera*, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI ████████ //HCS//ORCON/NOFORN

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

██████████████████████████████

██  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████ . Accordingly, I assert the state secrets and DNI statutory privilege over such

████████████████████████████████████████

████████████

### (U) RISK OF LITIGATION

64.  ~~(TS//TSP/SI//OC/NF)~~ Finally, I concur with the NSA that further litigation of this case will inherently risk the disclosure of highly classified activities. While plaintiffs wrongly allege that the NSA is conducting a dragnet program of content surveillance, disproving plaintiffs' speculation would risk or require revealing NSA intelligence activities, sources and methods, including bulk metadata collection activities. Those vital activities, as described herein, are highly classified, sensitive, and fragile, and any effort to disclose information about

Classified *In* Camera, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)

TOP SECRET//TSP/SI██████████//HCS//ORCON/NOFORN

them could have grave consequences for the national security.

## (U) CONCLUSION

65.    (U) In sum, I am asserting the state secrets privilege and the DNI's statutory privilege set forth in 50 U.S.C. § 403-1(i)(1) to protect the classified national security information described herein and in the Classified NSA Declaration.  Moreover, because proceedings in this case risk disclosure of privileged and classified intelligence-related information, I respectfully request that the Court not only protect that information from disclosure, but take all steps necessary, including dismissal of this action, to protect the intelligence information, sources, and methods described herein in order to prevent exceptional harm to the national security of the United States.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: September _11_, 2012

JAMES R. CLAPPER
Director of National Intelligence

TOP SECRET//TSP/SI██████████//HCS//ORCON/NOFORN          33

Classified *In Camera*, *Ex Parte* Declaration of James R. Clapper, Director of National Intelligence
*Jewel et al. v. National Security Agency et al.* (08-cv-4873-JSW)