Pages 1 - 98

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

| | |
|---|---|
| CAROLYN JEWEL, TASH HEPTING, *et al.*,    ) | |
| ) | |
| ) | |
| Plaintiffs,    ) | |
| ) | NO. C 08-04373 JSW |
| vs.    ) | |
| ) | |
| NATIONAL SECURITY AGENCY, *et al.*,    ) | |
| ) | |
| ) | |
| Defendants.    ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯) | |
| ) | |
| FIRST UNITARIAN CHURCH OF LOS ANGELES, *et al.*,    ) | |
| ) | |
| ) | |
| Plaintiffs,    ) | |
| ) | NO. C 13-03287 JSW |
| vs.    ) | |
| ) | |
| NATIONAL SECURITY AGENCY, *et al.*,    ) | |
| ) | San Francisco, California |
| Defendants.    ) | Wednesday, March 19 2014 |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯) | 2:00 p.m. |

### AMENDED TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

| | |
|---|---|
| **For Plaintiffs Jewel, *et al.*:** | Electronic Frontier Foundation |
| | 815 Eddy Street |
| | San Francisco, CA 94109 |
| | (415) 436-9333 |
| | (415) 436-9993 (fax) |
| **BY:** | **CINDY COHN** |
| | **DAVID GREENE** |
| | **KURT OPSAHL** |
| | **MARK RUMOLD** |

Reported By:  Lydia Zinn, CSR No. 9223, Official Reporter

**APPEARANCES CONTINUED**

| | |
|---|---|
| **For Plaintiffs** | Law Office of Richard R. Wiebe |
| **Jewel**, *et al.*: | One California Street, Suite 900 |
| | San Francisco, CA  94111 |
| | (415) 433-3200 |
| | (415) 433-6382 (fax) |
| **BY:** | **RICHARD WIEBE** |

| | |
|---|---|
| **For Defendants** | U.S. Department of Justice |
| **National Security** | Civil Division |
| **Agency**, *et al.*: | 20 Massachusetts Avenue NW., Room 6102 |
| | Washington, D.C.  20001 |
| | (202) 514-4782 |
| **BY:** | **MARCIA BERMAN** |
| | **JAMES J. GILLIGAN** |
| | **RODNEY PATTON** |

| | |
|---|---|
| **For Defendant** | National Security Agency |
| **National Security** | 9800 Savage Road |
| **Agency:** | Fort Meade, MD  20755 |
| **BY:** | **CHAD BAYSE** |

1          THE COURT:   Good afternoon.  Please be seated.

2          THE CLERK:   Calling Case Number C. 08-4373,

3   *Caroyln Jewel, et al. versus National Security Agency, et al.*,

4   and Case Number C. 13-3287, *First Unitarian Church of Los*

5   *Angeles, et al., versus National Security Agency, et al.*

6      Counsel, please step forward to the podiums and state your

7   appearances.

8          MS. COHN:   Good afternoon, Your Honor.  Cindy Cohn,

9   for the plaintiffs in both cases.

10          THE COURT:   Good afternoon.

11          MR. WIEBE:   Good afternoon, Your Honor.

12   Richard Wiebe, for the plaintiffs in *Jewel* and *First Unitarian*.

13          THE COURT:   Good afternoon.

14          MR. OPSAHL:   Good afternoon, Your Honor.

15   Kurt Opsahl, for the plaintiffs in *Jewel* and *First Unitarian*.

16          THE COURT:   Good afternoon.

17          MR. GREENE:   Good afternoon, Your Honor.

18   David Greene, for the plaintiffs.

19          THE COURT:   Good afternoon.

20          MR. RUMOLD:   Good afternoon, Your Honor.

21   Mark Rumold, for plaintiffs.

22          THE COURT:   Good afternoon.

23          MR. GILLIGAN:   Good afternoon, Your Honor.

24   James Gilligan, with the Department of Justice, for the

25   Government Defendants.

1          THE COURT:   Good afternoon.

2          MS. BERMAN:   Good afternoon, Your Honor.

3  Marcia Berman, also from the Department of Justice, for the

4  Government Defendants.

5          THE COURT:   Good afternoon.

6          MR. PATTON:   Rodney Patton, from the Department of

7  Justice.

8          THE COURT:   Good afternoon.

9          MR. BAYSE:   Chad Bayse, with NSA.

10          THE COURT:   All right.  Welcome.  All right.  Before

11  we get started, I have a couple of comments I'd like to make.

12  As the parties know, now before the Court is Plaintiffs'

13  request for a leave regarding the Government's preservation

14  duties in both *Jewel versus NSA*, and *First Unitarian Church*

15  *versus NSA*.

16      Together, these related cases challenge the lawfulness of

17  the National Security Agency's collection of

18  communications-surveillance materials first authorized by

19  Executive Order of the President in October 2001 following the

20  terrorist attacks of September 11th, and continuing to the

21  present time under the supervision of the Foreign Intelligence

22  Surveillance Court.

23      The issues raised by the preservation of evidence in these

24  matters requires the Court to balance important competing

25  policies within our structure of government.  On the one hand,

1  the Court must weigh the critical mission of the

2  National Security Agency to protect citizens from real

3  terrorist threats, and the Government's obligations under

4  federal statute to protect the collective surveillance

5  materials from possible dissemination or misuse.  On the other

6  hand, the Court must balance the significant constitutional

7  challenge made by plaintiffs here to the Government's

8  collection efforts, and must protect the integrity of the court

9  system to preserve evidence relevant to ongoing litigation.

10      However, the hearing today is limited in scope.  It is not

11  about the substantive content of the Plaintiffs' challenge to

12  the governmental surveillance efforts.  And although this Court

13  is concerned about the Government's compliance with its prior

14  preservation orders, this hearing conducted to address the

15  emergency issue of the Government's impending directive to

16  destroy evidence is not about enforcement of this Court's

17  earlier preservation orders.  That is appropriately the subject

18  of further briefing by the parties, and further nonurgent

19  consideration by this Court.

20      The record should also reflect that yesterday, the Court

21  had reviewed all of the classified documents filed to date in

22  this matter, as well as the briefs, and public submissions made

23  by the parties.

24      In order to make the record clear, given the public

25  interest in these proceedings and the fact that it's being

1    videotaped, the Court will depart from its normal procedures,

2    and -- where I don't read questions into the record, and will

3    read the questions issued yesterday by the Court, and have the

4    parties address each of them in turn.

5        So starting right off with the questions, the first

6    question, which I --

7        And most -- many of these questions are addressed in the

8    first instance to the Government Defendants.  That may change

9    with respect to other ones; but of course, I will give all of

10   the plaintiffs an opportunity to respond.

11       So the first question is as follows.  Assuming without

12   deciding that the Preservation Order in *Jewel* does not cover

13   the retention or destruction of materials subject to orders of

14   the Foreign Intelligence Surveillance Court, or FISC, what is

15   the fundamental difference in the position of the Government

16   now on the argument that materials subject to FISC orders are

17   not similarly subject to preservation for discovery to

18   plaintiffs in *First Unitarian Church*?

19       And, just to complete the question, having made many of the

20   same arguments which failed to persuade the Court when it

21   issued the preservation order in the multidistrict litigation

22   and in *Jewel*, why should the Court be persuaded now that the

23   content of the materials allegedly collected under FISC

24   supervision, and clearly subject to the claims in *First*

25   *Unitarian*, should be subject to different preservation

1  treatment than the material allegedly collected under

2  Presidential directive, and clearly subject to the claims in

3  *Jewel*?

4      So I'll first hear from the defendant attorneys, and then

5  I'll hear from Plaintiffs' counsel.

6      And it would help the Court, at least throughout the

7  hearing, if you would just reintroduce yourself each time you

8  speak, so that it's clear to the reporter and to the recording

9  who is actually speaking.

10         **MR. GILLIGAN:**  Very well, Your Honor.  James Gilligan

11  again, for the Government.

12         **THE COURT:**  Yes.

13         **MR. GILLIGAN:**  Your Honor, just to start with a point

14  of clarification regarding this question, we take the Court's

15  question to be focused on the telephony metadata that are

16  subject to the five-year retention limit under FISC's orders,

17  because apart from that, as a general matter, we are -- that is

18  to say, the Government is preserving data and information

19  regarding the collection of telephony metadata pursuant to

20  Section 215 under FISA.  There's no dispute there that that

21  relevant information should be collected.

22      But we -- the concern here -- and I think this would be the

23  focus of my answer -- is the telephony metadata that were

24  subject to the age-off requirements under the FISC's orders.

25         **THE COURT:**  That's correct.  Especially -- and the

1 occasion, of course, for the Court's issuing of the Temporary

2 Restraining Order plus having this hearing is because of the

3 potentially imminent threat that these documents or this

4 metadata would be destroyed pursuant to federal statute, under

5 the guidance of the FISC court.  So you're correct in your

6 assumption.

7          **MR. GILLIGAN:**  Okay.  Thank you, Your Honor.

8      Well, there are essentially, as we see it, three

9 differences, then, between the telephony metadata collected

10 pursuant to FISC orders, and the telephony metadata previously

11 under Presidential authority that we are continuing to

12 preserve, pursuant to the orders in *Jewel* and in the

13 multidistrict litigation.

14      Well, the first difference that I'll mention is, as opposed

15 to the static set of data that were collected under

16 Presidential authority in a program that's no longer

17 operational, we are talking here about data that are going to

18 have to be aged off periodically in order to comply with FISC

19 requirements in a program that is still ongoing.  And that

20 creates greater burdens of preservation of a financial and

21 technological -- and, in terms of personnel resources --

22 greater burdens on the NSA; and therefore, greater burdens of

23 resources from its core national-security mission.

24      For example -- and this is set forth in both the -- well,

25 this is set forth in the -- certainly in the unclassified

1  public declaration by Ms. Shea that was submitted with our

2  brief.  Because we're talking about a periodic transition of

3  data from the operational database to a preservation medium,

4  we've got to develop a capability to do that, which is going to

5  require a software-development effort that could take many

6  months, and involve a diversion of many NSA resources.

7     So in terms of balancing the relevance of the data versus

8  the burden of preserving them, the burden is greater here with

9  respect to these data than with respect to the data under the

10  Presidential program.

11     Second, you know, in our calculus, there's far less need

12  for retention of the specific data that are at issue here.

13  It's -- it's not an all-or-nothing proposition that we are

14  contemplating here.  We're talking about destruction, as the

15  FISC requires, of the data to be aged off under the five-year

16  retention limit, while keeping all of the other data in the

17  database -- up to five years' worth at any time -- for ongoing

18  operational purposes.

19        **THE COURT:**  But if the lawsuit goes on for any period

20  of time, especially if it goes up on appeal, which it is likely

21  to do, then the quantum of evidence that will be subject to

22  destruction will increase periodically.  Isn't that true?

23        **MR. GILLIGAN:**  That is true, Your Honor; but yet --

24  but as new data are collected as part of the ongoing operations

25  of the Program, at all times there will be some collection

1   approaching five years' worth of data.

2      And it stands to reason that if there's evidence to support

3   Plaintiffs' standing and what we're aging off, there will still

4   be evidence to support Plaintiffs' standing of what we are

5   continuing to retain.  Certainly, this is a point that the

6   plaintiffs have not addressed in their papers.  There's no --

7   there's no evidence or argument in the record to suggest

8   otherwise.

9           **THE COURT:**  But is it merely the standing issue that

10  is teed up here, or is it perhaps the scope of the surveillance

11  that the NSA has been conducting?

12     And aren't the plaintiffs entitled to know the full scope

13  of what is potentially down the road, assuming they get that

14  far?  And therefore, as certain evidence is destroyed, doesn't

15  that reduce, perhaps, the evidence that might be available to

16  the plaintiffs, as to the quantum and the breadth of the

17  surveillance?  And also, couldn't some of the older data be

18  directly relevant to the claims that were made by the

19  plaintiffs, at least, in the *First Unitarian* lawsuit?

20          **MR. GILLIGAN:**  Well, we have not disputed their

21  relevance in principle, Your Honor.  We're very clear about

22  that, but when we get to the nub of:  Okay.  Is this relevant

23  evidence that is so potentially beneficial to the Plaintiffs'

24  case, that preservation is required, notwithstanding the burden

25  of doing so?

1   We -- we -- simply ascertaining that the data are relevant

2   within the meaning of the Rule 26 is only the start of the

3   inquiry.  It's not -- it doesn't get us the answer to the

4   question.

5       **THE COURT:**  So, as you put it, the nub of the issue,

6   really, is balancing the retention or destruction of what the

7   Government considers is relevant information, versus the cost

8   of retaining it, both in terms of financial costs as they are

9   quantified in the papers submitted to the Court, as well as the

10  cost in personnel who, the Government argues, would be diverted

11  from their core mission?

12      **MR. GILLIGAN:**  Correct, Your Honor, as well as

13  technological resources, all detailed in the classified

14  declarations, so it's not a matter I can go into in any depth

15  here.

16      But swinging back just quickly to the question of need and

17  your remarks about the scope the Program, we are, as I said,

18  preserving a great deal of evidence regarding the operational

19  details of the Program; the documents about the Program, as

20  opposed to the data acquired under the Program.  And while I

21  can't speak in any specificity to that, because they're still

22  classified in nature and the limits of my own knowledge, it

23  again would stand to reason that simply getting into questions

24  about the scope of the Program is something that could be

25  inquired into hypothetically through evidence other than the

1  data in question here.

2          **THE COURT:**  What if hypothetically -- and I say this

3  without regard to anything that the Court has reviewed in

4  either in the public record or the classified documents.  What

5  if hypothetically the facts were to show down the road that the

6  Program is evolving and changing, so that the destruction of

7  certain documents might actually take away part of the

8  Plaintiffs' arguments, if that were the case?  And we don't

9  know that, or we can't -- if we did know it, we can't speak

10 about that, but wouldn't that be a potential risk of destroying

11 older documents; that is to say that if the Program were

12 changing or were to change, the defendants might be deprived of

13 that evidence?

14         **MR. GILLIGAN:**  Well, assuming that, again,

15 hypothetically speaking, we were -- that the Program was of

16 such a scope that one day we're collecting information about

17 the communications of certain persons, but then as the Program

18 dramatically narrows and we're no longer doing so, even if --

19 even if something like that were to occur, those data would

20 still be there on -- under the FISC orders for up to five years

21 after they've been collected.

22     There would be an opportunity when that time came perhaps

23 for us to approach the Court in an *ex parte* fashion to discuss

24 how we should proceed.

25         **THE COURT:**  Well, what if the NSA was doing

1   something, say, five years ago that was broader in scope, and

2   more problematical from the constitutional perspective, and

3   those documents are now aged out?  And -- because now under the

4   FISC or the orders of the FISC Court, the activities of the NSA

5   have -- I mean, again, this is all hypothetical -- have

6   narrowed.  And wouldn't the Government -- wouldn't the

7   plaintiffs then be deprived of that evidence, if it existed, of

8   a broader, maybe more constitutionally problematic evidence, if

9   you will?

