CINDY COHN (SBN 145997)
cindy@eff.org
LEE TIEN (SBN 148216)
KURT OPSAHL (SBN 191303)
JAMES S. TYRE (SBN 083117)
MARK RUMOLD (SBN 279060)
ANDREW CROCKER (SBN 291596)
DAVID GREENE (SBN 160107)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
Telephone:  (415) 436-9333
Fax:  (415) 436-9993

RICHARD R. WIEBE (SBN 121156)
wiebe@pacbell.net
LAW OFFICE OF RICHARD R. WIEBE
One California Street, Suite 900
San Francisco, CA 94111
Telephone:  (415) 433-3200
Fax:  (415) 433-6382

RACHAEL E. MENY (SBN 178514)
rmeny@kvn.com
MICHAEL S. KWUN (SBN 198945)
AUDREY WALTON-HADLOCK (SBN 250574)
BENJAMIN W. BERKOWITZ (SBN 244441)
JUSTINA K. SESSIONS (SBN 270914)
PHILIP J. TASSIN (SBN 287787)
KEKER & VAN NEST, LLP
633 Battery Street
San Francisco, CA  94111
Telephone:  415/391-5400; Fax: 415/397-7188

THOMAS E. MOORE III (SBN 115107)
tmoore@rroyselaw.com
ROYSE LAW FIRM, PC
1717 Embarcadero Road
Palo Alto, CA 94303
Telephone: 650/813-9700; Fax: 650/813-9777

ARAM ANTARAMIAN (SBN 239070)
aram@eff.org
LAW OFFICE OF ARAM ANTARAMIAN
1714 Blake Street
Berkeley, CA 94703
Telephone:  (510) 289-1626

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

|  |  |
|---|---|
| CAROLYN JEWEL, TASH HEPTING, YOUNG BOON HICKS, as executrix of the estate of GREGORY HICKS, ERIK KNUTZEN and JOICE WALTON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL SECURITY AGENCY, *et al.*,<br><br>Defendants. | Case No.: 4:08-cv-4373-JSW<br><br>**PLAINTIFFS CAROLYN JEWEL, ERIK KNUTZEN, AND JOICE WALTON'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**(Fourth Amendment Violation)**<br><br>Date:  October 31, 2014<br>Time: 9:00 a.m.<br>Courtroom 5, Second Floor<br>The Honorable Jeffrey S. White |

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT .................1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................2

I.   INTRODUCTION ......................................................................................................2

II.  STATEMENT OF FACTS ........................................................................................3

    A.  The Government Seizes And Searches Communications Flowing Through The Nation's Internet Backbone ................................................................................3

    B.  Seizure And Searching Of Plaintiffs' Communications From AT&T's Internet Backbone .........................................................................................................9

III. ISSUES FOR DECISION ......................................................................................11

IV.  ARGUMENT ..........................................................................................................11

    A.  The Fourth Amendment's Fundamental Principles—And The Warrant Requirement—Apply With Full Force To The Digital World, And Protect Plaintiffs' Private Internet Communications ....................................................11

        1.  The Fourth Amendment Guarantees Fundamental Personal Privacy By Prohibiting Suspicionless, Indiscriminate Government Intrusions Into Americans' Papers And Effects ................................................................11

        2.  The Fourth Amendment's Warrant Requirement Is The Time-Tested Mechanism That Prevents Government Overreaching And Suspicionless Searches, And It Applies To Digital Seizure And Searching Of Electronic Communications ........................................................................................14

    B.  Stage One:   The Government's Warrantless, Suspicionless Mass Seizure Of Domestic Internet Communications Violates The Fourth Amendment .......................16

    C.  Stage Three:   The Government's Warrantless, Suspicionless Searching Of The Contents Of Plaintiffs' Internet Communications Is Unconstitutional ........................19

    D.  The Government's Defenses Fail ..........................................................................21

        1.  Section 702 Orders Cannot Substitute For Constitutionally-Required Warrants ................................................................................................21

        2.  The "Special Needs" Exception Cannot Justify The Government's Dragnet ..........24

V.   CONCLUSION .......................................................................................................25

1

## TABLE OF AUTHORITIES

2

### Federal Cases

3

*Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*,
686 F.3d 965 (9th Cir. 2011) ............................................................... 24

4

5

*Andresen v. Maryland*,
427 U.S. 463 (1976) .............................................................................. 20

6

*Berger v. New York*,
388 U.S. 41 (1967) ......................................................... 13, 15, 17, 23

7

8

*Camara v. Municipal Court of San Francisco*,
387 U.S. 523 (1967) .............................................................................. 11

9

*Chandler v. Miller*,
520 U.S. 305 (1997) .............................................................................. 24

10

11

*Coolidge v. New Hampshire*,
403 U.S. 443 (1971) .............................................................................. 15

12

*Doe 1 v. AOL LLC*,
552 F.3d 1077 (9th Cir. 2009) ............................................................. 13

13

14

*Ex parte Jackson*,
96 U.S. 727 (1877) ......................................................................... 12, 14

15

*Florida v. Jardines*,
133 S. Ct. 1409 (2013) ......................................................................... 17

16

17

*Go-Bart Importing Co. v. U.S.*,
282 U.S. 344 (1931) .............................................................................. 18

18

*Halperin v. Kissinger*,
807 F.2d 180 (D.C. Cir. 1986) ....................................................... 14, 17

19

20

*Hepting v. AT&T Corp.*,
439 F. Supp. 2d 974 (N.D. Cal. 2006) ............................................ 10, 16

21

*Home Building & Loan Ass'n v. Blaisdell*,
290 U.S. 398 (1934) .............................................................................. 25

22

23

*In re Grand Jury Subpoenas Dated Dec. 10, 1987*,
926 F.2d 847 (9th Cir. 1991) ............................................................... 15

24

*Joffe v. Google, Inc.*,
729 F.3d 1262 (9th Cir. 2013) ............................................................... 6

25

26

*Katz v. U.S.*,
389 U.S. 347 (1967) ..................................................................... 13, 16, 17

27

*Marcus v. Search Warrant of Property*,
367 U.S. 717 (1961) ....................................................................... 12, 18, 20

28

*Marron v. U.S.*,
    275 U.S. 192 (1927) ................................................................................................ 15

*Maryland v. Garrison*,
    480 U.S. 79 (1987) .................................................................................................. 15

[Name and docket no. redacted],
    2011 WL 10945618 (FISC Oct. 3, 2011) ...................................................... 4, 7, 8

*Olmstead v. United States*,
    277 U.S. 438 (1928) ......................................................................................... 11, 15

*Payton v. New York*,
    445 U.S. 573 (1980) .................................................................................................. 2

*Riley v. California*,
    573 U.S. __, 134 S. Ct. 2473 (2014) ................................................................ *passim*

*Stanford v. Texas*,
    379 U.S. 476 (1965) .......................................................................................... 12, 18

*Steagald v. U.S.*,
    451 U.S. 204 (1981) ................................................................................................ 20

*U.S. v. Abrams*,
    615 F.2d 541 (1st Cir. 1980) ................................................................................. 17

*U.S. v. Bridges*,
    344 F.3d 1010 (9th Cir. 2003) ............................................................................... 15

*U.S. v. Choate*,
    576 F.2d 165 (9th Cir. 1978) ................................................................................. 12

*U.S. v. Collins*,
    845 F.2d 145 (1987) ................................................................................................ 19

*U.S. v. Cotterman*,
    709 F.3d 952 (9th Cir. 2013) ................................................................................. 12

*U.S. v. Jones*,
    565 U.S. __, 132 S. Ct. 945 (2012) .................................................................. *passim*

*U.S. v. Kow*,
    58 F.3d 423 (9th Cir. 1995) ................................................................................... 17

*U.S. v. Tamura*,
    694 F.2d 591 (9th Cir. 1982) ................................................................................. 17

*U.S. v. U.S. District Court (Keith)*,
    407 U.S. 297 (1972) ............................................................................. 13, 15, 16, 25

*U.S. v. Van Leeuwen*,
    397 U.S. 249 (1970) .......................................................................................... 12, 14

*U.S. v. Warshak,*
  631 F.3d 266 (6th Cir. 2010) ................................................................................. 12

*Virginia v. Moore,*
  553 U.S. 164 (2008) .................................................................................... 18, 21

