# EXHIBIT A



# NSA Director of Civil Liberties and Privacy Office Report

## NSA's Implementation of Foreign Intelligence Surveillance Act Section 702

April 16, 2014



National Security Agency, Civil Liberties and Privacy Office
Report
NSA's Implementation of Foreign Intelligence Surveillance Act Section 702

April 16, 2014

## INTRODUCTION

This report was prepared by the National Security Agency (NSA) Civil Liberties and Privacy Office as part of its responsibilities to enhance communications and transparency with the public and stakeholders. Its Director is the primary advisor to the Director of NSA when it comes to matters of civil liberties and privacy. Created in January 2014, the Office is also charged with ensuring that civil liberties and privacy protection are integrated into NSA activities. The intent of this paper is to help build a common understanding that can serve as a foundation for future discussions about the existing civil liberties and privacy protections.

The mission of NSA is to make the nation safer by providing policy makers and military commanders with timely foreign intelligence and by protecting national security information networks. NSA collects foreign intelligence based on requirements from the President, his national security team, and their staffs through the National Intelligence Priorities Framework. NSA fulfills these national foreign intelligence requirements through the collection, processing, and analysis of communications or other data, passed or accessible by radio, wire or other electronic means.

NSA's authority to conduct signals intelligence collection for foreign intelligence and counterintelligence purposes is provided primarily by Section 1.7(c)(1) of Executive Order 12333, as amended. The execution of NSA's signals intelligence mission must be conducted in conformity with the Fourth Amendment. This includes NSA's acquisition of communications to which a U.S. person is a party under circumstances in which the U.S. person has a reasonable expectation of privacy. The Foreign Intelligence Surveillance Act of 1978 (FISA) further regulates certain types of foreign intelligence collection, including that which occurs with compelled assistance from U.S. communications providers.

This Report describes one way in which NSA meets these responsibilities while using Section 702 of FISA, as amended by the FISA Amendments Act of 2008. Although multiple federal agencies participate in Section 702 collection, this paper describes the process by which NSA obtains, uses, shares, and retains communications of foreign intelligence value pursuant to Section 702. It also describes existing privacy and civil liberties protections built into the process.



The NSA Civil Liberties and Privacy Office (CLPO) used the Fair Information Practice Principles (FIPP)[1] as an initial tool to describe the existing civil liberties and privacy protections in place for collection done under Section 702 authority.[2]

## SECTION 702 OF FISA

Section 702 of FISA was widely and publicly debated in Congress both during the initial passage in 2008 and the subsequent re-authorization in 2012. It provides a statutory basis for NSA, with the compelled assistance of electronic communication service providers, to target non-U.S. persons reasonably believed to be located outside the U.S. in order to acquire foreign intelligence information. Given that Section 702 only allows for the targeting of non-U.S. persons outside the U.S., it differs from most other sections of FISA. It does not require an individual determination by the U.S. Foreign Intelligence Surveillance Court (FISC) that there is probable cause to believe the target is a foreign power or an agent of a foreign power. Instead, the FISC reviews annual topical certifications executed by the Attorney General (AG) and the Director of National Intelligence (DNI) to determine if these certifications meet the statutory requirements. The FISC also determines whether the statutorily required targeting and minimization procedures used in connection with the certifications are consistent with the statute and the Fourth Amendment. The targeting procedures are designed to ensure that Section 702 is only used to target non-U.S. persons reasonably believed to be located outside the U.S.

The minimization procedures are designed to minimize the impact on the privacy on U.S. persons by minimizing the acquisition, retention, and dissemination of non-publicly available U.S. person information that was lawfully, but incidentally acquired under Section 702 by the targeting of non-U.S. persons reasonably believed to be located outside the U.S. Under these certifications the AG and the DNI issue directives to electronic communication service providers (service providers) that require these service providers to "immediately provide the Government with all information ... or assistance necessary to accomplish the acquisition [of foreign intelligence information] in a manner that will protect the secrecy of the acquisition...." The Government's acquisition of communications under its Section 702 authority thus takes place pursuant to judicial review and with the knowledge of the service providers.

NSA cannot intentionally use Section 702 authority to target any U.S. citizen, any other U.S. person, or anyone known at the time of acquisition to be located within the U.S. The statute also prohibits the use of Section 702 to intentionally acquire any communication as to which the

---

[1] The FIPPS are the recognized principles for assessing privacy impacts. They have been incorporated into EO13636, *Improving Critical Infrastructure Cybersecurity* and the National Strategy for Trusted Identities in Cyberspace. These principles are rooted in the U.S. Department of Health, Education and Welfare's seminal 1973 report, "Records, Computers and the Rights of Citizens." The FIPPs have been implemented in the Privacy Act of 1974, with certain exemptions, including ones that apply to certain national security and law enforcement activities.