10          **MR. GILLIGAN:**  There -- we submit a twofold answer to

11   that, Your Honor.

12      We submit that there are documents that -- and this goes to

13   Your Honor's Question 5B, perhaps.  There are documents that

14   could shed light on the Plaintiffs' standing, whether we've

15   actually collected information about their communications, even

16   in the absence of those data.

17      As far as -- as Your Honor's hypothetical goes, it's a

18   question that I am very hesitant to discuss on the public

19   record; but I can say if this is something that the Court

20   wishes to explore, we could we could make a further classified

21   *ex parte* submission to Your Honor on that point.

22          **THE COURT:**  All right.  Did you want anything,

23   Ms. Berman?

24          **MS. BERMAN:**  No, thank you.

25          **THE COURT:**  Let's hear -- all right.  Is that the --

1   is that the --

2         MR. GILLIGAN:  The only other difference I would draw

3   the Court's attention to between the current data --

4         THE COURT:  Yes.

5         MR. GILLIGAN:  -- and the data we are preserving from

6   the Presidential program is the fact that -- I believe

7   Your Honor touched on this a few moments ago -- that these data

8   were acquired pursuant to the FISA and the FISA's minimization

9   requirements, which direct that, in the interests of protecting

10  the privacy interests of the U.S. persons, data that are not

11  being used for purposes of acquiring foreign intelligence

12  therefore should be destroyed.

13        THE COURT:  All right.  Thank you very much.

14     Ms. Cohn.  So isn't that somewhat of an irony -- and you

15  noted this in your papers, Ms. Cohn -- that is, that the very

16  documents that you claim constituted constitutional

17  interference, your clients are seeking to preserve, even though

18  the law -- the policy and the literal wording of the law --

19  seems to require that those materials be minimized, sort of, if

20  you will, to the extreme, by being destroyed?  So do you agree

21  with that irony?

22        MS. COHN:  Yes, Your Honor.  It's a very strange

23  position to be in, to be arguing for the preservation for the

24  very records we think they shouldn't have gotten in the first

25  place.

1        THE COURT:  All right.

2        MS. COHN:  Nonetheless, the Government has not

3    wavered from its position that we cannot -- you know, unless we

4    can demonstrate individual collection for each of the

5    individual plaintiffs, we can't pursue this case.  And so I

6    think they've put themselves in a position where, on the one

7    hand, their position with regard to standing, which we disagree

8    with -- but their position with regard to standing requires the

9    retention of the very records that now they're seeking to

10   destroy.  So, you know, it's somewhat ironic for me, but I also

11   think there's a little irony on the other side, as well.

12        THE COURT:  What about the argument that the

13   Government just made, which is that there's plenty of -- if you

14   will, there's plenty of stuff to go around here?  It's not like

15   it's all going to be destroyed, you know, immediately.  It's

16   going to be destroyed incrementally, and aged out?

17        So wouldn't your concerns be allayed by the fact that there

18   will continue to exist at any point in time massive amounts of

19   documents -- or data, shall we say?

20        MS. COHN:  Well, again, if the Government is prepared

21   to make some sort of a statement that we can rely on going

22   forward about what was included in the records before they

23   destroyed them, then -- I mean, this was our suggestion to the

24   Court as a way to allow the records to be destroyed, without

25   the information within them being lost to us, as something we

1    can do.

2        I think that five years -- a five-year backdrop, for --

3    for -- for, you know, standing, and for the fact of collection

4    is probably not sufficient here.

5        First of all, I'm a little puzzled by their position in

6    front of Your Honor, because what we proposed is what they

7    proposed to the FISC.  They proposed just keeping everything,

8    for purposes of the litigation.

9        And the FISC turned them down; but it turned them down

10   based upon not a full record of the litigation needs.

11       So I'm a little confused about why they're fighting in

12   front of you for the very thing they asked for in the FISC.

13   They didn't talk about operational problems or difficulties

14   preserving it when they asked the FISC for permission for this

15   on March 7.

16       The other thing, Your Honor, is, as I think Your Honor

17   pointed out, you know, times change.  You know, one of my

18   clients in the *Jewel* case has passed away.  And so, you know,

19   this litigation's being going on now for a long time.  I

20   started this in 2006, eight years ago.  I certainly wouldn't

21   want to tell his widow that, you know, because the Government

22   aged off the information, that the cause that he tried to stand

23   up for, you know, just goes away, because, you know, he didn't

24   manage to outlast the litigation.

25       I'm -- I also think that the President is indicating that

1  he might end or significantly change the Program.  And so I

2  think your concern about changes in the Program over time is a

3  very legitimate one that may leave our clients in a situation

4  in which they can't prove that the Government did what the

5  Government actually did with their telephone records.

6      I think it's not a fair place to put them in, to have to

7  guess whether their information is -- happens to be in the five

8  years that the Government has it at any point in time.

9          **THE COURT:**  How does the Government -- how does the

10  Court deal with the issue of -- although, putting aside that

11  the Government may have taken a different position before the

12  FISC Court, it is represented in the public filing that there

13  would be -- putting aside the economic issues -- they don't

14  persuade the Court.  But the operational issues and the

15  diverting of resources of the NSA to -- just to keep these

16  documents.  And let's assume hypothetically that the

17  representations made -- and I don't think what I'm about to say

18  is classified.  There's an attempt to support that in the

19  classified portion of the materials.  How does that Court

20  balance those legitimate interests?

21          **MS. COHN:**  Well, yeah, it's difficult, Your Honor.

22  I'm shadow boxing here, because I don't know what they've told

23  you in their secret presentation.  It does appear that the

24  NSA's pretty good at saving big amounts of data, so I would

25  question whether it's really not within their capabilities to

1   keep this, but I don't know what they've told you in secret.

2       I do think that the -- you know, we tried to point the way

3   to an answer here, which is, you know, this is all about their

4   position that the clients can't possibly sue unless they can

5   prove that their individual phone records were collected.  And

6   if that position was not the position that the Court adopted,

7   or if the Court put into someplace where we could preserve that

8   fact -- right? -- in a way that I could rely on later in a

9   motion for summary judgment; or as the case goes forward, I

10  don't think I need them to keep the actual records.  I need to

11  know the fact that the records were collected, and what time

12  frames for damages and for mapping a class.  In *Jewel*, we have

13  a class action of the AT&T customers.  Those are the only

14  things I need those records for.

15      I don't need to know on February 27th, there was a phone

16  call from Joe to Mary.  That was included in the records.

17      I would like that.  And I think as a litigator, you know,

18  you always kind of want everything; but we thought hard about

19  this, Your Honor.  We thought about what is the minimum we need

20  in order to be able to go forward with our case, so that you

21  could have an opportunity to balance these things in a way that

22  I think is very different than the position I'd be taking in

23  ordinary litigation, which would be, you know, we don't know

24  yet what's in those records, and until we get discovery,

25  nothing should be --

1      **THE COURT:** So your primary focus really is on the

2  standing issue before you get to the standing; i.e., were or

3  were not your clients actually illegally or surveilled --

4      **MS. COHN:** Right.

5      **THE COURT:** -- period; and if so, to what extent and

6  over what period?

7      **MS. COHN:** I think that's right.  I hesitate to land

8  it only on standing, Your Honor, because the Government has

9  raised this fact -- this fact that -- you know, this question

10  of whether they, in fact, collected or not in support of a

11  bunch of different arguments that they've made.

12     I think it sounds most easy to see in it standing, but I

13  would say that rather than thinking about standing, we think

14  about it in terms of this fact:  The fact of the collection of

15  our clients' records.  And then how that fact gets played out

16  in support of what legal arguments we might make or defenses

17  they might raise, we might disagree and we might have arguments

18  later on; but I don't have to argue about the fact of

19  collection or the time frame.

20     Again, I've got a client who's deceased.  I've got some

21  other things where I've kind of got a class where I'm going to

22  need to know a little bit about the time frame for collection

23  at least for possibly damages purposes, but --

24     So I agree with you.  I think standing is the way that I

25  think of this first; but I'm not sure that that's the only

1  place that the Government might try to argue this.  So I'd like

2  to have the fact established in a way that I can rely on it,

3  and that they are estopped to deny it for whatever purposes we

4  have going forward in the case.

5      **THE COURT:**  Let me ask you this question.  And I

6  don't think this reveals anything classified, because there are

7  three possible answers to the question "Were your clients

8  surveilled?"

9      "Yes," "No," or "We don't know."

10      **MS. COHN:**  Yes.

11      **THE COURT:**  Let's assume the answer was "No,"

12  hypothetically, without any basis for it.  Let's assume it --

13  where would that leave you, if they could say that in a sworn

14  declaration or something that was credible?  Where would that

15  leave this case?

16      **MS. COHN:**  Well, Your Honor, I guess I'd have to

17  unpack that a little bit, given that the Government has

18  admitted mass collection, you know, repeatedly and a lot since

19  2013.  How would that -- how does that play, given that I've

20  got 23 different plaintiffs groups in the First Unitarian

21  Church who have a range of providers, and who call a lot of

22  people for other providers?

23      I guess I would -- I would find it difficult, given what we

24  know on the public record right now, to believe that somehow,

25  magically, none of the people who I represent have ever had

1  their phone records collected by the Government.

2  　　　　**THE COURT:**  Okay.  So let's say the answer -- the

3  next possibility is "Yes."  Maybe you'd want to know:  What was

4  the scope?  You know.  What was the scope?  What was the --

5  both temporally and from a quantitative perspective.  Correct?

6  　　　　**MS. COHN:**  I think so.  And temporally is, frankly,

7  more important, Your Honor, because the Government, as we know,

8  and as has actually become clear -- that the Government has had

9  different -- if you want, you know, different authorities under

10  which they've conducted the same behavior over time.

11  　　So I think Your Honor might feel differently about stuff

12  that was collected under Presidential authority, or stuff that

13  was collected under one FISC order.

14  　　We know in the context of the FISC orders that have been

15  unsealed so far that there's been a lot of tinkering with the

16  Program in terms of what they're allowed to collect, how long

17  they're allowed to keep it.  And they've had to admit some

18  mistakes in overcollection in various different programs.  And

19  so I think we do need to have some idea of the time frame, in

20  order to be sure what this -- you know, what the scope of the

21  of the collection was; but I think time frame is more

22  important.

23  　　I mean, I don't need to know that they collected

24  20 million -- you know, 2,000 calls from my clients in February

25  of 2008.  I just need to know that as of February 2008, there

1   was a bulk-collection order that included my clients' carriers.

2          **THE COURT:**  Oh, okay.  Without regard to a search of

3   the specific call data?

4          **MS. COHN:**  I think, Your Honor.  I mean, our case

5   turns on the collection of the call records data.

6       What the Government does after it -- their searching, which

7   is all still a very murky kind of situation -- we could sort

8   that out later, but the first step is I need to know that they

9   collected it.

10         **THE COURT:**  Well, let me ask you this.  It's easy to

11  ask it rather than to assert something that might be

12  classified.  Has it come out of the public record as to the

13  need -- the identity of any carriers who may or may not have

14  been coöperating with the Government?

15         **MS. COHN:**  Well, certainly the Government is no

16  longer denying the Verizon order that was the subject of the

17  very first revelation in June of last year; Verizon Business

18  Services, which is a bunch of Verizon services.  So that one, I

19  don't think the Government is denying anymore.

20      And this is my -- the thing that we pointed you to in the

21  *ACLU versus Clapper* case.  In that case, the Government isn't

22  contesting that the ACLU's phone records were collected.  They

23  were a Verizon customer during the time frame of that

24  particular order.

25      I think that if you look at Congressional testimony, if you

1  look at the Presiden'ts statements, if you look at a lot of

2  statements from the Department of Justice and the NSA since

3  then, it's very clear that there is a massive, bulk,

4  telephone-records collection.  They have a program.  They have

5  admitted that.

6      And there are things in various other -- things about the

7  scope of it, about which there's references to various

8  companies -- Company A, Company B, Company C -- and FISC

9  orders, for instance, that talk about the size of the company

10 that -- you know, if you do a little searching online, you can

11 figure out that a company of a certain size -- that's AT&T.

12 And company of a certain size --

13         THE COURT:  So what you want to know or what your

14 clients want to know is:  What carriers?  You want the full

15 list of carriers or companies that were coöperating with the

16 Government, and over what time period?

17         MS. COHN:  I think, Your Honor, that would clear this

18 up.  I mean, I honestly think there's a lot of public evidence

19 here.  We've made presentations to you in the stuff that we've

20 filed so far that there's really no secret about the fact that

21 they're collecting AT&T phone records, and have been for a very

22 long time.

23     But as long as the Government is taking the position that

24 that's not enough -- I mean, we think it's enough.  And we've

25 told you we think it's enough.  But as long as the Government's

1   taking the position that's not enough, I don't think they can

2   simultaneously say that you don't have enough evidence; that

3   we've collected your information, and then destroyed the very

4   evidence we would need to make that showing, consistent with

5   their own standards.  I just think that's not fair or right.

6          **THE COURT:**  Okay.  All right.  Anything further on

7   that question?

8          **MS. COHN:**  I think the only other thing -- so, I

9   mean, in answer to the actual question you asked, Your Honor --

10         **THE COURT:**  I did get you off on a tangent.

11         **MS. COHN:**  I think that the Court's language in the

12  MDL order from 2007 that was adopted in *Jewel* should apply in

13  *First Unitarian*.  We suggested an additional clause, to be

14  really clear about the fact that this preservation requirement

15  doesn't depend on the particular legal authority under which

16  the Government's doing the collection.

17      So Mr. Gilligan pointed out that, you know, they're talking

18  about collection under Section 215.

19      I think it's not at all clear that collection telephone

20  records is only happening under Section 215 of the PATRIOT Act

21      We didn't sue only about the collection that's happening

22  under whatever hat the Government happens to be wearing this

23  day.  We sued about the collection of telephone records.  So I

24  wouldn't want the preservation order to be tied to the

25  particular authority that they're under right now, because we

1   know that could change.

2       And, in fact, you know, President Obama has asked, I think,

3   for -- very soon for a report back about how the

4   telephone-records-collection program might change; but it's not

5   at all clear they're going to stop collecting telephone

6   records.  I think there's a good possibility they're just going

7   to change the hat under which they do it.

8       So we wouldn't want our preservation order to be tied to

9   any particular authority.

10      And I don't think -- Judge Walker didn't do that in 2007.

11      I think the Government's arguments that that is what

12  happened are wrong.  And I know Your Honor wants to hear about

13  that later.

14          **THE COURT:**  Yes.

15          **MS. COHN:**  I wouldn't want us to re-create that

16  problem now.

17          **THE COURT:**  All right.  I got you.  All right.