**Federal Statutes**

50 U.S.C. § 1801(e) ................................................................................................ 25

50 U.S.C. § 1804(a) ................................................................................................ 22

50 U.S.C. § 1805(c) ................................................................................................ 22

50 U.S.C. § 1881a .................................................................................... 21, 22, 25

**Constitutional Provisions**

U.S. Const., amend. IV ....................................................................................... *passim*

**Legislative Materials**

S. Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, *Book II: Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-755 at 139 (1976) ........ 18

**Other Authorities**

Barton Gellman, *How 160,000 Intercepted Communications Led To Our Latest NSA Story*, Washington Post, July 11, 2014 ...................................................................... 4

Barton Gellman, Julie Tate & Ashkan Soltani, *In NSA-Intercepted Data, Those Not Targeted Far Outnumber The Foreigners Who Are*, Washington Post, July 5, 2014 ...................... 4

Dan York, *IPv4 Exhaustion Gets Real – Microsoft Runs Out Of U.S. Addresses For Azure Cloud – Time To Move To IPv6!*, Internet Society (June 13, 2014) ...................................... 7

Ingmar Poese et al., *IP Geolocation Databases: Unreliable?*, ACM SIGCOMM Computer Comm. Rev., April 2011 ........................................................................................ 7

James Bamford, *The Agency That Might Be Big Brother*, New York Times, Dec. 25, 2005 .......... 19

Michael Barbaro and Tom Zeller, Jr., "A Face Is Exposed for AOL Searcher No. 4417749" (New York Times, Aug. 9, 2006) ............................................................................ 13

Sen. Frank Church, Meet the Press, NBC, August 17, 1975 .............................................. 19

Testimony of the Hon. James Robertson (U.S. District Judge, ret.), "Workshop Regarding Surveillance Programs Operated Pursuant to Section 215 of the USA PATRIOT Act and Section 702 of the Foreign Intelligence Surveillance Act," Transcript at 35-37 (July 9, 2013) .............. 22

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

**(Fourth Amendment Violation, Limited To The Government's Ongoing Seizure And Searching Of Internet Communications)**

PLEASE TAKE NOTICE that on October 31, 2014 at 9:00 a.m. in Courtroom 5, Second Floor, United States District Court, 1301 Clay Street, Oakland, CA, plaintiffs Carolyn Jewel, Erik Knutzen, and Joice Walton will move for partial summary judgment holding that defendants National Security Agency, United States, Department of Justice, Barack H. Obama, Michael S. Rogers, Eric H. Holder, Jr., and James R. Clapper, Jr. (in their official capacities) (collectively, the "government defendants") have violated the Fourth Amendment rights of plaintiffs Jewel, Knutzen, and Walton by seizing and searching their Internet communications.[1]

The ground for this motion is that defendants are conducting an ongoing program of bulk, untargeted seizure of the Internet communications of millions of innocent Americans, including plaintiffs Jewel, Knutzen, and Walton, and subsequently searching many of those communications. Plaintiffs' motion is based on the accompanying memorandum and declarations of Carolyn Jewel, Erik Knutzen, Joice Walton, and Richard Wiebe, the filings and pleadings of record in this action and the related action of *Hepting v. AT&T* (No. 06-cv-00672-VRW), and the argument and evidence presented at the hearing of this motion.

In this motion, plaintiffs seek a determination that the government defendants are violating the Fourth Amendment by their ongoing seizures and searches of plaintiffs' Internet communications.

At this time, plaintiffs do not seek a determination of the government defendants' liability for: a) past Fourth Amendment violations, including during periods that those activities were conducted solely under presidential authority without any Foreign Intelligence Surveillance Court order; b) *past or present* Fourth Amendment violations arising from government activities other than Internet communications seizure or searching; or c) *past or present* violations of statutory and constitutional provisions other than the Fourth Amendment. Those claims are outside the scope of

---

[1] The other two plaintiffs, Tash Hepting and Young Boon Hicks (as executrix of the estate of Gregory Hicks), are not joining in this motion as they are not current AT&T Internet customers.

1  this motion and are not at issue here.  Plaintiffs also do not seek at this time a determination of the

2  appropriate remedy for the government defendants' ongoing Fourth Amendment violations.

3  **MEMORANDUM OF POINTS AND AUTHORITIES**

4  **I.   INTRODUCTION**

5  The eyes and ears of the government now sit on the Internet.  The government

6  indiscriminately copies and searches communications passing through the Internet's key domestic

7  junctions, on what is called the Internet "backbone."  By doing so, the government is operating a

8  digital dragnet—a technological surveillance system that makes it impossible for ordinary

9  Americans not suspected of any wrongdoing to engage in a fully private online conversation, to

10  privately read online, or to privately access any online service.  Millions of innocent Americans have

11  their communications seized and searched as part of this dragnet even when the government is not

12  targeting them or those with whom they communicate.

13  This unprecedented mass surveillance violates the core purpose of the Fourth Amendment—

14  to protect Americans' privacy against indiscriminate and suspicionless searches and seizures.

15  "Indiscriminate searches and seizures conducted under the authority of 'general warrants' were the

16  immediate evils that motivated the framing and adoption of the Fourth Amendment."  *Payton v. New*

17  *York*, 445 U.S. 573, 583 (1980); *accord Riley v. California*, 573 U.S. __, 134 S. Ct. 2473, 2494

18  (2014).

19  The government's indiscriminate mass collection of Internet communications creates two

20  separate Fourth Amendment violations:

21  First, the government unconstitutionally seizes plaintiffs' Internet communications.

22  Technology at plaintiffs' Internet service provider, AT&T, automatically creates and delivers to the

23  government a copy of plaintiffs' online activities, along with those of millions of other innocent

24  Americans—including email, live chat, reading and interacting with websites, Internet searching,

25  and social networking.

26  Second, the government unconstitutionally searches the content of much of the

27  communications stream it has seized.  The government admits that it searches the content of the

28

online communications that it has seized if it believes there is some indication that the origin or destination of the communication is outside the United States.

The Fourth Amendment prohibits the government from intercepting, copying, or searching through Americans' communications without a warrant issued by a neutral and detached magistrate, upon probable cause, particularly describing the place to be searched and the things to be seized. The government conducts the seizures and searches at issue here without a Fourth Amendment warrant.   While the government does obtain a periodic order from the Foreign Intelligence Surveillance Court (FISC) approving its general "targeting" and "minimization" procedures, those orders are simply not warrants.   The FISC does not specify or limit the persons whose communications the government may seize or search, the communications facilities or accounts from which the government may seize communications, or what information the government may search for within the seized communications.  The government alone determines these, without any judicial review.  The FISC also does not make any determination that there is probable cause or reasonable suspicion to believe that the government's seizures or searches will yield foreign intelligence information.

In truth, no valid warrant could authorize the government's admitted practices here.   The government's targeting and minimization procedures are no substitute for the fundamental protections that the Constitution guarantees to all Americans.  The ongoing dragnet seizure and search of innocent Americans' Internet activities violates the Fourth Amendment.

## II.   STATEMENT OF FACTS

### A.   The Government Seizes And Searches Communications Flowing Through The Nation's Internet Backbone

The information revealed by a person's Internet activities paints an intimate and richly detailed portrait of the person's life—often on a day-by-day or minute-by-minute basis.  It is precisely this deeply personal information that the government is seizing and searching.   The Washington Post recently examined a sample of 160,000 Internet communications intercepted and retained by the NSA.  Even after significantly more filtering and minimization than is at issue here, the Post reported:  "Many other files, described as useless by the analysts but nonetheless retained,

have a startlingly intimate, even voyeuristic quality.  They tell stories of love and heartbreak, illicit sexual liaisons, mental-health crises, political and religious conversions, financial anxieties and disappointed hopes.  The daily lives of more than 10,000 account holders who were not targeted are catalogued and recorded nevertheless."[2]

    The government conducts its domestic surveillance by seizing and searching Internet communications as they flow through major fiber-optic network junctions on the Internet "backbone."[3]  Almost all ordinary Internet traffic travels at some point over the Internet backbone—high-capacity, long-distance fiber-optic cables controlled by major Internet providers such as AT&T. The seizures at issue here occur on the junctions between AT&T and other providers on the backbone.