[2] NSA CLPO will continue to refine its assessment tools to best suit the mission of NSA, as a member of the Intelligence Community, and to protect civil liberties and privacy.



sender and all intended recipients are known at the time of acquisition to be located inside the U.S. Similarly, the statute prohibits the use of Section 702 to conduct "reverse targeting" (i.e., NSA may not intentionally target a person reasonably believed to be located outside of the U.S. if the purpose of such acquisition is to target a person reasonably believed to be located inside the U.S.). All acquisitions conducted pursuant to Section 702 must be conducted in a manner consistent with the Fourth Amendment. NSA's FISC-approved targeting procedures permit NSA to target a non-U.S. person reasonably believed to be located outside the U.S. if the intended target possesses, is expected to receive, and/or is likely to communicate foreign intelligence information concerning one of the certifications executed by the AG and DNI. Although the purpose of Section 702 is to authorize targeting of non-U.S. persons outside the U.S., the statute's requirement for minimization procedures recognizes that such targeted individuals or entities may communicate about U.S. persons or with U.S. persons. For this reason, NSA also must follow FISC-approved minimization procedures that govern the handling of any such communications.

NSA must report to the Office of the Director of National Intelligence (ODNI) and the Department of Justice (DOJ) any and all instances where it has failed to comply with the targeting and/or minimization procedures. In addition, ODNI and DOJ have access to documentation concerning each of NSA's Section 702 targeting decisions and conduct regular reviews in order to provide independent oversight of NSA's use of the authority. The FISC Rules of Procedure require the Government to notify the Court of all incidents of non-compliance with applicable law or with an authorization granted by the Court. The Government reports Section 702 compliance incidents to the Court via individual notices and quarterly reports. In addition, the Government reports all Section 702 compliance incidents to Congress in the Attorney General's Semiannual Report. Depending on the type or severity of compliance incident, NSA may also promptly notify the Congressional Intelligence Committees, as well as the President's Intelligence Oversight Board of an individual compliance matter.

***Existing Privacy and Civil Liberties Protections:*** Each of the three branches of federal government oversees NSA's use of the Section 702 authorities. NSA provides transparency to its oversight bodies (Congress, DOJ, ODNI, DoD, the President's Intelligence Oversight Board and the FISC) through regular briefings, court filings, and incident reporting. In addition, DOJ and ODNI conduct periodic reviews of NSA's use of the authority and report on those reviews. More recently, at the direction of the President, the Government has provided additional transparency to the public regarding the program by declassifying FISC opinions and related documents. Although FISA surveillance is normally kept secret from the targets of the surveillance, there are exceptions. For example, if the Government intends to use the results of FISA surveillance, to include Section 702 surveillance, in a trial or other proceeding against a person whose communications were collected, the Government must notify the person so the person can challenge whether the communications were acquired lawfully. These protections implement the general Fair Information Practice Principle (FIPP) of transparency.



## TRAINING

Before an analyst gains access to any NSA signals intelligence data, the analyst must complete specialized training on the legal and policy guidelines that govern the handling and use of the data. Additional training is required for access to Section 702 data. These annual mandatory training requirements include scenario-based training, required reading, and a final competency test. The analyst must pass this test before being granted access. Furthermore, if a compliance incident involves a mistake or misunderstanding of relevant policies, the analyst is re-trained in order to continue to have access to the data acquired pursuant to Section 702.

## IDENTIFYING AND TASKING A SELECTOR

Next in the Section 702 process is for an NSA analyst to identify a non-U.S. person located outside the U.S. who has and/or is likely to communicate foreign intelligence information as designated in a certification. For example, such a person might be an individual who belongs to a foreign terrorist organization or facilitates the activities of that organization's members. Non-U.S. persons are not targeted unless NSA has reason to believe that they have and/or are likely to communicate foreign intelligence information as designated in a certification; U.S. persons are never targeted.

Once the NSA analyst has identified a person of foreign intelligence interest who is an appropriate target under one of the FISC-approved Section 702 certifications, that person is considered the target. The NSA analyst attempts to determine how, when, with whom, and where the target communicates. Then the analyst identifies specific communications modes used by the target and obtains a unique identifier associated with the target – for example, a telephone number or an email address. This unique identifier is referred to as a selector. The selector is not a "keyword" or particular term (e.g., "nuclear" or "bomb"), but must be a specific communications identifier (e.g., e-mail address).