18      Anything you want to say in reply, Counsel?

19          **MR. GILLIGAN:**  Well, Your Honor, as both Plaintiffs'

20  counsel alluded -- took something of a detour there through a

21  number of the other questions that the Court has raised.  And I

22  can address those issues now or.

23          **THE COURT:**  No.  We can raise -- and I want to keep

24  things sort of in the order in which I proposed them, but just

25  in response to the question, the Government -- there seems to

1    be an inconsistent position the Government has taken before the

2    FISC Court versus this Court.  So that is directly related to,

3    I think, Question Number 1.  And it also relates to the issue

4    of the burden that the Government claims this would put on

5    them, if they had to preserve this aged -- otherwise aged-out

6    information.

7               **MR. GILLIGAN:**  Correct, Your Honor.

8         The situation that we found ourselves in before we filed

9    our motion for the FISC was that we were coming up on our

10   deadline to comply with the five-year retention requirement.

11   And we -- and we had about half dozen of these cases around the

12   country, and did not -- calculated that we simply did not have

13   time before action had to be taken one way or the other to

14   litigate this issue in a half dozen courts around the country

15   with various sets of plaintiffs.  And so we went to FISC, and

16   asked the FISC for relief from the five-year destruction

17   requirement, as we put it, until we could be relieved of any

18   preservation obligations we might have in the civil litigation.

19        We never contemplated that our motion before the FISC would

20   be the end of the matter.  We were asking for leave, really, as

21   it were, to put a lit. hold on these data until the issue that

22   we are talking about today could be resolved.

23        Now, unfortunately, the FISC denied that motion without

24   prejudice, but that's what then put us in the emergency

25   circumstance we find ourselves today; but we'd always

1  contemplated that even if the FISC had given us relief, if the
2  burdens of maintaining the data proved to be too great on the
3  NSA -- and we've outlined those burdens in the classified
4  submissions we've made -- that we would come to the District
5  Courts, as we are in this Court today, seeking relief from a
6  long-term obligation to preserve those data.
7        And since that seems to be what we're talking about here --
8  a long-term obligation pending the completion of litigation
9  certainly in the *First Unitarian* matter -- we felt we had no
10 choice but to resist that.
11             **THE COURT:**  All right.  Is there anything further you
12 want to say on that point, Ms. Cohn?
13             **MS. COHN:**  Well, the only thing that is a bit of a
14 puzzle in what they -- first of all, this second phase of their
15 proposal to -- that they were going to come to you and to the
16 Courts around the country and ask for relief from preservation
17 isn't really reflected in what they said to the FISC.  It
18 certainly isn't reflected in anything ever, before now; but
19 also it does appear from the Shea Declaration that they
20 actually were destroying evidence; that they were -- they were
21 continuing their destruction through until March 11th, which
22 was four days after they asked the FISC for -- for relief.
23       And one of the questions that this raises for me is:  We
24 filed *First Unitarian* and *Jewel*.  The Government was clearly on
25 notice in June that it was going to happen.  I think there's a

1  chance that, even in *First Unitarian*, they haven't preserved

2  everything that they needed to preserve, because it appears

3  they have been continuing their five-year roll-off destruction

4  efforts all the way through until March 11th, from June.

5       THE COURT:  Well, as I said in my opening comments, I

6  don't want to get into that now; not that I'm minimizing it in

7  any way, but I do want to focus on what to do now vis-à-vis

8  preservation, so at least as of this moment or as of the

9  issuing of the Temporary Restraining Order, whatever practice

10 was going on would cease or would not cease.

11      So I want to stay with you, Ms. Cohn.

12      Yes.

13      MR. GILLIGAN:  Your Honor, can I answer that specific

14 point while the moment is still ripe?

15      THE COURT:  Yes.

16      MR. GILLIGAN:  I want to be very clear about this,

17 because this is a point raised in Plaintiffs' reply.  We didn't

18 have a chance to respond to it in writing.

19      Since this suit was filed, the NSA has destroyed no

20 telephony metadata collected under Section 215 for purposes of

21 complying with the FISC's five-year retention requirement, or

22 at least, as far as I am aware, for any other reason.  And I

23 trust that is clear in -- or at least it can be understood in

24 the basic classified files.

25      THE COURT:  Since the question's ripe, now I'll

1  violate my own rule and get into this.

2       Has there been any evidence that the NSA has destroyed that

3  would be properly within the subject matter of the *First*

4  *Unitarian* lawsuit since the lawsuit was filed?

5            **MR. GILLIGAN:**  Not that I'm aware of, Your Honor.

6            **THE COURT:**  Okay.  Well, that's to be continued until

7  a later time.

8            **MR. GILLIGAN:**  We're moving on a very fast timetable

9  here.

10           **THE COURT:**  I understand.  Ms. Cohn, I want you to

11  address Question Number 2, which is:  Must the Court determine

12  the intended scope of the allegations in the *Jewel* Complaint,

13  and the resulting preservation order in that matter, or may it

14  issue a similar preservation order -- excuse me -- in

15  *First Unitarian Church*, and proceed accordingly and

16  concomitantly?

17      Next part of the question:  Should the Court revisit in a

18  separate proceeding the issue of whether the *Jewel* preservation

19  order covered the currently disputed FISC-related materials

20  with regard to the Plaintiffs' contention that the Government

21  has failed its retention obligations?

22      Boy, that is a long, run-on sentence.  Get the idea?

23           **MS. COHN:**  I think I do.  I got to read it last

24  night.

25           **THE COURT:**  Okay.

1          **MS. COHN:**   I think if we're only talking about going

2    forward, and we're talking about telephone records only, then

3    this Court can just issue an order in *First Unitarian* that

4    reeds like the Order that we had in *Jewel*.   And that will cover

5    the telephone records program going forward.

6          We suggested a little addendum to our proposed order that I

7    think is appropriate, but I think if the only question is "What

8    should happen going forward with regard to only the telephone

9    records?" that that order -- just issuing an order like the

10   *Jewel* Order going forward in *First Unitarian* will reach all

11   phone records.   If all of the phone records are preserved, then

12   I think we're okay going forward.

13         As I said, I think we've got backwards-looking problems in

14   both *First Unitarian* and *Jewel*.

15         And in *First Unitarian* -- I appreciate the counsel's

16   statement here today, but I'm still puzzled about what Ms. Shea

17   meant in her declaration, but in -- and then, of course,

18   there's going backwards.   And going backwards in *Jewel*, you

19   know, Your Honor has to address the scope questions so that we

20   can figure out both going backwards what happened in the

21   remedy; but also going forward in *Jewel* what needs to be

22   preserved, because we're still litigating *Jewel*.

23         And if the Government -- if the Court doesn't agree the

24   Government about their creative reinterpretation of my

25   Complaint in *Jewel*, then they need to start preserving in *Jewel*

 1   immediately.

 2              **THE COURT:**  All right.  What's your response?

 3              **MR. GILLIGAN:**  Your Honor, we -- as we've said in our

 4   papers, we don't have objection to the entry in *First*

 5   *Unitarian*.

 6        And a preservation order that is exactly the same, with the

 7   addendum that Plaintiffs' counsel is speaking of, I think, is

 8   the subject of another one of Your Honor's questions.  We

 9   object very strenuously, actually, to that addendum.  I can get

10   into that now or later, as the Court prefers.

11        But in terms of entering an order in *First Unitarian* that's

12   exactly the same as *Jewel*, we have no objection to that.  Of

13   course, the parties are going to need the Court's guidance on

14   the specific question before us today, whether that requires

15   the preservation of metadata that are subject to the FISC's

16   age-off requirements.

17        And we at all -- in all events, we don't want to find

18   ourselves in a situation where we're subject to conflicting

19   directives from Courts.  We want to know some way or another

20   where our ultimate legal obligation lies.

21              **THE COURT:**  This may be the elephant in the room.

22   Maybe it's not, because nobody's really mentioned it.  Maybe

23   that's the way it is -- an elephant in the room -- which is:  I

24   assume the Government doesn't contest the fact or dispute the

25   fact that that Court has inherent jurisdiction to order

1  retention, even if that retention of the otherwise aged-off

2  material would be directly in contravention to FISA.  Is there

3  any dispute about the Court's authority to do that?

4       **MR. GILLIGAN:**  We don't dispute the Court's authority

5  in this case to direct the preservation of relevant information

6  if it's deemed to be so valuable to the case as to outweigh the

7  burdens of preservation.

8       What we, as we've said in our papers, would do if this

9  Court were to order preservation is then go to the FISC and say

10  that this Court has directed that we preserve this data, and

11  ask the FISC on that basis then to allow us to continue to do

12  so, notwithstanding the destruction requirement that would

13  otherwise apply.

14       **THE COURT:**  I was under the impression that the

15  Judge Walton of the FISC Court deferred to this Court's

16  jurisdiction.

17       **MR. GILLIGAN:**  The -- the Order that Judge Walton

18  entered, at least as we read it, Your Honor, says that

19  permission is granted for us to continue to retain the data is

20  through the pendency of this proceeding immediately before this

21  Court.  So as we read the Order, we would then have to go back

22  to the FISC and get permission for long-term retention of the

23  data, pending the conclusion of the litigation.

24       **THE COURT:**  All right.  Well, we won't get into the

25  issue of what happens at that point.

1    But, Ms. Cohn, is there anything -- I assume I'm preaching

2    to the choir here, but is there any dispute over any of this

3    Court's jurisdiction to essentially override a federal statute

4    that requires destruction -- purports to require destruction of

5    the aged-off information?

6         **MS. COHN:**  Your Honor, I think that the Court's duty

7    to preserve evidence that might be relevant in litigation is

8    the paramount issue here.  I don't think that -- I mean, the

9    statute doesn't require five years aging-off.  The statute

10   requires there be minimization requirements; and the

11   Attorney General has said five years is what they want.  So to

12   be clear, it's not a statutory duty that they are objecting to

13   here.  It's their own rules, that then -- the FISC Court said

14   they had to follow their own rules.

15       But yes, I think that the -- the preservation of --

16   evidence preservation applies, regardless of other duties that

17   one might have to -- to destroy evidence.

18        **THE COURT:**  All right.

19        **MR. GILLIGAN:**  Your Honor, on that point,

20   Judge Walton issued an opinion on March 7th, I believe it was,

21   that said otherwise.  So there's -- there's where we are.

22       And so we're hoping that the situation will resolve itself,

23   without the Government being placed --

24        **THE COURT:**  "Said otherwise" in what sense?

25        **MR. GILLIGAN:**  Judge Walton said that the obligation

1  under FISA to comply with minimization procedures that are

2  reduced to writing in the FISC's orders would trump a

3  common-law obligation to preserve evidence.

4      **THE COURT:**  Well, you know, this -- we're here in

5  this lowly trial court.  And it's hard enough to do this

6  Court's job.  To worry about conflicting orders or something

7  that maybe others will have to deal with at the appropriate

8  time -- and I think that then raises very interesting appellate

9  jurisdiction issues, as well, which we don't need to get into

10  at this point.

11      **MR. GILLIGAN:**  That was our view of the matter as

12  well, Your Honor.

13      **THE COURT:**  Yes.

14      **MS. COHN:**  Your Honor, I do think that, you know, the

15  fact that, A, we weren't there, it was all done *ex parte*, and

16  B, when Judge Walton found out we were here, and we cared, he

17  changed his mind, and recognized this Court's authority here.

18   I think that they're still trying to pretend like something

19  didn't happen after the FISC Court got full information, but it

20  did.  And what happened was the FISC Court said, "I recognize

21  this Court has primary" -- thing.

22   And I think it would be improper -- and I'm troubled by the

23  idea -- that they could sign a preservation order or this Court

24  could issue a preservation order that then they would go

25  violate, because the FISC told them to do something else.

1    I think there needs to be one place where we decide what

2  they're preserving; and that place is here.

3        **THE COURT:**  All right.  I'd like to move on to

4  Question Number 3, and start with Government counsel.  So

5  Question 3A says:  With regard to the NSA's retention policy,

6  according to the Government's now partially unclassified

7  submission filed in conjunction with the preservation

8  proceeding before the multidistrict litigation in the MDL

9  matter, quote, "NSA's operational policy is to continue to

10  migrate telephony metadata beyond five years old in an online

11  database to tapes for preservation."  Unquote.  And I was

12  citing Exhibit A to the Government's opposition in paragraph

13  25.  See also Exhibit B at paragraph 9.

14    Has the NSA retention policy changed since those

15  submissions from October 2007?

16        **MR. GILLIGAN:**  Well, regarding the data collected

17  under Presidential authorization, no.  The policy, Your Honor,

18  is still to retain them.  And we are retaining them, in

19  accordance with the preservation orders that were entered in

20  the multidistrict litigation and in *Jewel*.

21    With respect to telephony metadata acquired under FISC

22  orders pursuant to the FISA, our policy -- if you want to call

23  it that -- is has been to obey the orders of the FISC, and to

24  comply with the five-year retention limit in those orders, at

25  least until -- at least until now.  We are now, of course,

1  preserving them, pending the outcome of the instant matter.

2         **THE COURT:**  So basically what you're saying, then, is

3  this migration has continued, and continues to this day?

4         **MR. GILLIGAN:**  Well, there is -- in terms of the data

5  that were acquired under Presidential authority, that program

6  is terminated.  And there is a static set of data that are now

7  in a preservation state.  That is -- that is all done and taken

8  care of.  There's no ongoing operation of any kind.

9     With respect to data acquired under authority of the FISC

10  pursuant to FISA, the policy has been, as necessary, to destroy

11  data that are subject to the five-year retention limit; that

12  that is the way we have been operating under FISA, the

13  Section 215 program, at least until now.  We've put things on

14  hold, pending the resolution of the issues before the Court

15  today.

16         **THE COURT:**  Now, I need to ask you this question.  So

17  are you saying that up until the time that the Government went

18  to the FISA court, asking its permission to withhold joint,

19  aged-out information -- up to that, in previous years, the

20  Government was destroying that information, pursuant to FISA?

21         **MR. GILLIGAN:**  Yes, Your Honor.

22         **THE COURT:**  Even since the pendency of this lawsuit?

23         **MR. GILLIGAN:**  Not since the pendency of this

24  lawsuit.  As I said a few moments ago when the question came up

25  the first time, since the pendency of this lawsuit, no data

1   have been destroyed for purposes of complying with the

2   five-year retention requirement or of any other data that I'm

3   aware of.

4          THE COURT:  Okay.  So the question specifically then

5   is:  Any information, any metadata that would otherwise be

6   destroyed as aged out has now been -- but ordered preserved at

7   least temporarily by this Court has been recorded on tapes?

8          MR. GILLIGAN:  I -- I -- I believe I can say without

9   getting into any classified matters that it is -- it's not --

10  it is not on tape, Your Honor.

11         THE COURT:  Just a second.  I just read an

12  unclassified portion of the declaration in which it says that

13  the policy is to continue to migrate telephony metadata beyond

14  five years old from on online database to tapes for

15  preservation.