[2] Barton Gellman, Julie Tate & Ashkan Soltani, *In NSA-Intercepted Data, Those Not Targeted Far Outnumber The Foreigners Who Are*, Washington Post, July 5, 2014, *available at* http://www.washingtonpost.com/world/national-security/in-nsa-intercepted-data-those-not-targeted-far-outnumber-the-foreigners-who-are/2014/07/05/8139adf8-045a-11e4-8572-4b1b969b6322_story.html; *see also* Barton Gellman, *How 160,000 Intercepted Communications Led To Our Latest NSA Story*, Washington Post, July 11, 2014, *available at* http://www.washingtonpost.com/world/national-security/your-questions-answered-about-the-posts-recent-investigation-of-nsa-surveillance/2014/07/11/43d743e6-0908-11e4-8a6a-19355c7e870a_story.html.

[3] *See, e.g.,* ECF No. 227 at ¶ 38, 25:14-16 (12/20/13 NSA Deputy Dir. Fleisch Classified Decl.) ("NSA collects electronic communications with the compelled assistance of electronic communications service providers as they transit Internet 'backbone' facilities within the United States"); ECF No. 169 at 17 (12/20/13 NSA Deputy Dir. Fleisch Unclassified Decl.); ECF No. 253-3 at 3 (6/27/14 Gilligan Decl., Ex. B (The Intelligence Community's Collection Programs Under Title VII of the Foreign Intelligence Surveillance Act)) ("NSA collects telephone and electronic communications as they transit the Internet 'backbone' within the United States"); 7/25/14 Wiebe Decl., Ex. A at 7, 35-37 (Privacy and Civil Liberties Oversight Board, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* ("PCLOB 702 Report") (July 2, 2014)); ECF No. 174-1 at 26 (1/10/14 Rumold Decl., Ex. 1 (Memorandum Opinion ("9/25/12 FISC Opinion"), [Name and docket no. redacted] (FISC Sept. 25, 2012)); Memorandum Opinion ("10/3/11 FISC Opinion"), [Name and docket no. redacted], 2011 WL 10945618, at *2 n.3 (FISC Oct. 3, 2011); 7/25/14 Wiebe Decl., Ex. B (NSA PRISM slides) at 3-4.

As these sources explain, the government also describes its Internet backbone seizures and searches as "upstream" collection.

1      As relevant to this motion, the government's surveillance process occurs in four stages,

2  illustrated below:



First, as shown in stage one, the government taps into the Internet backbone networks of the nation's leading telecommunications carriers, including AT&T, giving it access to the entire stream of domestic and international communications ("communications stream") carried on the fiber-optic cables of those carriers.   The communications stream includes *all* varieties of Internet activities, including email, live chat, and Internet telephone and video calls, as well as activities such as web browsing, video viewing, and search queries and results.[4]

To accomplish this access while not interrupting or slowing Internet communications carried by AT&T, the communications stream is copied.[5]   The copying is done via a simple technology called a fiber-optic "splitter."[6]   A splitter is a device that "splits" the light signals on a fiber-optic cable, making identical copies of the communications stream carried on the cable.[7]   The splitters installed at AT&T allow one copy of the communications stream to travel as it normally would to its intended destination on the Internet while a second copy of the communications stream is diverted for further processing and searching by the NSA.[8]

Second, as shown in stage two above, after the communications stream is copied, the government roughly filters it in an attempt to eliminate wholly domestic communications and leave only communications in which at least one end is located outside the United States.[9]   This filtering

---

[4] ECF No. 84-2 at ¶¶ 9, 19, 34 (Mark Klein Decl.).  *See also, e.g., Joffe v. Google, Inc.,* 729 F.3d 1262, 1264 (9th Cir. 2013) (noting that analogous interception of WiFi network data "includes everything transmitted by a device connected to a Wi-Fi network, such as personal emails, usernames, passwords, videos, and documents").

[5] ECF No. 84-2 at ¶¶ 24-34 (Klein Decl.); ECF No. 89 at ¶¶ 56, 62, 72 (J. Scott Marcus Decl.).

[6] ECF No. 84-2 at ¶¶ 24-34 (Klein Decl.).

[7] ECF No. 84-2 at ¶¶ 21-22, 23-25 (Klein Decl.); ECF No. 89 at ¶¶ 56-58, 109 (Marcus Decl.).

[8] ECF No. 84-2 at ¶¶ 25-34 (Klein Decl.); ECF Nos. 84-3, 84-4, 84-5, 84-6 (Klein Decl., Exs. A, B, C); ECF No. 89 at ¶¶ 56, 62, 70-73, 77 (Marcus Decl.); *see also* ECF No. 84-1 at ¶¶ 6, 10-12, 15, 19-23 (AT&T Managing Director-Asset Protection James Russell authenticating Klein Declaration statements and documents).

[9] The government says it applies an Internet Protocol ("IP") filter to the seized communications in an attempt to limit its search to only those communications that either terminate or originate abroad. ECF No. 174-5 at 1-2 (1/10/14 Rumold Decl., Ex. 5 ("Procedures Used By The National Security Agency For Targeting . . . ")).   An IP filter functions by sifting communications based on their destination "IP address"—a numerical label assigned to each device connected to the Internet.  (In *(footnote continued on next page)*

intentionally keeps communications between Americans and persons located abroad.  Moreover, this filtering is imprecise as to purely domestic communications, resulting in a significant amount of purely domestic traffic in the filtered communications stream.[10]

Third, as shown in stage three above, the government searches the *entire contents* of the filtered communications stream for particular "selectors"—email addresses, domain names, phone

---

*(footnote continued from previous page)*
the case of a home or business network, many computers or other devices may share the single IP address on the Internet that is assigned to the modem or router through which they connect to the Internet.)  An IP address gives a computer the ability to locate another device connected to the Internet and, in some circumstances, it serves as a loose proxy for geographic location.  However, IP filters are only rough indicators of physical location.  ECF No. 89 at ¶¶ 110-11 (Marcus Decl.); Ingmar Poese, *et al.*, *IP Geolocation Databases: Unreliable?*, ACM SIGCOMM Computer Comm. Rev., April 2011, at   56 (reporting 2-4% error rates in country geolocation with commercial databases), *available at* http://www.sigcomm.org/sites/default/files/ccr/papers/2011/April/1971162-1971171.pdf.

Recently, for example, communications sent by accountholders on Microsoft servers in the United States appeared to IP geolocation filters to be communications that were originating from South America, not the United States.  Dan York, *IPv4 Exhaustion Gets Real – Microsoft Runs Out Of U.S. Addresses For Azure Cloud – Time To Move To IPv6!*, Internet Society (June 13, 2014), http://www.internetsociety.org/deploy360/blog/2014/06/ipv4-exhaustion-gets-real-microsoft-runs-out-of-u-s-addresses-for-azure-cloud-time-to-move-to-ipv6.

[10] One reason why the government's filtering fails to exclude domestic communications is the inaccuracy of IP geolocation.  *See* n.9 above.  Another reason is that the pathway a communication takes on the Internet from its origin to its destination is unpredictable and can change with every transmission.  A communication between two domestic parties can follow a path that takes it outside the United States for part of its journey; thus, as the FISC noted, "NSA's upstream collection devices will acquire a wholly domestic 'about' [communication] if it is routed internationally." 10/3/11 FISC Opinion, 2011 WL 10945618, at *11.  A third reason is that the websites and Internet services that appear to be domestic may be located anywhere in the world unbeknownst to the user.  As the President's Review Group noted:  "Today, and unbeknownst to US users, websites and cloud servers may be located outside the United States.  Even for a person in the US who never knowingly sends communications abroad, there may be collection by US intelligence agencies outside of the US."  7/25/14 Wiebe Decl., Ex. F at 183 (President's Review Group on Intelligence and Communications Technologies, *Liberty and Security in a Changing World*).  The providers of Internet services may back up or store a user's data on servers anywhere in the world.  For example, Yahoo! provides the AT&T-branded email services that plaintiffs Knutzen and Walton use.  Knutzen Decl. at ¶ 5; Walton Decl. at ¶ 5.  The NSA has intercepted massive bulk shipments of user email accounts by Yahoo! between its United States and overseas servers, shipments that are completely unknown to the user.  7/25/14 Wiebe Decl., Ex. C at 2-3 (Special Source Operations Weekly, 3/14/13 edition).