Next the NSA analyst must verify that there is a connection between the target and the selector and that the target is reasonably believed to be (a) a non-U.S. person and (b) located outside the U.S. This is not a 51% to 49% "foreignness" test. Rather the NSA analyst will check multiple sources and make a decision based on the totality of the information available. If the analyst discovers any information indicating the targeted person may be located in the U.S. or that the target may be a U.S. person, such information must be considered. In other words, if there is conflicting information about the location of the person or the status of the person as a non-U.S. person, that conflict must be resolved before targeting can occur.

For each selector, the NSA analyst must document the following information: (1) the foreign intelligence information expected to be acquired, as authorized by a certification, (2) the information that would lead a reasonable person to conclude the selector is associated with a



non-U.S. person, and (3) the information that would similarly lead a reasonable person to conclude that this non-U.S. person is located outside the U.S. This documentation must be reviewed and approved or denied by two senior NSA analysts who have satisfied additional training requirements. The senior NSA analysts may ask for more documentation or clarification, but regardless must verify that all requirements have been met in full. NSA tracks the submission, review, and approval process through the documentation and the senior NSA analysts' determinations are retained for further review by NSA's compliance elements, as well as external oversight reviewers from DOJ and ODNI. Upon approval, the selector may be used as the basis for compelling a service provider to forward communications associated with the given selector. This is generally referred to as "tasking" the selector.

***Existing Privacy and Civil Liberties Protections:*** NSA trains its analysts extensively through a variety of means to ensure that analysts fully understand their responsibilities and the specific scope of this authority. If the analyst fails to meet the training standards, the analyst will not have the ability to use the Section 702 authority for collection purposes. If the analyst fails to maintain ongoing training standards, the analyst will lose the ability to use the Section 702 authority for collection purposes and all ability to retrieve any data previously collected under the authority. NSA requires any authorized and trained analyst seeking to task a selector using Section 702 to document the three requirements for use of the authority – that the target is connected sufficiently to the selector for an approved foreign intelligence purpose, that the target is a non-U.S. person, and that the target is reasonably believed to be located outside the U.S. This documentation must be reviewed, validated, and approved by the senior analysts who have received additional training. These protections implement the general FIPPs of purpose specification, accountability and auditing, and minimization.

## ACCESSING AND ASSESSING COMMUNICATIONS OBTAINED UNDER SECTION 702 AUTHORITY

Once senior analysts have approved a selector as compliant, the service providers are legally compelled to assist the government by providing the relevant communications. Therefore, tasking under this authority takes place with the knowledge of the service providers. NSA receives information concerning a tasked selector through two different methods.

In the first, the Government provides selectors to service providers through the FBI. The service providers are compelled to provide NSA with communications to or from these selectors. This has been generally referred to as the PRISM program.

In the second, service providers are compelled to assist NSA in the lawful interception of electronic communications to, from, or about tasked selectors. This type of compelled service provider assistance has generally been referred to as Upstream collection. NSA's FISC-approved targeting procedures include additional requirements for such collection designed to prevent acquisitions of wholly domestic communications. For example, in certain circumstances NSA's procedures require that it employ an Internet Protocol filter to ensure that the target is



located overseas. The process for approving the selectors for tasking is the same for both PRISM and Upstream collection.

Once NSA has received communications of the tasked selector, NSA must follow additional FISC-approved procedures known as the minimization procedures. These procedures require NSA analysts to review at least a sample of communications acquired from all selectors tasked under Section 702, which occurs on a regular basis to verify that the reasonable belief determination used for tasking remains valid.

The NSA analyst must review a sample of communications received from the selectors to ensure that they are in fact associated with the foreign intelligence target and that the targeted individual or entity is not a U.S. person and is not currently located in the U.S. If the NSA analyst discovers that NSA is receiving communications that are not in fact associated with the intended target or that the user of a tasked selector is determined to be a U.S. person or is located in the U.S., the selector must be promptly "detasked." As a general rule, in the event that the target is a U.S. person or in the U.S., all other selectors associated with the target also must be detasked.

***Existing Privacy and Civil Liberties Protections:*** In addition to extensive training, the analyst is required to review the collection to determine that it is associated with the targeted selector and is providing the expected foreign intelligence shortly after the tasking starts and at least annually thereafter. This review allows NSA to identify possible problems with the collection and provides an additional layer of accountability. In addition, NSA has technical measures that alert the NSA analysts if it appears a selector is being used from the U.S. These protections implement the general FIPPs of purpose specification, minimization, accountability and auditing, data quality, and security.