16         MR. GILLIGAN:  That was from, I believe, the 2007

17  declaration regarding the Presidential --

18         THE COURT:  Correct.

19         MR. GILLIGAN:  -- the data acquired under the

20  Presidentially authorized program.

21         THE COURT:  All right.  So you're saying it would be

22  classified for you to disclose whether, with respect to

23  otherwise aged-off information that the Government has been

24  retaining, that that is also being put on -- migrated to tapes?

25         MR. GILLIGAN:  It has -- I do not believe it has been

1   migrated to tapes.  It's being held now in such a way that it

2   is not available to NSA intelligence analysts for query and for

3   intelligence purposes.

4       I do not believe -- I can confer with my co-counsel about

5   that, if you would like.

6           **THE COURT:**  Yes.  Please do.

7   (Discussion off the record.)

8           **MR. GILLIGAN:**  Because of the sort of

9   twixt-and-between setting where we find ourselves litigating

10  here, litigating in front of the FISC all at a time when we

11  were in a compliance mode, if you will, Your Honor, the data

12  that were to be aged off are in various media at the moment,

13  including tape, but not exclusively.

14          **THE COURT:**  All right.  Let -- before I give Ms. Cohn

15  a chance to respond, let's go to Question B, because that's

16  really what I was getting to --

17          **MR. GILLIGAN:**  Okay.

18          **THE COURT:**  -- which is:  The Government's most

19  recent submission indicates that, quote, "The NSA intended to

20  preserve and/or store the data that would otherwise be

21  destroyed in a format that precludes any access or use by NSA

22  intelligence analysts for any purpose."  See Exhibit C to

23  response declaration of Teresa H. Shea -- S-h-e-a -- in

24  paragraph 14.

25      Is there any reason to treat the materials clearly made

1  relevant to the *First Unitarian Church* matter differently from

2  the potentially discoverable material covered by the retention

3  order in *Jewel*; or, put another way, is there any reason why

4  those materials could not be migrated to tapes that would not

5  be available to NSA people?

6        **MR. GILLIGAN:**  I think the answer to this question,

7  Your Honor, brings us back to the discussion we were having

8  with respect to your first question.  The -- migrating the data

9  to tape would require, because we're dealing here with a live

10  program, where data are coming in and data are periodically

11  being aged off, rather than a program that has been terminated,

12  and you have a static data set, you're going to have to or the

13  NSA is going to have to engage in a complicated

14  software-development effort to basically come up with a

15  capability of periodically aging data off from the operational

16  database into a preservation medium.

17        **THE COURT:**  But you're not saying the NSA, with all

18  of its computer expertise, can't do this.  You're not saying

19  it's impossible to do it.

20    You're saying it would be a burden financially and perhaps

21  operationally, but it can be done; can it not?

22        **MR. GILLIGAN:**  Your Honor, we have not said it can't

23  be done.  If it -- but again, it would be at significant costs

24  that are detailed in classified declaration, and would result

25  in a diversion of financial, technological, and personnel

1   resources from the NSA's core national-security mission.

2          **THE COURT:**  All right.  What's your response?  As an

3   American citizen, does that concern you at all, Ms. Cohn?

4          **MS. COHN:**  Well, I certainly want the NSA to be doing

5   its job; but Your Honor, you know, the burden of evidence

6   preservation hits every litigant.  And it just strikes me that

7   I -- you know, I don't know what you've seen in secret, but

8   this is basically aging stuff off into backup tapes.  And large

9   institutions dealing with a lot of data can age things off into

10  backup tapes, into a place where they can be available in case

11  of an emergency, or in case of a litigation -- under a

12  litigation hold, and not operationally available, such that

13  they get in the way.

14      I just -- it's difficult for me to imagine that the NSA,

15  given what we know about their capabilities, can't create a

16  backup system, which is kind of what I think they said they

17  were doing in 2007 in the *Jewel* case.

18      They also raised this same burden in 2007, as Your Honor

19  pointed out in his first question.  They claimed that this was

20  really burdensome in 2007, too; and Judge Walker didn't buy it.

21  And so I don't see any significant difference here.

22      I mean, of course, the new news is that they claim that it

23  was only about stuff that was done under Presidential authority

24  in *Jewel*, and that they had secretly gotten a FISC order by the

25  time they were telling the Judge this.  This was all, of

1  course, news to me as of Monday.

2      But I still don't think there's any reason why they can't

3  institute a preservation program that would be consistent with

4  our needs; but also, of course, I tried to point to another way

5  out of this problem.

6      I do think it's important when they say when -- I just want

7  to clarify.  I think, Your Honor, we were all on the same page;

8  but when they say they're "preserving" in this case, they're

9  just talking about *First Unitarian*.  They're not talking about

10  *Jewel*, because in *Jewel*, it's very clear that they are not

11  preserving anything after, I guess, May 2006, because they've

12  reinterpreted our Complaint in way that --

13          **THE COURT:**  Well, we had a representation just a

14  little while ago that they were not destroying any documents or

15  evidence -- sorry -- data that I guess they contend is covered

16  by the issues in *Jewel*.

17      The issue is:  What are the issues in *Jewel*, I guess.

18          **MS. COHN:**  Yeah.  So I just think it's a funny --

19  because it's not an ongoing thing.  Right?  As of --

20      Under their theory, which again I find very -- it's very

21  hard for me to not talk about how astounding their theory is,

22  but under their theory, this was a static set of information as

23  of about a year before they told about the Court about it.  So

24  there wasn't any ongoing thing, because they didn't think they

25  had any ongoing preservation duties, because they'd misread my

1  complaint -- I think intentionally -- to make there be no

2  duties to preserve.

3         **THE COURT:**  Would your proposed order -- let's assume

4  the Court had to do something that addresses the Plaintiffs'

5  concerns about the interpretation of the *Jewel* Complaint.  Is

6  there some change/modification/whatever in the *Jewel* Order or

7  in a superseding order that would cover both cases that the

8  Court needs to consider that would address the Plaintiffs'

9  concerns?

10        **MS. COHN:**  Yeah, Your Honor.  Excuse me.  Yes,

11  Your Honor.  We put it in our proposed order.

12        **THE COURT:**  That was what I was asking you.  Do you

13  believe your proposed order covers that --

14        **MS. COHN:**  Well.

15        **THE COURT:**  -- your belief with respect to at least

16  your interpretation of the issues in *Jewel*?

17        **MS. COHN:**  As of our interpretation as of Monday

18  afternoon, yes, Your Honor.

19      But I do think it's important that we make this order based

20  upon a really clear understanding of what the Government -- you

21  know, what the Government's actually doing, and what they think

22  its duties are.  I mean, we've discovered one secret

23  reinterpretation of the *Jewel* Complaint.  I would hate for us

24  to go to all this bother, and discover that they actually made

25  a second secret reinterpretation of the *Jewel* Complaint that we

1  didn't address; but yes, the language on our proposed order

2  that starts on page 1, line 10 through line 17, is the language

3  that we crafted to try to capture this.

4       I mean, the best that thing that we captured is for the

5  Government to respond in good faith, and for the Court to order

6  them to, because if you're -- you know, all of the language in

7  the world won't protect against that, but we think this

8  language would -- would do it.

9       And we think that, in order to be clear, it ought to be in

10  both a *Jewel* context and in a *First Unitarian* context, so that

11  we don't a run into a problem later on where they claim that

12  the *First Unitarian* Complaint only applies to 215 collection,

13  when it obviously doesn't, and because they're not doing it

14  under 215 anymore, they no longer have to preserve evidence.  I

15  just don't want this problem to continue.

16       So this is our effort to try to do that.  And, you know,

17  I'm happy to have the Court think about whether we did it well,

18  or not.

19            **THE COURT:**  All right.

20        **MR. GILLIGAN:**  Your Honor, may I address the repeated

21  remarks by Plaintiffs' counsel that we have intentionally

22  reinterpreted their Complaint so as to avoid our preservation

23  obligations?  Because that is certainly not the case.

24       Plaintiffs, themselves, in their own motion to relate the

25  *Jewel* case to the cases in the multidistrict litigation

1  describe their claims as being claims about activities being

2  undertaken under Presidential authority, without Court orders

3  or judicial approval.

4      We made our understanding of the Complaint based on its

5  plain language and the plainer language in the *Shubert*

6  Complaint clear to this Court in the only way we could in 2007,

7  when even the existence of these programs was still classified

8  fact.

9      We explained to the Court -- Judge Walker -- in 2007

10  exactly how we had read the claims, and the extent of our

11  preservation obligation.  We were clear.  We were only going to

12  preserve data and information acquired under the Presidentially

13  authorized program, not the FISC-authorized programs.

14      And we advised the Court that we were prepared to answer

15  any questions the Court had about our submissions.  We -- we

16  certified compliance under Rule 11 with our preservation

17  obligations by reference to that classified declaration, which

18  was extraordinarily clear about what we were doing.  And we

19  were never advised that our interpretation of our preservation

20  obligation was in any way erroneous.

21          **THE COURT:**  Was it public knowledge about what FISC

22  orders had been issued at that point?

23          **MR. GILLIGAN:**  No, it was not, Your Honor.

24          **THE COURT:**  Well, how would Judge Walker or the

25  Plaintiffs know --

1          **MR. GILLIGAN:**  We --

2          **THE COURT:**  -- how the Government was interpreting

3    this -- you know, its obligations?

4       So what I hear you saying is the Government, pursuant to

5    Judge Walker's Order, preserved all of the *Jewel*-related

6    information, i.e., from the so-called "TSP" or "Presidential"

7    program; but it secretly destroyed information related to FISC

8    orders about which the Plaintiffs had no knowledge or no way of

9    knowing.  Is that what you're saying?

10          **MR. GILLIGAN:**  No, not at all, Your Honor.  We -- the

11   informs about the FISC -- about the programs being transferred

12   to FISC orders, with the possible exception of the content

13   collection, was not public knowledge; but it was spelled out in

14   the declaration that we submitted to Judge Walker.  And it

15   was -- it was -- it was explicit.  It was clear.

16      We said the Program -- the Plaintiffs are challenging the

17   programs under Presidential authority.  They have now

18   transferred/transitioned to FISC authority, but because the

19   claims only pertained to Presidentially authorized activities,

20   it was only with respect to the Presidentially authorized

21   activities that we were going to preserve data and information.

22      And we don't mean to speak for the Court on this question,

23   but we can say we were never advised that -- that very clear

24   understanding of what our obligations was was disputed by the

25   Court.

1          THE COURT:  All right.  Ms. Berman, do you want to

2     say something?

3          MS. BERMAN:  I just wanted to add on that point that

4     we did not keep from the Plaintiffs a secret that we were

5     filing a classified submission.  That was in our public brief.

6     There's a notice of lodging of a classified submission on the

7     docket.

8        And furthermore, the whole sort of dispute between the

9     parties at that point was really bound up in the fact that --

10    and we told them this -- we couldn't talk about this

11    information in a public way.  We couldn't confer with them in

12    any meaningful way about the information.

13         THE COURT:  Wasn't there a concern by Judge Walker

14    that the -- that the Government attorneys had not even read the

15    classified submissions?  Wasn't that a concern of Judge Walker?

16         MS. BERMAN:  I'm sorry.  That the Government

17    attorneys?

18         THE COURT:  Yeah, that the Government attorneys that

19    were arguing before him were not familiar with the classified

20    information that was submitted to the Court.

21         MS. BERMAN:  I'm not aware of that, Your Honor.

22         MR. GILLIGAN:  I don't know.

23         THE COURT:  I don't know that we're going to be able

24    to address that issue in this hearing.  We have enough to deal

25    with in this hearing.

1        I understand certainly what the parties' positions are in

2    this regard, and I certainly will look at the order in that

3    context.

4        Did you want to say something?

5            **MS. COHN:**  I just wanted to point out that, you know,

6    their declaration and assertion of this came when they were

7    trying to convince Judge Walker not to issue a preservation

8    order.  And he denied their request, and issued a preservation

9    order that in no way says that it's limited to Presidential

10   authority.

11       I mean, obviously, you know, this is -- I feel it's very

12   difficult for me to not be upset about this, because,

13   Your Honor, I've been doing this for eight years.  The idea

14   that in 2007 they secretly sent a declaration to Judge Walker

15   that he did nothing about, denying the motion they asked, and

16   that therefore my Complaint suddenly became significantly less

17   than it was at the time I even filed it -- this is -- I'm

18   sorry.  This is outrageous.

19           **THE COURT:**  All right.

20           **MR. GILLIGAN:**  Well, Your Honor, if I may --

21           **THE COURT:**  All right.  Well --

22           **MR. GILLIGAN:**  -- if I may take up that contention as

23   well, that Judge Walker didn't buy our arguments, Plaintiffs

24   move for a preservation order.  Ms. Berman can correct me if

25   I'm misrepresenting anything.  Our position was that an order

1  wasn't necessary because of everything we were doing.  We

2  didn't ask not to do the things that we outlined in the

3  declaration.  We said we were doing them, and so, Judge, you

4  don't need to enter an order.

5      Judge Walker entered an Order, but we were never advised

6  that anything that we had told the Court in great detail we

7  were doing was insufficient to meet our preservation

8  obligations.

9          **MS. BERMAN:**  And, Your Honor, just to add one more

10 point on that front, the Order that Judge Walker entered in

11 2007 that the *Jewel* Order was patterned on added the phrase in

12 the retention paragraph, "to the extent practicable during the

13 pendency of this case."  That was not in the Plaintiffs'

14 proposed order.  So he didn't just give them everything they

15 had asked for.  He added that phrase, which we interpreted to

16 be significant, and based on our classified filing.

17         **THE COURT:**  We have enough to deal with in this

18 hearing, but it does sort of, if I might use the term,

19 "migrate" to paragraph 4 or Question 4, which is --

20     Because it may be this may be a broader question.  It is a

21 broader question.

22     As the Government argued before the FISC in February and

23 acknowledged before this Court in its joint case management

24 conference statement, what is the scope of the Government's

25 obligation to preserve relevant evidence under Federal Rule of

1  Civil Procedure 26, 45, and 56(3), regardless of any

2  preservation order?

3      **MR. GILLIGAN:**  Your Honor, I apologize in advance if

4  this answer isn't getting at what the question is driving at,

5  but the response that comes to my mind is that in a suit such

6  as *First Unitarian*, where there is not as yet a preservation

7  order of any kind, our obligation is the common-law obligation

8  to preserve all evidence that could be relevant to the facts

9  alleged in the claims asserted in the Complaint before us,

10  which is not what actually the Plaintiffs are proposing with

11  the addendum that they have in mind for the *First Unitarian*

12  preservation order.

13      What they're talking about is, if I may borrow the phrase,

14  a dragnet lit. hold on entire National Security Agency for

15  preservation of information, irrespective of whether it has any

16  bearing on the actual allegations in their Complaint.  And

17  that's a subject that we can come back to; but as Ms. Cohn has

18  raised it several times, I thought it would raise that as well.