1   numbers, or other identifiers.[11]   The government intentionally includes Americans' international

2   communications, including those of plaintiffs, in these searches.  As noted above, the searches also

3   include many wholly domestic Internet communications.

4          In stage four, the results of the seizing and searching described above are then deposited into

5   government databases for retention.[12]   It is only at this fourth stage in the process that the

6   government deems the information "collected" or "acquired."[13]   And it is only these retained

7   communications that the government takes into account in asserting that its Internet backbone

8   seizures and searches are "targeted," ignoring the first three stages outlined above.   The

9   _____

10  [11]   ECF No. 227 at ¶ 64, p. 45:6-9 (12/23/13 NSA Deputy Dir. Fleisch Classified Decl.);
    7/25/14 Wiebe Decl., Ex. D at 7 (12/8/11 Monaco/Inglis/Litt Joint Statement); 10/3/11 FISC
    Opinion, 2011 WL 10945618, at *5-*6; ECF No. 253-3 at 4 (The Intelligence Community's

11  Collection Programs Under Title VII of the Foreign Intelligence Surveillance Act); ECF No. 254-1
    at 8 (Corrected Defs. Reply Br. Re Preservation Orders) (citing 10/3/11 FISC Opinion,

12  2011 WL 10945618, at *10, *27); ECF No. 174-1 at 26 (9/25/12 FISC Opinion).

13  As these sources note, the government sometimes refers to communications whose contents contain

14  a reference to a selector as "about" communications.

15  [12] The PCLOB 702 Report acknowledges:  "The NSA's 'upstream collection' (described elsewhere
    in this Report) may require access to a larger body of international communications than those that

16  contain a tasked selector." 7/25/14 Wiebe Decl., Ex. A at 111 n.476 (PCLOB 702 Report).

17  [13] *See, e.g,* 7/25/14 Wiebe Decl., Ex. A at 37 (PCLOB 702 Report), describing "acquired" as the
    point of "ingest[ion] into government databases."

18
    The government consistently uses terms like "collection" and "acquired" in its public discussions not

19  as ordinary people use those terms, but very specifically to mean a point *after* the government has
    actual custody or control over communications.  For instance, Department of Defense regulations

20  provide that information is considered to be *collected* only after it has been "received for use by an
    employee of a DoD intelligence component," and that "[d]ata acquired by electronic means is

21  'collected' only when it has been processed into intelligible form," without regard to when the
    information was initially acquired by a surveillance device.  DOD 5240 1-R, Procedures Governing

22  the Activities of DOD Intelligence Components that Affect United States Persons § C.2.2.1 at 15
    (Dec. 1982), provided in Plaintiffs' Federal Rule of Evidence Section 1006 Summary of Voluminous

23  Evidence, ECF No. 113 at 46:9-18. [Vol. II, Ex. 24, p.1070]. Similarly, DNI Clapper later explained
    his Senate testimony in which, in response to a direct question from Senator Wyden, he denied

24  "collecting" data on millions or hundreds of millions of Americans by stating:  "[T]here are honest
    differences on the semantics when someone says 'collection' to me, that has a specific meaning,

25  which may have a different meaning to him [Senator Wyden]." Interview by Andrea Mitchell with

26  DNI        James       R.       Clapper       (June        8,        2013),       *available       at*
    http://www.dni.gov/index.php/newsroom/speeches-and-interviews/195-speeches-interviews-

27  2013/874-director-james-r-clapper-interview-with-andrea-mitchell.

28

communications the government retains at stage four are not at issue here.  Instead, this motion

challenges the constitutionality of the initial seizure and search:  *stage one*, the wholesale seizure of

the stream of Internet communications; and *stage three*, the searching, post-IP-filtering, of the

contents of those communications for selectors.

The PCLOB 702 Report describes the overall process as follows, explicitly adopting the

government's use of the term "acquire" as only occurring at stage four:

> Once tasked, selectors used for the acquisition of upstream Internet transactions are
> sent to a United States electronic communication service provider to acquire
> communications that are transiting through circuits that are used to facilitate
> Internet communications, what is referred to as the "Internet backbone."  The
> provider is compelled to assist the government in acquiring communications across
> these circuits.  To identify and acquire Internet transactions associated with the
> Section 702–tasked selectors on the Internet backbone, Internet transactions are
> first filtered to eliminate potential domestic transactions, and then are screened to
> capture only transactions containing a tasked selector.  Unless transactions pass
> both these screens, they are not ingested into government databases.

7/25/14 Wiebe Decl., Ex. A at 36-37 (PCLOB 702 Report) (citations omitted).[14]  As the PCLOB

noted, "[n]othing comparable [to the government's Internet backbone surveillance] is permitted as a

legal matter or possible as a practical matter with respect to analogous but more traditional forms of

communication."  *Id*. at 122.

**B.    Seizure And Searching Of Plaintiffs' Communications From AT&T's Internet
        Backbone**

Plaintiffs Jewel, Knutzen, and Walton are AT&T Internet service subscribers.  Jewel Decl. at

¶¶ 2-3; Knutzen Decl. at ¶¶ 2-3; Walton Decl. at ¶¶ 2-3.  Each of them relies on the Internet to send

and receive personal and professional emails, to stay in touch with friends and loved ones, and to

conduct private activities including web browsing and social media.  Jewel Decl. at ¶¶ 4-5, Knutzen

Decl. at ¶¶ 4, 6; Walton Decl. at ¶¶ 4, 6.  Plaintiff Carolyn Jewel is a novelist who communicates

online with fans and members of the publishing industry and uses the Internet to research the

---

[14] "Nevertheless, the government has no ability to examine or otherwise make use of this larger body of communications, except to promptly determine whether any of them contain a tasked selector. Only those communications (or more precisely, 'transactions') that contain a tasked selector go into government databases."  7/25/14 Wiebe Decl., Ex. A at 111 n.476 (PCLOB 702 Report).

settings for her fiction.  Jewel Decl. at ¶¶ 1, 5, 7.  Plaintiff Erik Knutzen is a writer who blogs about urban homesteading, staying in touch with others in his field via various online mediums.  Knutzen Decl. at ¶¶ 1, 7.  Plaintiff Joice Walton is a recording who artist who promotes her music on her website and through social media and email.  Walton Decl. at ¶¶ 1, 7-8.

As described above, at stage one, AT&T allows the government to seize the entire communications stream of its customers carried on a portion of the Internet backbone.  Thus, the government has seized the electronic communications of each of these three plaintiffs.  Additionally, each of them has had their communications searched, as described in stage three above.  At a minimum, this includes their international communications since, like nearly all Internet users, each plaintiff has routinely communicated with persons whose email service is hosted abroad (*see* Jewel Decl. at ¶ 6; Knutzen Decl. at ¶ 8; Walton Decl. at ¶ 7), and each has visited websites that are hosted abroad (*see* Jewel Decl. at ¶ 8; Knutzen Decl. at ¶ 9; Walton Decl. at ¶ 9).

No genuine issue of material fact exists that plaintiffs' provider AT&T is one of the Internet backbone providers at issue.  Even on the much more limited record that existed eight years ago, this Court in *Hepting* (per Walker, C.J.) found that "AT&T and the government have for all practical purposes already disclosed that AT&T assists the government in monitoring communication content."  *Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974, 991-92 (N.D. Cal. 2006).  The Klein and Marcus evidence, described above, demonstrates the NSA's bulk seizure of the content of plaintiffs' AT&T Internet communications from the Internet backbone.[15]  ECF No. 84-2 (Klein Decl.); ECF No. 89 at ¶¶ 56-58, 62, 70-73, 77 (Marcus Decl.).  The NSA Draft OIG Report also demonstrates AT&T's participation.  ECF No. 147, Ex. A (NSA Draft OIG Report).  Specifically, the NSA Draft OIG Report describes in detail the NSA's relationship with two telecommunications companies described as "Company A" and "Company B" in the report, and observes that the NSA's relationship with each company gives NSA access to large volumes of communications "transiting the United States through fiber-optic cables, gateway switches, and data networks."  *Id.* at 27-29, 33-

---

[15] AT&T's continuing participation in Internet seizure and collection was confirmed again in 2013 by the Wall Street Journal.  ECF No. 174-2; *see also* ECF No. 174-4.