## NSA PROCESSING AND ANALYSIS OF COMMUNICATIONS OBTAINED UNDER SECTION 702 AUTHORITY

Communications provided to NSA under Section 702 are processed and retained in multiple NSA systems and data repositories. One data repository, for example, might hold the contents of communications such as the texts of emails and recordings of conversations, while another, may only include metadata, i.e., basic information about the communication, such as the time and duration of a telephone call, or sending and receiving email addresses.

NSA analysts may access communications obtained under Section 702 authority for the purpose of identifying and reporting foreign intelligence. They access the information via "queries," which may be date-bound, and may include alphanumeric strings such as telephone numbers, email addresses, or terms that can be used individually or in combination with one another. FISC-approved minimization procedures govern any queries done on Section 702-derived information. NSA analysts with access to Section 702-derived information are trained in the proper construction of a query so that the query is reasonably likely to return valid foreign



intelligence and minimizes the likelihood of returning non-pertinent U.S. person information. Access by NSA analysts to each repository is controlled, monitored, and audited. There are, for example, automated checks to determine if an analyst has completed all required training prior to returning information responsive to a query. Further, periodic spot checks on queries by NSA analysts are conducted.

Since October 2011 and consistent with other agencies' Section 702 minimization procedures, NSA's Section 702 minimization procedures have permitted NSA personnel to use U.S. person identifiers to query Section 702 collection when such a query is reasonably likely to return foreign intelligence information. NSA distinguishes between queries of communications content and communications metadata. NSA analysts must provide justification and receive additional approval before a content query using a U.S. person identifier can occur. To date, NSA analysts have queried Section 702 content with U.S. person identifiers less frequently than Section 702 metadata. For example, NSA may seek to query a U.S. person identifier when there is an imminent threat to life, such as a hostage situation. NSA is required to maintain records of U.S. person queries and the records are available for review by both DOJ and ODNI as part of the external oversight process for this authority. Additionally, NSA's procedures prohibit NSA from querying Upstream data with U.S. person identifiers.

***Existing Privacy and Civil Liberties Protections:*** In addition to the training and access controls, NSA maintains audit trails for all queries of the Section 702 data. NSA's Signals Intelligence Directorate's compliance staff routinely reviews a portion of all queries that include U.S. person identifiers to ensure that all such queries are only conducted when appropriate. Personnel from DOJ and ODNI provide an additional layer of oversight to ensure that NSA is querying the data appropriately. These protections implement the general FIPPs of security, accountability and auditing, and data quality.

## NSA DISSEMINATION OF INTELLIGENCE DERIVED FROM COMMUNICATIONS OBTAINED UNDER SECTION 702 AUTHORITY

NSA only generates signals intelligence reports when the information meets a specific intelligence requirement, regardless of whether the proposed report contains U.S. person information. Dissemination of information about U.S. persons in any NSA foreign intelligence report is expressly prohibited unless that information is necessary to understand foreign intelligence information or assess its importance, contains evidence of a crime, or indicates a threat of death or serious bodily injury. Even if one or more of these conditions apply, NSA may include no more than the minimum amount of U.S. person information necessary to understand the foreign intelligence or to describe the crime or threat. For example, NSA typically "masks" the true identities of U.S. persons through use of such phrases as "a U.S. person" and the suppression of details that could lead to him or her being successfully identified by the context. Recipients of NSA reporting can request that NSA provide the true identity of a masked U.S. person referenced in an intelligence report if the recipient has a legitimate need to know the identity. Under NSA policy, NSA is allowed to unmask the identity only under certain



conditions and where specific additional controls are in place to preclude its further dissemination, and additional approval has been provided by one of seven designated positions at NSA. Additionally, together DOJ and ODNI review the vast majority of disseminations of information about U.S. persons obtained pursuant to Section 702 as part of their oversight process.

*Existing Privacy and Civil Liberties Protections:* As noted above, NSA only generates signals intelligence reports when the information meets a specific intelligence requirement, regardless of whether the proposed report contains U.S. person information or not. Additionally, NSA's Section 702 minimization procedures require any U.S. person information to be minimized prior to dissemination, thereby reducing the impact on privacy for U.S. persons. The information may only be unmasked in specific instances consistent with the minimization procedures and NSA policy. These protections implement the general FIPPs of minimization and purpose specification.

## RETENTION OF UNEVALUATED COMMUNICATIONS OBTAINED UNDER SECTION 702 AUTHORITY

The maximum time that specific communications' content or metadata may be retained by NSA is established in the FISC-approved minimization procedures. The unevaluated content and metadata for PRISM or telephony data collected under Section 702 is retained for no more than five years. Upstream data collected from Internet activity is retained for no more than two years. NSA complies with these retention limits through an automated process.