19      But to come back to the exact question, we recognize we

20  have a common-law obligation to preserve evidence that's

21  relevant to the claims in the *First Unitarian* suit.  We've

22  issued a litigation hold for that matter.

23      **THE COURT:**  But is it broader than the preservation

24  order issued in the *Jewel* case?  Is that what you call a common

25  law -- it's not really common law.  It's a statutory.  It's

1   created by the Federal Rules.

2       **MR. GILLIGAN:**  Correct, Your Honor.  It's rooted in

3   the rules and the common law; various sources.

4       Well, I guess I would say that in principle, it's

5   coextensive with -- and I don't want to get into specifics, but

6   in principle, it's coextensive with our obligation in *Jewel*,

7   because the *Jewel* Order essentially tells the parties to abide

8   by their common-law obligation to -- and the obligation rooted

9   in the rules to maintain the integrity and to avoid destruction

10  of evidence that's relevant to the claims in the case.

11      There's -- one of the problems that we have here is that

12  the Order does not give parties guidance on the preservation or

13  not of specific types and bodies of evidence, which is why I

14  said to the Court we need particular guidance on the issue of

15  metadata to be aged off.

16      **THE COURT:**  Okay.  What's your response?

17      **MS. COHN:**  Your Honor, the obligations are the same.

18  I mean, the point of a preservation order is generally to put a

19  little meat on the bones of the general thing.

20      It was very difficult for us in 2007, given the

21  Government's position that they couldn't say word one about

22  what they were doing, to try to fashion something more specific

23  at that time.  And we had the same problem in 2009 in *Jewel*.

24      So it's just a general recitation.  So I don't think

25  there's any difference between -- as Your Honor, I think,

1   correctly points out:  It's not just a duty in the common law.

2   It's part of the Federal Rules of Civil Procedure.  I think

3   that duty and the duty contained in the Order should be -- if

4   we did it right, should be the same.

5           THE COURT:  All right.  At least we have agreement on

6   one question -- at least one answer.

7       All right.  Question Number 5.  And I think this has been

8   alluded to, to some extent, but let me make it clear by the

9   question, because this was my view before I started hearing

10  argument from you.  The Court is persuaded that a targeted

11  retention policy with regard to materials possibly collected

12  pertaining specifically and only to the named Plaintiffs is

13  untenable.  The alternative addressed by the Government is the

14  mass retention of all raw data possibly collected by the NSA

15  under the challenged programs.  According to both the public

16  and classified declarations of the Director of Signals

17  Intelligence Directorate of the NSA, this mass data retention

18  would negatively interfere with the NSA's -- I'm sorry --

19  current mission.

20      So, A -- I'm going to ask this of -- I guess I'll start

21  with the Government, although I also want to hear from the

22  Plaintiffs on this.  Is there some lesser quantum of materials

23  that would satisfy the requirements to preserve evidence

24  relevant to provide possible support for Plaintiffs' claims?

25  For instance, can the Government satisfy its obligation to

1  preserve evidence by retaining evidence of the challenged

2  surveillance programs and their breadth, without retaining all

3  of the actual collected raw data incident to the Program's

4  implementation?

5         **MR. GILLIGAN:**  Your Honor, this is this question

6  focuses on, we think, a very important point, because we

7  believe -- and we talked about this a bit; and you've talked

8  about it with Ms. Cohn a bit already.  We believe we are

9  already proposing to and are, in fact, preserving a great deal

10  of data that could shed light on the question of the

11  Plaintiffs' standing, without having to preserve metadata that

12  the FISC orders require us to destroy.

13       Just to recap just for a moment, we, of course, still have

14  at all times up to five years' worth of metadata at any time,

15  which would certainly shed light on the issues, setting aside

16  issues of classification and possible privilege and

17  what-have-you; but there are all of the other documents and

18  records and information the Government is preserving about the

19  operation of the Program that could provide information about

20  the scope of the Program, and -- and possibly the Plaintiffs'

21  standing.

22       One specific example that I can bring to Your Honor's

23  attention are the so-called "Secondary Orders."  These are the

24  orders that the FISC issues to individual carriers, directing

25  them to provide call-detail records, telephony metadata to the

1  NSA for purposes of inclusion in the database.

2      And we have them.  We have them going back to the inception

3  of the Program.  They show at what particular times what

4  particular carriers were participating in the Program.

5      This, it seems to us, would go a long way toward addressing

6  the temporal point that Ms. Cohn was talking about with

7  Your Honor a few moments ago.

8      We can't say that they would answer the question.

9          **THE COURT:**  Are they classified?

10         **MR. GILLIGAN:**  Oh, yes, Your Honor.  Yes.  We have

11  asserted the State Secrets Privilege in the *Jewel* case, for

12  example, over the identities of carriers.

13     We're talking about here about preservation.  Production of

14  any of the information we're talking about here is, to put it

15  mildly, another thing entirely.

16         **THE COURT:**  All right.  So essentially what -- your

17  position is that if you combined the non-aged-off information

18  with these Orders, the plaintiff has all it needs to prove

19  whatever it needs to prove, at least, in the current iteration

20  of the *First Unitarian* Complaint.

21         **MR. GILLIGAN:**  Well, I don't know that I can agree

22  with that formulation, Your Honor, that it would provide them

23  with all they need to prove; but it would -- it would, I think

24  it would provide possible support for their standing, as stated

25  in Your Honor's question.

1    And in terms of, you know -- you know, what carriers were

2   subject to these orders at what times, you know, that would

3   provide sort of a temporal guide to the scope of the Program

4   that -- of a kind that it appears Ms. Cohn was talking about a

5   little while ago.

6         **THE COURT:**  All right.  So this gets back to -- well,

7   it doesn't "get back to," but this is the point I'm thinking

8   about here, is, you know, this is a trial court.  And to the

9   extent we get into evidentiary hearings, the Court's concerned

10  with the rules of evidence, and as interpreted, you know, in

11  the context of the case.  And so what I was thinking about -- I

12  wasn't even focused on the non-aged-off information.  I was

13  thinking about -- that there may exist other evidence out there

14  that is less than the full quantum of data that the Government

15  might be destroying pursuant to FISA that might be sufficient

16  to get the Plaintiffs what they need down the road, if they

17  convince the Court that they're entitled to it.  So why isn't

18  that an answer?

19        **MS. COHN:**  Well, Your Honor, we don't know what the

20  "is" is there.  Like the thing that's very troubling to me

21  about Mr. Gilligan's position is he said, "Well, there's

22  possible support for standing.  It might get part of the way

23  there."

24    These are all hedging words that basically say, "Well,

25  we're going to destroy the best evidence.  And maybe there's

1   enough left after we destroy the best evidence.  And take your

2   best shot, Plaintiffs."  That's just not fair or right.

3       So if the Government wants to take the position that the

4   Secondary Orders will not be challenged by them, and will be

5   accepted by them as evidence of collection of everybody who was

6   a customer during that time frame, then maybe there's some

7   space there; but I think as long as they're preserving their

8   opportunity to attack the -- what's left after they destroy the

9   best evidence, then it's not fair to us to destroy that

10  evidence.

11      Again, I think the onus is on them.  If that's what they

12  want to do, then they need to actually make some

13  representations about their position regarding that information

14  if we try to use it in absence of the best evidence, which

15  would be the records, themselves.

16          **THE COURT:**  Well, could the Court fashion an Order

17  that requires the Government to maintain records of *X; x* being

18  what carriers they were dealing with over what time period, for

19  example?  So they would -- if they were ordered to do that,

20  together with the non-aged-off information, wouldn't that be

21  adequate?

22          **MS. COHN:**  It might be, Your Honor.  I'd need to talk

23  with my team and think about it.  I think that the -- you know,

24  the better thing would be for us to have it.

25      I'm very worried about secret --

1          THE COURT:  "It" being all of it?

2          MS. COHN:  Well, no.  I mean for us to have a

3  representation from the Government that I know that's public

4  that I can rely on about what it is they're saying about our

5  clients' collections.

6          THE COURT:  So it's a classification piece that

7  you're concerned about; sort of the pig-in-the-poke argument?

8          MS. COHN:  Your Honor, I've been through a rough week

9  with regard to secret government representations to the Court,

10  and it's not the first time.  So, yeah, I think that Plaintiffs

11  need to know.  We need to know what this evidence is, and

12  whether it's going to be sufficient for our purposes.  And I

13  don't think we can do that if it's a secret -- if it's a secret

14  situation at this point, especially if the Government's not

15  waiving their right to challenge whether what they've preserved

16  for us is sufficient.

17          THE COURT:  All right.

18          MR. GILLIGAN:  Well, Your Honor, I -- I -- there's a

19  little bit of, it seems to me, not taking "Yes" for an answer

20  there in Plaintiffs' counsel's remarks.

21      And the point here is a larger one.  And Secondary Orders

22  are an example.  As I say, we're preserving, in general, the

23  documents and information concerning the operation of the

24  Program.  And it may be that there are additional documents

25  that I am certainly unaware of, and certainly couldn't talk

1   about on the public record that, again, in a further classified

2   submission, if the Court wishes, we could explore this issue

3   further to see's if there is --

4         **THE COURT:**  But, see, the problem is, Counsel, the

5   "maybes" and the "possiblys."  And it's putting the Plaintiffs

6   at an unfair advantage, probably with great justification,

7   because the nature of the materials that we're talking about,

8   you know, are -- in the Government's view, the disclosure of

9   them could cause grave damage to our national security.  So I'm

10  not deriding what you're saying; but you understand the

11  position that it puts the Plaintiffs in, and even the Court,

12  because the Court is not really free to rely on those documents

13  in any kind of a public filing.

14        **MR. GILLIGAN:**  Well, I mean, the fact that all of the

15  information we're talking about is classified, Your Honor, and

16  cannot be, you know, used as part of the litigation of a case

17  on the public record in this case -- and potentially in the

18  *First Unitarian*, and in some cases already has been subjected

19  to claims of State Secrets Privilege -- I mean, that -- that is

20  an underlying problem here, you know, regardless of whether the

21  information is preserved.

22     And the question of whether it could ever be utilized in

23  litigation --

24        **THE COURT:**  That's a wholly different issue.

25     And even whether it can be -- can even -- even whether

1  there -- it is technologically capable of being accessed at a

2  later point is a whole other point that we haven't discussed,

3  and we can't really discuss, except in very general, high-level

4  terms.

5          **MR. GILLIGAN:**  But Your Honor, I'm not aware -- I

6  mean, Ms. Cohn talks about us waiving our position on standing

7  or pursuant to that.

8      I'm not aware of there being an obligation on a nonmoving

9  party in a situation like this to -- to have to waive its

10 defenses in order to -- in order to be relieved of onerous and

11 unreasonable preservation.

12         **THE COURT:**  But that's not the argument.

13     The argument is, you know, the Government has a choice at

14 some level, which is -- because here, we're talking about not

15 grave harm to national security; we're talking about a burden

16 and an inconvenience on the NSA.

17     So what the Plaintiffs are arguing, as I hear their

18 argument, is:  You know, you can't have it both ways.  You

19 can't say, "Well, we're not going to keep this material.  And

20 based upon that, we may argue later on that you don't have

21 standing or any basis to claim damages.  And take our word for

22 it."

23     And they're saying, you know, if that's your position, then

24 they have to do it the old-fashioned way, and keep the evidence

25 preserved, and argue later on that they're entitled to see it.

1    So I don't really think that -- it's not like -- it's not

2 like the -- that you're being ordered or even compelled in any

3 way to waive a position that you have.  It's really the Court

4 trying to find a balancing, so that the Plaintiffs can attempt

5 to vindicate their rights, and the Government can maintain

6 its -- you know, its secrets.

7        **MR. GILLIGAN:**  And as I say, Your Honor, we're

8 willing to explore that with you with, as I say, a further

9 classified submission, where we can talk about --

10    You know, we've got up to five years of actual data at any

11 given time.  And I've given you the example of the Secondary

12 Orders, which could shed light on the issue.  There may be

13 further information that we can bring to the Court's attention.

14    But I mean, if the Plaintiffs' position is that, you know,

15 they have to have it all, short of us essentially waiving

16 standing as an issue, which I don't know -- which I don't

17 believe we can, because it's jurisdictional, then, you know,

18 there's -- I don't -- I'm not seeing any -- any room, at least,

19 in the position -- Plaintiffs' position.

20        **THE COURT:**  You know, the Court's answer -- I'm

21 sorry.  I didn't mean to interrupt you.  I apologize.

22    The Court's answer to what you've just said is that there

23 has been ample opportunity by the Government to file

24 information in the public record, and classified information,

25 and information, you know, that is so secret, that the Court is

1  not even allowed to reveal the level of classification that

2  it's classified at.  That sounds kind of doublespeak.

3      But the point I want to make is, you know, enough is

4  enough.  We're here on a proceeding.  We're now in a phase of

5  essentially a preliminary injunction phase.  The Government had

6  this opportunity to propose alternatives.  It didn't do it.

7  And it's too late to do it.

8      So let's move on to the next question at this point,

9  because I'm kind of getting tired of this, you know, death by a

10  thousand cuts here, which is being inflicted upon the Court and

11  to some extent on the plaintiff.  So let's move on to the next

12  question.

13      I assume the Government's -- first of all, I assume you've

14  already answered Question Number B, which is, Ms. Cohn, whether

15  the scope of Plaintiffs' request is reflected in the first

16  paragraph of your clients' proposed order, together with the

17  added sentences from the Plaintiffs' reply.

18          **MS. COHN:**  Yes, Your Honor.  That's our best effort

19  right now.

20          **THE COURT:**  What is the basis of your objection,

21  Counsel, which is at --

22      I assume the answer to the next question is:  Yes, the

23  Government does object.

24      And now I'd like to know:  What are the grounds?

25          **MR. GILLIGAN:**  Yes.  Well, because the additional

1  provision there they're seeking to have added to the Order,

2  Your Honor, is clearly overbroad, and would vastly expand the

3  Government's preservation obligations beyond the limits of

4  reason.

5      There's at issue here and in these cases are a discrete

6  number of identified activities:  Content of collection --

7  content collection of communications reasonably believed to

8  involve communications with agents of terrorist organizations;

9  collection of bulk Internet metadata under Presidential

10  authority; collection of telephony metadata in bulk under

11  Presidential authority under Section 215.

12      But what they want is an order that would require us to

13  essentially, as I said before place, a dragnet lit. hold over

14  the entire NSA, to search for -- and, if there are any,

15  segregate -- records pertaining to the Plaintiffs or their

16  communications, regardless of what authority the Program is

17  being run under, whether it's a Title I FISA order, whether

18  it's collection of foreign communications under

19  Executive Order 12333.

20      The preservation obligation is rooted in the facts asserted

21  and the claims raised in the Plaintiffs' Complaint.  And they

22  want to completely unmoor our preservation obligation from any

23  of that.  And that's -- that is simply far beyond anything

24  that's contemplated under the common law or the Federal Rules

25  of Civil Procedure, at least as far as we're aware.