34.  The report says that Company A and Company B were the two largest providers of international telephone calls into and out of the United States when surveillance began in 2001.  *Id.* at 27.  Federal Communications Commission records confirm that AT&T and MCI/Worldcom (now Verizon) were the country's two largest international telephone call providers at that time.  7/25/14 Wiebe Decl., Ex. E (Common Carrier Bureau, FCC, 1999 International Telecommunications Data at 29, fig. 9 (Dec. 2000)).

## III.   ISSUES FOR DECISION

1.  Does the warrantless, suspicionless seizure of plaintiffs' communications as part of a mass seizure and copying of Internet communications violate the Fourth Amendment?

2.  Does the warrantless, suspicionless searching of the contents of plaintiffs' Internet communications violate the Fourth Amendment?

## IV.   ARGUMENT

### A.   The Fourth Amendment's Fundamental Principles—And The Warrant Requirement—Apply With Full Force To The Digital World, And Protect Plaintiffs' Private Internet Communications

#### 1.   The Fourth Amendment Guarantees Fundamental Personal Privacy By Prohibiting Suspicionless, Indiscriminate Government Intrusions Into Americans' Papers And Effects

The Fourth Amendment is a fundamental guarantee of personal privacy, "a right of the people which 'is basic to a free society.'"  *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 528 (1967).  The Supreme Court has emphasized in "countless decisions" that "[t]he basic purpose of this Amendment . . . is to *safeguard the privacy and security of individuals against arbitrary invasions* by governmental officials." *Id.* (emphasis added).  As Justice Brandeis explained in his famous dissent in *Olmstead v. United States*, the Founders "sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations.  They conferred, as against the government, the right to be let alone . . . " 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).

Protecting privacy in personal communications such as plaintiffs' Internet communications is one of the core principles of the Fourth Amendment.  The Fourth Amendment expressly designates a person's "papers" and "effects" as two of the four categories it shields from government intrusion. U.S. Const., amend. IV.  The Amendment "embod[ies] a particular concern for government trespass

upon the areas ('persons, houses, papers, and effects') it enumerates."  *U.S. v. Jones*, 565 U.S. __, 132 S. Ct. 945, 950 (2012).  The Founders' special protection for papers and effects stems directly from their determination to prohibit the indiscriminate, suspicionless rummaging and seizure of any person's papers that the English Crown had conducted using "general warrants"—warrants that failed to specify the papers that were sought, the person whose papers could be searched and seized, or the place to which the search for the papers was limited.  *Riley*, 134 S. Ct. at 2494; *Stanford v. Texas*, 379 U.S. 476, 480-85 (1965); *Marcus v. Search Warrant of Property*, 367 U.S. 717, 726-29 & n.22 (1961).

The Fourth Amendment protects a person's information in digital as well as physical form. "The papers we create and maintain not only in physical but also in digital form reflect our most private thoughts and activities."  *U.S. v. Cotterman*, 709 F.3d 952, 957 (9th Cir. 2013) (en banc). The Ninth Circuit has held *en banc* that emails "implicate[] the Fourth Amendment's specific guarantee of the people's right to be secure in their 'papers.'  The express listing of papers 'reflects the Founders' deep concern with safeguarding the privacy of thoughts and ideas—what we might call freedom of conscience—from invasion by the government.'  These records are expected to be kept private and this expectation is 'one that society is prepared to recognize as "reasonable."'"  *Id.* at 964 (citations omitted); *accord U.S. v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010).

The Fourth Amendment also protects a person's communications when they are in transit, as are plaintiffs' Internet communications here.  *Ex parte Jackson*, 96 U.S. 727, 733 (1877) ("Whilst in the mail, [letters] can only be opened and examined under like warrant, issued upon similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subjected to search in one's own household."); *accord U.S. v. Van Leeuwen*, 397 U.S. 249, 251 (1970); *U.S. v. Choate*, 576 F.2d 165, 174 (9th Cir. 1978).

Even apart from the Fourth Amendment's specific protection of "papers" and "effects," plaintiffs' electronic communications are protected because plaintiffs have a reasonable expectation

1   of privacy in them.[16]  *Berger v. New York*, 388 U.S. 41, 51 (1967); *see also U.S. v. U.S. District*

2   *Court (Keith)*, 407 U.S. 297, 313 (1972) (hereinafter, "*Keith*"); *Katz v. U.S.,* 389 U.S. 347, 353

3   (1967).

4         The Supreme Court recently affirmed that the government's search and seizure of digital

5   information implicates core Fourth Amendment values and triggers the warrant requirement.  *Riley*,

6   134 S. Ct. at 2495 ("The fact that technology now allows an individual to carry such information in

7   his hand does not make the information any less worthy of the protection for which the Founders

8   fought.").  The Court specifically noted the protectable privacy interests one has in her Internet

9   browsing records, explaining, "Internet search and browsing history, for example, can be found on

10  an Internet-enabled phone and could reveal an individual's private interests or concerns—perhaps a

11  search for certain symptoms of disease, coupled with frequent visits to WebMD."[17]  *Id*. at 2490.  The

12  Court went on to detail how a person's digital information gives a complete picture of a person's

13  most private thoughts and actions—even beyond what a general search of their home might reveal.

14  *Id*. at 2489-91.

15        The Supreme Court's conclusion that the digital information in cell phones is protected by

16  the Fourth Amendment because, "[w]ith all they contain and all they may reveal, they hold for many

17  Americans 'the privacies of life'" (*Id*. at 2494-95) is equally, if not more, applicable to the digital

18  information plaintiffs transmit over the Internet.  The Court noted:

19        First, a cell phone collects in one place many distinct types of information—an
        address, a note, a prescription, a bank statement, a video—that reveal much more in
20      combination than any isolated record.  Second, a cell phone's capacity allows even
        just one type of information to convey far more than previously possible.  The sum of
21

---

22  [16]  The "reasonable expectation of privacy test" is the alternative test for the scope of Fourth

23  Amendment protections.  *See U.S. v. Jones*, 132 S. Ct. at 950, 953; *id*. at 954-55 (Sotomayor, J., concurring); *id*. at 959-60 (Alito, J., concurring).

24  [17]  The power of browsing and search history to reveal a person's life was demonstrated in 2006

25  when AOL inadvertently released the three-month search history of over 650,000 AOL users.  *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1079 (9th Cir. 2009).  Even though AOL did not release the names of

26  the users, it was an easy task for reporters to use an individual's browsing history to identify and track down the individual.  Michael Barbaro and Tom Zeller, Jr., "A Face Is Exposed for AOL

27  Searcher  No.  4417749"  (New  York  Times,  Aug.  9,  2006),  *available  at* http://www.nytimes.com/2006/08/09/technology/09aol.html?pagewanted=all.

28

1

2

an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet. Third, the data on a phone can date back to the purchase of the phone, or even earlier. A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone.

3

4

5

*Id*. at 2489. This same information about a person can be determined from their stream of

6

communications flowing through the Internet backbone. Indeed, the Court noted that much of the

7

information it was protecting in *Riley* is increasingly not stored on phones themselves but in the

8

Internet "cloud," with phones used to access the information over the Internet. *Id*. at 2491. Thus, the

9

Fourth Amendment privacy interests in digital information that the Supreme Court recognized in

10

*Riley* are fully applicable to the Internet activities of plaintiffs that the government is seizing—

11

emails, web browsing and searching, live chat, voice calls, social networking, photos, videos, or

12

otherwise.

13

14

**2.    The Fourth Amendment's Warrant Requirement Is The Time-Tested Mechanism That Prevents Government Overreaching And Suspicionless Searches, And It Applies To Digital Seizure And Searching Of Electronic Communications**

15

16

Like other "papers" and "effects," plaintiffs' electronic communications can only be seized

17

and searched with a warrant issued by a neutral and detached judicial officer, supported by probable

18

cause and describing with particularity the communications to be seized. *See Ex parte Jackson*, 96

19

U.S. at 733; *Van Leeuwen*, 397 U.S. at 251. National security does not excuse the need for a warrant

20

to intercept or search plaintiffs' communications. "It is now clear that [the warrant] requirement

21

attaches to national security wiretaps that are not directed against foreign powers or suspected agents

22

of foreign powers." *Halperin v. Kissinger*, 807 F.2d 180, 185 (D.C. Cir. 1986) (Scalia, Circuit

23

Justice, for the court).