NSA's procedures also specify several instances in which NSA must destroy U.S. person collection promptly upon recognition. In general, these include any instance where NSA analysts recognize that such collection is clearly not relevant to the authorized purpose of the acquisition nor includes evidence of a crime. Additionally, absent limited exceptions, NSA must destroy any communications acquired when any user of a tasked account is found to have been located in the U.S. at the time of acquisition.

*Existing Privacy and Civil Liberties Protections:* NSA has policies, technical controls, and staff in place to ensure the data is retained in accordance with the FISC-approved procedures. The automated process to delete the collection at the end of the retention period applies to both U.S. person and non U.S. person the information. There is an additional manual process for the destroying information related to U.S. Persons where NSA analysts have recognized the collection is clearly not relevant to the authorized purpose of the acquisition nor includes evidence of a crime. These protections implement the general FIPPs of minimization and security.

8



## ORGANIZATIONAL MANAGEMENT, COMPLIANCE, AND OVERSIGHT

NSA is subject to rigorous internal compliance and external oversight. Like many other regulated entities, NSA has an enterprise-wide compliance program, led by NSA's Director of Compliance, a position required by statute. NSA's compliance program is designed to provide precision in NSA's activities to ensure that they are consistently conducted in accordance with law and procedure, including in this case the Section 702 certifications and accompanying Section 702 targeting and minimization procedures and additional FISC requirements. As part of the enterprise-wide compliance structure, NSA has compliance elements throughout its various organizations. NSA also seeks to detect incidents of non-compliance at the earliest point possible. When issues of non-compliance arise regarding the way in which NSA carries out the FISC-approved collection, NSA takes corrective action and, in parallel, NSA must report incidents of non-compliance to ODNI and DOJ for further reporting to the FISC and Congress, as appropriate or required.

These organizations, along with the NSA General Counsel, the NSA Inspector General, and most recently the Director of Civil Liberties and Privacy have critical roles in ensuring all NSA operations proceed in accordance with the laws, policies, and procedures governing intelligence activities. Additionally, each individual NSA analyst has a responsibility for ensuring that his or her personal activities are similarly compliant. Specifically, this responsibility includes recognizing and reporting all situations in which he or she may have exceeded his or her authority to obtain, analyze, or report intelligence information under Section 702 authority.

*Compliance:* NSA reports all incidents in which, for example, it has or may have inappropriately queried the Section 702 data, or in which an analyst may have made typographical errors or dissemination errors. NSA personnel are obligated to report when they believe NSA is not, or may not be, acting consistently with law, policy, or procedure. If NSA is not acting in accordance with law, policy, or procedure, NSA will report through its internal and external intelligence oversight channels, conduct reviews to understand the root cause, and make appropriate adjustments to its procedures.

If NSA discovers that it has tasked a selector that is used by a person in the U.S. or by a U.S. person, then NSA must cease collection immediately and, in most cases must also delete the relevant collected data and cancel or revise any disseminated reporting based on this data. NSA encourages self-reporting by its personnel and seeks to remedy any errors with additional training or other measures as necessary. Following an incident, a range of remedies may occur: admonishment, written explanation of the offense, request to acknowledge a training point that the analyst might have missed during training, and/or required retesting. In addition to reporting described above, any intentional violation of law would be referred to the NSA Office of Inspector General. To date there have been no such instances, as most recently confirmed by the President's Review Group on Intelligence and Communications Technology.



*External Oversight:* As required by the Section 702 targeting procedures, both DOJ and ODNI conduct routine oversight reviews. Representatives from both agencies visit NSA on a bi-monthly basis. They examine all tasking datasheets that NSA provides to DOJ and ODNI to determine whether the tasking sheets meet the documentation standards required by NSA's targeting procedures and provide sufficient information for the reviewers to ascertain the basis for NSA's foreignness determinations. For those records that satisfy the standards, no additional documentation is requested. For those records that warrant further review, NSA provides additional information to DOJ and ODNI during or following the onsite review. NSA receives feedback from the DOJ and ODNI team and incorporates this information into formal and informal training to analysts. DOJ and ODNI also review the vast majority of disseminated reporting that includes U.S. person information.

***Existing Privacy and Civil Liberties Protections:*** The compliance and oversight processes allow NSA to identify any concerns or problems early in the process so as to minimize the impact on privacy and civil liberties. These protections implement the general FIPPs of transparency to oversight organizations and accountability and auditing.

## CONCLUSION

This Report, prepared by NSA's Office of Civil Liberties and Privacy, provides a comprehensive description of NSA's Section 702 activities. The report also documents current privacy and civil liberties protections.