1        THE COURT:  All right.  Ms. Cohn, is it overbroad?

2        MS. COHN:  Our effort here was to moor this in the

3   allegations of the Complaint.  And I think that, sadly, this

4   gets down to the bottom of, you know, their attempt to try to

5   reconstrue our Complaint here; but we didn't allege anything

6   based upon communications with one end involving terrorists.

7   In fact, we specifically excluded from the class in *Jewel*

8   anybody who was involved with a terrorist obligation.  We're

9   talking about ordinary people and bulk collection.

10      So, first of all, all of this TSP --

11      "TSP" is a made-up term.  Right?  It's a term that the

12  Government --

13        THE COURT:  Well, it's not made up.  It was coined

14  after the fact.

15        MS. COHN:  Right, to describe something that they

16  admitted, as opposed to a program.

17      And so whenever they lodged stuff in the idea of the

18  Terrorist Surveillance Program, it's always -- I think it's

19  nonsensical from our perspective, because it doesn't give us

20  any indication of what it is they're keeping; but certainly our

21  Complaint has never been about people talking to terrorists.

22  Our Complaint is about ordinary people; a class of AT&T

23  subscribers who aren't talking to terrorists.  And that's how

24  the class is defined, in the class terms.

25      So the idea that this is about people talking to terrorists

1   is just not in the Complaint, at all.  So they kind of made

2   that part up.

3       But in any event, the idea here is to map the preservation

4   obligations to the allegations of the Complaint.  And the

5   allegations of the Complaint are about bulk collection,

6   regardless of what legal "hat" or authority the Government is

7   putting on it at any particular point in time.  And that's what

8   we were trying to do.

9           **THE COURT:**  If it's unconstitutional.

10          **MS. COHN:**  If it's unconstitutional or violations of

11  the statutes that we've alleged.

12      I know you have an order.  And there's some -- the

13  statutory stuff is still a little unclear, what's left; but

14  yeah, the things that we think are unconstitutional and illegal

15  are the things we want them to preserve.

16      And we've alleged -- and our allegations -- the thing

17  that's difficult here is our allegations -- that's difficult is

18  there's a disconnect between what the Government -- the way

19  this Government wants this case framed, and the way we want

20  this case framed.

21      I submit that we are the masters of our Complaint, so we

22  get to frame it the way we want.

23      We framed this about the behaviors:  About the content

24  collection, about the Internet metadata collection, and about

25  the telephone records collection.

1    And honestly we started all of this in 2006, we did think

2    it was just Presidential authority.

3        **THE COURT:**  So you're saying it goes beyond

4    President Bush's -- George W. Bush's authorization, beyond

5    FISA, beyond the PATRIOT Act.

6        Collection of this metadata by whatever -- whatever actual

7    or apparent or asserted authority?

8        **MS. COHN:**  That's correct, Your Honor.  If they're

9    collecting the --

10        **THE COURT:**  Wouldn't that essentially, as counsel

11   said, if correct -- yes, there's a lawsuit; but yes, there's a

12   country here that has security issues that we all agree are

13   with us every day.  So isn't there some limit, or isn't there

14   some way we can draw a line, so that we don't essentially have,

15   in effect -- and I don't want to be cynical about this -- the

16   NSA working for the Plaintiffs in this case, as opposed to for

17   all of us?

18        **MS. COHN:**  No, Your Honor.  I want them to protect

19   us.  I think the NSA is an important agency, and it needs to do

20   its job.

21        On the other hand, it's important that we get a judicial

22   ruling about whether it's doing its job constitutionally.  And

23   all I'm trying to get is the regular rules of civil litigation

24   to apply here as much as we possibly can.

25        **THE COURT:**  Let me ask you a question that's a little

1   bit -- maybe it's off the wall, and maybe it's improper, but

2   you know, I get to do that with life tenure --

3       (Laughter.)

4           **THE COURT:**  -- and that is:  Has this issue ever

5   arisen in any of the other cases around the country that have

6   dealt with similar issues:  The collection of telephony records

7   and metadata; a preservation order?  Is this the only Court in

8   which this issue has arisen, to your knowledge?

9           **MS. COHN:**  Well, Your Honor, in the *ACLU versus*

10  *Clapper* case, which is the phone-records case, the Government

11  isn't contesting that they collected the records, so the issue

12  hasn't come up.  And they didn't need a preservation order,

13  because they're not fighting them on collection.

14          **THE COURT:**  Now I want to ask you about that

15  question, because I've read the brief.  You know, when you're a

16  Judge, you have no life other than the cases; you read this

17  stuff.

18      And there was a cite.  It was a statement in -- I just read

19  the ACLU's brief.

20          **MS. COHN:**  Right.

21          **THE COURT:**  And they said it is admitted.

22      I didn't have the record to go back to.  In what judicial

23  format was this admission that the Government had actually

24  intercepted the ACLU?  Because I don't know that it's not

25  there, but I just couldn't find reference to it.

 1          **MS. COHN:**  I believe in the declarations, Your Honor,

 2   that were submitted in that case, it is assumed that they're

 3   collecting it.  They're not fighting about whether they're

 4   collecting.

 5      Let's put it this way.  I don't know exactly where in the

 6   record.  I know the ACLU has a citation to the record.  I

 7   wasn't able to track it back, in the 24 hours between when we

 8   got there and today.

 9          **THE COURT:**  No, but the point is you're arguing --

10   you're saying that the reason -- I guess it's a little bit of

11   speculation, maybe, but the reason you believe there was no

12   order in that case was because of this acknowledgment that the

13   Government made.

14      And what about in the other case?  I think it's in the D.C.

15   case?

16          **MS. COHN:**  The *Klayman* case?  I don't know about the

17   *Klayman* case.  The *Rand Paul* case was just filed, so I'm not

18   even sure that it's been served yet.  There's a case called --

19   my opponents certainly know all of the litigation.

20      I mean, the reason there wasn't a preservation order before

21   the most recent spate of cases in June is because they were all

22   collected in the MDL.  And we had the -- you know, the original

23   preservation is order is for the MDL.  So there was a

24   preservation order in place for all of the cases that were

25   filed prior to June 2013.  It's the MDL order that we're

1  fighting over here.  So because the cases all got combined,

2  they weren't popcorned out around the country.  There was all

3  one.

4      Now, since June, there are three or four different cases.

5  As I said, I don't think it was challenged in the *ACLU*.  I'm

6  not sure the status in *Klayman*; but obviously, they got a

7  preliminary injunction, and now that's up on appeal.  And the

8  other cases, I think, are in motion practice still.  So I don't

9  know the status of those; but again, I suspect the Government

10  does.

11          **THE COURT:**  Maybe you could enlighten us, first of

12  all, on the *ACLU* case.  I don't know if you were involve din

13  that case.

14          **MR. GILLIGAN:**  I was involved.  Yes, sir.

15          **THE COURT:**  Was there such an acknowledgment in that

16  case?

17          **MR. GILLIGAN:**  There was no admission as such,

18  Your Honor.

19      What happened was the Secondary Order directed to Verizon

20  Business Network Services was unlawfully disclosed.  The day

21  after its disclosure, the Director of National Intelligence

22  acknowledged its authenticity.

23      Thereafter, after we had already taken that step, the ACLU

24  filed its case and alleged in its Complaint and thereafter

25  submitted declarations attesting that the organization was a

customer of Verizon Business Network Services during the time

that that order to VBNS was in place.  And so we had not

contested the fact of collection in that case.

However, in all of the other cases pending around the

country involving this issue -- *Terry*, and the *Klayman* case.

And there's a case call *"Smith"* in Idaho.  There's

Senator Paul's case; another case called *"Perez"* down in Texas.

Well, the *Perez* case is -- we haven't engaged in motion

practice there yet; but in all of the other cases, we have

challenged the Plaintiffs' standing.  There are the

preservation orders in many of those other cases, because

haven't asked for any Preservation Orders, nor have any of

those other plaintiffs asked that we be required to retain the

data that the FISC's orders require us to age off,

notwithstanding that we've given them all of the same notice

that we've provided to the Plaintiffs in these cases.

         **THE COURT:**  All right.  Not my case, but -- and I

asked the question, so I'm certainly not criticizing counsel,

but we have enough to chew on here.

         **MR. GILLIGAN:**  May I, Your Honor?

         **THE COURT:**  Yes, please.

         **MR. GILLIGAN:**  Coming back to question 5B, and the

language the Plaintiffs were proposing, just the one other

thing I would say about that is they're asking for language

that says the Court reaffirms that the order extends to

1   telephone records, Internet metadata records, and content data,

2   without regard to when the Government obtained them, or the

3   legal authority under which the Government obtained them.

4       That's another way of saying, "All."

5       And that's an obligation that's unmoored from any

6   allegation in the Complaint, or to which any litigant --

7           THE COURT:  So it's your contention that the

8   Complaint in both cases, collectively, identify particular

9   programs which they contend are illegal, and under which this

10  information was intercepted, as opposed to the act of

11  intercepting, however, on whatever authority it was done?  Is

12  that your position?

13          MR. GILLIGAN:  That's our position.  They *First*

14  *Unitarian* is about collection of bulk telephony metadata

15  pursuant to Section 215 of the USA PATRIOT Act.

16      *Jewel* certainly is about -- there's no dispute -- bulk

17  collection of Internet data under Presidential authority.

18      Those -- there are -- there's language there that are

19  touchstones by which a litigant in our position can make

20  reasonable decisions about their preservation obligations.

21      This language that the Plaintiffs would have the Court

22  include is essentially a requirement to basically preserve all

23  such communications data that the NSA collects, period,

24  regardless of under what authority, regardless of any relation

25  whatsoever to the matters raised in those Complaints.

1        **THE COURT:**  Okay.  So it would be a pretty simple

2    matter for the Court to go through the Complaint in both of

3    those cases, and fashion an order that moors the preservation

4    obligations to those allegations.  Correct?

5        **MR. GILLIGAN:**  In principle, yes, Your Honor.

6        **THE COURT:**  All right.

7        **MS. COHN:**  Your Honor, that's what we tried to do.  I

8    apologize.  Again, we had all of 27 hours to do this; but I

9    guess this was last week, so we had a little more.  Couple

10   days.

11      But I do want to point out that on page 4 of our reply

12   brief, we give you three of many, many allegations in the

13   *First Unitarian* Complaint that are not tied to Section 215.  We

14   just used 215 as an example, because it's changed over time.

15      And it will -- there's -- it's not -- you know, we're

16   not -- we're cognizant of the fact that that could happen, and

17   we drafted our Complaint so that the underlying authority

18   wasn't the driver here.

19      I'm happy to go ahead and try to propose something that

20   anchors into the allegations of our Complaint, but I'm not --

21   I'm not happy to revise our Complaint to be limited in the way

22   that the Government's trying to revise it.

23        **THE COURT:**  Yeah.  You see the problem that the Court

24   has is this.  To some extent, the Plaintiffs are kind of

25   shooting -- throwing darts in the dark, because they don't no

1    the full breadth of the Government's programs.

2        The Court has a better idea of that, because the Court has

3    seen classified information.  So in terms of essentially trying

4    to be fair to both sides, the Court must take into account what

5    it's been told without revealing classified information in

6    fashioning a proper order, because the Court knows a lot more

7    than the Plaintiffs know.

8        And so I guess the Court's task is -- whether with the help

9    or counsel, or on its own -- to go through the Compliant, using

10   the briefs and the Complaint, itself, and to try to fashion an

11   order that fairly reflects the allegations as liberally

12   construed, because the Plaintiffs don't know all of what was

13   happening here.  Is that a fair point?

14           MR. GILLIGAN:  A fair point, Your Honor, to which I

15   would say we are -- we'd be happy to draft a proposed order of

16   our own to assist the Court in that endeavor, if the Court

17   would allow.

18       And not -- not to return to an issue that I know that the

19   Court spoke its mind about on earlier, but again, to the extent

20   that there's any more information we can provide to the Court

21   to assist it in that endeavor, we stand ready to do so.

22           THE COURT:  All right.  Let's go to the Question

23   Number -- let's see -- C.

24           MR. GILLIGAN:  5C?

25           THE COURT:  Yes, 5C.  So what is the Government's

1 response to the Plaintiffs' suggestion that the Government

2 admit or deny that Plaintiffs' telephone records have been

3 collected, or for how long?

4          **MR. GILLIGAN:**  We cannot do that, Your Honor.  I

5 don't think that comes as a shock.  That's precisely the kind

6 of information over which we've asserted the States Secrets

7 Privilege in the *Jewel* case.

8     As we were discussing a little bit ago, we did not admit to

9 collection of people's data -- at least, under circumstances as

10 we have in this case -- in the *ACLU* case.

11     Counsel, in raising this issue in their reply brief, used

12 the *ACLU* cases as, I suppose, a model for what could happen

13 here.  And what happened there was -- is that that case

14 involves Plaintiffs who were subscribers to a carrier whose

15 participation in the Program at a particular time has been

16 officially acknowledged; but there has been no other

17 acknowledgment.

18          **THE COURT:**  And it was only officially acknowledged

19 because it had been inappropriately disclosed?

20          **MR. GILLIGAN:**  Only because it had been

21 inappropriately disclosed, and prior to the filing of the

22 lawsuit in question, not because of the lawsuit in question.

23     And since that time -- and before, for that matter -- the

24 Government has never confirmed or denied the participation of

25 any carrier at any particular time in any of these programs.

1          **THE COURT:**  All right.

2          **MR. GILLIGAN:**  And we cannot do so here.

3          **THE COURT:**  All right.  Well, I had to ask the

4    question.  Counsel proposed it as a possible solution.

5    Sometimes you need to get that on the record.  And I think in

6    case of this importance, I think you need to get the

7    parties' -- especially the Government's -- position on the

8    record.

9          Let's move to Question Number 6.  Does the Government

10   object to the insertion of the third paragraph in Plaintiffs'

11   proposed order regarding the FISC's imposed restriction

12   concerning that Court's required authorization of any review or

13   use of records for intelligence gathering or any other

14   nonlitigation-related purposes?

15          **MR. GILLIGAN:**  Your Honor, our trouble with this

16   proposal is twofold.

17          One, it seems we were talking a little while ago about the

18   respective jurisdiction of the two Courts:  This Court, and the

19   FISC.  Seems that the language that the Plaintiffs are

20   proposing there is -- involves matters that fall within the

21   FISC's jurisdiction.  What access should the -- should the

22   Government and the state personnel and what-have-you have to

23   these data that collected under authority of the FISC's orders?

24          This Court's jurisdiction is to determine what our

25   preservation obligation is; but apart from preserving data,

1  what access we should have to it is something that should be

2  determined by the FISC, and in accordance with statutes and

3  regulations and Executives Orders that otherwise govern such

4  matters.

5         **THE COURT:**  On minimization?