24

The warrant requirement is not a dusty formalism but *the* tested method for protecting

25

Americans' privacy against government intrusion. The Supreme Court recently affirmed: "Our

26

cases have historically recognized that the warrant requirement is an 'important working part of our

27

machinery of government,' not merely an 'inconvenience to be somehow weighed against'" the

28

government's interest in proceeding without a warrant. *Riley*, 134 S. Ct. at 2493 (citations omitted).

1   Its two components are probable cause and the particularity requirement, both judged before any

2   search or seizure occurs by an independent and detached judicial officer.  U.S. Const., amend. IV.

3           The probable cause requirement ensures that no search occurs where there is less than

4   probable cause or, worse, no suspicion at all.  *Keith*, 407 U.S. at 316 ("The further requirement of

5   'probable cause' instructs the magistrate that baseless searches shall not proceed."); *Coolidge v. New*

6   *Hampshire*, 403 U.S. 443, 467 (1971) (same).  It also serves to limit the scope of the search.  *In re*

7   *Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991).

8           The particularity requirement ensures that "those searches deemed necessary [are] as limited

9   as possible."  *Coolidge*, 403 U.S. at 467.  The "need for particularity" "is especially great in the case

10  of [electronic] eavesdropping" because it "involves an intrusion on privacy that is broad in scope."

11  *Berger*, 388 U.S. at 56.  It ensures that "the search will be carefully tailored to its justifications,"

12  eliminating the threat of "general searches."  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).  The

13  particularity requirement also makes general searches "impossible" by ensuring that when it comes

14  to what can be searched or seized, "nothing is left to the discretion of the officer executing the

15  warrant."  *Marron v. U.S.*, 275 U.S. 192, 195-96 (1927); *see also Berger*, 388 U.S. at 49-50, 56, 58-

16  59; *U.S. v. Bridges*, 344 F.3d 1010, 1016 (9th Cir. 2003) ("Search warrants . . . are fundamentally

17  offensive to the underlying principles of the Fourth Amendment when they are so bountiful and

18  expansive in their language that they constitute a virtual, all-encompassing dragnet of personal

19  papers and property to be seized at the discretion of the State.").

20          Judicial warrants based on particularity and probable cause are especially crucial in

21  electronic surveillance, where searches and seizures occur without leaving a trace and where the

22  threat to privacy is especially great.  *Keith*, 407 U.S. at 313 ("the broad and unsuspected

23  governmental incursions into conversational privacy which electronic surveillance entails necessitate

24  the application of Fourth Amendment safeguards").  "Few threats to liberty exist which are greater

25  than that posed by the use of eavesdropping devices."  *Berger*, 388 U.S. at 63; *accord Olmstead*, 277

26  U.S. at 476 (1928) (Brandeis, J., dissenting) ("writs of assistance and general warrants are but puny

27  instruments of tyranny and oppression when compared with wire-tapping").  Because electronic

28

seizures of communications occur by stealth, they can easily "evade[] the ordinary checks that constrain abusive law enforcement practices." *Jones*, 132 S. Ct. at 956 (Sotomayor, J., concurring).

The warrant requirement is therefore essential:  the alternative of "bypassing a neutral predetermination of the scope of a search leaves individuals secure from Fourth Amendment violations 'only in the discretion of the [government].'"  *Katz*, 389 U.S. at 358-59.  "[P]ost-surveillance review would never reach the surveillances which failed to result in prosecutions.  Prior review by a neutral and detached magistrate is the time-tested means of effectuating Fourth Amendment rights."  *Keith*, 407 U.S. at 318 (citation omitted).  This concern is heightened in the case of mass surveillance, where the overwhelming majority of those whose communications are seized and searched are not even suspected of a crime or of being an agent of a foreign power.  As the Supreme Court recently affirmed:  "[A] warrant ensures that the inferences to support a search are 'drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'"  *Riley*, 134 S. Ct. at 2482.[18]

**B.**    **Stage One:  The Government's Warrantless, Suspicionless Mass Seizure Of Domestic Internet Communications Violates The Fourth Amendment**

The government's seizure of the contents of the Internet activities of plaintiffs and millions of other Americans at the Internet backbone facilities of AT&T—the first stage of the government's surveillance—is unconstitutional.  It is a general seizure that is not, and never could be, authorized by a valid warrant.  As this Court (per Walker, C.J.) previously concluded:  "Because the alleged dragnet here encompasses the communications of 'all or substantially all of the communications transmitted through [AT&T's] key domestic telecommunications facilities,' it cannot reasonably be said that the program as alleged is limited to tracking foreign powers.  Accordingly, AT&T's alleged actions here violate the constitutional rights clearly established in *Keith* [requiring a warrant for electronic surveillance of persons who are not agents of foreign powers]."  *Hepting*, 439 F. Supp. 2d at 1010.

---

[18] As described further in Section D(1) below, the Supreme Court also firmly rejected the notion that government protocols alone could substitute for a warrant:  "[T]he Founders did not fight a revolution to gain the right to government agency protocols."  *Riley*, 134 S. Ct. at 2491.

The Court's conclusion remains correct.  Because the contents of plaintiffs' communications fall within the Fourth Amendment's categorical protection of a person's "papers" and "effects," the warrantless copying done at the Internet backbone is *per se* a Fourth Amendment violation.  *See Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) ("When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." (internal quotation marks omitted)); *Jones*, 132 S. Ct. at 950 n.3.  Independently, plaintiffs also have a reasonable expectation of privacy in their communications, which is violated when the government seizes their communications without a warrant.  *Katz*, 389 U.S. at 353, 356-59; *Berger*, 388 U.S. at 55-64; *Halperin v. Kissinger*, 807 F.2d at 185.

No warrant could justify the mass, suspicionless seizures occurring here.  Even in cases of seizures under valid warrants, the Ninth Circuit has routinely invalidated wholesale seizure of documents as a violation of the Fourth Amendment.  Although the Court has noted that "all items in a set of files may be inspected during a search" in order to find the particular documents described in a warrant whose seizure is supported by probable cause, "the wholesale *seizure* for later detailed examination of records not described in a warrant is significantly more intrusive" and is precisely "'the kind of investigatory dragnet that the fourth amendment was designed to prevent.'" *U.S. v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982) (quoting *U.S. v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980)) (italics original).

Similarly, in *U.S. v. Kow*, 58 F.3d 423 (9th Cir. 1995), the Ninth Circuit found that a search warrant that "contained no limitations on which documents . . . could be seized or suggested how they related to specific criminal activity" failed the particularity requirement.  58 F.3d at 427.  The Court held that "generalized seizure" of a large group of documents may be justified only if there is a showing that there is probable cause that the entire set of records are likely to show evidence of criminal activity.  *Id*.

In the Fourth Amendment, the Founders "emphasize[d] the purpose to protect against all general searches.  Since before the creation of our government, such searches have been deemed obnoxious to fundamental principles of liberty. . . .  The need of protection against them is attested

1    alike by history and present conditions." *Go-Bart Importing Co. v. U.S.*, 282 U.S. 344, 357 (1931).

2    "Opposition to such searches was in fact one of the driving forces behind the Revolution itself."

3    *Riley*, 134 S. Ct. at 2494.  "The immediate object of the Fourth Amendment was to prohibit the

4    general warrants and writs of assistance that English judges had employed against the colonists,"

5    *Virginia v. Moore*, 553 U.S. 164, 168-69 (2008), and its words "reflect the determination of those

6    who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their

7    persons, houses, papers, and effects' from intrusion and seizure by officers acting under the

8    unbridled authority of a general warrant," *Stanford*, 379 U.S. at 481-82.

9         The government's indiscriminate, suspicionless bulk seizure of plaintiffs' Internet activities

10   here is the modern-day equivalent of the hated "general warrants" that the Fourth Amendment was

11   meant to stamp out forever.  As the Supreme Court explained in *Marcus*, it was precisely this power

12   to seize papers and effects indiscriminately, in bulk, and without particularized suspicion—the same

13   conduct the government is engaging in here—that made general warrants objectionable as "'totally

14   subversive of the liberty of the subject.'"  *Marcus*, 367 U.S. at 728-29.  This is equally true today, as

15   the Supreme Court recently reaffirmed in *Riley*.