6         **MR. GILLIGAN:**  On minimization, yes.  Principally,

7  minimization; but perhaps otherwise.

8      The other thing that troubles us in this language is that I

9  could foresee, particularly after the debate we've been having

10  today, all in good faith, that we could find ourselves here

11  three or four years down the road, arguing whether or not this

12  language imposed some sort of independent restriction on the

13  Government's access to preserve data, which it absolutely

14  should not do.

15     Why -- the Court's writ here is to tell us whether or not

16  to preserve; but what access we should have to our own data

17  while it's being preserved is something, again, that is not at

18  issue in this litigation.

19         **THE COURT:**  All right.

20     Ms. Cohn, so the issue, from the Court's's perspective, is:

21  Is this really going beyond the purpose of this hearing and

22  beyond the Court's's authority?  There's statutory authority

23  that requires minimization.

24     I understand, given the colloquy we had at the beginning

25  about the irony issue about the Plaintiffs perpetuating data

1   that they find maybe to have been unconstitutionally obtained;

2   but where does this Court have authority to do something

3   required by statute, and really is beyond the purview of this

4   case?

5           MS. COHN:  Well, all I was trying to do -- and that's

6   why it says nothing in that Order shall change what the FISC

7   has ordered them to do -- was to be clear that there wouldn't

8   be a problem down the road that somehow, even though the FISC

9   had told them they couldn't use the data for anything other

10  than the litigation, somehow your Order countermanded that, and

11  they could use it for purposes other than the litigation.

12      I mean, ordinarily -- and again, I'm just coming from the

13  regular preservation situation, where a preservation order

14  routinely says, "You should preserve -- "You could preserve

15  this stuff for litigation, but you can't use it for any other

16  purposes."  I was trying to put that idea into this; that this

17  wouldn't open the door for the Government to be able to

18  continue to make operational use of this information.

19      And so that's all I was trying to do, was to make sure

20  that, to the extent it was preserved because of this Court's

21  Order, this Court's Order doesn't authorize access outside of

22  the scope of the litigation, either.

23          THE COURT:  All right.  Well, does the Government

24  acknowledge that it would be inappropriate for the Government

25  to access any of the preserved information that would otherwise

1  be aged out?

2      **MR. GILLIGAN:**  It would -- within -- any access we

3  should have to that aged-out data would have to be with the

4  permission of the FISC, and in accordance with FISC orders.

5      The language here, Your Honor, I don't believe accomplishes

6  the objective that Ms. Cohn just described.  I'm either

7  misunderstanding the language, or I'm misunderstanding

8  Ms. Cohn's explanation of it.

9      It says nothing in this order -- this is language that

10  Plaintiffs would have this Court enter -- nothing in this order

11  where the Court's prior preservation orders shall be construed

12  as authorizing any review or use of telephone orders records or

13  intelligence gathering for any other nonlitigation purposes.

14      What we fear is that this -- we don't want sort of a day to

15  come where there's an argument that this language independently

16  barred us from accessing the data.  Any restrictions on our

17  access to the data are -- should be imposed by the FISC in

18  accordance with the terms of FISA.  To the extent that that --

19      **THE COURT:**  So it's a jurisdictional issue, is really

20  what you're saying?

21      **MR. GILLIGAN:**  Right.  The Congress, through FISA,

22  conferred on the FISC the authority to determine whether and

23  under what circumstances the particular personnel should have

24  access to data that are acquired under the authority of FISA.

25      To the extent that this has some more benign purpose, it's

1   unnecessary.  And we would --

2          **THE COURT:**  Let me ask you this question.

3      Do you acknowledge and do you represent that any access

4   that the Government would want of this aged-out information --

5   they would first seek permission from the FISA Court?

6          **MR. GILLIGAN:**  Absolutely.

7          **THE COURT:**  Okay.  So there you go.  We've got a

8   representation on the record.  And I think that would be the

9   law whether you said it, or not; but it's clear on the record.

10      And I do think, thinking out loud again -- I haven't

11  decided how I'm going to rule -- I think this is a little bit

12  more -- this goes a little bit beyond this Court's

13  jurisdiction, and may be unnecessary, especially in light of

14  the Government's representation.  And also, from a 30,000-foot

15  level, the feasibility of accessing this information, as well.

16  So --

17          **MS. COHN:**  Well, Your Honor, all I really wanted to

18  do here -- and this isn't the most important point that we're

19  here to talk about -- but is to say that nothing in this order

20  shall be construed as giving them the authority.  And my

21  intention was to preserve; to make sure that there wasn't an

22  argument later that this order somehow gave them authority, so

23  that they have to go to the FISC if they want to seek it,

24  because the only reason this is being preserved is because of

25  this order.

1          THE COURT:  Well, I understand that.  All right.  I

2   hear you.

3      Let's move on to Question Number 7.  The preservation order

4   in *Jewel* requires that counsel submit to the Court under seal

5   and pursuant to Federal Rule of Civil Procedure 11 a statement

6   that the Court's preservation directive has been carried out.

7   Does the Government's recent and partially declassified

8   submissions regarding its preservation protocol under the *Jewel*

9   preservation order satisfy this requirement?  And does the

10  Government object to this same provision in any preservation

11  order issued in *First Unitarian Church*?

12          MR. GILLIGAN:  Well, Your Honor, we satisfied the

13  certification requirement, actually, in 2007.  We filed under

14  seal a certification executed by lead counsel at the time,

15  certifying that, on the basis of the efforts that were outlined

16  in our then-classified declaration, that we had complied with

17  our preservation obligations.  And so we did that back in 2007.

18      We would have no objection to, if the Court so wished that

19  part of the preservation order issued in *First Unitarian*, doing

20  the same thing here.

21          THE COURT:  All right.  Counsel.

22          MS. COHN:  Your Honor, I think they should have the

23  same obligations here.  This brings up something I do want to

24  discuss.

25      First of all, the Rule 11 statement in the *Jewel* case is

1   Docket Number 67.  And it's still classified.

2       These two filings that they presented on Monday are

3   still -- are still on the secret docket, but your Court -- you

4   know, you ordered them in September to go back through the

5   entire record of both *Jewel* and the MDL, and do

6   declassification of anything that they could declassify.  These

7   documents weren't part of what they submitted on December 20th.

8   We gave Your Honor a list in our response in January of some of

9   the ones that we saw at this particular point in time; but I

10  think that they need -- they haven't complied with what you

11  asked them to do in September.  It's plain now -- this thing

12  they just sprung on us on Monday -- that they could have

13  declassified that before this.

14      And so I think they should have to go back through and

15  actually do a real declassification of things like what they

16  said in order to say that they had complied, and anything else

17  that they can declassify.  I think they've failed pretty

18  dramatically to abide by what the Court ordered them to do in

19  September.  That's why we're in this mess, and that's why we're

20  in this mess on an emergency basis.

21          **THE COURT:**  Well, this is somewhat apart from the

22  purposes for which you're here; that it's a separate issue

23  about whether the Government has complied with the Court's most

24  recent Order with respect to declassification.

25      And you're saying that they didn't comply with that.

1          **MS. COHN:**   Your Honor, I think that's why we're here.

2    If they'd have shown us this stuff in December, we'd have known

3    that this problem was coming, and we'd have known that their

4    reinterpretation was coming.   So I guess that I think that, you

5    know, they need to declassify as much as they can.

6          Again, the actual statement that is referenced in the *Jewel*

7    order in the MDL order, you know, is Docket 67; is the one that

8    they filed in *Jewel*.   I couldn't find the docket number in the

9    MDL from 2007 in the moments we had before this hearing; but

10   that they did do those things.   We don't know what they look

11   like, but I think they should be ordered to try to go back and

12   declassify as much as of that as possible, so we get as big a

13   picture as we can about what they're doing for evidence

14   preservation.

15               **THE COURT:**   All right.   Ms. Berman.

16          **MS. BERMAN:**   Your Honor, on the larger point about

17   our compliance with the December 20th deadline, I went back and

18   looked at the transcript from the case-management conference on

19   September 27th.   It's very clear from the colloquy between the

20   Court and both counsel that Your Honor was ordering the

21   Government to do a declassification review of the State Secrets

22   declarations that the Government had submitted.

23          And there was a whole colloquy about it sort of ending with

24   Mr. Coppolino saying, "And we're talking about the *ex parte*

25   *in camera* State Secrets privileged declarations in *Shubert* and

1   *Jewel*; the two cases?"

2       And the Court said, "That's correct."

3       And so that was our understanding of our obligation, was

4   that we were to do a declassification review by December 20th

5   of the various State Secrets declarations that had been

6   produced in both of those cases.

7       And then, Your Honor, on the more narrow point about the

8   Rule 11 certification, my understanding is that that -- that

9   the 2007 one filed in the MDL case was filed under seal, and

10  was not -- but that it was not classified.

11          **MS. COHN:**  These are not distinctions that were

12  readily apparent to Plaintiffs

13          **THE COURT:**  Well, do they need to be sealed?

14          **MS. BERMAN:**  Your Honor, my understanding is that

15  there's nothing classified in them.

16          **THE COURT:**  That's a different issue.

17          **MS. BERMAN:**  I think they were ordered under seal by

18  the Court.  That's what Mr. Coppolino just told me.

19          **THE COURT:**  All right.  Do you have any objection

20  to -- once the Court reviews those, to them being unsealed?

21          **MS. BERMAN:**  I think we'd have to check back with the

22  client, just to make double sure that there's nothing in there.

23          **THE COURT:**  Why don't you do that, and let the Court

24  know one week from today whether the Rule 11 certifications can

25  be unsealed?

1          Ms. Ottolini, that date would be --

2               **THE CLERK:**  March 26th.

3               **THE COURT:**  Do you want to say something else?

4          I have a bigger point, but -- not a bigger point, but a

5     point.  It's a question, which I -- okay.

6          So hypothetically, if there were documents that are

7     submitted under -- that are classified -- the documents are

8     classified, but within those documents, there are unclassified

9     paragraphs that are designated as such, is there any reason

10    that those cannot be disclosed?

11         The fact that they're in a document such as a declaration

12    may be the -- I understand from your classifications guru, you

13    know, the document, itself, remains classified; but I was

14    interested in the fact that as I was reviewing some of this

15    information, it had a classification that was -- which was

16    translated to me unclassified.

17         So my question is:  Why can't the unclassified portions be

18    published?

19         Not -- not the document; but as I understand that, if any

20    part -- if one word of the document is classified, the whole

21    document is classified; but the individual paragraphs -- so it

22    could be broken out if they're unclassified?

23              **MS. BERMAN:**  Well, I think that's what we do when we

24    submit a public version of the classified -- of a classified

25    declaration or document.

1          THE COURT:  Well, I'm not sure.  I didn't do -- I was

2     trying to, you know, compartmentalize my brain from

3     inadvertently disclosing, but it struck me that there were a

4     lot of paragraphs that were designated as unclassified.

5          And I didn't go through then the public filing to see

6     whether all of those paragraphs were disclosed in the public

7     record; but as a matter of -- in sort of theory or practice, is

8     there any reason why those stated to be unclassified paragraphs

9     could not be broken out from the document, and published?

10          MS. BERMAN:  I think the answer to your question is:

11     That is what we do when we do the public ones.

12          So in every case where there has been a classified

13     declaration -- you know, at least the State Secrets privileged

14     declarations -- we submitted a public version of it -- with

15     that.

16          THE COURT:  The December 2013 materials and

17     declaration.

18          MS. BERMAN:  Right.  Well, again, Your Honor, that --

19     this is sort of another way of answering it.  I mean, the 2007

20     classified declaration and brief, we just went through this

21     process --

22          THE COURT:  Right.

23          MS. BERMAN:  -- of figuring out what was no longer

24     classified and could be produced in a public document.

25          THE COURT:  All right.

1       **MS. BERMAN:**  So we just did that for the 2007

2   documents.

3       **MR. GILLIGAN:**  May I for a moment, Your Honor?

4       **THE COURT:**  Yes.

5   (Discussion off the record.)

6       **MS. BERMAN:**  So, Your Honor, I think if you look at

7   the -- that the redacted version of the 2007 declaration that

8   we just submitted, I mean, you will see that that paragraph

9   that has a "U" next to it is fully produced.

10      **THE COURT:**  All right.  So that answers my question.

11  All right.

12      And again, I just didn't do a redlined version on my own to

13  see; but it struck me as I was reading the still-classified

14  materials that were used, but which indicates "unclassified."

15  So you're saying those would have -- are now in the public

16  record?

17      **MS. BERMAN:**  Yes.  I'm flipping through them now, and

18  that's --

19      **THE COURT:**  All right.  What's your position about

20  what the Court's actually said in the case-management

21  conference with respect to what it was ordering?

22      **MS. COHN:**  I did not understand the Court to only be

23  limiting their need to do a declassification review to just

24  stuff having to do with their -- just their State Secrets

25  allegations.

1          My -- my companion here just gave me the quote.  And this

2     is a quote from you.  "I'm going to require that all previous

3     declarations be declassified and presented to the Court -- all

4     of them, without exception -- because I want a full record

5     before the Court."

6          I did not understand that --

7          This was discussed in September.

8          I didn't understand that to be limited to their

9     declarations regarding State Secrets.

10          **THE COURT:**  Well --

11          **MS. COHN:**  We should have access to all facts that

12     they submitted *ex parte in camera* to this Court that they're no

13     longer claiming classification under, regardless of whether it

14     was in a State Secrets declaration, or a declaration in support

15     of evidence preservation, or any other secret declaration.  If

16     it's not properly classified anymore, we should see it.

17          **THE COURT:**  Well, Ms. Berman, my intention was at the

18     time -- and you've given me quotes from what I said, but my

19     intention was and the whole context of it was there had been

20     all of these unauthorized -- some would say "treasonous"; I

21     would say "treasonous" -- revelations made.

22          And the Government had acknowledged, just like counsel --

23     your colleague had just said with respect to the telephony

24     carriers -- carrier, at least -- it acknowledged the

25     authenticity of what had been leaked.

1    And so my concern was, in order to even the playing field,

2   is that any anything of that ilk which had been submitted to

3   this Court in a declaration that was otherwise classified, all

4   I was asking -- I wasn't ordering the Government to publish

5   that.  I was ordering the Government to reassess whether or not

6   this information was, in fact, revealed in public and

7   acknowledged by the Government, such that they could be

8   unclassified for purposes of this litigation.

9    So irrespective of the narrow reading that you've given it,

10   I think my intention, at least, was -- and I'm not criticizing

11   the Government, because clearly I was ambiguous about it --

12   that was the intention of it.  And is that something that can

13   readily be done, or has it been done?

14       **MS. BERMAN:**  Your Honor, I think that the Government

15   has basically done that.  I -- you know, I don't think that

16   there are other classified declarations in the *Jewel* and

17   *Shubert* cases that have not been -- gone through

18   declassification review process at this point.