16        Because of this clear historical antipathy towards general warrants, the nation has never had

17   to address dragnet surveillance anything like the government's practices here.  The most analogous

18   situation was the NSA's post-World War II "Operation Shamrock," where, with the cooperation of

19   the telegraph companies, the NSA collected copies of each and every international telegram that was

20   sent into and out of the United States from 1945 to 1975.  The constitutionality of that mass

21   collection was never considered by the courts, but Congress did address it and the Church

22   Committee, charged with investigating the mass surveillance, concluded that it violated the Fourth

23   Amendment rights of those who sent telegrams.  S. Select Comm. to Study Governmental

24   Operations with Respect to Intelligence Activities, *Book II: Intelligence Activities and the Rights of

25   Americans*, S. Rep. No. 94-755 at 139 (1976).[19]  Indeed, Senator Church warned:

26

27   _____

[19] *Available at* http://www.intelligence.senate.gov/pdfs94th/94755_II.pdf.

28

1

2

> [The government's] capability at any time could be turned around on the American people, and no American would have any privacy left, such is the capability to monitor everything: telephone conversations, telegrams, it doesn't matter.  There would be no place to hide.[20]

3

4

5

6

Such surveillance alters "the relationship between citizen and government in a way that is inimical to a democratic society," *Jones*, 132 S. Ct. at 956 (Sotomayor, J., concurring) (citation omitted), by creating the specter that the government can peer into its citizens' private communications at any moment.

7

8

9

10

If the Fourth Amendment means anything, it means that the government may not engage in indiscriminate, suspicionless, mass surveillance of its own citizens.  But that is exactly what the government has done here, by sitting on the Internet and seizing plaintiffs' communications as they pass through AT&T's facilities.  That seizure violates the Fourth Amendment.

11

12

### C. Stage Three:  The Government's Warrantless, Suspicionless Searching Of The Contents Of Plaintiffs' Internet Communications Is Unconstitutional

13

14

15

16

17

18

The Fourth Amendment is independently violated by the government's warrantless and indiscriminate content searching of plaintiffs' Internet communications after it seizes them—stage three of the government's surveillance.[21]  To find targeted "selectors," *i.e.*, email addresses, websites or similar identifiers of one or multiple persons or entities, the government undisputedly searches the contents of vast numbers of innocent Americans' Internet activities, both international and domestic.[22]  This includes plaintiffs, none of whom has been suspected of any wrongdoing but each

19

20

21

[20] Sen. Frank Church, Meet the Press, NBC, August 17, 1975, *available at* http://www.nbcnews.com /video/meet-the-press/52669547#52669547, at 5:50 to 6:40, and *quoted in* James Bamford, *The Agency That Might Be Big Brother*, New York Times, Dec. 25, 2005, *available at* http://www.nytim es.com/2005/12/25/weekinreview/25bamford.html?pagewanted=print.

22

23

24

[21] Seizing and searching the communications of known foreign terrorists, even if constitutional, does not give the government license to circumvent the warrant requirement in searching *plaintiffs'* communications.  The Fourth Amendment does not sanction "constitutionality by proximity:"  a warrant to search your neighbor's house does not validate a search of your house. *See U.S. v. Collins*, 845 F.2d 145, 145-46 (1987).

25

26

27

28

[22] As noted above, the government's filtering (stage two in the figure on page 5) for some indication of foreignness is imperfect.  *See supra* at nn. 9-10.  But even if stage two filtering were completely effective, the stage three searching is intended to, and does, search the contents of communications of plaintiffs and millions of other "United States persons" within the United States who are not surveillance targets and who are not suspected of being agents of a foreign power or possessing *(footnote continued on next page)*

of whom has attested to communications with people abroad and visiting websites hosted abroad. *See* Jewel Decl. at ¶¶ 6, 8; Knutzen Decl. at ¶¶ 8, 9; Walton Decl. at ¶¶ 8, 9. Because these suspicionless searches of plaintiffs' Internet activities are conducted without a warrant, they violate the Fourth Amendment.

Like the unconstitutional seizures discussed above, the government's warrantless searching of the communications of persons suspected of no wrongdoing is nothing more than a suspicionless and unconstitutional general search at the government's discretion. It is the same "general, exploratory rummaging" that the Fourth Amendment prohibits. *Andresen v. Maryland*, 427 U.S. 463, 480 (1976). Like general warrants, searching the communications stream of millions of persons for "selectors" (without any suspicion of the persons whose communications are searched) gives the government "the most general discretionary authority," *Marcus*, 367 U.S. at 726; has no limits on place or duration, *id.* at 729 n.22; and "provide[s] no judicial check on the determination of the executing officials that the evidence available justifie[s] an intrusion," *Steagald v. U.S.*, 451 U.S. 204, 220 (1981).

Moreover, the searches here are more extensive than even the broadest general warrant, since the government performs its content searches on the entire post-filtering communications stream. Searching of the communications stream means that hundreds of millions of communications are searched that do *not* contain the selectors along with the relatively few that do. These communications that are searched and found not to contain the selectors are the communications of millions of innocent Americans with no connection to any surveillance target. For comparison, for the colonial general warrants to be the equivalent of the searches here, the British troops would have had to search *every* home that ever received a package from abroad. This fact is elided in the government's assertions regarding its collection from the Internet backbone, in which it claims, for instance, that it ultimately retains only roughly 22 million electronic communications in 2011. *See*

---

*(footnote continued from previous page)*
foreign intelligence information. Whether the searching is of all plaintiffs' communications or only their international or internationally transiting communications after stage two filtering does not change the conclusion of unconstitutionality.

1   ECF No. 254-1 at 7:16-17.   As described above, the government here is only counting the

2   communications it retains at the end (stage four in the figure above), not all those it searches (stage

3   three).   This is akin to the British only counting the homes where they found some evidence of

4   smuggling, not all of those they searched pursuant to their general warrants.

5   The government's searches are unconstitutional because the government has no warrant

6   authorizing its content searching, and because the searches are indiscriminate and suspicionless

7   general searches that no warrant could properly authorize.

8   **D.     The Government's Defenses Fail**

9   **1.     Section 702 Orders Cannot Substitute For Constitutionally-Required Warrants**

10   The government's chief affirmative defense for the legality of its domestic Internet backbone

11   seizures and content searching has been that it currently conducts these activities under color of a

12   FISC Order under section 702 of the FISA Amendments Act (50 U.S.C. § 1881a).   This defense

13   fails.

14   The section 702 orders upon which the government relies to conduct its Internet backbone

15   seizures and searches are nothing like warrants, and they do not satisfy the Fourth Amendment.

16   Section 702 orders only approve protocols for future seizures by the government.   But as the

17   Supreme Court explained in *Riley*: "[T]he Founders did not fight a revolution to gain the right to

18   government agency protocols." *Riley*, 134 S. Ct. at 2491.   And of course, neither section 702, nor

19   any order issued under it, can relax the Fourth Amendment's requirements.   The Fourth Amendment

20   is not merely a "redundant guarantee of whatever limits on search and seizure legislatures might

21   have enacted." *Virginia v. Moore*, 553 U.S. at 168.

22   Section 702 orders have none of the features required for a valid, constitutional warrant.   In

23   sharp contrast to the particularity and probable cause requirements of warrants, section 702 orders

24   are periodic administrative approvals by the FISC of very generalized targeting and minimization

25   procedures.   Under section 702, the government proposes these procedures and then negotiates their

26   terms with the FISC if it raises any objections.   In doing so, the FISC acts in essence as an

administrative agency engaged in prospective rulemaking, not as a court issuing a warrant.[23]  Indeed, unlike a warrant or a traditional FISA order, a FISC order under section 702 does not authorize the search or seizure of anything from anyone.  Rather, the Executive subsequently decides what communications to seize and compels the seizure by issuing directives to telecommunications providers. 50 U.S.C. § 1881a(h)(1).

For comparison, under a traditional FISA order, the government would be required in support of its application to specify to the FISC its surveillance targets, what evidence supports the belief that the targets are agents of a foreign power and that surveillance of their communications is likely to yield foreign intelligence information, what communications facilities it will subject to surveillance, and what information the government's surveillance is seeking.  50 U.S.C. § 1804(a); *see* 7/25/14 Wiebe Decl., Ex. A at 24 (PCLOB 702 Report).  The order would be limited to surveillance of the communications of particular identified targets and could not authorize mass suspicionless seizures as are occurring here.  50 U.S.C. § 1805(c).