19    I think that there's a few briefs, classified briefs; but

20   those would just summarize facts that were in declarations.

21    And so in terms of your goal that it be, you know, the

22   Government's sort of confirmation of information, I believe

23   that that has been done.

24       **THE COURT:**  All right.  Ms. Berman.

25       **MS. COHN:**  Your Honor, we submitted a partial list.

1          THE COURT:  Sorry.  I said "Ms. Berman."  I meant

2    Ms. Cohn.

3          MS. COHN:  I'm happy to be confused with her.

4          MS. BERMAN:  Thank you.

5          MS. COHN:  It's Document 173 is our motion for

6    partial summary judgment where, on page -- well, 15 of 17 in

7    the Court's things, we begin to talk about the things that we

8    can glean right now they didn't give unclassified versions of

9    on their December 20th.

10         Now, I don't have a full list.  I mean, we're still kind of

11   guessing a little bit here; but they certainly know.  And I

12   think that they should have to go back through, and give a list

13   of everything that they've filed *ex parte in camera*, and

14   explain where they did it.

15         I'd also like, frankly, a bit of a map, because in the

16   declaration that they have just unsealed in 2007, they refer to

17   an Alexander Declaration in *Verizon* cases.  That's not -- I

18   can't find that.  That's not what it's called in the context of

19   the -- of the actual Court docket.  So I would also like a map

20   to things that -- you know, if they're calling something in a

21   later document that's referring to something in an earlier

22   document, I really don't want to have to play *Where's Waldo?* to

23   find it.  That was one we were very interested to see finally

24   unsealed.

25         And we have some guesses about which Alexander Declaration

1  they're talking about, but there's nothing called "Alexander

2  Declaration in Support of *Verizon* Cases" on the docket.  So --

3        **MS. BERMAN:**  Your Honor, again, Mr. Coppolino tried

4  to clarify this, to get an understanding of what the Court

5  wanted us to do at that hearing.  And that's why he

6  specifically said, "Declarations in the *Jewel* and *Shubert*

7  cases; those two cases?"  And the Court said, "That's correct."

8        **MS. COHN:**  Well, *Shubert's* part of the MDL.

9        **MS. BERMAN:**  Well, there were other declarations

10  filed in the MDL that did not specifically apply to *Jewel* and

11  *Shubert*.

12        **THE COURT:**  It wasn't my intention to basically issue

13  an Order that anything that was confirmed from the

14  inappropriate leaks would then be affirmed by the Government.

15     I only cared about what was relevant to the cases before

16  this Court.  So to the extent that declarations or materials

17  were presented to this Court in any proceeding, whether it's

18  summary judgment or case management or whatever -- that those

19  would be unsealed, so that we would at least have a little bit

20  more of a level playing field.

21        **MS. COHN:**  Your Honor, the *Verizon* --

22        **THE COURT:**  So is there a way to get to that?

23        **MS. COHN:**  The *Verizon* case is part of the MDL, so

24  this was all under the same case number.

25     And I think they're trying to parse things now between

1   stuff that might have been specific to *Shubert*, which was part

2   of the MDL, versus stuff that was specific to Verizon, which

3   was also part of the MDL; but certainly to the extent that, in

4   telling Judge Walker how they read our Complaint, they're

5   referencing something that they filed in a different MDL case,

6   we should be entitled to see what they told Judge Walker that

7   they're referencing.  Right?

8       So that -- I mean, I feel like I'm in this kind of strange

9   treasure hunt here, to try to figure out what the Government is

10  doing.  And all I really want is a map, so I can then figure

11  out, like, what -- what are the facts that could be available

12  to us now that we deserve to see?

13      And it's not just the revelations, themselves; but of

14  course, the Government has released a large amount of

15  information.  They have a whole tumbler with FISC orders, and

16  statements from officials about the mass spying now.  So the

17  revelations started something, but the Government has now done

18  a lot of revealing of things that -- I think it's --

19          **THE COURT:**  That would also be pertinent to the cases

20  before this Court?

21          **MS. COHN:**  I believe so, Your Honor, because it's --

22  they revealed a lot of the mass spying programs.  They revealed

23  the upstream program.

24          **THE COURT:**  We've been going -- I usually don't go

25  two hours without giving everybody a break.  So let's take a

1  break.  I want to noodle over what you've said.  And I want to

2  come back and give some final remarks.

3      **MS. BERMAN:**  Your Honor, could I just wrap -- to wrap

4  this point up, briefly address Ms. Cohn's point?

5      **THE COURT:**  Please.  Yes.

6      **MS. BERMAN:**  So first of all, she has a roadmap.

7  It's the docket.  Every time we filed a classified filing, we

8  filed a notice of filing -- of lodging of a classified

9  document.  So all she has to do with look at the docket for

10 that.

11     And just to also point out that the declarations that were

12 filed -- the State Secrets privileged declarations that were

13 filed in the *Shubert* case that Your Honor specifically told us

14 to declassify -- the caption on those, even though it's in the

15 MDL, it says, "This document relates to *Shubert*."  So it's

16 clear that these are *Shubert* declarations.

17     And the ones that were filed in an MDL case, such as

18 *Hepting* or one of the other cases, that would have had the same

19 indication on those captions, too; that this document relates

20 to *Hepting*.

21     **THE COURT:**  All right.  Let's take a break.

22 (Recess taken from 3:55 p.m. until 4:26 p.m.)

23     **THE COURT:**  Okay.  So the first thing the Court is

24 going to do is direct the parties to jointly order a transcript

25 of these proceedings on an expedited basis, because I'm going

1   to make some rulings here from the Bench; some scheduling.  And

2   the Court does not have -- parties may, but the Court does not

3   have an eidetic memory about what I've said.  So I'm going to

4   say it on the record, and that will be the Order of the Court,

5   because, given the nature of these proceedings, it needs to be

6   on an expedited basis.

7       So first, the Court hereby extends the Temporary

8   Restraining Order issued on March 10th, 2014, until such time

9   as it issues a Final Order resolving the evidence-preservation

10  issue in this matter.  So that Order is continuing until

11  further -- until that is superseded by the Final Order that the

12  Court will issue.

13      The Court is inclined to issue a preservation order in

14  *First Unitarian Church*, and adopt the language from the *Jewel*

15  preservation order.

16      The Court will not include paragraphs 3 or 4, as suggested

17  by the Plaintiffs.

18      Paragraph 1 of Plaintiffs' proposed preservation order is

19  too broad.  The Court is inclined not to adopt the language

20  regarding reaffirming or referencing the preservation order in

21  *Jewel*.

22      In addition, the Court finds that the Plaintiffs' suggested

23  language on the scope of the materials to be preserved is not

24  sufficiently tethered to their Complaint.  Therefore, the

25  parties are hereby ordered to submit suggested language to

1  preserve the evidence that relates to the precise claims made

2  by Plaintiffs in the *First Unitarian Church* Complaint.

3      Because of the expedited nature of these proceedings, I

4  have to give very short turnaround times for this.  So the

5  Plaintiffs' submission must be made by no later than

6  March 20th, 2014, at 10:00 a.m. Pacific Standard Time.  The

7  Government Defendants' submission must be made no later than

8  March 20th, 2014, at 2:00 p.m. Pacific Standard Time.

9      Now, with regard to the Government's compliance with this

10  Court's prior preservation order in *Jewel*, the Court hereby

11  issues the following briefing schedule.  The Government brief

12  on this issue will be filed no later than May 9th, 2014.  And

13  it shall be supported by detailed evidentiary declarations.

14      The Plaintiffs' brief shall be filed no later than

15  May 30th, 2014.

16      The Government's replies shall be filed no later than

17  June 13th, 2014.

18      And the Court will set a hearing, if necessary, by further

19  order; but I'm not going to do it right now.

20      Now, with regard to the Court's directive to the Government

21  to review the classification of declarations filed in these

22  matters, the Court hereby clarifies its oral Order from

23  September 2013 as follows.  The Court requires the

24  declassification of information that has previously been

25  disclosed by the Government within all previously classified

1   declarations filed in *Jewel*, *Shubert*, and

2   *First Unitarian Church* cases.  The deadline shall be 30 days

3   from today:  April 21st, 2014.

4        The Government shall file a submission on April 21st, 2014,

5   indicating which declarations, by their docket numbers, will be

6   declassified as a result of the Government review, pursuant to

7   this Order and the September Order.

8        All declarations, whether from the MDL or any other matter

9   incorporated by reference, shall be similarly reviewed for

10  declassification purposes pursuant to this Court's Order.

11       And again, the parties are directed to order a transcript

12  of these proceedings, so they will have a precise indication of

13  what this Court has ordered.

14       So any questions or comments from Plaintiffs?

15            **MS. COHN:**  Yes, Your Honor.  I -- just one point of

16  clarification.  So when you say *"Shubert*," do you mean the

17  entire MDL, or the subsection of the MDL?  Because it appears

18  that they did not -- they understood that only to mean --

19            **THE COURT:**  Well, remember the remaining -- the

20  other -- the *Hepting* case and the other cases have been

21  dismissed.  Correct?

22            **MS. COHN:**  Yes, Your Honor.

23            **THE COURT:**  All right.  So just the cases that are

24  extant before this Court.  So just *Shubert*.

25            **MS. COHN:**   *Shubert*.

1          THE COURT:  Yes.

2          MS. COHN:  And the ones that are referred -- and then

3    the declarations that referred to, which would solve my

4    problem.

5          THE COURT:  That's correct.  Exactly.  That are

6    incorporated.

7          MS. COHN:  Okay, Your Honor.  That's fine.  I would

8    like to see if we could get some hearing dates in some of the

9    other things that are before the Court, as long as we have your

10   attention.

11         THE COURT:  Well, why don't you tell me what the

12   things are?  I'm not promising to give it to you right now,

13   because it's a lot for -- to digest at one time; but why don't

14   you -- perhaps I'll do it in a further written order.  So what

15   are the matters that you would like hearings on?

16         MS. COHN:  So, Your Honor, we have a preliminary

17   injunction and then a cross-motion to dismiss in

18   *First Unitarian* that is fully briefed.

19         THE COURT:  All right.

20         MS. COHN:  We had an April 24th hearing date that was

21   vacated; I suspect because of your move.

22         THE COURT:  Yes.

23         MS. COHN:  But we were hoping to get a new date for

24   that.

25         THE COURT:  All right.

1         **MS. COHN:**  The -- in *Jewel*, you had asked for four

2    follow-up questions to be briefed by the parties.  The last

3    brief in that will be filed, I think, in a week.

4         **THE COURT:**  Right.

5         **MS. COHN:**  So we'd like to have a hearing date for

6    that --

7         **THE COURT:**  All right.

8         **MS. COHN:**  -- so that we can kind of get these things

9    moving.

10        I mean, you know, our view is that some of this

11   evidence-preservation question might be able to be handled a

12   little better if we could get to the place where we could issue

13   the discovery that we need -- so even in a limited basis, for

14   this.

15        And the other thing I just wanted to remind the Court of,

16   which maybe we lost sight of in the fight, is that in *Jewel*,

17   our clients are AT&T customers.  So to the extent there's

18   preservation obligations with -- on the NSA with regard to the

19   *Jewel* Complaint, they only reach AT&T; they don't reach the

20   other carriers.

21        Now, I can't speak for my colleague who handles the *Shubert*

22   case, but at least our case is limited to one carrier.

23        **THE COURT:**  All right.

24        **MS. COHN:**  And I just don't want us to lose sight of

25   that, with his statement about how we want to preserve

1 | everything.

2 |     **THE COURT:**  I understand that.

3 |     **MS. COHN:**  That's not the scope of our -- we've never

4 | claimed our Complaint reaches beyond the class, which is a

5 | class of AT&T customers.

6 |     **THE COURT:**  All right.  I will take that under

7 | advisement.

8 |   Anything else?

9 |     **MS. COHN:**  Well, Your Honor, I have one request with

10 | regard to the Government's ongoing filings of stuff that

11 | they've been filing that's classified or under seal, which is:

12 | It would be really helpful to us if, when they file the public

13 | version of something that they've filed under seal, it's the

14 | same format, only just with redactions, rather than what they

15 | do now, which is that they rewrite the declaration.

16 |     **THE COURT:**  Well, I thought their most recent

17 | submission was in that format, with the blacking out and --

18 |     **MS. COHN:**  That's correct, Your Honor.  I guess what

19 | I would like Your Honor to assist us in requiring is that they

20 | do it like that in the ongoing one.  We kind of have a

21 | *Where's Waldo?* game trying to figure out what's going on.

22 |     **THE COURT:**  All right.

23 |     **MS. COHN:**  And if they file the same declaration form

24 | with just the redactions, then the match between the two is

25 | easier for everyone to see.

1      **MR. GILLIGAN:**  Your Honor, that -- especially when

2    we're operating on a very compressed timetable, as in this kind

3    of matter, that can be a very time-consuming enterprise

4    involving line-by-line review of a declaration that we're

5    struggling just to complete the classified version of on the

6    day of the filing, such as just this last Monday, in the middle

7    of a Government shutdown.

8      So what we tried to do is to extract from those classified

9    filings the information that we're able to determine, as best

10   we can in a short period, can safely be put on the public

11   record.  Persons familiar with the mechanics of preparing

12   classified and unclassified versions of declarations and

13   similar filings would understand that is not a trivial request

14   that has just been made by Plaintiffs' counsel.

15      **THE COURT:**  Well, I'm ordering you to do it anyway.

16   That's the Order of the Court, because it's confusing for the

17   Court as well, because again, I made the error, obviously --

18   and it was corrected properly by your colleague -- about

19   whether all of these materials I was looking at that had "U"s -

20   next to them -- meaning defined as "unclassified" -- had been

21   in the public record.  And there would be no way readily to do

22   that, except to do it -- either myself or a staff member to do

23   a copy -- some kind of copying.  So it seems to me it's easier,

24   actually, to do a redaction like you just did, which was very

25   helpful, in the last group of filings.  So that's the order of

1   the Court.

2       Anything further?

3           MS. COHN:  One -- one small thing, Your Honor.  The

4   times that you mentioned -- 10:00 a.m. and 2:00 p.m. -- that's

5   California time?

6           THE COURT:  PST.

7           MS. COHN:  Yes.

8           THE COURT:  Yes.  Thank you very much.

9           MS. COHN:  We're in PDT now, but yes.

10          THE COURT:  Pacific Savings [sic] Time.  I don't

11  know.  California time.

12          MS. COHN:  The time we're in, like, now.

13          THE COURT:  I look at my iPhone.  It says

14  "Cupertino."  I don't know.

15      Thank you very much, counsel.  I appreciate it.

16  (At 4:35 p.m. the proceedings were concluded.)

17  I certify that the foregoing is a correct transcript from the

18  record of proceedings in the above-entitled matter.

19

20  *Lydia Zinn*

21  _____      March 19, 2014
    Signature of Court Reporter/Transcriber    Date
22  Lydia Zinn

23

24

25