In contrast, the decisions about the actual surveillance conducted pursuant to a section 702 order are made by the Executive without any judicial review.  A section 702 order does not specify or limit the persons whose communications the government may seize or search, the communications facilities or accounts from which the government may seize communications, or what information the government may search for within the seized communications.  50 U.S.C. § 1881a(i)(1)(A), (i)(2), (i)(3)(A); 7/25/14 Wiebe Decl., Ex. A at 24-25, 27 (PCLOB 702 Report).  The FISC never determines whether there is probable cause (or any level of suspicion) that seizing the communications from a particular Internet backbone facility will yield the communications of a non-U.S. person located outside the United States who possesses foreign intelligence information.  7/25/14 Wiebe Decl., Ex. A at 24-25, 27 (PCLOB 702 Report).  As to searching of the seized communications, the FISC never determines whether there is probable cause (or any level of

---

[23] *See, e.g.,* Testimony of the Hon. James Robertson (U.S. District Judge, ret.), "Workshop Regarding Surveillance Programs Operated Pursuant to Section 215 of the USA PATRIOT Act and Section 702 of the Foreign Intelligence Surveillance Act," Transcript at 35-37 (July 9, 2013), *available at* http://www.pclob.gov/All Documents/July 9, 2013 Workshop Transcript.pdf.

1  suspicion) that each (or even any) of the communications the government is searching will yield

2  evidence of wrongdoing or foreign intelligence information, or that the persons whose

3  communications are searched are non-U.S. persons located outside the United States.  *Id*.  No court

4  ever reviews the selectors that the government uses to search the contents of communications of

5  persons like plaintiffs not suspected of anything.   ECF No. 253-3 at 2-3 (The Intelligence

6  Community's Collection Programs Under Title VII of the Foreign Intelligence Surveillance Act).

7  The Executive alone makes all of these decisions without judicial oversight.   These are

8  impermissible general seizures and searches.

9      Section 702 involves far less judicial scrutiny than even the electronic surveillance statute the

10  Supreme Court found constitutionally inadequate in *Berger*, the case that launched the application of

11  the Fourth Amendment to electronic surveillance.  In *Berger*, the Supreme Court considered a state

12  statute that authorized electronic surveillance and required prior judicial approval, but did not

13  require as part of that approval either probable cause or a description of the particular conversations

14  to be seized.  Among its deficiencies, the Court noted that naming the surveillance target "does no

15  more than identify the person whose constitutionally protected area is to be invaded rather than

16  'particularly describing' the communications, conversations, or discussions to be seized."  388 U.S.

17  at 59.  The Court found the electronic surveillance statute in *Berger* unconstitutional, even though it

18  required prior judicial approval, because it authorized "indiscriminate use of electronic devices" and

19  "actually permits general searches by electronic devices."  *Id*. at 58.

20      The Fourth Amendment requires a warrant before plaintiffs' Internet activities may be seized

21  from the Internet backbone and searched because the personal privacy interests the Fourth

22  Amendment protects are at their zenith here.  Only enforcement of the warrant requirement—by

23  requiring a particularized description of the communications to be seized and the places from which

24  they are to be seized, and by requiring a judicial determination that probable cause exists to support

25  the seizure and search—can adequately protected plaintiffs' privacy interests in their Internet

26  activity.

27

28

### 2. The "Special Needs" Exception Cannot Justify The Government's Dragnet

"In most circumstances, searches and seizures conducted without a warrant are '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*, 686 F.3d 965, 990 (9th Cir. 2011) (quoting *Katz*, 389 U.S. at 357).

The warrantless, suspicionless mass seizures of communications occurring here cannot be justified under the "special needs" exception to the warrant requirement. *See Chandler v. Miller*, 520 U.S. 305, 313-14 (1997). As the Supreme Court has explained, "When such 'special needs'—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id*. (internal citations omitted).

The "special needs" exception is a "closely guarded category." *Chandler*, 520 U.S. at 309. Its requirements are rigorous: "'In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of [individualized] suspicion.'" *Id*. at 314.

Here, the suspicionless mass seizure of Americans' Internet communications fails the first prong of the "special needs" exception. Plaintiffs' privacy interest in their Internet activities, far from being "minimal," lies at the heart of the Fourth Amendment. As previously described, a person's Internet activities encompass a vast array of intimate details about that person's private life. The government intrudes massively on plaintiffs' privacy interest in their Internet activities by copying every single one of plaintiffs' communications passing through the Internet backbone. It also does so by content-searching a subset of plaintiffs' Internet activity filtered by IP address, without any individualized suspicion.

Nor does the important purpose of the government's surveillance overcome its massive intrusion into the privacy of plaintiffs and millions of other Americans. Although "the government's interest in preventing terrorism . . . is extremely high," the importance of that interest "is no excuse for the dispensing altogether with domestic persons' constitutional rights." *Al Haramain Islamic*

*Foundation*, 686 F.3d at 993; *see also Keith*, 407 U.S. at 316-21 (rejecting government's argument that national security required dispensing with the warrant requirement in domestic security surveillance cases).  "Emergency does not create power.  Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. . . . [¶] . . . [E]ven the war power does not remove constitutional limitations safeguarding essential liberties." *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425-26 (1934).  Allowing even legitimate national security concerns to override the most fundamental of Fourth Amendment protections—the prohibition on the modern-day equivalent of the despised "general warrant"—would turn the Constitution on its head and destroy the basic civil liberties that the Founders fought to protect.[24]

## V.    CONCLUSION

The government's indiscriminate, suspicionless seizures and content searches at issue here violate the fundamental privacy rights of plaintiffs and millions of other Americans, as guaranteed by the Fourth Amendment.  The Fourth Amendment requires that the government must obtain a warrant by showing individualized suspicion, probable cause, and a particularized description of the communications to be seized or searched.  Enforcing those bedrock Fourth Amendment requirements here is necessary to keep the government within constitutional bounds, and to preclude the general searches and seizures the government is now conducting.

For the foregoing reasons, plaintiffs respectfully request that the Court rule that (1) the government's seizure of plaintiffs' Internet communications violates the Fourth Amendment and (2) the government's content searching of plaintiffs' Internet communications violates the Fourth Amendment.

---

[24] Moreover, the government's purpose is far broader than simply addressing terrorist threats. Section 702 permits collection of any "foreign intelligence information," a broadly-defined category that includes information that relates to national defense or foreign affairs.  50 U.S.C. § 1801(e). And even as to that category, section 702 requires only that foreign intelligence be a *significant* purpose of the investigation, not the sole or even primary purpose.  50 U.S.C. § 1881a(g)(2)(A)(v). This is far beyond the limited category of important government interests that could justify dispensing with the warrant requirement of the Fourth Amendment.  In addition, the fruits of section 702 seizures and searches are admittedly used for even more remote purposes.  They include, as a "routine practice," searching by the FBI in ordinary criminal cases, thus rendering the special needs exception inapplicable.  *See* 7/25/14 Wiebe Decl., Ex. A at 137-38 (PCLOB 702 Report).

1

Dated:  July 25, 2014                    Respectfully submitted,

2

3                                         _____/s/ *Richard R. Wiebe*___
                                          RICHARD R. WIEBE
4                                         LAW OFFICE OF RICHARD R. WIEBE

5                                         CINDY COHN
                                          LEE TIEN
6                                         KURT OPSAHL
                                          JAMES S. TYRE
7                                         MARK RUMOLD
                                          ANDREW CROCKER
8                                         DAVID GREENE
                                          ELECTRONIC FRONTIER FOUNDATION
9

10                                        THOMAS E. MOORE III
                                          ROYSE LAW FIRM
11

12                                        RACHAEL E. MENY
                                          MICHAEL S. KWUN
13                                        BENJAMIN W. BERKOWITZ
                                          AUDREY WALTON-HADLOCK
14                                        JUSTINA K. SESSIONS
                                          PHILIP J. TASSIN
15                                        KEKER & VAN NEST LLP

16                                        ARAM ANTARAMIAN
17                                        LAW OFFICE OF ARAM ANTARAMIAN

18                                        *Counsel for Plaintiffs*

19

20

21

22

23

24

25

26

27

28