CINDY COHN (SBN 145997)
cindy@eff.org
LEE TIEN (SBN 148216)
KURT OPSAHL (SBN 191303)
JAMES S. TYRE (SBN 083117)
MARK RUMOLD (SBN 279060)
ANDREW CROCKER (SBN 291596)
DAVID GREENE (SBN 160107)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
Telephone:  415/436-9333; Fax:  415/436-9993

RICHARD R. WIEBE (SBN 121156)
wiebe@pacbell.net
LAW OFFICE OF RICHARD R. WIEBE
One California Street, Suite 900
San Francisco, CA 94111
Telephone: 415/433-3200; Fax: 415/433-6382

RACHAEL E. MENY (SBN 178514)
rmeny@kvn.com
MICHAEL S. KWUN (SBN 198945)
AUDREY WALTON-HADLOCK (SBN 250574)
BENJAMIN W. BERKOWITZ (SBN 244441)
JUSTINA K. SESSIONS (SBN 270914)
PHILIP J. TASSIN (SBN 287787)
KEKER & VAN NEST, LLP
633 Battery Street
San Francisco, CA  94111
Telephone:  415/391-5400; Fax: 415/397-7188

THOMAS E. MOORE III (SBN 115107)
tmoore@rroyselaw.com
ROYSE LAW FIRM, PC
1717 Embarcadero Road
Palo Alto, CA 94303
Telephone: 650/813-9700; Fax: 650/813-9777

ARAM ANTARAMIAN (SBN 239070)
aram@eff.org
LAW OFFICE OF ARAM ANTARAMIAN
1714 Blake Street
Berkeley, CA 94703
Tel.: 510/289-1626

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

|  |  |
|---|---|
| CAROLYN JEWEL, TASH HEPTING, YOUNG BOON HICKS, as executrix of the estate of GREGORY HICKS, ERIK KNUTZEN and JOICE WALTON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL SECURITY AGENCY, *et al.*,<br><br>Defendants. | Case No.: 4:08-cv-4373-JSW<br><br>**PLAINTIFFS' NOTICE OF ADDITIONAL AUTHORITIES**<br><br>Date: December 19, 2014<br>Time: 9:00 a.m.<br>Courtroom 5, 2nd Floor<br>The Honorable Jeffrey S. White |

Case No. 08-cv-4373-JSW

1   Pursuant to the Court's December 16, 2014 Order (ECF No. 309), plaintiffs submit the

2   following attached authorities on which they intend to rely at the December 19, 2014 hearing on

3   the parties' cross-motions for partial summary judgment.

4   Exhibit A:   Privacy and Civil Liberties Oversight Board, Report on the Surveillance

5   Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act (July 2,

6   2014), pages 5-6, 16-20, 32, and 38-41;

7   Exhibit B:   *Hearst v. Black*, 87 F.2d 68 (D.C. Cir. 1936), at pages 70-71;

8   Exhibit C:   *United States v. Fowlkes*, 770 F.3d 748 (9th Cir. 2014), at pages 756-57; and

9   Exhibit D:   *Coolidge v, New Hampshire*, 403 U.S. 443 (1971), at pages 454-55.

10

11   Dated:  December 17, 2014                Respectfully submitted,

12                                                     /s/ Richard R. Wiebe
                                              RICHARD R. WIEBE
13                                            LAW OFFICE OF RICHARD R. WIEBE

14                                            CINDY COHN
15                                            LEE TIEN
                                              KURT OPSAHL
16                                            JAMES S. TYRE
                                              MARK RUMOLD
17                                            ANDREW CROCKER
                                              DAVID GREENE
18                                            ELECTRONIC FRONTIER FOUNDATION

19
                                              THOMAS E. MOORE III
20                                            ROYSE LAW FIRM

21
                                              RACHAEL E. MENY
22                                            MICHAEL S. KWUN
                                              BENJAMIN W. BERKOWITZ
23                                            AUDREY WALTON-HADLOCK
                                              JUSTINA K. SESSIONS
24                                            PHILIP J. TASSIN
                                              KEKER & VAN NEST LLP
25

26                                            ARAM ANTARAMIAN
                                              LAW OFFICE OF ARAM ANTARAMIAN
27
                                              *Counsel for Plaintiffs*
28

# Exhibit A

# Exhibit A



### PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD

*Report on the Surveillance Program Operated Pursuant to Section 702*
*of the Foreign Intelligence Surveillance Act*

**JULY 2, 2014**

**Part 2:**

**EXECUTIVE SUMMARY**

In 2008, Congress enacted the FISA Amendments Act, which made changes to the Foreign Intelligence Surveillance Act of 1978 ("FISA"). Among those changes was the addition of a new provision, Section 702 of FISA, permitting the Attorney General and the Director of National Intelligence to jointly authorize surveillance conducted within the United States but targeting only non-U.S. persons reasonably believed to be located outside the United States. The Privacy and Civil Liberties Oversight Board ("PCLOB") began reviewing implementation of the FISA Amendments Act early in 2013, shortly after the Board began operations as an independent agency.[9] The PCLOB has conducted an in-depth review of the program now operated under Section 702, in pursuit of the Board's mission to review executive branch actions taken to protect the nation from terrorism in order to ensure "that the need for such actions is balanced with the need to protect privacy and civil liberties."[10] This Executive Summary outlines the Board's conclusions and recommendations.

I.      **Overview of the Report**

A.  **Description and History of the Section 702 Program**

Section 702 has its roots in the President's Surveillance Program developed in the immediate aftermath of the September 11th attacks. Under one aspect of that program, which came to be known as the Terrorist Surveillance Program ("TSP"), the President authorized interception of the contents of international communications from within the United States, outside of the FISA process. Following disclosures about the TSP by the press in December 2005, the government sought and obtained authorization from the Foreign Intelligence Surveillance Court ("FISA court") to conduct, under FISA, the collection that had been occurring under the TSP. Later, the government developed a statutory framework specifically designed to authorize this collection program. After the enactment and expiration of a temporary measure, the Protect America Act of 2007, Congress passed the FISA Amendments Act of 2008, which included the new Section 702 of FISA. The statute

---

[9]      *See* Privacy and Civil Liberties Oversight Board, Minutes of Open Meeting of March 5, 2013, at 4-5, *available at* http://www.pclob.gov/SiteAssets/meetings-and-events/5-march-2013-public-meeting/5%20March%202013%20Meeting%20Minutes.pdf.

[10]     42 U.S.C. § 2000ee(c)(1).

provides a procedural framework for the targeting of non-U.S. persons reasonably believed to be located outside the United States to acquire foreign intelligence information.

Section 702 permits the Attorney General and the Director of National Intelligence to jointly authorize surveillance targeting persons who are not U.S. persons, and who are reasonably believed to be located outside the United States, with the compelled assistance of electronic communication service providers, in order to acquire foreign intelligence information. Thus, the persons who may be targeted under Section 702 cannot intentionally include U.S. persons or anyone located in the United States, and the targeting must be conducted to acquire foreign intelligence information as defined in FISA. Executive branch authorizations to acquire designated types of foreign intelligence under Section 702 must be approved by the FISA court, along with procedures governing targeting decisions and the handling of information acquired.

Although U.S. persons may not be targeted under Section 702, communications of or concerning U.S. persons may be acquired in a variety of ways. An example is when a U.S. person communicates with a non-U.S. person who has been targeted, resulting in what is termed "incidental" collection. Another example is when two non-U.S. persons discuss a U.S. person. Communications of or concerning U.S. persons that are acquired in these ways may be retained and used by the government, subject to applicable rules and requirements. The communications of U.S. persons may also be collected by mistake, as when a U.S. person is erroneously targeted or in the event of a technological malfunction, resulting in "inadvertent" collection. In such cases, however, the applicable rules generally require the communications to be destroyed.

Under Section 702, the Attorney General and Director of National Intelligence make annual certifications authorizing this targeting to acquire foreign intelligence information, without specifying to the FISA court the particular non-U.S. persons who will be targeted. There is no requirement that the government demonstrate probable cause to believe that an individual targeted is an agent of a foreign power, as is generally required in the "traditional" FISA process under Title I of the statute. Instead, the Section 702 certifications identify categories of information to be collected, which must meet the statutory definition of foreign intelligence information. The certifications that have been authorized include information concerning international terrorism and other topics, such as the acquisition of weapons of mass destruction.

Section 702 requires the government to develop targeting and "minimization" procedures that must satisfy certain criteria. As part of the FISA court's review and approval of the government's annual certifications, the court must approve these procedures and determine that they meet the necessary standards. The targeting procedures govern how the executive branch determines that a particular person is reasonably believed to be a non-U.S. person located outside the United States, and that

**Part 3:**

**DESCRIPTION AND HISTORY**

I.        **Genesis of the Section 702 Program**

As it exists today, the Section 702 program can trace its lineage to two prior intelligence collection programs, both of which were born of counterterrorism efforts following the attacks of September 11, 2001. The first, and more well-known, of these two efforts was a program to acquire the contents of certain international communications, later termed the Terrorist Surveillance Program ("TSP"). In October 2001, President George W. Bush issued a highly classified presidential authorization directing the NSA to collect certain foreign intelligence by electronic surveillance in order to prevent acts of terrorism within the United States, based upon a finding that an extraordinary emergency existed because of the September 11 attacks. Under this authorization, electronic surveillance was permitted within the United States for counterterrorism purposes without judicial warrants or court orders for a limited number of days.[16] President Bush authorized the NSA to (1) collect the contents of certain international communications, a program that was later referred to as the TSP, and (2) collect in bulk non-content information, or "metadata," about telephone and Internet communications.[17] The acquisition of telephone metadata was the forerunner to the Section 215 calling records program discussed in a prior report by the Board.

The President renewed the authorization for the NSA's activities in early November 2001. Thereafter, the authorization was renewed continuously, with some modifications and constrictions to the scope of the authorized collection, approximately every thirty to sixty days until 2007. Each presidential authorization included the finding that an extraordinary emergency continued to exist justifying ongoing warrantless surveillance. Key members of Congress and the presiding judge of the Foreign Intelligence Surveillance Court ("FISC" or "FISA court") were briefed on the existence of the program. The collection of communications content and bulk metadata under these presidential authorizations became known as the President's Surveillance Program. According to a 2009 report by the inspectors general of several defense and intelligence agencies, over time, "the program

---

[16]        *See* DNI Announces the Declassification of the Existence of Collection Activities Authorized by President George W. Bush Shortly After the Attacks of September 11, 2001 (Dec. 21, 2013) ("Dec. 21 DNI Announcement"), *available at* http://icontherecord.tumblr.com/post/70683717031/dni-announces-the-declassification-of-the.

[17]        *See* Dec. 21 DNI Announcement, *supra*.

became less a temporary response to the September 11 terrorist attacks and more a permanent surveillance tool."[18]

In December 2005, the *New York Times* published articles revealing the TSP, i.e., the portion of the President's Surveillance Program that involved intercepting the contents of international communications. In response to these revelations, President Bush confirmed the existence of the TSP,[19] and the Department of Justice issued a "white paper" outlining the legal argument that the President could authorize these interceptions without obtaining a warrant or court order.[20] Notwithstanding this legal argument, the government decided to seek authorization under the Foreign Intelligence Surveillance Act ("FISA") to conduct the content collection that had been occurring under the TSP.[21] In January 2007, the FISC issued orders authorizing the government to conduct certain electronic surveillance of telephone and Internet communications carried over listed communication facilities where, among other things, the *government* made a probable cause determination regarding one of the communicants, and the email addresses and telephone numbers to be tasked were reasonably believed to be used by persons located outside the United States.[22]

The FISC's order, referred to as the "Foreign Telephone and Email Order," in effect replaced the President's authorization of the TSP, and the President made no further reauthorizations of the TSP.[23] When the government sought to renew the January 2007 Foreign Telephone and Email Order, however, a different judge on the FISC approved the program, but on a different legal theory that required changes in the collection program.[24] Specifically, in May 2007 the FISC approved a modified version of the Foreign Telephone and Email Order in which the *court*, as opposed to the *government*, made probable cause determinations regarding the particular foreign telephone numbers and email addresses that were to be used to conduct surveillance under this program.[25] Although the modified

---

[18]    *See* UNCLASSIFIED REPORT ON THE PRESIDENT'S SURVEILLANCE PROGRAM, PREPARED BY THE OFFICE OF INSPECTORS GENERAL OF THE DEPARTMENT OF DEFENSE, DEPARTMENT OF JUSTICE, CENTRAL INTELLIGENCE AGENCY, NATIONAL SECURITY AGENCY, AND THE OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, at 31 (2009).

[19]    *See, e.g.*, President's Radio Address (Dec. 17, 2005), *available at* http://georgewbush-whitehouse.archives.gov/news/releases/2005/12/20051217.html.

[20]    Legal Authorities Supporting the Activities of the National Security Agency Described by the President (January 19, 2006), *available at* http://www.justice.gov/olc/opiniondocs/nsa-white-paper.pdf.

[21]    *See* Dec. 21 DNI Announcement, *supra*.

[22]    Declassified Certification of Attorney General Michael B. Mukasey, at ¶ 37, *In re National Security Agency Telecommunications Records Litigation*, MDL Dkt. No. 06-1791-VRW (N.D. Cal. Sept. 19, 2008) ("2008 Mukasey Decl."), *available at* http://www.dni.gov/files/documents/0505/AG%20Mukasey%202008%20Declassified%20Declaration.pdf.

[23]    2008 Mukasey Decl., *supra*, at ¶ 37.

[24]    2008 Mukasey Decl., *supra*, at ¶ 38 & n.20.

[25]    2008 Mukasey Decl., *supra*, at ¶ 38.

Foreign Telephone and Email Order permitted the government to add newly discovered telephone numbers and email addresses without an individual court order in advance,[26] the government assessed that the restrictions of the order, particularly after the May 2007 modifications, was creating an "intelligence gap."[27]

Separate from, but contemporaneous with, the TSP and the Foreign Telephone and Email Orders, a second collection effort was being undertaken. Specifically, the government used the then-existing FISA statute to obtain individual court orders to compel private companies to assist the government in acquiring the communications of individuals located overseas who were suspected of engaging in terrorism and who used United States–based communication service providers.[28] The government stated that it and the Foreign Intelligence Surveillance Court (FISC) expended "considerable resources" to obtain court orders based upon a probable cause showing that these overseas individuals met the legal standard for electronic surveillance under FISA,[29] i.e., that the targets were agents of a foreign power (such as an international terrorist group) and that they used the specific communication facilities (such as email addresses) regarding which the government was seeking to conduct electronic surveillance.[30] The persons targeted by these efforts were located outside the United States, and the communications being sought were frequently with others who were also located outside the United States.[31]

Drafting applications that demonstrated satisfaction of this probable cause standard, the government has asserted, slowed and in some cases prevented the acquisition of foreign intelligence information.[32] The government has not disclosed the scale of this second effort to target foreign individuals using traditional FISA electronic surveillance authorities, but in the years following the passage of the Protect America Act of 2007 and the FISA Amendments Act of 2008, which eliminated the requirement for the

---

[26]     2008 Mukasey Decl., *supra*, at ¶ 38.

[27]     *See* S. Rep. No. 110-209, at 5 (2007) (stating that "the DNI informed Congress that the decision . . . had led to degraded capabilities"); Eric Lichtblau, James Risen, and Mark Mazzetti, *Reported Drop in Surveillance Spurred a Law*, New York Times (Aug. 11, 2007) (reporting on Administration interactions with Congress that led to the enactment of the Protect America Act, including reported existence of an "intelligence gap").

[28]     Statement of Kenneth L. Wainstein, Assistant Attorney General, *Senate Select Committee on Intelligence Hearing On Modernization of the Foreign Intelligence Surveillance Act*, at 6-7 (May 1, 2007) ("May 2007 Wainstein Statement"), *available at* http://www.intelligence.senate.gov/070501/wainstein.pdf.

[29]     May 2007 Wainstein Statement, *supra*, at 6-7.

[30]     50 U.S.C. § 1805(a)(2).

[31]     May 2007 Wainstein Statement, *supra*, at 7.

[32]     *See, e.g.,* May 2007 Wainstein Statement, *supra*, at 7.

government to seek such individual orders, the total number of FISA electronic surveillance applications approved by the FISC dropped by over forty percent.[33]

In light of the perceived growing inefficiencies of obtaining FISC approval to target persons located outside the United States, in the spring of 2007 the Bush Administration proposed modifications to FISA.[34] Reports by the Director of National Intelligence to Congress that implementation of the FISC's May 2007 modifications to the Foreign Telephone and Email Order had resulted in "degraded" acquisition of communications, combined with reports of a "heightened terrorist threat environment," accelerated Congress' consideration of these proposals.[35] In August 2007, Congress enacted and the President signed the Protect America Act of 2007,[36] a legislative forerunner to what is now Section 702 of FISA. The Protect America Act was a temporary measure that was set to expire 180 days after its enactment.[37]

The government transitioned the collection of communications that had been occurring under the Foreign Telephone and Email Orders (previously the TSP) and some portion of the collection targeting persons located outside the United States that had been occurring under individual FISA orders to directives issued under the Protect America Act.[38] The Protect America Act expired in February 2008,[39] but existing Protect America Act certifications remained in effect until they expired.[40]

Shortly after passage of the Protect America Act, efforts began to replace it with a more permanent statute.[41] After substantial debate, in July 2008 Congress enacted and President Bush signed into law the FISA Amendments Act of 2008.[42] The FISA Amendments

---

[33]     *Compare* 2007 ANNUAL FISA REPORT (2,371 Title I FISA applications in 2007), *available at* http://www.fas.org/irp/agency/doj/fisa/2007rept.pdf  *with* 2009 ANNUAL FISA REPORT (1,329 Title I FISA applications in 2009), *available at* http://www.fas.org/irp/agency/doj/fisa/2009rept.pdf.

[34]     *See* S. Rep. No. 110-209, at 2, 5 (noting Administration's submission of proposed modifications in April 2007); *see generally* May 2007 Wainstein Statement, *supra*; Statement of J. Michael McConnell, Director of National Intelligence, Before the Senate Select Committee on Intelligence (May 1, 2007), *available at* http://www.intelligence.senate.gov/070501/mcconnell.pdf.

[35]     *See* S. Rep. No. 110-209, at 5.

[36]     Pub. L. No. 110-55; 121 Stat. 552 (2007) ("Protect America Act").

[37]     Protect America Act § 6(c).

[38]     2008 Mukasey Decl., *supra*, at ¶ 13 & n.22.

[39]     *See* Protect America Act—Extension, Pub. L. No. 110-182, 122 Stat. 605 (2008) (extending Protect America Act for two weeks).

[40]     Protect America Act § 6.

[41]     *See, e.g.*, Press Release, The White House, President Bush Discusses the Protect America Act of 2007 (Sept. 19, 2007), *available at* http://georgewbush-whitehouse.archives.gov/news/releases/2007/09/20070919.html; S. Rep. No. 110-209, at 5.

[42]     Pub L. No. 110-261, 122 Stat. 2436 (2008).

Act replaced the expired Protect America Act provisions with the new Section 702 of FISA. The authorities and limitations of Section 702 are discussed in detail in this Report. In addition to Section 702, the FISA Amendments Act of 2008 also enacted Sections 703 and 704 of FISA, which required judicial approval for targeting U.S. persons located abroad in order to acquire foreign intelligence information.[43]

After passage of the FISA Amendments Act, the government transitioned the collection activities that had been conducted under the Protect America Act to Section 702.[44] Section 702, as well as the other provisions of FISA enacted by the FISA Amendments Act, were renewed in December 2012, and are currently set to expire in December 2017.[45]

## II.   Statutory Structure: What Does Section 702 Authorize?

The Foreign Intelligence Surveillance Act is a complex law, and Congress' authorization of surveillance under Section 702 of FISA is no exception. In one sentence, the statutory scope of Section 702 can be defined as follows: Section 702 of FISA permits the Attorney General and the Director of National Intelligence to jointly authorize the (1) targeting of persons who are not United States persons, (2) who are reasonably believed to be located outside the United States, (3) with the compelled assistance of an electronic communication service provider, (4) in order to acquire foreign intelligence information.[46] Each of these terms is, to various degrees, further defined and limited by other aspects of FISA. Congress also imposed a series of limitations on any surveillance conducted under Section 702. The statute further specifies how the Attorney General and Director of National Intelligence may authorize such surveillance, as well as the role of the FISC in reviewing these authorizations. This section describes this complex statutory framework.

### A.  Statutory Definitions and Limitations

Our description of Section 702's statutory authorization begins by breaking down the four-part sentence above.

First, Section 702 authorizes the *targeting of persons*.[47] FISA does not define what constitutes "targeting," but it does define what constitutes a "person." Persons are not only

---

[43]   50 U.S.C. §§ 1881b, 1881c.

[44]   2008 Mukasey Decl., *supra*, at ¶ 40 & n.22.

[45]   FISA Amendments Act Reauthorization Act of 2012, Pub. L. No. 112-238, 126 Stat. 1631 (2012).

[46]   50 U.S.C. § 1881a(a), (b)(3), (g)(2)(A)(vi).

[47]   50 U.S.C. § 1881a(a).

### D.  Directives

As noted above, Section 702 targeting may occur only with the assistance of electronic communication service providers. Once Section 702 acquisition has been authorized, the Attorney General and the Director of National Intelligence send written directives to electronic communication service providers compelling the providers' assistance in the acquisition.[109] Providers that receive a Section 702 directive may challenge the legality of the directive in the FISC.[110] The government may likewise file a petition with the FISC to compel a provider that does not comply with a directive to assist the government's acquisition of foreign intelligence information.[111] The FISC's decisions regarding challenges and enforcement actions regarding directives are appealable to the Foreign Intelligence Surveillance Court of Review ("FISCR"), and either the government or a provider may request that the United States Supreme Court review a decision of the FISCR.[112]

### III.   Acquisition Process: How Does Section 702 Surveillance Actually Work?

Once a Section 702 certification has been approved, non-U.S. persons reasonably believed to be located outside the United States may be targeted to acquire foreign intelligence information within the scope of that certification. The process by which non-U.S. persons are targeted is detailed in the next section. This section describes how Section 702 acquisition takes place once an individual has been targeted.

### A.  Targeting Persons by Tasking Selectors

The Section 702 certifications permit non-U.S. persons to be targeted only through the "tasking" of what are called "selectors." A selector must be a specific communications facility that is assessed to be used by the target, such as the target's email address or telephone number.[113] Thus, in the terminology of Section 702, people (non-U.S. persons reasonably believed to be located outside the United States) are *targeted*; selectors (e.g., email addresses, telephone numbers) are *tasked*. The users of any tasked selector are

---

[109]     50 U.S.C. § 1881a(h).

[110]     50 U.S.C. § 1881a(h)(4).

[111]     50 U.S.C. § 1881a(h)(5).

[112]     50 U.S.C. § 1881a(h)(6). However, as noted in the Board's Section 215 report, to date, only two cases have been appealed to the FISCR. One, *In re Directives Pursuant to Section 105B of the Foreign Intelligence Surveillance Act,* 551 F.3d 1004 (FISA Ct. Rev. 2008), involved a directive under the Protect America Act, the predecessor to Section 702, but none have involved Section 702. Nor has the U.S. Supreme Court ever considered the merits of a FISA order or ruled on the merits of any challenge to FISA.

[113]     *See* AUGUST 2013 JOINT ASSESSMENT, *supra*, at A-2; NSA DCLPO REPORT, *supra*, at 4; The Intelligence Community's Collection Programs Under Title VII of the Foreign Intelligence Surveillance Act, *supra*, at 3.

"target" of a traditional FISA electronic surveillance "is the individual or entity . . . about whom or from whom information is sought."[137]

There are technical reasons why "about" collection is necessary to acquire even some communications that are "to" and "from" a tasked selector. In addition, some types of "about" communications actually involve Internet activity of the targeted person.[138] The NSA cannot, however, distinguish in an automated fashion between "about" communications that involve the activity of the target from communications that, for instance, merely contain an email address in the body of an email between two non-targets.[139]

In order to acquire "about" communications while complying with Section 702's prohibition on intentionally acquiring known domestic communications, the NSA is required to take additional technical steps that are not required for other Section 702 collection. NSA is required to use other technical means, such as Internet protocol ("IP") filters, to help ensure that at least one end of an acquired Internet transaction is located outside the United States.[140] If, for example, a person located in Chicago sent an email to a friend in Miami that mentioned the tasked selector "JohnTarget@example.com," the IP filters (or comparable technical means) are designed to prevent the acquisition of this communication. The IP filters, however, do not operate perfectly,[141] and may fail to filter out a domestic communication before it is screened against tasked selectors. A United States-based user, for example, may send a communication (intentionally or otherwise) via a foreign server even if the intended recipient is also in the United States.[142] As such, the FISC has noted the government's concession that in the ordinary course of acquiring single communications, wholly domestic communications could be acquired as much as 0.197% of the time.[143] While this percentage is small, the FISA court estimated in 2011 that the

---

[137]   *See In re Sealed Case*, 310 F. 3d 717, 740 (FISA Ct. Rev. 2002) (quoting H.R. Rep. 95-1283, at 73 (1978)); *see also* PCLOB March 2014 Hearing Transcript, *supra*, at 55 (statement of Brad Wiegmann, Deputy Assistant Attorney General, National Security Division, DOJ) (confirming the FISC had held that targeting includes communications about a particular selector that are not necessarily to or from that selector).

[138]   Bates October 2011 Opinion, *supra*, at 37-38, 2011 WL 10945618, at *12 (describing the types of acquired Internet transactions and noting that a subset involve transactions of the target).

[139]   Bates October 2011 Opinion, *supra*, at 31, 43, 2011 WL 10945618, at *10, *14 (describing limitations on what can be distinguished at the acquisition stage).

[140]   Bates October 2011 Opinion, *supra*, at 33, 2011 WL 10945618, at *11 (regarding the "technical measures" that NSA uses to prevent the acquisition of upstream collection of domestic communications); NSA DCLPO Report, *supra*, at 5-6 (acknowledging that IP filters are used to prevent the acquisition of domestic communications).

[141]   December 2011 Joint Statement, *supra*, at 7 (acknowledging measures to prevent acquisition of domestic communications "are not perfect").

[142]   Bates October 2011 Opinion, *supra*, at 34-35 n.33, 2011 WL 10945618, at *11 n.33.

[143]   Bates October 2011 Opinion, *supra*, at 34 n.32, 2011 WL 10945618, at *11 n.32.

overall number of communications the government acquires through Section 702 upstream collection could result in the government acquiring as many as tens of thousands of wholly domestic communications per year.[144]

In addition, wholly domestic communications could also be acquired because they were embedded in a larger multi-communication transaction ("MCT"), the subject of the next section.

### 3. Upstream Collection of Internet Communications: Multi-Communication Transactions ("MCTs")

While the NSA's upstream collection is intended to acquire Internet *communications*, it does so through the acquisition of Internet *transactions*. The difference between *communications* and *transactions* is a significant one, and the government's failure to initially distinguish and account for this distinction caused the FISA court to misunderstand the nature of the collection for over two years, and later to find a portion of the Section 702 program to be unconstitutional.

The NSA-designed upstream Internet collection devices acquire transactions as they cross the Internet. An Internet transaction refers to any set of data that travels across the Internet together such that it may be understood by a device on the Internet.[145] An Internet transaction could consist of a single discrete communication, such as an email that is sent from one server to another. Such communications are referred to as single communication transactions (SCTs).[146] Of the upstream Internet transactions that the NSA acquired in 2011, approximately ninety percent were SCTs.[147]

In other instances, however, a single Internet transaction might contain multiple discrete communications. These transactions are referred to as MCTs.[148] If a single discrete communication within an MCT is to, from, or about a Section 702–tasked selector, and at least one end of the transaction is foreign, the NSA will acquire the entire MCT.[149]

If the acquired MCT is a transaction between the Section 702 target (who is assessed to be a non-U.S. person located outside the United States and is targeted to acquire foreign intelligence information falling under one of the approved certifications) and a server, then

---

[144]    Bates October 2011 Opinion, *supra*, at 34 n.32, 2011 WL 10945618, at *11 n.32; December 2011 Joint Statement, *supra*, at 7.

[145]    *See* Bates October 2011 Opinion, *supra*, at 28 n.23, 2011 WL 10945618, at *9 n.23 (quoting government characterization of what constitutes an Internet transaction).

[146]    Bates October 2011 Opinion, *supra*, at 27-28, 2011 WL 10945618, at *9.

[147]    Bates October 2011 Opinion, *supra*, at 34 n.32, 2011 WL 10945618, at *11 n.32.

[148]    Bates October 2011 Opinion, *supra*, at 28, 2011 WL 10945618, at *9.

[149]    December 2011 Joint Statement, *supra*, at 7.

all of the discrete communications acquired within the MCT are also communications to or from the target. Based on a statistical sample conducted by the NSA, the FISC estimated that as of 2011 the NSA acquired between 300,000 and 400,000 such MCTs every year (i.e., MCTs where the "active user,"[150] was the target him or herself).[151]

When the acquired MCT is not a transaction between the target and the server, but instead a transaction between another individual and a server that happens to include a Section 702 tasked selector, the MCT may "include communications that are not about a tasked selector and may have no relationship, or no more than an incidental relationship to the [tasked] selector."[152] These non-target MCTs break down into three categories. Based on the NSA's statistical study, the FISC estimated that (as of 2011) the NSA acquired at least 1.3 million MCTs each year where the user who caused the transaction to occur was not the target, but was located outside the United States.[153] Using this same statistical analysis, the FISA court estimated that the NSA would annually acquire an additional approximately 7,000 to 8,000 MCTs of non-targeted users who were located in the United States, and between approximately 97,000 and 140,000 MCTs each year where NSA would not be able to determine whether the user who caused the transaction to occur was located inside or outside the United States.[154]

The NSA's acquisition of MCTs is a function of the collection devices it has designed. Based on government representations, the FISC has stated that the "NSA's upstream Internet collection devices are generally incapable of distinguishing between transactions containing only a single discrete communication to, from, or about a tasked selector and transactions containing multiple discrete communications, not all of which are to, from, or about a tasked selector."[155] While some distinction between SCTs and MCTs can be made with respect to some communications in conducting acquisition, the government has not been able to design a filter that would acquire only the single discrete communications within transactions that contain a Section 702 selector. This is due to the constant changes in the protocols used by Internet service providers and the services provided.[156] If time

---

[150]     The "active user" is the actual human being who is interacting with a server to engage in an Internet transaction.

[151]     Bates October 2011 Opinion, *supra*, at 38, 2011 WL 10945618, at *12.

[152]     December 2011 Joint Statement, *supra*, at 7.

[153]     Bates October 2011 Opinion, *supra*, at 39, 2011 WL 10945618, at *12.

[154]     Bates October 2011 Opinion, *supra*, at 38-40, 2011 WL 10945618, at *12. With respect to this last category, the unidentified user could be the Section 702 target. *Id.* at 38, 40-41, 2011 WL 10945618, at *12.

[155]     Bates October 2011 Opinion, *supra*, at 31, 2011 WL 10945618, at *10. In 2011, the NSA was able to determine that approximately 90 percent of all upstream Internet transactions consisted of SCTs as the result of a post-acquisition statistical sample that required a manual review. *Id.* at 34 n.32, 2011 WL 10945618, at *11.

[156]     Bates October 2011 Opinion, *supra*, at 32, 2011 WL 10945618, at *10.

were frozen and the NSA built the perfect filter to acquire only single, discrete communications, that filter would be out-of-date as soon as time was restarted and a protocol changed, a new service or function was offered, or a user changed his or her settings to interact with the Internet in a different way. Conducting upstream Internet acquisition will therefore continue to result in the acquisition of some communications that are unrelated to the intended targets.

The fact that the NSA acquires Internet communications through the acquisition of Internet transactions, be they SCTs or MCTs, has implications for the technical measures, such as IP filters, that the NSA employs to prevent the intentional acquisition of wholly domestic communications. With respect to SCTs, wholly domestic communications that are routed via a foreign server for any reason are susceptible to Section 702 acquisition if the SCT contains a Section 702 tasked selector.[157] With respect to MCTs, wholly domestic communications also may be embedded within Internet transactions that also contain foreign communications with a Section 702 target. The NSA's technical means for filtering domestic communications cannot currently discover and prevent the acquisition of such MCTs.[158]

Because of the greater likelihood that upstream collection of Internet transactions, in particular MCTs, will result in the acquisition of wholly domestic communications and extraneous U.S. person information, there are additional rules governing the querying, retention, and use of such upstream data in the NSA minimization procedures. These additional procedures are discussed below.

## IV.     Targeting Procedures: Who May Be Targeted? How? And Who Decides?

As is discussed above, the government targets persons under Section 702 by tasking selectors — communication facilities, such as email addresses and telephone numbers — that the government assesses will be used by those persons to communicate or receive foreign intelligence information that falls within one of the authorized Section 702 certifications.[159] Under Section 702, this targeting process to determine which persons are (1) non-U.S. persons, that are (2) reasonably believed to be located outside the United States, who will (3) use the tasked selectors to communicate or receive foreign intelligence

---

[157]     Bates October 2011 Opinion, *supra*, at 34-35, n.32 & n.33; *id.* at 45, 2011 WL 10945618, at *11 ("[T]he government readily concedes that NSA will acquire a wholly domestic "about" communication if the transaction containing the communication is routed through an international Internet link being monitored by NSA or is routed through a foreign server.")

[158]     Bates October 2011 Opinion, *supra*, at 45, 47, 2011 WL 10945618, at *15.

[159]     *See, e.g.*, AUGUST 2013 SEMIANNUAL ASSESSMENT, *supra*, at A-2.

# Exhibit B

# Exhibit B

87 F.2d 68
United States Court of Appeals for the District of Columbia.

HEARST
v.
BLACK et al.

No. 6808. | Argued Oct. 12, 1936. | Decided Nov. 9, 1936.

Appeal from the District Court of the United States for the District of Columbia.

Suit by William Randolph Hearst against Hugo L. Black, Chairman of the Special Committee of the United States Senate to Investigate Lobbying Activities, and others. From an adverse decree, plaintiff appeals.

Affirmed.

**Attorneys and Law Firms**

**68 *313** Elisha Hanson, of Washington, D.C., for appellant

Crampton Harris, of Birmingham, Ala., for appellee.

Before ROBB, VANORSDEL, GRONER, and STEPHENS, JJ.

**Opinion**

GRONER, J.


Appellant is engaged in the business of publishing daily newspapers and magazines. In March of this year he brought in the court below his bill to enjoin the Special Senate Committee and the Federal Communications Commission from copying and using telegraphic messages in the possession of the telegraph companies sent by him to his employees in the conduct of his business. The bill alleges that in the month of September, 1935, the Senate Committee under blanket subpoenas duces tecum demanded of the telegraph companies doing business in the City of Washington the delivery to it (the committee) of all communications- i.e., telegraph messages- transmitted through the offices of such companies during the period February 1, 1935, to September 1, 1935; that when the companies expressed reluctance to make delivery of the messages, the committee went to the commission and asked its assistance to compel the production of the communications desired by the committee; that thereafter the committee and the commission conspired together to deprive appellant of his constitutional rights and liberties under the First, Fourth, and Fifth Amendments to the Constitution of the United States, in that the commission by a formal resolution detailed a member of its staff to work with an examiner of the Senate Committee in an examination of the messages and records in the offices of the telegraph companies; that pursuant to this arrangement agents of the commission 'made copies of or notes concerning thousands of telegrams' from or to sundry individuals, firms, or corporations, and turned **69 *314** the same over to the Senate Committee; that among the telegrams examined and copied were messages from appellant to his associates and employees and messages from his associates and employees to him which had no connection with the subject matter of the investigation- all of which were sent in the regular and orderly conduct of the business in which appellant was engaged; that the use of the messages will result in the disclosure of the contents to the committee and to the general public and will disclose to appellant's business competitors privileged and private information relating to his private business affairs and will result in irreparable injury to appellant.

The bill further alleges that the members of the Senate Committee are about to make further search in an effort to gather up additional messages which have passed between appellant and his associates and employees and that the commission is ready and willing to co-operate in the illegal seizure of such messages unless restrained by the court.

Appellees, who are the members of the Senate Committee, filed a special appearance through counsel and a motion to dismiss the bill of complaint for lack of jurisdiction. The commission neither answered the bill nor moved to dismiss, but filed what is called an 'opposition' to the motion for preliminary injunction. This paper appears in the record and in it is a statement that the examination by the commission of the local telegraph offices had been completed prior to the filing of the bill and that no further investigation or examination was then planned or contemplated.

The District Court refused to grant the injunction pendente lite and for lack of jurisdiction dismissed the bill as to the Senate Committee, but took jurisdiction as to the commission; and the judge stated from the bench that the denial of the motion for preliminary injunction as against the commission was made solely on its disclaimer of any intention thereafter to make any further examination of the telegraphic messages of appellant or otherwise to change the then status of the case, and was without prejudice to renewal of the motion upon any evidence of further activities in the respects mentioned. Apparently it is agreed that thereafter the commission by formal resolution rescinded its original order for an investigation and examination of the messages in the telegraph offices. And we assume- as did the lower court-that the commission's activity in the respects complained of will not be repeated. But because of the importance of the question raised as to the Senate Committee, we granted a special appeal.

Section 1 of the Communications Act of 1934 (48 Stat. 1064 (47 U.S.C.A. § 151)) states the purpose of the act to be to regulate interstate and foreign commerce in communications by wire and radio so as to make available to the people of the United States an efficient nation-wide and world-wide wire and radio communication for the national defense. The act provides for the appointment by the President of a commission and provides (section 220(c), 47 U.S.C.A. § 220(c) that the commission shall 'at all times have access to and the right of inspection and examination of all accounts, records, and memoranda, including all documents, papers, and correspondence now or hereafter existing, and kept or required to be kept by such carriers.' And further, that the prohibition in section 605 (47 U.S.C.A. § 605) against disclosure of the contents of messages shall not apply to the provisions just above quoted.

This last provision we think means merely that the commission shall have complete freedom in the examination and inspection necessary in the discharge of its duty and that the prohibition (section 605) against disclosure of the contents of telegraph messages by telegraph companies shall not be so construed as to cripple or destroy the statutory right and duty of examination and inspection of records, etc., necessary in the enforcement of the act.

Section 605 (47U.S.C.A. § 605) provides: 'No person receiving or assisting in receiving, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination,' etc.

The Senate Committee was appointed pursuant to two resolutions of the Senate, the first July 11, 1935, and the second **70 *315 July 29, 1935. The committee was authorized to investigate 'all lobbying activities and all efforts to influence, encourage, promote, or retard legislation, directly or indirectly, in connection with the so-called 'holding company bill,' or any other matter or proposal affecting legislation'; to investigate also the financial structure of persons, companies, corporations, partnerships, or groups seeking to influence the passage or defeat of legislation; to investigate their political contributions and activities, and their efforts to control the sources and mediums of communication and information. The resolutions permit the committee to require by subpoena or otherwise the attendance of such witnesses and the production of such correspondence, books, papers, and documents as it deems advisable.

Appellant's bill does not challenge the power to the committee in any of the respects just mentioned, but rests on the proposition that the Communications Commission was without lawful authority to coerce the telegraph companies, over which it has supervisory control, to make the contents of appellant's telegrams available to the Senate Committee or any one else- and that the committee is now unlawfully in possession of the messages and therefore without legal right to retain, disclose, or in any manner use them. The judge of the lower court, as we assume from his statement from the bench, was of opinion that, though the court would have had jurisdiction to restrain the commission and its agents from doing an unlawful act, it ought not to grant the prayer for injunction because the things charged- whether lawful or unlawful- had been done before the filing of the bill, and because the commission had then disclaimed any purpose to give any further assistance to the committee to obtain private telegraph messages. As to the Senate Committee the court held it had no jurisdiction. In dismissing the bill as to it, the judge said: 'If the Senate committee has been proceeding in a way which some people might regard as unlawful, it is better to let them continue to do it and let that be corrected in some other way than it is for me to proceed in the way that seems to me to be unlawful to attempt to correct what they do that I do not agree with.'

[1] [2] As the allegations of the bill are not denied, we are obliged to take them as true. And in that view we are of opinion that the resolution adopted by the commission, under which its agents took possession of the telegraph companies' offices and examined wholesale the thousands of private telegraph messages received and dispatched therefrom over a period of seven months- for the purpose of securing to the Senate Committee knowledge of the contents of the messages- was without authority of law and contrary to the very terms of the act under which the Commission was constituted. And we may, we think, properly go farther and say that, even without the express prohibition contained in the act, the disclosure by the commission of the contents of private telegraph messages- solely, as the bill charges, for the purpose of furnishing to the committee information relevant or irrelevant which might or might not be used for legislative purposes- was unauthorized.

And this we think, is true because the property right in private telegrams is in no material respect different from the property right in letters and other writings; nor is there any good reason why the right of privacy in the one should be any greater than in the other. Telegraph messages do not lose their privacy and become public property when the sender communicates them confidentially to the telegraph company. Indeed, in many of the States their publication without authorization- except as a necessary incident in the due administration of justice- is a penal offense; and this is so because of an almost universal recognition of the fact that the exposure of family confidences and business and official secrets would as to telegrams equally with letters, 'be subversive of all the comforts of society.'

That there is and always has been a property right in letters and other writings which a court of equity will protect is too well settled to discuss. It is one of those rights which antedate the Constitution. It is inherent in a free government. Pope v. Curl, 2 Atk, 342, 26 English Reports, 608. Judge Story, in Folsom v. Marsh, 9 Fed.Cas. 342, No. 4,901, speaking of the nature and extent of this property interest, said: 'In short, the person, to whom letters are addressed, has but a limited right, or special property (if I may so call it), in such letters, as a trustee, or bailee, for particular purposes, either of information or of protection, or of support of his own rights and **71 *316 character. The general property, and the general rights incident to property, belong to the writer, whether the letters are literary compositions, or familiar letters, or details of facts, or letters of business. The general property in the manuscripts remains in the writer and his representatives, as well as the general copyright. A fortiori, third persons, standing in no privity with either party, are not entitled to publish them, to subserve their own private purposes of interest, or curiosity, or passion.'

And the Supreme Court of Massachusetts, in Baker v. Libbie, 210 Mass. 599, 97 N.E. 109, 111, 37 L.R.A.(N.S.) 944 Ann. Cas. 1912D, 551, said: 'The existence of a right in the author over his letters, even though private and without worth as literature, is established on principle and authority. The right is property in its essential features. It is, therefore, entitled to all the protection which the constitution and laws give to property.'

See, also, Knights of Ku Klux Klan v. International Magazine Co. (C.C.A.) 294 F. 661; King v. King, 25 Wyo. 275, 168 P. 730.

In principle, therefore, we think that a dragnet seizure of private telegraph messages as is alleged in the bill, whether made by persons professing to act under color of authority from the government or by persons acting as individuals, is a trespass which a court of equity has power to enjoin. As the Supreme Court said in Federal Trade Commission v. American Tobacco Company, 264 U.S. 298, 44 S.Ct. 336, 337, 68 L.Ed. 696, 32 A.L.R. 786: 'It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up.' And we cannot doubt that the purpose and intent of Congress, in including in the Communications Act a positive prohibition against disclosure, was to recognize this principle and give it effect.

[3] [4] And so we think the law is settled that, if appellant were before the Senate Committee as a witness and were questioned as to matters unrelated to the legislative business in hand, as his bill alleges is true of the messages in question, he would be entitled to refuse to answer; and if, for his supposed contumacy, he were imprisoned, he could secure his release on habeas corpus. And so, also, if a Senate Committee were to attempt to force a telegraph company to produce telegrams not pertinent to the matters the committee was created to investigate, the company could be restrained at the instance of the sender of the telegrams, for as the Supreme Court said in McGrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1, the decisions in Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377 and Marshall v. Gordon, 243 U.S. 521, 37 S.Ct. 448, 61 L.Ed. 881, L.R.A. 1917F, 279, Ann. Cas. 1918B, 371, point, in such circumstances, to admissible measures of relief. We are, therefore, of opinion that the court below was right in assuming jurisdiction as to the commission, and if the bill had been filed while the trespass was in process it would have been the duty of the lower court by order on the commission or the telegraph companies or the agents of the committee to enjoin the acts complained of. But the main question we have to decide is in a different aspect. Here, as appears both from the bill and by admission of parties, the committee has obtained copies of the telegrams and they are now physically in its possession; and this means neither more nor less than that they are in the hands of the Senate, for the committee is a part of the Senate (McGrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1) created, as we have seen, by the Senate for the purpose of investigating the subject of lobbying, in aid of proposed legislation. The Prayer of the bill is that the committee be restrained from keeping the messages or making any use of them or disclosing their contents. In other words, that if we find that the method adopted to obtain the telegrams was an invasion of appellant's legal rights, we should say to the committee and to the Senate that the contents could not be disclosed or used in the exercise by the Senate of its legitimate functions. We know of no case in which it has been held that a court of equity has authority to do any of these things. On the contrary, the universal rule, so far as we know it, is that the legislative discretion in discharge of its constitutional functions, whether rightfully or wrongfully exercised, is not a subject for judicial interference.

The Constitution has lodged the legislative power exclusively in the Congress. If a court could say to the Congress that it could use or could not use information **72 *317 in its possession, the independence of the Legislature would be destroyed and the constitutional separation of the powers of government invaded. Nothing is better settled than that each of the three

great departments of government shall be independent and not subject to be controlled directly or indirectly by either of the others. 'This separation and the consequent exclusive character of the powers conferred upon each of the three departments is basic and vital- not merely a matter of governmental mechanism.' Springer v. Philippine Islands, 277 U.S. 189, 201, 48 S.Ct. 480, 482, 72 L.Ed. 845. In McChord v. Louisville R.R. Co., 183 U.S. 483, 22 S.Ct. 165, 46 L.Ed. 289, a somewhat similar question arose. There the railroad sought to enjoin McChord and others, as Railroad Commissioners of the State of Kentucky, from acting as directed by the Legislature of that State in connection with the establishment of railroad rates. The lower court granted the injunction, but the Supreme Court reversed the decree on the ground that the making of rates was a legislative function and as such could not be controlled by a court. The opinion cites and quotes from New Orleans, 164 U.S. 471, 17 S.Ct. 161, 41 L.Ed. 518, and Alpers v. San Francisco (C.C.) 32 F. 503. Both of these cases involve the attempted restraint of a city council by a court. In the latter case, which was decided by Mr. Justice Field, the complainant alleged he had a contract with the city and county of San Francisco, and that the council proposed to pass an ordinance which would impair the obligation of the contract. In other words, the enactment of an unconstitutional law. After recognizing that what complainant said was true, the court said (32 F. 503, at page 506): 'The difficulty presented in the case before us is that the application to enjoin the passage of any resolution, order, or ordinance, which may tend to impair the obligation of the contract, is an application to enjoin a legislative body from the exercise of legislative power, and to enjoin the exercise of such power is not within the jurisdiction of a court of equity. This no one will question as applied to the power of the legislature of the state. * * * The fact that * * * the legislative action threatened may be in disregard of constitutional restraints, and impair the obligation of a contract, as alleged in this case, does not affect the question. It is legislative discretion which is exercised, and that discretion, whether rightfully or wrongfully exercised, is not subject to interference by the judiciary.'

If courts cannot enjoin the enactment of unconstitutional laws- as to which proposition there can be no doubt- then by the same token they cannot enjoin legislative debate or discussion of constitutional measures because of the incidental disclosure or publication of knowledge unconstitutionally acquired. If it be insisted that this is the acknowledgment of a power whose plenitude may become a cataclysm, the answer is that the Congress 'is as much the guardian of the liberties and welfare of the people as the courts'; and in this view the assumption may properly be indulged that, attention being called to the unlawful nature of the search, the Senate will not use its proceeds in disregard of appellant's rights.

Decree affirmed.


**Parallel Citations**

87 F.2d 68

| End of Document | © 2014 Thomson Reuters. No claim to original U.S. Government Works. |
| --- | --- |

# Exhibit C

# Exhibit C

770 F.3d 748
United States Court of Appeals,
Ninth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Mark Tyrell FOWLKES, aka Mark
Fowlkes, aka Marq Tyrell Fowlkes, aka
Shawn Walls, Defendant–Appellant.

No. 11–50273.    |    Argued and Submitted
May 7, 2013.    |    Filed Aug. 25, 2014.

**Synopsis**
**Background:** Following denial of his motion to suppress evidence, defendant was convicted in the United States District Court for the Central District of California, Christina A. Snyder, J., of drug distribution and possession with intent to distribute. Defendant appealed.

**Holdings:** The Court of Appeals, Wardlaw, Circuit Judge, held that:

[1] exigent circumstances did not justify police officers' warrantless search of defendant's rectum for drugs;

[2] special needs exception to warrant requirement did not justify officers' warrantless search of defendant's rectum for drugs;

[3] officers' warrantless search of arrestee's rectum for drugs was patently unreasonable;

[4] failure of federal agent's affidavit in support of wiretap to identify officer authorizing wiretap application did not require suppression of evidence obtained as result of wiretap;

[5] defendant was not entitled to *Franks* hearing;

[6] probable cause coupled with exigent circumstances justified officers' warrantless entry into defendant's apartment;

[7] officer had probable cause to believe that defendant violated traffic laws, justifying traffic stop; and

[8] search of defendant's car following valid traffic stop was appropriate under automobile exception to warrant requirement.

Affirmed in part, reversed in part, vacated in part, and remanded.

Jane A. Restani, United States Court of International Trade Judge, sitting by designation, filed an opinion dissenting in part.

**Attorneys and Law Firms**

**\*753** Thomas P. Sleisenger (argued), Law Offices of Thomas P. Sleisenger, Los Angeles, CA, for Defendant–Appellant.

Cheryl L. O'Connor (argued) and Kevin S. Rosenberg, Assistant United States Attorneys; Robert E. Dugdale, Chief, Criminal Division; and André Birotte Jr., United States Attorney, Office of the United States Attorney, Los Angeles, CA, for Plaintiff–Appellee.

Appeal from the United States District Court for the Central District of California, Christina A. Snyder, District Judge, Presiding. D.C. No. 2:07–cr–00497–CAS–1.

Before: KIM McLANE WARDLAW and MARY H. MURGUIA, Circuit Judges, and JANE A. RESTANI, Judge. [*]

[*] The Honorable Jane A. Restani, Judge for the U.S. Court of International Trade, sitting by designation.

Opinion by Judge Wardlaw; Partial Dissent by Judge Restani.

**OPINION**

WARDLAW, Circuit Judge:

Mark Tyrell Fowlkes appeals his conviction for drug distribution and possession with intent to distribute. Fowlkes raises a number of claims on appeal, but only one has merit: that the forcible removal of drugs from Fowlkes's rectum by officers without medical training or a warrant violated his Fourth Amendment rights. Because we conclude that the evidence obtained from this brutal and physically invasive

search should have been suppressed, we vacate Fowlkes's conviction in part, vacate his sentence, and remand to the district court.

## I.

## A.

Drug Enforcement Administration ("DEA") agents and Long Beach Police Department ("LBPD") officers obtained warrants for wiretaps on two phones (Target Telephones # 1 and # 2) in July and August of 2006. On September 3, 2006, officers intercepted communications pursuant to the wiretap, which led them to conclude that Fowlkes was arranging a drug deal. Based on that information, LBPD officers placed Fowlkes under surveillance and witnessed what appeared to be a drug deal between Fowlkes and two other individuals, Shaun Lee and Elaine Watson. Lee walked away from the deal, but officers stopped him and found he possessed 0.61 grams of crack cocaine.

On September 4, 2006, the LBPD and DEA intercepted several more phone calls, leading them to conclude that Fowlkes was planning to destroy or remove contraband from his apartment. Within an hour of the last phone call, officers arrived at the apartment. Upon entry, they saw Fowlkes and another individual, Latoya Marshall, as well as a 9mm handgun. The officers handcuffed Fowlkes and Marshall and conducted a protective sweep of the apartment. After securing a warrant, officers searched the apartment and found **\*754** approximately 2.6 grams of crack cocaine, a digital scale, and the loaded 9mm handgun.

On September 13, 2006, after witnessing what appeared to be a narcotics transaction between Fowlkes and an unidentified man, LBPD officers requested that a marked book execute a pretextual traffic stop. Pulled over for an expired registration, Fowlkes and his passenger were asked to exit the vehicle. Fowlkes denied consent to search the car. Asserting that they saw marijuana in the open side panel of the car and a substance they believed was cocaine base on the front seats of the car, officers arrested Fowlkes for felony drug possession and transported him to the Long Beach City Jail for processing.

At intake, the officers strip searched Fowlkes in the jail's strip search room, a five by six enclosure with three concrete walls and an opening in the fourth wall. Five officers observed the

strip search, including Officer Jeffrey Harris and Sergeant Michael Gibbs, who brought along his taser, gloves and "assistance" in the form of additional officers because he thought Fowlkes might have drugs. The officers instructed Fowlkes to remove his clothing and face the far wall as they watched him. Fowlkes was instructed to bend over, spread his buttocks, and cough, but according to Sergeant Gibbs, Fowlkes instead moved his hand toward his right buttock. Instructed to repeat the procedure, Fowlkes made a quick movement to his buttocks area with his hand and appeared to Gibbs "to be forcing or forcibly pushing an item inward." Officer Harris testified he believed it was possible Fowlkes was attempting to push something into his anus. However, he did not actually see any object Fowlkes could have been pushing, and he acknowledged that there was no other way for Fowlkes to comply with the directive other than by reaching back and putting his fingers towards his anus. For his part, Sergeant Gibbs testified that he believed Fowlkes appeared "to be forcing or moving an object or further secreting an object" inside his rectum to destroy evidence.

To prevent that, Gibbs "delivered a drive stun tase to the center portion of the defendant's back." Fowlkes's arms went straight into the air, and the officers handcuffed him. Fowlkes began to "squirm[ ]" and "struggl[e]," and the officers "lean[ed] him against the wall, ... brace[d] his body up against the wall" so that "[h]e end[ed] up being bent over." With Fowlkes in this position, the officers testified that they could see what appeared to be a plastic bag partially protruding from Fowlkes's rectum.

Officers continued to "brac[e] [Fowlkes] up against the wall" to prevent him from resisting. At this point, Fowlkes was handcuffed and incapacitated by five male officers, making escape or resistance impossible. Fowlkes had no ability to destroy or further secrete what was in the plastic bag. Neither Sergeant Gibbs nor the other officers could tell what, if anything, the plastic bag contained while it remained in Fowlkes's rectum. Nor could they determine how large it was or how far it extended into Fowlkes's body. Despite this, and despite the fact that none of the officers had any relevant medical training, the officers did not attempt to obtain a warrant, summon medical personnel, move Fowlkes to a sanitary location, or allow Fowlkes to pass the suspected contraband naturally. Instead, Sergeant Gibbs forcibly "retrieved" the bag. He put on the protective gloves he had brought along to the "search" and pulled the object from Fowlkes's rectum without the assistance of anesthesia, lubricant, or medical dilation. Although Sergeant

Gibbs testified that he was able to remove the object using his **755** thumb and index finger without penetrating Fowlkes's anal cavity, Officer Harris testified that the removal itself was a difficult, abrasive procedure:

> I watched the entire process of him removing it in his fingers. [The object] went from a dime size to a penny size to a nickel size to a quarter size to somewhat near a golf ball size as it was taken out.

Officer Harris further testified that he could "see blood and what looked to be feces" on the plastic bag after it had been removed. Photographs of the object that are included in the appellate record confirm that the object was covered in blood.

### B.

On June 6, 2008, the government filed an indictment charging Fowlkes with three counts of drug possession and distribution and two related firearm counts. Before trial, Fowlkes moved to suppress all of the evidence obtained in the case pursuant to the wiretap, the evidence seized from the searches of his apartment and car, and the drugs found within his person during the body cavity search at the jail. The district court denied each of these motions.

On July 8, 2008, a jury trial commenced, but it ended two days later when Fowlkes requested a mistrial after Federal Marshals arrested a key defense witness outside of the courtroom doors, but within earshot and possible view of the jury. Fowlkes subsequently filed a motion to dismiss the indictments on double jeopardy or due process grounds because the government's misconduct had goaded him into requesting the mistrial. On September 17, 2008, the district court denied the motion.

On November 4, 2008, Fowlkes's retrial began, and on November 20, the jury found Fowlkes guilty of the three drug related counts. The court sentenced Fowlkes to time served (forty-six months) and supervised release for eight years.

Fowlkes claims the district court erred by denying his motions to: (1) suppress the evidence obtained through the wiretaps because the application for the warrant was technically deficient, and, at the least, the district court should have held a *Franks* hearing; (2) suppress evidence seized from his apartment because the officers' warrantless entry

was unlawful and the warrant authorizing the search was unsupported by probable cause; (3) suppress the cocaine base and marijuana seized from his car because the initial stop and subsequent search of his car was unlawful; (4) suppress the evidence obtained from the body cavity search performed at the jail because the warrantless search violated his Fourth Amendment rights; (5) dismiss the indictment on a claim of evidence tampering;[1] and (6) dismiss the indictment on double jeopardy grounds following a mistrial.

1   Because the evidence seized from within Fowlkes's body during the unconstitutional body cavity search, as to which Fowlkes claims tampering, should have been suppressed, we need not resolve Fowlkes's other allegations of discovery violations or chain of custody issues pertaining to that evidence.

We affirm the district court's rulings except the denial of Fowlkes's motion to suppress the cocaine seized from within his body during the warrantless body cavity search at the Long Beach Jail. We therefore reverse the conviction on the count predicated on that evidence.

### II.

**[1]**   "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."   **756** *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). We review de novo a district court's denial of a motion to suppress evidence, and we review the underlying factual issues for clear error. *United States v. Fernandez,* 388 F.3d 1199, 1234 (9th Cir.2004). The district court concluded a warrant was not required for the drugs forcibly removed from Fowlkes's rectum, reasoning that the officers conducted a *visual* search rather than a *physical* one. We conclude to the contrary based on the particular circumstances of the search at issue.

### A.

**[2]   [3]   [4]**   The Fourth Amendment requires police officers to obtain a warrant to search for and seize drugs within a person's body. *See Bouse v. Bussey,* 573 F.2d 548, 550 (9th Cir.1977) (per curiam) (quoting *Schmerber v. California,* 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ("Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less

could be required where intrusions into the human body are concerned.")). A warrantless search of the human body implicates an individual's "most personal and deep-rooted expectations of privacy," *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), and is reasonable only if it falls within one of the Fourth Amendment's recognized exceptions, *Missouri v. McNeely,* —— U.S. ——, 133 S.Ct. 1552, 1558, 185 L.Ed.2d 696 (2013). The government bears the burden of demonstrating that an exception to the warrant requirement exists in any given case. *See United States v. Licata,* 761 F.2d 537, 543 (9th Cir.1985) (internal citations omitted) ("The government bears a heavy burden of demonstrating that exceptional circumstances justif[y] departure from the warrant requirement.").

[5]  [6]  Exigent circumstances did not justify the warrantless search of Fowlkes' rectum. The exception for exigent circumstances "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *McNeely,* 133 S.Ct. at 1558 (quoting *Kentucky v. King,* ——U.S. ——, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011)). The government is correct that a warrantless search may be conducted if an officer reasonably believes that evidence will be destroyed if he does not act quickly, so long as the search is conducted in a reasonable manner. *See, e.g., Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). However, it is well-settled that the exception applies only where "there is [a] compelling need for official action *and* no time to secure a warrant." *McNeely,* 133 S.Ct. at 1559 (emphasis added) (quoting *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978)).

The record is devoid of any evidence from which the officers might reasonably have inferred that they were confronted with an exigent circumstance—the possible destruction of evidence—that left them with "no time to secure a warrant." *Id.* When he was searched, Fowlkes was handcuffed, tased, and surrounded by five police officers. He was under arrest and in the custody of the LBPD. The record contains no evidence that Fowlkes could have destroyed evidence or that a medical emergency existed. *See United States v. Cameron,* 538 F.2d 254, 259 & n. 8 (9th Cir.1976) ("There were no facts on the record indicating that failure to remove the heroin would constitute a danger to the suspect.... [O]nly a showing of the greatest imminent harm would justify intrusive action for the purpose of removal of the drug."); *see also* **\*757** *Johnson v. United States,* 333 U.S. 10, 15, 68 S.Ct. 367, 92

L.Ed. 436 (1948) ("No suspect was fleeing or likely to take flight."). Under these circumstances, there was ample time for the officers to secure a warrant, and the government's claim of exigency fails.

[7]  [8]  [9]  Having found the exigency argument unavailing, we turn to the question of whether the "special needs" exception justifies this class of warrantless searches. Contrary to the dissent's contention, it does not. Under the special needs exception, "suspicionless searches may be upheld if they are conducted for important non-law enforcement purposes in contexts where adherence to the warrant-and-probable cause requirement would be impracticable." *Friedman v. Boucher,* 580 F.3d 847, 853 (9th Cir.2009) (emphasis omitted) (citation omitted). To meet its burden of proving that the special needs exception justifies this search, the government must demonstrate that its interests were sufficient to outweigh the constitutional rights of the arrestee. *See Bull v. City and Cnty. of S.F.,* 595 F.3d 964, 975 (9th Cir.2010) (en banc). We must balance "the need for the particular search against the invasion of personal rights that the search entails" by "consider[ing] the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

The government has a strong interest in preventing contraband from entering its prisons and jails, but to satisfy the special needs exception, the government must also demonstrate that "adherence to the warrant-and-probable cause requirement would be impracticable." *Friedman,* 580 F.3d at 853 (internal quotation marks omitted). The government does not meet this burden.

In *Bull,* we addressed whether suspicionless *visual* body cavity searches may be performed without a warrant during the jail intake process. 595 F.3d at 968–69. Answering this question in the affirmative, we relied primarily on two factors to conclude that it would be impracticable for the government to obtain a warrant prior to each individual search. First, we looked to the sheer number of individuals the San Francisco Sheriff's Department intakes annually: "50,000 individuals are booked and processed each year." *Id.* at 966. Given these large numbers, it would be difficult, if not impossible, for the San Francisco Sheriff's Department to obtain a warrant prior to performing every individual visual cavity search. Second, we observed that visual cavity searches are often suspicionless; rather than justified by probable cause, they are

necessary by virtue of the jail's security concerns. *See id.* at 966–67.

Similarly, in *Florence v. Board of Chosen Freeholders,* ––– U.S. ––––, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012), the Supreme Court upheld a blanket strip search and *visual* body cavity search for arrestees entering detention facilities based on the same impracticability rationale that we applied in *Bull.* The Court considered, for example, that the Essex County Correctional Facility intakes more than 25,000 inmates each year, *id.* at 1514, and that it would be very difficult practically to identify or sort those detainees who should be searched because they are more likely to be carrying contraband from those who should not be searched, *id.* at 1520–22. The Court also explicitly noted: "There are no allegations that the detainees here were touched in any way as part of the searches." *Id.* at 1515.

**[10]** Neither of the concerns that animated our reasoning in *Bull* or the Court's reasoning in *Florence* is present in this case. First, the government does not contend that it is necessary to physically penetrate **\*758** the body cavities of every person booked into the Long Beach City Jail. Instead, it seeks to justify the warrantless intrusion into one inmate's body cavity. In *Bull,* for example, over a sixty month period, from April 2000 to April 2005, *visual* body cavity searches revealed only seventy-three cases of illegal drugs or drug paraphernalia hidden in arrestees' body cavities—a rate of approximately fifteen cases a year. 595 F.3d at 969. And, in *Bell,* the Supreme Court noted "only one instance" where an inmate was discovered attempting to smuggle contraband into the institution in this manner. 441 U.S. at 558, 99 S.Ct. 1861. The relatively small numbers of inmates concealing contraband in their body cavities shows there is not a "special need" for officers to conduct warrantless searches into inmates' body cavities in general. These small numbers and the technological advancements that facilitate nearly immediate access to warrants,[2] render the burden placed on the government to obtain a warrant negligible. Because officers likely will be able to establish probable cause based on their visual observations of the small number of individuals whom they suspect of secreting contraband, the time, feasibility, and practicability concerns underlying *Bull* and *Florence* do not apply here.

2     "[A]dvances in the 47 years since *Schmerber* was decided ... allow for the more expeditious processing of warrant applications, particularly in contexts ... where the evidence offered to establish probable cause is simple.

The Federal Rules of Criminal Procedure were amended in 1977 to permit federal magistrate judges to issue a warrant based on sworn testimony communicated by telephone.... And in addition to technology-based developments, jurisdictions have found other ways to streamline the warrant process, such as by using standard-form warrant applications.... *McNeely,* 133 S.Ct. at 1561–62."

### B.

**[11]** Cementing the Fourth Amendment violation in this case is the unreasonableness of the manner in which the search was executed. "Even if a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for it must be reasonable in its scope and manner of execution. Urgent government interests are not a license for indiscriminate police behavior." *Maryland v. King,* ––– U.S. ––––, 133 S.Ct. 1958, 1970, 186 L.Ed.2d 1 (2013); *see also Bull,* 595 F.3d at 967 n. 2 ("There is no doubt ... that on occasion a security guard may conduct the search in an abusive fashion, and such an abuse cannot be condoned." (quoting *Bell,* 441 U.S. at 560, 99 S.Ct. 1861)).

**[12]** The conduct of the search here was patently unreasonable. In determining whether an individual search is reasonable, we evaluate the "totality of the circumstances," *McNeely,* 133 S.Ct. at 1559, including "the scope of the particular intrusion, the manner of its conduct, and the justification for initiating it." *Cameron,* 538 F.2d at 258 (internal quotation marks omitted).

First, Sergeant Gibbs evinced an intent to conduct any body cavity search he thought necessary long before he saw the plastic bag protruding from Fowlkes's rectum or was privy to any other possible justification for such an intrusion. Gibbs, suspecting that Fowlkes had contraband in his person, made his way to the strip search room in the basement armed with his protective gloves, a stun gun taser, and additional officers —in short, everything he needed to conduct a cavity search, *except* a warrant.

**[13]** Second, the scope of the search intruded beyond the surface of Fowlkes's body, interfering with his bodily integrity. **\*759** As the Supreme Court explained in *Schmerber,* "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." 384 U.S. at 767, 86 S.Ct. 1826. There, the Court upheld a warrantless blood draw by

hospital personnel under "special facts" where there was no time to obtain a warrant because the amount of alcohol in the blood dissipates when the drinking stops and the evidence of alcohol would disappear. *See id.* at 770–71, 86 S.Ct. 1826. However, in doing so, the Court also noted, "The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained." *Id.* at 769–70, 86 S.Ct. 1826. The Court has subsequently described the interest in bodily integrity as implicating the "most personal and deep-rooted expectations of privacy." *Lee,* 470 U.S. at 760, 105 S.Ct. 1611 (holding a compelled surgical intrusion to remove a bullet fired by a robbery victim from the chest of the suspect unreasonable under the Fourth Amendment).

**[14]   [15]**   Third, the manner in which this search was conducted was unreasonable. "[T]he fourth amendment imposes a stricter standard on the 'means and procedures' of a body search than does the due process clause." *Cameron,* 538 F.2d at 258. In evaluating whether the manner in which a search is conducted is reasonable, we consider a variety of factors including hygiene, medical training, emotional and physical trauma, and the availability of alternative methods for conducting the search. *See Vaughan v. Ricketts,* 859 F.2d 736, 741 (9th Cir.1988), *abrogated on other grounds by Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Thompson v. Souza,* 111 F.3d 694, 700–01 (9th Cir.1997) (considering hygiene and medical training of officers in evaluating the reasonableness of the search).

As an initial matter, the officers violated the jail's own written policy for body cavity searches[3] by failing to conduct the search "under sanitary conditions" and by not using a "Physician, Nurse Practitioner, Registered Nurse, Licensed Vocational Nurse, or Emergency Medical Technician." There is no evidence that any of the officers had medical or any other relevant training on how to safely remove suspicious objects from an arrestee's rectum or how to evaluate whether such removal could cause serious physical harm or death. The manner of this search is the very sort the Supreme Court explicitly distinguished from the blood test it found "performed in a reasonable manner" in *Schmerber:*

[3]   The dissent is incorrect in suggesting that the physical search was conducted in accordance with the jail's written policy.

We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain. 384 U.S. at 771–72, 86 S.Ct. 1826. As the Supreme Court accurately predicted forty-years ago, tolerating such searches does invite an unjustified element of personal risk-a risk that Fowlkes experienced first—hand and one that is constitutionally **\*760** intolerable.[4]

[4]   As the dissent correctly notes, we have applied *Schmerber* to both visual and physical body cavity searches. *See Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1449 (9th Cir.1991). This does not mean, however, that visual searches and physical searches are identical with regard to whether they "might ... invite an unjustified element of personal risk of infection and pain." *Schmerber,* 384 U.S. at 772, 86 S.Ct. 1826.

In *Cameron,* then-Judge Anthony M. Kennedy explained, "[a]ny body search, if it is to comport with the reasonableness standard of the fourth amendment, must be conducted with regard for the subject's privacy and be designed to minimize emotional and physical trauma." 538 F.2d at 258. Specifically, he noted:

[T]he person accused of concealing contraband within his body is faced with the real prospect that the most intimate portions of his anatomy will be invaded and that he will suffer resulting pain or even physical harm. As in the case before us, the suspect usually faces this ordeal without assistance, surrounded by persons who administer the procedure on behalf of the government and thus appear to him to have as their overriding motive the obtaining of evidence to convict, and not his personal well being. In a situation thus laden with the potential for fear and anxiety, a reasonable search will include, beyond the usual procedural requirements, reasonable steps to mitigate the

anxiety, discomfort, and humiliation
that the suspect may suffer.

*Id.* Here there was no effort to minimize the potential for internal physical trauma to Fowlkes or the emotional humiliation he suffered. *Schmerber* is again instructive. There the Court explicitly considered that the blood draw in question "involves virtually no risk, trauma, or pain," and that it "was performed in a reasonable manner" because "blood was taken by a physician in a hospital environment according to accepted medical practices." 384 U.S. at 771, 86 S.Ct. 1826. Here by contrast, despite undisputed testimony by the officers themselves that Fowlkes posed no threat, much less an immediate threat to himself or the officers, and was not a flight risk (he was naked and bent over at the time), Sergeant Gibbs used a stun-gun taser to shock Fowlkes in an apparent effort to subdue him before conducting the physical search. *Cf. Bryan v. MacPherson,* 630 F.3d 805 (9th Cir.2010); *Mattos v. Agarano,* 661 F.3d 433, 446 (9th Cir.2011) (en banc) (holding a finder of fact could find the use of a drive stun taser against a person posing no immediate threat unreasonable and unconstitutionally excessive). Once Fowlkes was subdued, the officers proceeded with the degrading and dangerous removal of the as yet unidentified cocaine from Fowlkes's rectum. [5]

[5]    The dissent suggests that it is immaterial that the materials lodged inside of Fowlkes' body were unidentified, because they were indisputably contraband. The officers' lack of information about the object—its precise size, shape and texture; whether the surrounding plastic was abraded; whether the inside of Fowlkes' rectal cavity was injured; and whether the substance inside could potentially poison—highlights the heightened "personal risk" inherent in the physical search. *See Schmerber,* 384 U.S. at 772, 86 S.Ct. 1826. That Fowlkes may have been acting unlawfully by smuggling an item into jail does not affect this calculus.

**[16]**   Such conduct is a far cry from *Cameron's* directive to "allay the anxieties and concerns of the suspect," or contemplate whether any "less intrusive means of obtaining the evidence may properly have been considered." *Cameron,* 538 F.2d at 248. As the Fourth Circuit recently held, "The manner in which contraband is removed from a suspect during a sexually intrusive search, no less than the manner **\*761** in which the contraband initially is discovered, must be considered in determining under the *Bell* analysis whether the search was reasonable." *United States v. Edwards,* 666 F.3d 877, 884 (4th Cir.2011). There, the court determined

that the manner in which an officer removed a plastic bag that an arrestee had tied around his penis was unreasonable. The officer put on gloves and then used a knife to cut the bag off the suspect's penis. The Fourth Circuit concluded that the manner of the removal "posed a significant and an unnecessary risk of injury to Edwards, transgressing well-settled standards of reasonableness. The fortuity that Edwards was not injured in the course of this action does not substantiate its safety." *Id.* at 885.

There are any number of alternative methods the officers could have considered employing to recover this evidence. This is not to require a least-restrictive alternative test as determinative of reasonableness, but it would have been more reasonable simply to comply with the jail's written policy and summon medical personnel.

## C.

Finally, numerous jurisdictions have concluded in similar circumstances that such warrantless searches violate the Fourth Amendment. *See, e.g., Meeks v. City of Minneapolis,* 822 F.Supp.2d 919 (D.Minn.2011) (granting summary judgement for plaintiff in a § 1983 suit on the claim that officers' conduct in pulling an item protruding from defendant's anus while he was pushed up against a squad car violated his Fourth Amendment rights); *United States v. Broadway,* 580 F.Supp.2d 1179, 1185 (D.Colo.2008) (suggesting that "actual touching, penetration, attempted touching, or attempted penetration of Defendant's anus or anal cavity" might constitute unreasonable scope or manner of search); *State v. Barnes,* 215 Ariz. 279, 281, 159 P.3d 589 (Ariz.Ct.App.2007) ("[A]n officer must secure a warrant to remove items partially protruding from an arrestee's rectum."); *State v. Robinson,* 105 Conn.App. 179, 937 A.2d 717, 728–29 (2008) (noting that, under Connecticut law, police must procure a warrant before obtaining contraband from a defendant's anus, but finding that the search at issue was not a body cavity search because "the bag was wholly outside of the defendant's rectum"); *People v. Hall,* 10 N.Y.3d 303, 311, 856 N.Y.S.2d 540, 886 N.E.2d 162 (2008) ("[T]he removal of an object protruding from a body cavity, regardless of whether any insertion into the body cavity is necessary, is subject to the *Schmerber* rule and cannot be accomplished without a warrant unless exigent circumstances reasonably prevent the police from seeking prior judicial authorization."); *Hughes v. Commonwealth,* 31 Va.App. 447, 524 S.E.2d 155 (2000) (holding that a search in which officer

asked suspect to bend over, inspected his anus, instructed him to cough, then manually removed plastic bag protruding from suspect's anus violated suspect's Fourth Amendment rights).

The lack of a warrant coupled with the unreasonable and dangerous methods used during the body cavity search compel our conclusion that this search violated Fowlkes's Fourth Amendment rights and that the district court should have suppressed the evidence.

### III.

Although the district court erred in failing to suppress the evidence seized from within Fowlkes's body, it appropriately denied Fowlkes's remaining motions.

### A.

**[17]**  Fowlkes asserts that an apparent discrepancy between the person who prepared **\*762** the government's application for the wiretap and the person who signed it renders the interception of the wire communications "unlawful" and mandates suppression of any evidence obtained as a result of that wiretap. At a minimum, he claims the district court erred in denying him a *Franks*[6] hearing because the affidavit in support of the wiretap contained material misrepresentations and omissions. Because any technical deficiencies in the wiretap application do not warrant suppression and because Fowlkes's *Franks* claim is without merit, the district court did not err in denying the motion to suppress.

6  "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

**[18]**  Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, governs wiretapping by law enforcement. *United States v. Garcia–Villalba,* 585 F.3d 1223, 1227 (9th Cir.2009). Evidence obtained from a wiretap must be suppressed if "the communication was unlawfully intercepted." 18 U.S.C. § 2518(10)(a)(i). In *United States v. Chavez,* the Supreme Court held that

establishing a rule in which "every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications unlawful" "would be at odds with the statute itself." 416 U.S. 562, 574–75, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974) (internal quotation marks omitted). Rather, "suppression is required only for a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Donovan,* 429 U.S. 413, 433–34, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977) (internal quotation marks omitted).

**[19]**  Here, any technical deficiency caused by one AUSA signing for another does not constitute a failure to satisfy such a statutory requirement. The affidavit prepared by Agent Jonathan Koeppen in support of the wiretap application satisfies the statutory requirements of 18 U.S.C. § 2518(1)—it was prepared in writing by an investigative or law enforcement officer, it stated Koeppen's authority to make an application, it provided a full and complete statement of the facts and circumstances relied upon, and it was signed under oath. We have previously implied that an affidavit attached to a wiretap application can fulfill the requirements of 18 U.S.C. § 2518(1) in lieu of the application itself. *See Garcia–Villalba,* 585 F.3d 1223, 1227–28 (9th Cir.2009) (evaluating whether the *affidavit* contained the full and complete statement as to whether other investigative procedures had been tried and failed as required by 18 U.S.C. § 2518(1)(c), which governs the requirements of a wiretap *application* ); *United States v. Fernandez,* 388 F.3d 1199, 1234–37 (9th Cir.2004).

**[20]**  The only statutory requirement that Koeppen's affidavit failed to meet was to identify the officer authorizing the application, as required under 18 U.S.C. § 2518(1)(a). The Supreme Court, however, has held that misidentification of the authorizing officer in the wiretap application is not a technical deficiency that requires suppression. **\*763** *Chavez,* 416 U.S. at 575, 94 S.Ct. 1849. So too here. Exhibit A attached to the wiretap application did provide authorization for the wiretap, and the singular failure of Agent Koeppen's affidavit to identify the authorizing official does not warrant suppression.

**[21]**  The district court did not err in denying a *Franks* hearing because Fowlkes has not shown that "the allegedly false statement[s] [were] necessary to the finding of probable

cause." *Franks,* 438 U.S. at 155–56, 98 S.Ct. 2674. Even if we accept as true all of Fowlkes's allegations regarding misstatements and omissions in Koeppen's affidavit, Fowlkes must still "show that the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding of probable cause." *United States v. Stanert,* 762 F.2d 775, 782 (9th Cir.1985) (citing *Franks,* 438 U.S. at 171–72, 98 S.Ct. 2674). This he cannot do. The affidavit contains many unchallenged factual allegations linking the phones and implicating Target Telephone # 2 in the service of drug trafficking. These include numerous calls between the phones, shared subscriber information, high call volume, and toll information connecting one phone to suspected narcotics traffickers.

## B.

Fowlkes also asserts that the district court erred in denying his motion to suppress the 2.6 ounces of cocaine seized from his apartment because the officers' warrantless entry was unlawful and the warrant authorizing the search was unsupported by probable cause. As the district court correctly found, however, probable cause coupled with exigent circumstances justified the officers' warrantless entry, and the warrant itself was supported by probable cause. *See United States v. Alaimalo,* 313 F.3d 1188, 1193 (9th Cir.2002) ( "Even when exigent circumstances exist, police officers must have probable cause to support a warrantless entry into a home.").

**[22]** **[23]** Probable cause justifying a warrantless entry requires the government to show a "fair probability that contraband or evidence of a crime" was in the residence. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see Bailey v. Newland,* 263 F.3d 1022, 1032 (9th Cir.2001). Examining the totality of the circumstances known to the officers at the time, *Alaimalo,* 313 F.3d at 1193, the officers here had probable cause sufficient to believe there was contraband at Fowlkes's Cedar Avenue apartment. Officers intercepted a voicemail suggesting that Fowlkes paid rent for the apartment. They also intercepted calls in which Fowlkes mentioned undercover officers and referenced "get[ting] everything out of" the premises and "trash[ing]" his phone because he's "not gonna give them shit to put together on me." On this basis, the officers reasonably concluded that drugs were present at Fowlkes' Cedar Avenue apartment. *See United States v. Angulo–Lopez,* 791 F.2d 1394, 1399 (9th Cir.1986) ("In the

case of drug dealers, evidence is likely to be found where the dealers live.").

**[24]** Exigent circumstances include "those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent ... the destruction of relevant evidence." *United States v. Howard,* 828 F.2d 552, 555 (9th Cir.1987) (quoting *United States v. McConney,* 728 F.2d 1195, 1199 (9th Cir.) (En banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)). The September 4 calls further support a finding of exigent circumstances. During those calls, Fowlkes stated, "It's a 911.... The homie said the police is outside in the back .... I was gonna tell you to take that shit over to **\*764** Keisha's house," and he instructed the person on the other end of the line to "move that computer and the rest of all that you know, just get everything out of here...." As the district court correctly found, those intercepted communications, viewed as they would reasonably appear to a prudent law enforcement officer, could have led to the conclusion that it was necessary to enter and secure the Cedar Avenue apartment to prevent Fowlkes from destroying contraband. The one-hour lapse between the last intercepted call and officers' entry into the apartment did not undermine the exigency of the situation. In *United States v. Lindsey,* 877 F.2d 777, 782–83 (9th Cir.1989), we held that a delay of the same duration did not negate the exigency because the delay was caused by officers awaiting reinforcements. Similarly, here the delay occurred because of the time it took officers to respond and then "coordinate[ ] their efforts" for entry.

**[25]** Finally, the magistrate judge did not clearly err in finding probable cause sufficient to support the search warrant for the apartment. *United States v. Krupa,* 658 F.3d 1174, 1177 (9th Cir.2011). The affidavit in support of the warrant alleged the following: 1) Fowlkes was a cocaine distributor; 2) he was using a phone that was the subject of an ongoing wiretap; 3) he resided at 2310 Cedar Avenue, Apartment 3, Long Beach, CA; and 4) during a phone call on one of the tapped phones, Fowlkes instructed a woman to clear out the place, including the computer, which the affiant interpreted as telling the woman to remove all evidence of narcotics distribution from the Cedar Avenue apartment. These facts are sufficient to support the magistrate's finding of probable cause. Fowlkes's assertion that the affidavit contained material misrepresentations and omissions is unavailing. As the district court correctly found, some of Fowlkes's allegations lack evidentiary support. The

other errors he points to appear simply to be typographical errors, which do not alter the substance of the affidavit.

### C.

 **[26]** **[27]** **[28]** Finally, the district court correctly denied Fowlkes's motion to suppress the cocaine base seized from his car. An officer may conduct a traffic stop if the officer has "probable cause to believe that a traffic violation has occurred." *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "The fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop." *United States v. Wallace,* 213 F.3d 1216, 1219 (9th Cir.2000). Here, the officer observed an expired temporary operating permit on the car Fowlkes was driving, which provided the basis for the *Terry* stop. *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

 **[29]** **[30]** The search of the car was likewise appropriate under the automobile exception to the warrant requirement, which allows police officers to "conduct a warrantless search of a vehicle if they have probable cause to believe that it contains contraband." *United States v. Pinela–Hernandez,* 262 F.3d 974, 977–78 (9th Cir.2001). A determination of probable cause is based on the "totality of the circumstances" known to the officers, *United States v. Smith,* 790 F.2d 789, 792 (9th Cir.1986), and because the officers were acting in concert in this case, we "look[ ] to the collective knowledge of all the officers involved in the criminal investigation." *United States v. Ramirez,* 473 F.3d 1026, 1032–37 (9th Cir.2007) (internal quotation marks and citation omitted). Here, the officers who ordered the traffic stop had just observed what they believed, based on **\*765** previous surveillance of Fowlkes and their own experiences, to be a narcotics transaction between Fowlkes and another individual. Once the car was pulled over and Fowlkes ordered to get out of the car, officers observed small, off-white rock-like chips on the driver and passenger seats in plain view and a green, leaf-like substance inside a clear bag in plain sight. Based upon the totality of these circumstances, the district court properly denied Fowlkes's motion to suppress the evidence found in the car.

### IV.

 **[31]** **[32]** The district court did not clearly err when it found, following its grant of Fowlkes's request for a mistrial, that the government had not "goad[ed]" him into making the request. *See United States v. Lun,* 944 F.2d 642, 644 (9th Cir.1991). "[O]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *United States v. Lopez–Avila,* 678 F.3d 955, 962 (9th Cir.2012) (internal citations omitted).

Fowlkes asserts that the government's conduct in arresting Marshall, a witness who had just testified for the defense, immediately outside the courtroom doors and within sight and hearing of the jury, goaded him into requesting the mistrial. The trial court, after two days of evidentiary hearings, found it could not "conclude that the arrest of Ms. Marshall was done in bad faith or with the intention to secure a mistrial." The evidence supports the district court's finding "that the government did not intentionally effectuate Ms. Marshall's arrest so as to bring it to the attention of the jury." Indeed, the jury was only able to observe the arrest because the glass panes on the courtroom doors afforded them a view of the hallway where the arrest was taking place. Given these facts, the district court's finding is not clearly erroneous. *See United States v. Hagege,* 437 F.3d 943, 951–52 (9th Cir.2006). Moreover, while not conclusive, the government's opposition to Fowlkes's motion for a mistrial supports the district court's finding of a lack of intent. *See United States v. McKoy,* 78 F.3d 446, 449 (9th Cir.1996) (considering the government's opposition to a motion for a mistrial as a factor in the district court's finding that the government lacked the requisite intent to trigger double jeopardy and prevent a retrial).

### V.

For the foregoing reasons, we affirm in part and reverse in part. We vacate Fowlkes's conviction and sentence on Count V, which was predicated on the drugs unconstitutionally seized from his body cavity, and remand for re-sentencing consistent with this decision.[7]

---

7    Because we remand for re-sentencing consistent with this opinion, we decline to address Fowlkes's challenge to the propriety of his original sentence under the Fair Sentencing Act of 2010.

**AFFIRMED, REVERSED, VACATED, and REMANDED.**

RESTANI, Judge, dissenting in part.

The majority opinion departs from the record presented to us on appeal to craft a blanket rule that ultimately may prove difficult to administer, at the expense of jailhouse security.[1] Because I believe the **\*766** facts found by the district court, which the majority does not contend are clearly erroneous, render the warrantless search and seizure reasonable under the totality of the circumstances, I dissent from the majority's decision to suppress the evidence seized during the jailhouse search.[2]

[1]   As discussed infra, it is difficult to tell at this juncture how the majority's new rule will play out, in part because these issues were not clearly presented below, resulting in a sparse record that does not discuss statistics involving the frequency of cases like Fowlkes' within this particular jail or jail system. The motion to suppress consisted of one paragraph of argument and one-sentence descriptions of three cases. It also focused on the visual strip search, mentioning the removal of the contraband only in passing.

   Although the majority supports the administrability of its rule by citing to some statistics, these are not on the record of the present case, relate to completely different prison systems, and do not address directly the actual circumstances presented. *See* Maj. Op. at 757–58.

[2]   I concur in the reasoning of the majority opinion with respect to all other issues raised on appeal.

## I.

The majority begins its discussion of the present case by choosing to describe the facts surrounding the jailhouse search in the most unfavorable light, at times engaging in wholesale speculation, to portray this case as one involving brutal, unnecessary police action. I believe it is helpful to clarify some of the more important factual considerations in order to fairly lay out the context the court must consider in evaluating the reasonableness of the police actions at issue.[3]

[3]   Of course, as an appellate court, we are not to engage in independent fact finding, deferring instead to the findings of the district court unless they are clearly erroneous. In seemingly making new factual findings, the majority appears dissatisfied with the lack of clear factual findings in the district court's order. If this is so, the remedy would be to remand to the district court, not to engage in our own weighing of the disputed facts, without the benefit of live testimony.

One such unfounded speculation is the majority's suggestion of a nefarious, pre-search intent of Sergeant Gibbs to engage in a body cavity search of Fowlkes. *See* Maj. Op. at 758. The opinion makes much of the fact that Gibbs "made his way to the strip search room in the basement[4] armed with his protective gloves, a stun gun taser, and additional officers." *Id.* Not only is this discussion irrelevant under the objective test used to evaluate the reasonableness of the search, but Gibbs provided testimony, which the trial court appeared to credit, plausibly explaining all of his actions. Gibbs testified that he wore gloves during all strip searches in the event he recovered evidence that was hidden on or in the arrestee's body, because these items might be used as evidence (in which case fingerprints and/or DNA evidence might need to be protected) and because the items could have bodily fluids on them (posing a health hazard). He also explained that he brought his taser from his patrol vehicle, after obtaining permission to bring it into the jail, because Fowlkes had been verbally aggressive, and Fowlkes was a large individual (over six feet tall and 250 pounds).[5]

[4]   The strip search room appears to have been on the sixth floor of the jail.

[5]   The majority's statement that Fowlkes posed no threat at all to the officers simply is not supported by the record, although it was acknowledged that Fowlkes was not physically aggressive, only verbally aggressive, prior to the search. Maj. Op. at 760.

The majority also ignores an important fact in describing the search in this case. The officers here were not completely in the dark as to what they were seeking to seize, probing inside Fowlkes as part of a wild goose chase. Instead, testimony from Officer Harris made clear that the officers **\*767** knew that the object protruding from Fowlkes' body cavity was unmistakably contraband for two reasons: a) it was an undisclosed plastic baggie, and b) it was almost certainly drugs.[6] Officer Harris described the bag as "a white object slightly protruding ... maybe a little bit less than a golf ball size, off-white substance in a plastic baggy. Or inside plastic."

[6]   Contraband refers to any unauthorized item, not just illegal items, including lighters, matches, currency, and pens. *See Florence v. Bd. of Chosen Freeholders,* ——

U.S. ——, 132 S.Ct. 1510, 1519, 182 L.Ed.2d 566 (2012) ("*Contraband* is any item that is possessed in violation of prison rules. Contraband obviously includes drugs or weapons, but it can also be money, cigarettes, or even some types of clothing." (quoting *Prisons: Today and Tomorrow* 237 (J. Pollock ed.1997))). Here, when the object was protruding, the officers could see that it was a plastic bag with an off-white substance inside, and thus it was readily apparent that Fowlkes possessed an unauthorized object. Contrary to the majority's suggestion, I do not believe that the officer's knowledge of the type of contraband secreted inside the arrestee's body is immaterial, and in this case, we need not consider the situation where the unauthorized nature or general character of the object is not apparent.

Finally, the majority asserts that the "record is devoid of any evidence from which the officers might reasonably have inferred that they were confronted with an exigent circumstance." Maj. Op. at 756. Contrary to this assertion, Gibbs testified during the evidentiary hearing on the motion to suppress that he was concerned the evidence could be destroyed or adulterated by Fowlkes. In fact, Gibbs explained that during past searches, he had witnessed defendants, who had secreted drugs into their body cavities, attempt to crush and swallow them during the strip search. Moreover, Gibbs explained that it was not uncommon for arrestees to become physically violent in order to prevent recovery of the contraband once it fell out.

## II.

Having set out the facts, tethered to the record before us, I turn now to the majority's holding that a warrant was required.

"The expectations of privacy of an individual taken into police custody necessarily are of a diminished scope. Both the person and the property in his immediate possession may be searched at the station house. A search of the detainee's person when he is booked into custody may involve a relatively extensive exploration...." *Maryland v. King,* —— U.S. ——, 133 S.Ct. 1958, 1978, 186 L.Ed.2d 1 (2013) (internal quotation marks, brackets, and citations omitted). "Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, ... his or her expectations of privacy and freedom from police scrutiny are reduced." *Id.*

Here, Fowlkes was strip searched pursuant to a blanket LBPD policy that all individuals booked on felony charges are

subject to a strip search before being housed in "General Population Felony cells."[7] The undisputed testimony is that the purpose of this policy is to "prevent the introduction of contraband or weapons into the jail." Thus, because the search here was performed in order to maintain institutional security and order, we should evaluate the reasonableness of the search given this particular context. *See Bull v. City & Cnty. of San Francisco,* 595 F.3d 964, 971–72 (9th Cir.2010) (citing *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)) (noting that prison **\*768** policies must be evaluated in the light of the prison's primary objective of institutional security).

[7]
> My views are not directed to any due process claim in a separate action under 42 U.S.C. § 1983, stemming from the officers' failure to follow the jail's own regulations. *See Marsh v. Cnty. of San Diego,* 680 F.3d 1148, 1155 (9th Cir.2012).

Although the majority is correct that under *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), any bodily intrusion is a search within the meaning of that term, "[t]he fact that an intrusion is negligible is of central relevance to determining reasonableness." *King,* 133 S.Ct. at 1969. The majority here ignores the applicability of the special needs exception, summarily dismissing this assertion. Although *King* involved government needs and privacy intrusions different from the ones present in this case, it demonstrates that the analysis should focus on the balance between the government's needs and the individual's privacy concerns, instead of merely a determination that a bodily intrusion occurred.[8] The government's interests were particularly strong here where contraband that needed to be seized came into plain view during the booking process, and there was a reasonable concern that Fowlkes would attempt to destroy the evidence.

[8]
> In *Fuller v. M.G. Jewelry,* we stated that *Schmerber's* reference to "intrusions into the body" applies to "all searches that invade the interior of the body ... [including] a visual intrusion into a body cavity." 950 F.2d 1437, 1449 & n. 11 (9th Cir.1991) (noting the Ninth Circuit, unlike other courts, has not limited *Schmerber* to cases in which skin is pierced or entry is forced). Thus, even the visual inspection of the body cavity here was an intrusion into the human body under *Schmerber,* but as noted above, that particular intrusion into the body is justified by the need to maintain institutional security. *See Bell,* 441 U.S. at 560, 99 S.Ct. 1861. Thus, *Schmerber* does not require a warrant

or exigent circumstances for all searches involving intrusion beyond the body's surface.

Additionally, when contraband is revealed during a lawful strip search initiated to prevent the introduction of contraband, there are few, if any, facts for a magistrate to consider. *See King,* 133 S.Ct. at 1969–70 ("The need for a warrant is perhaps least when the search involves no discretion that could properly be limited by the 'interpolation of a neutral magistrate between the citizen and the law enforcement officer.' " (quoting *Treasury Emps. v. Von Raab,* 489 U.S. 656, 667, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)) (brackets omitted)). The contraband here was already in plain sight; this is not a situation where a magistrate must consider various facts to determine the likelihood evidence will be found in a particular place before the intrusion occurs. *Cf. Schmerber,* 384 U.S. at 770, 86 S.Ct. 1826 (noting a magistrate should determine the likelihood that evidence of guilt will be found before a search occurs). This simply is also not a case where the search requires the government to probe inside the subject's body cavity based on the belief that contraband might be concealed inside.

Additionally, because contraband includes any unauthorized item, *Florence,* 132 S.Ct. at 1519, the officers have no discretion to permit the unauthorized object, protruding or otherwise, in the jail. The officers also have no discretion to decide who will be subject to such a search because all felony arrestees classified for entry into the general population are subject to the visual search, and the officers have no control over which visual search will reveal protruding contraband. *Cf. Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,* 686 F.3d 965, 992–93 (9th Cir.2012) (finding special needs exception did not apply in part because seizure at issue was not limited to a "well-defined" class of persons, such as probationers or public employees). Similarly, because the type of search here occurs only after contraband is revealed in plain sight during a lawful strip search, there is little concern **\*769** that this type of search will occur randomly or arbitrarily. *See Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 621–22, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (noting a warrant can help assure individuals that a search is not random or arbitrary). Thus, in the present context, a warrant serves little purpose because the presence of contraband is readily apparent, there are no facts for a magistrate to weigh in deciding the probability that contraband will be discovered, and the officers are provided no discretion in deciding whether to recover the contraband.[9]

9
    Fowlkes argues that a magistrate could ensure that the procedure is performed in a medically appropriate manner. Magistrates are accustomed to making probable cause determinations and may not possess the medical expertise necessary to determine in a reasonable amount of time what manner of search is medically appropriate. Garnering specific medical evidence seems inconsistent with the standard ex parte procedure.

The argument that a warrant is required because there is an intrusion into the body implicates only the first step in the analysis, i.e. whether a search occurred, and the majority fails to articulate sufficiently why the balancing test under the special needs exception should weigh in Fowlkes' favor, given the relatively minimal additional invasion[10] of privacy caused by the removal of the plastic bag and the government's heightened interest in recovering the contraband that was already protruding.[11] Thus, I believe the lack of a warrant did not render the search here, including the removal of the protruding plastic bag, a violation of the Fourth Amendment.

10
    I do not read the majority's opinion as taking issue with the clearly established rule that a visual strip search, even without suspicion of concealment, is permissible under these circumstances. *See Florence,* 132 S.Ct. at 1515, 1518.

11
    For this reason, I find the majority's reliance on the series of cases cited on pages 19–20 of its opinion to be inapposite, as they are outside of the jail context, do not deal with facts analogous to the present case, or do not engage in the balancing test required under the special needs exception. Under *Bull,* these cases are distinguishable because "[c]ases that address searches of arrestees at the place of arrest, searches at the stationhouse prior to booking or placement in a holding cell, or searches pursuant to an evidentiary criminal investigation do not control our review." 595 F.3d at 971.

### III.

Although the majority appears to conclude that the search was per se unreasonable without a warrant, it goes on to examine, in dicta, the reasonableness of the method of seizure.

Under the Fourth Amendment, "[e]ven if a warrant is not required, a search ... must be reasonable in its scope and manner of execution." *King,* 133 S.Ct. at 1970. The reasonableness analysis is fact-intensive and requires considerations of issues such as privacy, hygiene, and the

training of those conducting the search. *See Vaughan v. Ricketts,* 859 F.2d 736, 741 (9th Cir.1988), *abrogated on other grounds by Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also United States v. Carpenter,* 496 F.2d 855, 855 (9th Cir.1974) (per curiam). [12] To determine the reasonableness of a search, **\*770** we balance the "scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell,* 441 U.S. at 559, 99 S.Ct. 1861.

[12]   In *Carpenter,* two judges concurred in the two sentence per curiam opinion to limit the holding to the particular facts of that case. *See* 496 F.2d at 856 (Chambers, J., concurring) ("I regard the case as one ... of no precedential value except on a similar record."); *id.* (Taylor, J., concurring) ("I am constrained to concur in reversing the conviction of appellant only because of the record made on remand...."). In *Carpenter,* the district court credited testimony from the government's expert witness that a doctor should have been summoned to dilate the anal cavity and did not credit other testimony from the same expert that the object could be removed by a customs official without danger. *Id.* at 856. Both concurring judges stated that if not for this particular medical evidence credited by the district court, they would have concluded that a custom official could remove the protruding object. *Id.* at 856 (Chambers, J., concurring) ("The customs officer was entitled to assume the probable—that the package was one that went in without much trouble and would come out the same way."); *id.* at 856–57 (Taylor, J., concurring) (noting that despite the idealistic testimony of medical experts, common sense dictates that the inspector was entitled to perform the simple process of taking hold of and pulling the protruding end of the condom) As indicated, there is no medical testimony here, and we can only speculate as to what is considered necessary by medical professionals.

The removal of the protruding object here admittedly required an invasion of Fowlkes' privacy interests beyond that of a visual search. The removal, however, did not require any further touching, intrusion, or probing into Fowlkes' body. [13] At the same time, the context of the search diminished Fowlkes' reasonable expectation of privacy. The removal occurred during the jail intake process, after a felony arrest supported by probable cause, after Fowlkes attempted to smuggle contraband into the jail, and after a lawful visual inspection revealed the contraband in plain sight. Given the government's interest in preventing the introduction of contraband into the facility, I believe that while removing the protruding object from Fowlkes' body was an invasion of privacy beyond that caused by a visual cavity inspection, we must conclude from this record that the search was nevertheless reasonable.

[13]   The majority relies on the Fourth Circuit's opinion in *United States v. Edwards,* 666 F.3d 877 (4th Cir.2011). Although the majority there held the search unreasonable because a knife was used to remove a bag of drugs tied to the defendant's genitals, the majority did not preclude any touching of the defendant. *See id.* at 886. Instead, the majority suggested other permissible alternatives including "untying the baggie, removing it by hand, tearing the baggie, requesting that blunt scissors be brought to the scene to remove the baggie, or removing the baggie by other non-dangerous means in any private, well-lit area." *Id.* (footnote omitted).

Here, Fowlkes presented no medical testimony related to the danger of removing the protruding plastic bag, nor did Fowlkes argue that he was at risk for injury or was injured by the removal. Fowlkes' assertion before the district court was that Gibbs forcefully inserted his fingers into Fowlkes' anal cavity and probed, unsuccessfully, for drugs, facts that were rejected by the district court. As a result, Fowlkes made no allegations as to the harm caused by the actual removal of the protruding plastic bag, and there is nothing on the record from Fowlkes' perspective indicating that the manner of removal was dangerous or harmful. Instead, the record states that the search was performed in a private area by LBPD officers wearing gloves and of the same sex as Fowlkes. The plastic bag was protruding far enough so that Gibbs could grab the bag with two fingers and pull it out, and there is no indication that this process was difficult or prolonged.

The only evidence on the record suggesting that the removal caused Fowlkes any pain or discomfort is a picture of the plastic bag after it was removed, which shows substances that appear to be blood and feces on the bag. Fowlkes argues the officers planted the plastic bag in the strip search room and denied that it was recovered from his body cavity. Thus, there is no testimony from Fowlkes as to the existence of the plastic bag inside of him or the manner of its removal, and there is **\*771** nothing on the record demonstrating that the possible presence of blood on the bag was caused by the officers' conduct, as opposed to Fowlkes' own conduct of forcing the plastic bag into his anal cavity, or his attempt to push the bag further into his anal cavity during the search. *See Thompson v. Souza,* 111 F.3d 694, 700 (9th Cir.1997) ("[T]he

prisoner 'bears the burden of showing that [prison] officials intentionally used exaggerated or excessive means to enforce security.' " (second alteration in original)).

On the suppression record before us, which demonstrates the object was removed without any intrusion into the anal cavity, [14] without any significant injury, harm, or pain to Fowlkes, and in a sanitary and private environment, I cannot conclude that the manner of removal was in violation of the Fourth Amendment or adopt the apparent blanket rule of the majority prohibiting all such extractions. [15]

[14]    The removal of a protruding object raises different, and less grave, considerations for health than when contraband is fully inserted inside a cavity and can only be located and removed through digital penetration and probing. The actual probing for the inserted object may itself cause medical harm distinct from the removal of the item, and the officers may have no idea as to its shape, size, or location. Thus, the need for medical training is less relevant when a protruding object is removed than when the discovery and removal of an object requires penetration and probing of the anal or rectal cavity.

[15]    Additionally, the facts in this case do not include those that we found, when combined with others, render the manner of removing an item unreasonable. For example, in *Vaughan,* we found a digital rectum search was performed unreasonably when conducted on an unsanitary table by medical assistants who were not trained in involuntary rectal searches, the assistants did not wash their hands between searches, and the search was visible to other inmates and prison personnel, including female prison officials. *Vaughan,* 859 F.2d at 741; *see also United States v. Cameron,* 538 F.2d 254, 258 (9th Cir.1976) (finding two forced digital probes of rectum by a doctor, two enemas, and a liquid laxative administered without the presence of a doctor unreasonable, especially when performed without consideration of the subject's claim that he was under medical supervision for stomach and rectal problems). The search here did not involve penetration of the anal cavity, let alone multiple forced probes and enemas as in *Cameron* or the unsanitary conditions and lack of privacy as in *Vaughan.* Officers also took steps to minimize potential harm to Fowlkes and to protect his privacy by conducting the search in an apparently clean, private room dedicated for this purpose and by using medical gloves.

## IV.

For the reasons above, I believe the seizure of the small baggie of obvious contraband during a constitutionally permissible strip search of a criminal detainee was reasonable under the totality of the circumstances. In concluding, however, it is worth passing upon the "alternative methods" [16] of recovering the contraband alluded to by the majority. *See* Maj. Op. at 761. The majority mentions these alternatives only with respect to its conception of a reasonable method of seizure, and not its requirement that the officers obtain a search warrant prior to removing protruding objects from body cavities. This may be because pleasant alternatives are less obvious under these circumstances.

[16]    As the majority concedes, the existence of a less-intrusive alternative "does not, in itself, render the search unreasonable." *United States v. Montoya de Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (noting a creative mind "can almost always imagine some alternative means by which the objectives of the police might have been accomplished"); *see Bell,* 441 U.S. at 559 n. 40, 99 S.Ct. 1861 (rejecting the "less-restrictive-alternative" test as determinative of reasonableness).

I suppose the officers could have placed Fowlkes in an isolation cell, handcuffed, partially clothed, and under constant surveillance, allowing them to respond immediately **\*772** when the baggie worked its way the other inch or so out of Fowlkes' body. This hardly seems to be, per se, a less intrusive or offensive condition in which to place a detainee. *See, e.g., Montoya de Hernandez,* 473 U.S. at 548, 105 S.Ct. 3304 (Brennan, J., dissenting) (noting individual was able to avoid passing naturally any of the 88 drug-filled balloons secreted in her alimentary canal for almost 27 hours after initial detention despite her obvious need to use the restroom).

With respect to removal, certainly a medical professional is always preferable, but it remains a mystery whether one was readily available to assist the officers in removing the baggie and what she would have done differently. Without such information, I am hesitant to impose the blanket rule apparently endorsed by the majority that all removals of protruding objects must be performed by medical personnel, even when the detainee is noncompliant during a strip search. *See Florence,* 132 S.Ct. at 1513–14 ("In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial

evidence showing their policies are an unnecessary or unjustified response to problems of jail security."); *Bull,* 595 F.3d at 976 ("When the allocation of resources and the ability of administrators to protect staff and detainees at the facility are at issue, 'courts should be particularly deferential to the informed discretion of corrections officials.' " (quoting *Turner v. Safley,* 482 U.S. 78, 90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987))). In sum, the factual record needed to find a Fourth Amendment violation warranting suppression is lacking.

Accordingly, I respectfully dissent.

**Parallel Citations**

14 Cal. Daily Op. Serv. 9916, 2014 Daily Journal D.A.R. 11,643

# Exhibit D

# Exhibit D

91 S.Ct. 2022
Supreme Court of the United States

Edward H. COOLIDGE, Jr., Petitioner,

v.

NEW HAMPSHIRE.

No. 323.    |    Argued Jan. 12, 1971.    |    Decided
June 21, 1971.    |    Rehearing Denied Oct. 12, 1971.

See 92 S.Ct. 26.

Defendant was convicted of murder in first degree by
assault with a deadly weapon and murder by the same
means in course of committing kidnapping and questions
of law were reserved and transferred. The Supreme
Court of New Hampshire, 109 N.H. 403, 260 A.2d 547,
overruled exceptions and certiorari was granted. The Supreme
Court, Mr. Justice Stewart, held that warrant issued upon
determination of probable cause by chief enforcement agent
of state, the Attorney General, who was actively in charge of
investigation and later was to be key prosecutor at trial was
invalid.

Judgment reversed and case remanded to Supreme Court of
New Hampshire for further proceedings.

Mr. Justice Harlan concurred in parts of the opinion and in the
judgment and filed an opinion. Mr. Justice Black concurred
in part and dissented in part and filed an opinion in which
Mr. Justice Blackmun joined in Parts II and III and in portion
of Part I. Mr. Justice White concurred in part and dissented
in part and filed an opinion in which Mr. Chief Justice
Burger joined. Mr. Chief Justice Burger dissented in part and
concurred in part and filed an opinion.

**2026 Syllabus [*]

[*]    The syllabus constitutes no part of the opinion of the
Court but has been prepared by the Reporter of Decisions
for the convenience of the reader. See United States v.
Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26
S.Ct. 282, 287, 50 L.Ed. 499.

*443  Police went to petitioner's home on January 28, 1964,
to question him about a murder. In the course of their inquiry
he showed them three guns; and he agreed to take a lie-

detector test on February 2. The test was inconclusive on the
murder but during its course petitioner admitted a theft. In
petitioner's absence, two other policemen came to the house
and questioned petitioner's wife to check petitioner's story and
corroborate his admission of the theft. Unaware of the visit of
the other officers who had been shown the guns and knowing
little about the murder weapon, the police asked about any
guns there might be in the house and were shown four by
petitioner's wife which she offered to let them take. After one
policeman first declined the offer, they took the guns, along
with various articles of petitioner's clothing his wife made
available to them. On February 19, petitioner was arrested in
his house for the murder and on that date a warrant to search
petitioner's automobile was applied for by the police chief
and issued by the Attorney General (who had assumed charge
of the investigation and was later the chief prosecutor at the
trial), acting as a justice of the peace. The car, which at the
time of the arrest was parked in petitioner's driveway, was
subsequently towed to the police station, where on February
21 and on two occasions the next year it was searched.
Vacuum sweepings from the car as well as from the clothing
were used as evidence at the trial, along with one of the guns
made available by petitioner's wife. Following the overruling
of pretrial motions to suppress that evidence, petitioner was
convicted, and the State Supreme Court affirmed. Held:

1. The warrant for the search and seizure of petitioner's
automobile did not satisfy the requirements of the Fourth
Amendment as made applicable to the States by the
Fourteenth because it was not issued by a 'neutral and
detached magistrate.' Johnson v. United States, 333 U.S. 10,
14, 68 S.Ct. 367, 369, 92 L.Ed. 436. Pp. 2028—2031.

2. The basic constitutional rule is that 'searches conducted
outside the judicial process, without prior approval by judge
or magistrate, are per se unreasonable under the Fourth
Amendment—subject only to a few specifically established
and well- **444  defined exceptions,' and, on the facts of this
case, a warrantless search and seizure of the car cannot be
justified under those exceptions. Pp. 2031—2047.

(a) The seizure of the car in the driveway cannot be justified
as incidental to the arrest which took place inside the house.
Even assuming, arguendo, that the police could properly have
made a warrantless search of the car in the driveway when
they arrested petitioner, they could not have done so at their
leisure after its removal. Pp. 2032—2033.

(b) Under the circumstances present here—where the police for some time had known of the probable role of the car in the crime, petitioner had had ample opportunity to destroy incriminating evidence, the house was guarded at the time of arrest and petitioner had no access to the car—there were no exigent circumstances justifying the warrantless search even had it been made before the car was taken to the police station, and the special exceptions for automobile searches in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, and Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed. 419, are clearly inapplicable. Cf. Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538. Pp. 2033—2037.

(c) Under certain circumstances the police may without a warrant seize evidence **2027 in 'plain view,' though not for that reason alone and only when the discovery of the evidence is inadvertent. That exception is inapplicable to the facts of the instant case, where the police had ample opportunity to obtain a valid warrant, knew in advance the car's description and location, intended to seize it when they entered on petitioner's property, and no contraband or dangerous objects were involved. Pp. 2033—2037.

3. No search and seizure were implicated in the February 2 visit when the police obtained the guns and clothing from petitioner's wife, and hence they needed no warrant. The police, who exerted no effort to coerce or dominate her, were not obligated to refuse her offer for them to take the guns, and in making these and the other items available to the police, she was not acting as the instrument or agent of the police. Pp. 2048—2050.

109 N.H. 403, 260 A.2d 547, reversed and remanded.

**Attorneys and Law Firms**

*445 Archibald Cox, Washington, D.C., for petitioner.

Alexander Kalinski, Manchester, N.H., for respondent.

**Opinion**

Mr. Justice STEWART delivered the opinion of the Court. **

** Parts II-A, II-B, and II-C of this opinion are joined only by Mr. Justice DOUGLAS, Mr. Justice BRENNAN, and Mr. Justice MARSHALL.

We are called upon in this case to decide issues under the Fourth and Fourteenth Amendments arising in the context of a state criminal trial for the commission of a particularly brutal murder. As in every case, our single duty is to determine the issues presented in accord with the Constitution and the law.

Pamela Mason, a 14-year-old girl, left her home in Manchester, New Hampshire, on the evening of January 13, 1964, during a heavy snowstorm, apparently in response to a man's telephone call for a babysitter. Eight days later, after a thaw, her body was found by the side of a major north-south highway several miles away. She had been murdered. The event created great alarm in the area, and the police immediately began a massive investigation.

On January 28, having learned from a neighbor that the petitioner, Edward Coolidge, had been away from home on the evening of the girl's disappearance, the police went to his house to question him. They asked *446 him, among other things, if he owned any guns, and he produced three, two shotguns and a rifle. They also asked whether he would take a lie-detector test concerning his account of his activities on the night of the disappearance. He agreed to do so on the following Sunday, his day off. The police later described his attitude on the occasion of this visit as fully 'cooperative.' His wife was in the house throughout the interview.

On the following Sunday, a policeman called Coolidge early in the morning and asked him to come down to the police station for the trip to Concord, New Hampshire, where the lie-detector test was to be administered. That evening, two plainclothes policemen arrived at the Coolidge house, where Mrs. Coolidge was waiting with her mother-in-law for her husband's return. These two policemen were not the two who had visited the house earlier in the week, and they apparently did not know that Collidge had displayed three guns for inspection during the earlier visit. The plainclothesmen told Mrs. Coolidge that her husband was in 'serious trouble' and probably would not be home that night. They asked Coolidge's mother to leave, and proceeded to question Mrs. Coolidge. During the course of the interview they obtained from her four guns belonging to Coolidge, and some clothes that Mrs. Coolidge thought her husband might have been wearing on the evening of Pamela Mason's disappearance.

**2028 Coolidge was held in jail on an unrelated charge that night, but he was released the next day. [1] During the ensuing two and a half weeks, the State accumulated a quantity of evidence to support the theory that it was he

who had killed Pamela Mason. On February 19, the results of the investigation were presented at a meeting between the police officers working on the case and the **\*447** State Attorney General, who had personally taken charge of all police activities relating to the murder, and was later to serve as chief prosecutor at the trial. At this meeting, it was decided that there was enough evidence to justify the arrest of Coolidge on the murder charge and a search of his house and two cars. At the conclusion of the meeting, the Manchester police chief made formal application, under oath, for the arrest and search warrants. The complaint supporting the warrant for a search of Coolidge's Pontiac automobile, the only warrant that concerns us here, stated that the affiant 'has probable cause to suspect and believe, and does suspect and believe, and herewith offers satisfactory evidence, that there are certain objects and things used in the Commission of said offense, now kept, and concealed in or upon a certain vehicle, to wit: 1951 Pontiac two-door sedan \* \* \*.' The warrants were then signed and issued by the Attorney General himself, acting as a justice of the peace. Under New Hampshire law in force at that time, all justices of the peace were authorized to issue search warrants. N.H.Rev.Stat.Ann. s 595:1 (repealed 1969).

1    During the lie-detector test, Coolidge had confessed to a theft of money from his employer. See III-A of text, infra.

The police arrested Coolidge in his house on the day the warrant issued. Mrs. Coolidge asked whether she might remain in the house with her small child, but was told that she must stay elsewhere, apparently in part because the police believed that she would be harassed by reporters if she were accessible to them. When she asked whether she might take her car, she was told that both cars had been 'impounded,' and that the police would provide transportation for her. Some time later, the police called a towing company, and about two and a half hours after Coolidge had been taken into custody the cars were towed to the police station. It appears that at the time of the arrest the cars were parked in the Coolidge driveway, and that although dark had fallen **\*448** they were plainly visible both from the street and from inside the house where Coolidge was actually arrested. The 1951 Pontiac was searched and vacuumed on February 21, two days after it was seized, again a year later, in January 1965, and a third time in April 1965.

At Coolidge's subsequent jury trial on the charge of murder, vacuum sweepings, including particles of gun powder, taken from the Pontiac were introduced in evidence against him, as part of an attempt by the State to show by microscopic

analysis that it was highly probable that Pamela Mason had been in Coolidge's car. [2] Also introduced in evidence was one of the guns taken by the police on their Sunday evening visit to the Coolidge house—a 22-caliber Mossberg rifle, which the prosecution claimed was the murder weapon. Conflicting ballistics testimony was offered on the question whether the bullets found in Pamela Mason's body had been fired from this rifle. Finally, the prosecution introduced vacuum sweepings of the clothes taken from the Coolidge house that same Sunday evening, and attempted to show through microscopic analysis that there was a high probability that the clothes had been in contact with Pamela Mason's body. Pretrial motions to suppress all this evidence were referred by the trial judge to the New Hampshire Supreme Court, which ruled the evidence admissible. **\*\*2029** 106 N.H. 186, 208 A.2d 322. The jury found Coolidge guilty and he was sentenced to life imprisonment. The New Hampshire Supreme Court affirmed the judgment of conviction, 109 N.H. 403, 260 A.2d 547, and we granted certiorari to consider the constitutional questions raised by the admission of this evidence against Coolidge at his trial. 399 U.S. 926, 90 S.Ct. 2253, 26 L.Ed.2d 806.

2    For a very strong argument that this evidence should have been excluded because altogether lacking in probative value, see Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv.L.Rev. 1329, 1342 n. 40 (1971).

### \*449 I

The petitioner's first claim is that the warrant authorizing the seizure and subsequent search of his 1951 Pontiac automobile was invalid because not issued by a 'neutral and detached magistrate.' Since we agree with the petitioner that the warrant was invalid for this reason, we need not consider his further argument that the allegations under oath supporting the issuance of the warrant were so conclusory as to violate relevant constitutional standards. Cf. Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503; Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723.

The classic statement of the policy underlying the warrant requirement of the Fourth Amendment is that of Mr. Justice Jackson, writing for the Court in Johnson v. United States, 333 U.S. 10, 13—14, 68 S.Ct. 367, 369, 92 L.Ed. 436:

'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw

from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. * * * When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.'

Cf. United States v. Lefkowitz, 285 U.S. 452, 464, 52 S.Ct. 420, 423, 76 L.Ed. 877; Giordenello v. United States, supra, at 486, 78 S.Ct., at 1250; **\*450** Wong Sun v. United States, 371 U.S. 471, 481—482, 83 S.Ct. 407, 413—414, 9 L.Ed.2d 441; Katz v. United States, 389 U.S. 347, 356—357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576.

 [1]    [2]    [3]    [4]    In this case, the determination of probable cause was made by the chief 'government enforcement agent' of the State—the Attorney General—who was actively in charge of the investigation and later was to be chief prosecutor at the trial. To be sure, the determination was formalized here by a writing bearing the title 'Search Warrant,' whereas in Johnson there was no piece of paper involved, but the State has not attempted to uphold the warrant on any such artificial basis. Rather, the State argues that the Attorney General, who was unquestionably authorized as a justice of the peace to issue warrants under then existing state law, did in fact act as a 'neutral and detached magistrate.' Further, the State claims that any magistrate, confronted with the showing of probable cause made by the Manchester chief of police, would have issued the warrant in question. To the first proposition it is enough to answer that there could hardly be a more appropriate setting than this for a per se rule of disqualification rather than a case-by-case evaluation of all the circumstances. Without disrespect to the state law enforcement agent here involved, the whole point of the basic rule so well expressed by Mr. Justice Jackson is that prosecutors and policemen simply cannot be

asked to maintain the requisite neutrality with regard to their own investigations—the 'competitive enterprise' that must rightly engage their single-minded **\*\*2030** attention. [3] Cf. Mancusi v. DeForte, 392 U.S. 364, 371, 88 S.Ct. 2120, 2125, 20 L.Ed.2d 1154. As for the proposition that the existence of probable cause renders noncompliance with the warrant procedure an irrelevance, **\*451** it is enough to cite Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 416, 70 L.Ed. 145, decided in 1925:

3          After hearing the Attorney General's testimony on the issuance of the warrants, the trial judge said:
          'I found that an impartial Magistrate would have done the same as you did. I don't think, in all sincerity, that I would expect that you could wear two pairs of shoes.'

'Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause.'
See also Jones v. United States, 357 U.S. 493, 497—498, 78 S.Ct. 1253, 1256, 2 L.Ed.2d 1514; Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319. ('(T)he rights * * * against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way.')

 [5]    But the New Hampshire Supreme Court, in upholding the conviction, relied upon the theory that even if the warrant procedure here in issue would clearly violate the standards imposed on the Federal Government by the Fourth Amendment, it is not forbidden the States under the Fourteenth. This position was premised on a passage from the opinion of this Court in Ker v. California, 374 U.S. 23, 31, 83 S.Ct. 1623, 1628, 10 L.Ed.2d 726:
'Preliminary to our examination of the search and seizures involved here, it might be helpful for us to indicate what was not decided in Mapp (v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081). First, it must be recognized that the 'principles governing the admissibility of evidence in federal criminal trials have not been restricted * * * to those derived solely from the Constitution. In the exercise of its supervisory authority over the administration of criminal justice in the federal courts * * * this Court has * * * formulated rules of evidence to be applied in federal criminal prosecutions.' McNabb v. United States, 318 U.S. 332, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943); * * * Mapp, however, established no assumption by this Court of supervisory authority over state courts * * * and, consequently, it implied no total **\*452**

obliteration of state laws relating to arrests and searches in favor of federal law. Mapp sounded no death knell for our federalism; rather, it echoed the sentiment of Elkins v. United States, supra, 364 U.S. (206), at 221, 80 S.Ct. (1437), at 1446, 4 L.Ed.2d 1669, that 'a healthy federalism depends upon the avoidance of needless conflict between state and federal courts' by itself urging that '(f)ederal-state cooperation in the solution of crime under constitutional standards will be promoted, if only by recognition of their now mutual obligation to respect the same fundamental criteria in their approaches.' 367 U.S., at 658, 81 S.Ct., at 1693, 6 L.Ed.2d 1081.' (Emphasis in Ker.)

It is urged that the New Hampshire statutes which at the time of the searches here involved permitted a law enforcement officer himself to issue a warrant was one of those 'workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States,' id., at 34, 83 S.Ct., at 1630, authorized by Ker.

That such a procedure was indeed workable from the point of view of the **2031 police is evident from testimony at the trial in this case:

'The Court: You mean that another police officer issues these (search warrants)?

'The Witness: Yes. Captain Couture and Captain Shea and Captain Loveren are J.P.'s.

'The Court: Well, let me ask you, Chief, your answer is to the effect that you never go out of the department for the Justice of the Peace?

'The Witness: It hasn't been our—policy to go out of the deparment.

'Q. Right. Your policy and experience, is to have a fellow police officer take the warrant in the capacity of Justice of the Peace?

'A. That has been our practice.'

*453 But it is too plain for extensive discussion that this now abandoned New Hampshire method of issuing 'search warrants' violated a fundamental premise of both the Fourth and Fourteenth Amendments—a premise fully developed

and articulated long before this Court's decisions in Ker v. California, supra, and Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. As Mr.Justice Frankfurter put it in Wolf v. Colorado, 338 U.S. 25, 27—28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782:

> 'The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment —is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause. The knock at the door, whether by day or by night, as a prelude to a search, without authority of law but solely on the authority of the police, did not need the commentary of recent history to be condemned * * *.'

We find no escape from the conclusion that the seizure and search of the Pontiac automobile cannot constitutionally rest upon the warrant issued by the state official who was the chief investigator and prosecutor in this case. Since he was not the neutral and detached magistrate required by the Constitution, the search stands on no firmer ground than if there had been no warrant at all. If the seizure and search are to be justified, they must, therefore, be justified on some other theory.

## II

[6] [7] The State proposes three distinct theories to bring the facts of this case within one or another of the exceptions to the warrant requirement. In considering them, we must not lose sight of the Fourth Amendment's fundamental guarantee. Mr. Justice Bradley's admonition in his opinion for the Court almost a century ago in *454 Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746, is worth repeating here:

'It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional

rights of the citizen, and against any stealthy encroachments thereon.'[4]

[4]   See also Gouled v. United States, 255 U.S. 298, 303—304, 41 S.Ct. 261, 263, 65 L.Ed. 647 (1921):
'It would not be possible to add to the emphasis with which the framers of our Constitution and this court * * * have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two Amendments (the Fourth and Fifth). The effect of the decisions cited is: that such rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty and private property'; that they are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen, —the right, to trial by jury, to the writ of habeas corpus and to due process of law. It has been repeatedly decided that these Amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned, but mistakenly overzealous executive officers.' See also Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374.

**\*\*2032** **[8]** **[9]**   Thus the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se **\*455** unreasonable under the Fourth Amendment —subject only to a few specifically established and well delineated exceptions.'[5] The exceptions are 'jealously and carefully drawn,'[6] and there must be 'a showing by those who seek exemption * * * that the exigencies of the situation made that course imperative.'[7] '(T)he burden is on those seeking the exemption to show the need for it.'[8] In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won—by legal and constitutional means in England,[9] and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing everyman's scope to do as he pleases in an urban and industrial world, the changes

have made the values served by the Fourth Amendment more, not less, important.[10]

[5]   Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576.

[6]   Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514.

[7]   McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153.

[8]   United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59.

[9]   See Entick v. Carrington, 19 How.St.Tr. 1029, 95 Eng.Rep. 807 (1765), and Wilkes v. Wood, 19 How.St.Tr. 1153, 98 Eng.Rep. 489 (1763).

[10]   See Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669.

### A

The State's first theory is that the seizure on February 19 and subsequent search of Coolidge's Pontiac were 'incident' to a valid arrest. We assume that the arrest of Coolidge inside his house was valid, so that the first condition of a warrantless 'search incident' is met. Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 567 n. 11, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306. And since the events in issue took place in 1964, we assess the State's argument **\*456** in terms of the law as it existed before Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, which substantially restricted the 'search incident' exception to the warrant requirement, but did so only prospectively. Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388. But even under pre-Chimel law, the State's position is untenable.

The leading case in the area before Chimel was United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, which was taken to stand 'for the proposition, inter alia, that a warrantless search 'incident to a lawful arrest' may generally extend to the area that is considered to be in the 'possession' or under the 'control' of the person arrested.' Chimel, supra, at 760, 89 S.Ct., at 2038. In this case, Coolidge was arrested inside **\*\*2033** his house; his car was outside in the driveway. The car was not touched until Coolidge had been removed from the scene. It was then seized and taken to the station, but it was not actually searched until two days later.

First, it is doubtful whether the police could have carried out a contemporaneous search of the car under Rabinowitz standards. For this Court has repeatedly held that, even under Rabinowitz, '(a) search may be incident to an arrest "only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest. * * *"' Vale v. Louisiana, 399 U.S. 30, 33, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409, quoting from Shipley v. California, 395 U.S. 818, 819, 89 S.Ct. 2053, 2054, 23 L.Ed.2d 732, quoting from Stoner v. California, 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856 (Emphasis in Shipley.) Cf. Agnello v. United States, 269 U.S., at 30—31, 46 S.Ct., at 5—6; James v. Louisiana, 382 U.S. 36, 88 S.Ct. 151, 15 L.Ed.2d 30. These cases make it clear beyond any question that a lawful pre-Chimel arrest of a suspect outside his house could never by itself justify a warrantless search inside the house. There is nothing in search-incident doctrine (as opposed to the special rules for automobiles and evidence in 'plain view,' to be considered below) that suggests **\*457** a different result where the arrest is made inside the house and the search outside and at some distance away.[11]

[11] The suggestion in Part III-A of the concurring and dissenting opinion of Mr. Justice BLACK that this represents the formulation of 'a per se rule reaching far beyond' Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, post, at 2056, is mistaken. The question discussed here is whether under pre-Chimel law the police could, contemporaneously with the arrest of Coolidge inside his house, make a search of his car for evidence—i.e., the particles later introduced at his trial. There can be no question that after Chimel, such a search could not be justified as 'incident' to the arrest, since Chimel held that a search so justified can extend only to the 'arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' 395 U.S., at 763, 89 S.Ct., at 2040. The quite distinct question whether the police were entitled to seize the automobile as evidence in plain view is discussed in Part II-C below. Cf. n. 24, infra.

**[10]** Even assuming, arguendo, that the police might have searched the Pontiac in the driveway when they arrested Coolidge in the house, Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777, makes plain that they could not legally seize the car, remove it, and search it at their leisure without a warrant. In circumstances virtually identical to those here, Mr. Justice Black's opinion for a unanimous Court held that '(o)nce an accused is under arrest and in

custody, then a search (of his car) made at another place, without a warrant, is simply not incident to the arrest.' Id., at 367, 84 S.Ct., at 883. Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538. Cf. Chambers v. Maroney, 399 U.S. 42, 47, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419. Search-incident doctrine, in short, has no applicability to this case.[12]

[12] Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730, is not in point, since there the State did not rely on the theory of a search incident to arrest, but sought to justify the search on other grounds. Id., at 60, 87 S.Ct., at 790. Mr. Justice Black's opinion for the Court in Cooper reaffirmed Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777.

**\*458 B**

The second theory put forward by the State to justify a warrantless seizure and search of the Pontiac car is that under Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, the police may make a warrantless search of an automobile whenever they have probable cause to do so, and, under our decision last Term in Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, whenever **\*\*2034** the police may make a legal contemporaneous search under Carroll, they may also seize the car, take it to the police station, and search it there. But even granting that the police had probable cause to search the car, the application of the Carroll case to these facts would extend it far beyond its original rationale.

Carroll did indeed hold that 'contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant,'[13] provided that 'the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband liquor therein which is being illegally transported.'[14] Such searches had been explicitly authorized by Congress, and, as we have pointed out elsewhere,[15] in the conditions of the time '(a)n automobile * * * was an almost indispensable instrumentality in large-scale violation of the National Prohibition Act, and the car itself therefore was treated somewhat as an offender and became contraband.' In two later cases,[16] each involving an occupied automobile stopped on the open highway and searched for contraband **\*459** liquor, the Court followed and reaffirmed Carroll.[17] And last Term in Chambers, supra, we did so again.

13     267 U.S., at 153, 45 S.Ct., at 285.

14     Id., at 156, 45 S.Ct., at 286.

15     United States v. Di Re, 332 U.S. 581, 586, 68 S.Ct. 222, 225, 92 L.Ed. 210.

16     Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629; Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879.

17     A third case that has sometimes been cited as an application of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, is Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151. There, the police were following an automobile that they had probable cause to believe contained a large quantity of contraband liquor. The facts were as follows:

The driver 'turned into a garage a few feet back of his residence within the curtilage. One of the pursuing officers left their car and followed. As petitioner was getting out of his car this officer approached, announced his official character, and stated he was informed that the car was hauling bootleg liquor. Petitioner replied, 'just a little for a party.' Asked whether the liquor was tax paid, he replied that it was Canadian whiskey; also, he said it was in the trunk at the rear of the car. The officer opened the trunk and found * * *.' 305 U.S., at 253, 59 S.Ct., at 175.

The Court held:

'Considering the doctrine of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, * * * and the application of this to the facts there disclosed, it seems plain enough that just before he entered the garage the following officers properly could have stopped petitioner's car, made search and put him under arrest. So much was not seriously controverted at the argument.

'Passage of the car into the open garage closely followed by the observing officer did not destroy this right. No search was made of the garage. Examination of the automobile accompanied an arrest, without objection and upon admission of probable guilt. The officers did nothing either unreasonable or oppressive. Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 5, 70 L.Ed. 145; Wisniewski v. United States, 47 F.2d 825, 826 (CA 6 1931).' 305 U.S., at 254—255, 59 S.Ct., at 176. Both Agnello, at the page cited, and Wisniewski dealt with the admissibility of evidence seized during a search incident to a lawful arrest.

[11]     The underlying rationale of Carroll and of all the cases that have followed it is that there is

'a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile *460 for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' 267 U.S., at 153, 45 S.Ct., at 285. (Emphasis supplied.)

**2035 As we said in Chambers, supra, at 51, 90 S.Ct., at 1981, 'exigent circumstances' justify the warrantless search of 'an automobile stopped on the highway,' where there is probable cause, because the car is 'movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.' '(T)he opportunity to search is fleeting * * *.' (Emphasis supplied.)

In this case, the police had known for some time of the probable role of the Pontiac car in the crime. Coolidge was aware that he was a suspect in the Mason murder, but he had been extremely cooperative throughout the investigation, and there was no indication that he meant to flee. He had already had ample opportunity to destroy any evidence he thought incriminating. There is no suggestion that, on the night in question, the car was being used for any illegal purpose, and it was regularly parked in the driveway of his house. The opportunity for search was thus hardly 'fleeting.' The objects that the police are assumed to have had probable cause to search for in the car were neither stolen nor contraband nor dangerous.

[12]     When the police arrived at the Coolidge house to arrest him, two officers were sent to guard the back door while the main party approached from the front. Coolidge was arrested inside the house, without resistance of any kind on his part, after he had voluntarily admitted the officers at both front and back doors. There was no way in which he could conceivably have gained access to the automobile after the police arrived on his property. When Coolidge had been taken away, the police informed Mrs. Coolidge, the only other adult occupant of the *461 house, that she and her bady had to spend the night elsewhere and that she could not use either of the Coolidge cars. Two police officers then drove her in a police car to the house of a relative in another town, and they stayed with her there until around midnight, long after the police had had the Pontiac towed to the station house. The Coolidge premises were guarded throughout the night by two policemen.[18]

Case 4:08-cv-04373-JSW   Document 310   Filed 12/17/14   Page 48 of 73

18

It is frequently said that occupied automobiles stopped on the open highway may be searched without a warrant because they are 'mobile,' or 'movable.' No other basis appears for Mr. Justice WHITE's suggestion in his dissenting opinion that we should 'treat searches of automobiles as we do the arrest of a person.' Post, at 2068. In this case, it is, of course, true that even though Coolidge was in jail, his wife was miles away in the company of two plainclothesmen, and the Coolidge property was under the guard of two other officers, the automobile was in a literal sense 'mobile.' A person who had the keys and could slip by the guard could drive it away. We attach no constitutional significance to this sort of mobility.

First, a good number of the containers that the police might discover on a person's property and want to search are equally movable, e.g., trunks, suitcases, boxes, briefcases, and bags. How are such objects to be distinguished from an unoccupied automobile—not then being used for any illegal purpose—sitting on the owner's property? It is true that the automobile has wheels and its own locomotive power. But given the virtually universal availability of automobiles in our society there is little difference between driving the container itself away and driving it away in a vehicle brought to the scene for that purpose. Of course, if there is a criminal suspect close enough to the automobile so that he might get a weapon from it or destroy evidence within it, the police may make a search of appropriately limited scope. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. See II-A of the text, supra. But if Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, permits a warrantless search of an unoccupied vehicle, on private property and beyond the scope of a valid search incident to an arrest, then it would permit as well a warrantless search of a suitcase or a box. We have found no case that suggests such an extension of Carroll. See nn. 16, 17, supra.

[13]    The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears. *462  And surely there is nothing in this case to invoke the meaning and purpose of the rule of Carroll v. United States —no **2036  alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized autobile. In short, by no possible stretch of the legal imagination can this be made into a case where 'it is not practicable to secure a warrant,' Carroll, supra, at 153, 45 S.Ct., at 285,

and the 'automobile exception,' despite its label, is simply irrelevant. [19]

19

Cf. United States v. Payne, 429 F.2d 169 (CA 9 1970). In that case, two couples were camping in an individually allotted campsite in Yosemite National Park. During the evening, an off-duty policeman camping with his family in an adjoining site observed the two couples smoking a substance he believed to be marihuana and also observed them making what he thought 'furtive' movements to remove objects he thought to be drugs from the glove compartment of a car parked nearby. He summoned a park ranger, and the two entered the campsite. They found that one of the couples was preparing to bed down for the night, while the couple to whom the car belonged were visiting in another campsite. The officers searched the unoccupied parked automobile, found 12 Seconal capsules, and arrested the couple who had stayed behind. The Government attempted to uphold the search under Carroll, supra, and Brinegar, supra. The Court of Appeals answered: 'While it is true that the Supreme Court has enunciated slightly different rules concerning a search of an automobile without a warrant, the rationale is apparently based upon the fact that a 'vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' Chimel v. California, 395 U.S. 752, 764, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). In the instant case the search of the Volkswagen cannot be justified upon this reasoning. There is no indication in the record that the appellant or any of his party were preparing to leave, and quite to the contrary it is clear that appellant was bedding down for the evening and that there was ample time to secure the necessary warrant for the search of the car had (the Park Ranger) believed there was probable cause to seek one.' 429 F.2d, at 171—172.

*463  Since Carroll would not have justified a warrantless search of the Pontiac at the time Coolidge was arrested, the later search at the station house was plainly illegal, at least so far as the automobile exception is concerned. Chambers, supra, is of no help to the State, since that case held only that, where the police may stop and search an automobile under Carroll, they may also seize it and search it later at the police station. [20] Rather,  **2037  this case is controlled by Dyke v. Taylor Implement Mfg. Co., supra. There the police lacked probable cause to seize or search the defendant's automobile at the time of his  *464  arrest, and this was enough by itself to condemn the subsequent search at the station house. Here there was probable cause, but no exigent circumstances justified the police in proceeding without a

warrant. As in Dyke, the later search at the station house was therefore illegal. [21]

[20]

Part III-B of the concurring and dissenting opinion of Mr. Justice BLACK argues with vehemence that this case must somehow be controlled by Chambers v. Maroney 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, yet the precise applicability of Chambers is never made clear. On its face, Chambers purports to deal only with situations in which the police may legitimately make a warrantless search under Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. Since the Carroll rule does not apply in the circumstances of this case, the police could not have searched the car without a warrant when they arrested Coolidge. Thus Mr. Justice BLACK's argument must be that Chambers somehow operated sub silentio to extend the basic doctrine of Carroll. It is true that the actual search of the automobile in Chambers was made at the police station many hours after the car had been stopped on the highway, when the car was no longer movable, any 'exigent circumstances' had passed, and, for all the record shows, there was a magistrate easily available. Nonetheless, the analogy to this case is misleading. The rationale of Chambers is that given a justified initial intrusion, there is little difference between a search on the open highway and a later search at the station. Here, we deal with the prior question of whether the initial intrusion is justified. For this purpose, it seems abundantly clear that there is a significant constitutional difference between stopping, seizing, and searching a car on the open highway, and entering private property to seize and search an unoccupied, parked vehicle not then being used for any illegal purpose. That the police may have been legally on the property in order to arrest Coolidge is, of course, immaterial, since, as shown in II-A of the text, supra, that purpose could not authorize search of the car even under United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653.

[21]

Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730, is no more in point here than in the context of a search incident to a lawful arrest. See n. 12, supra. In Cooper, the seizure of the petitioner's car was mandated by California statute, and its legality was not questioned. The case stands for the proposition that, given an unquestionably legal seizure, there are special circumstances that may validate a subsequent warrantless search. Cf. Chambers, supra. The case certainly should not be read as holding that the police can do without a warrant at the police station what they are forbidden to do without a warrant at the place of seizure.

**C**

The State's third theory in support of the warrantless seizure and search of the Pontiac car is that the car itself was an 'instrumentality of the crime,' and as such might be seized by the police on Coolidge's property because it was in plain view. Supposing the seizure to be thus lawful, the case of Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730, is said to support a subsequent warrantless search at the station house, with or without probable cause. Of course, the distinction between an 'instrumentality of crime' and 'mere evidence' was done away with by Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, and we may assume that the police had probable cause to seize the automobile. [22] But, for the reasons that follow, we hold that the 'plain view' exception to the warrant requirement is inapplicable to this case. Since the seizure was therefore **\*465** illegal, it is unnecessary to consider the applicability of Cooper, supra, to the subsequent search. [23]

[22]

Coolidge had admitted that on the night of Pamela Mason's disappearance he had stopped his Pontiac on the side of the highway opposite the place where the body was found. He claimed the car was stuck in the snow. Two witnesses, who had stopped and asked him if he needed help, testified that his car was not stuck.

[23]

See nn. 12 and 21, supra.

 **[14]**   It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, any evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

 **[15]**    **[16]**    An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character. Cf. Go-Bart Importing Co. v. United States, 282 U.S. 344, 358, 51 S.Ct. 153, 158, 75 L.Ed. 374; United States v. Lefkowitz, 285 U.S. 452, 465, 52 S.Ct. 420, 423, 76 L.Ed. 877; Steele v. United States, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757; Stanley v. Georgia, 394 U.S. 557, 571, 89 S.Ct. 1243, 1251, 22 L.Ed.2d 542 (Stewart, J., concurring in result). Where the initial intrusion that brings the police within plain view of such an article is supported,

not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in 'hot pursuit' of a fleeing suspect. *Warden v. Hayden, supra;* cf. *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898. And an object that comes into view during a search incident **\*\*2038** to arrest that is appropriately limited in scope under existing law may be seized without a warrant. [24] **\*466** *Chimel v. California,* 395 U.S., at 762—763, 89 S.Ct., at 2039—2040. Finally, the 'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object. *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067; *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684; *Ker v. California,* 374 U.S., at 43, 83 S.Ct., at 1635. Cf. *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312.

[24] The 'plain view' exception to the warrant requirement is not in conflict with the law of search incident to a valid arrest expressed in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. The Court there held that '(t)here is ample justification * * * for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' *Id.,* at 763, 89 S.Ct., at 2040. The 'plain view' doctrine would normally justify as well the seizure of other evidence that came to light during such an appropriately limited search. The Court in *Chimel* went on to hold that '(t)here is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant.' *Ibid.* Where, however, the arresting officer inadvertently comes within plain view of a piece of evidence, not concealed, although outside of the area under the immediate control of the arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee.

[17] [18] What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plan view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges. **\*467** Cf. *Stanley v. Georgia, supra,* at 571—572, 89 S.Ct., at 1251 (Stewart, J., concurring in result).

[19] [20] [21] [22] The rationale for the 'plain view' exception is evident if we keep in mind the two distinct constitutional protections served by the warrant requirement. First, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause. The premise here is that any intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity. See, e.g., *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 83 L.Ed. 153; *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782; *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576; *Chimel v. California,* 395 U.S., at 761—762, 89 S.Ct., at 2039. The second, distinct objective is that those searches deemed necessary should be as limited as possible. Here, the specific evil is the 'general warrant' abhorred by the colonists, and the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings. See, e.g., *Boyd v. United States,* 116 U.S., at 624—630, 6 S.Ct., at 528—532; *Marron v. United States,* 275 U.S. 192, 195—196, 48 S.Ct. 74, 75—76, 72 L.Ed. 231; *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431. The warrant accomplishes **\*\*2039** this second objective by requiring a 'particular description' of the things to be seized.

The 'plain view' doctrine is not in conflict with the first objective because plain view does not occur until a search is in progress. In each case, this initial intrusion is justified by a warrant or by an exception such as 'hot pursuit' or search incident to a lawful arrest, or by an extraneous valid reason for the officer's presence. And, given the initial intrusion, the seizure of an object in plain view is consistent with the second objective, since it does not convert the search into a general or exploratory one. As against the minor peril to Fourth Amendment protections, there is a major gain in effective law enforcement. Where, once an otherwise lawful search is in progress, the police inadvertently come upon **\*468** a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous—to the evidence or

to the police themselves—to require them to ignore it until they have obtained a warrant particularly describing it.

**[23]** **[24]** **[25]** The limits on the doctrine are implicit in the statement of its rationale. The first of these is that plain view alone is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure. Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153; Jones v. United States, 357 U.S. 493, 497—498, 78 S.Ct. 1253, 1256—1257, 2 L.Ed.2d 1514; Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828; Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663. [25]

25    Trupiano v. United States, supra, applied the principle in circumstances somewhat similar to those here. Federal law enforcement officers had infiltrated an agent into a group engaged in manufacturing illegal liquor. The agent had given them the fullest possible description of the layout and equipment of the illegal distillery. Although they had ample opportunity to do so, the investigators failed to procure search or arrest warrants. Instead, they staged a warrantless nighttime raid on the premises. After entering the property, one of the officers looked through the doorway of a shed, and saw one of the criminals standing beside an illegal distillery. The officer entered, made a legal arrest, and seized the still. This Court held it inadmissible at trial, rejecting the Government's argument based on 'the long line of cases recognizing that an arresting officer may look around at the time of the arrest and seize those fruits and evidences of crime or those contraband articles which are in plain sight and in his immediate and discernible presence.' 334 U.S., at 704, 68 S.Ct., at 1232. The Court reasoned that there was no excuse whatever for the failure of the agents to obtain a warrant before entering the property, and that the mere fact that a suspect was arrested in the proximity of the still provided no 'exigent circumstance' to validate a warrantless seizure. The scope of the intrusion permitted to make the valid arrest did not include a warrantless search for and seizure of a still whose exact location and illegal use were known well in advance. The fact that at the time of the arrest the still was in plain view

and nearby was therefore irrelevant. The agents were in exactly the same position as the policemen in Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951, who had unmistakable evidence of sight and smell that contraband liquor was stored in a garage, but nonetheless violated the Fourth Amendment when they entered and seized it without a warrant.

trupiano, to be sure, did not long remain undisturbed. The extremely restrictive view taken there of the allowable extent of a search and seizure incident to lawful arrest was rejected in United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. See Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. The case demonstrates, however, the operation of the general principle that 'plain view' alone can never justify a warrantless seizure. Cf. n. 24, supra.

**\*\*2040** **\*469** **[26]** **[27]** The second limitation is that the discovery of evidence in plain view must be inadvertent. [26] The rationale of the exception to the warrant requirement, as just stated, **\*470** is that a plain-view seizure will not turn an initially valid (and therefore limited) search into a 'general' one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'per se **\*471** unreasonable' in the absence of 'exigent circumstances.'

26    None of the cases cited in Part III-C of the concurring and dissenting opinion of Mr. Justice BLACK casts any doubt upon this conclusion. In Steele v. United States, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757, agents observed cases marked 'Whiskey' being taken into a building from a truck. On this basis, they obtained a warrant to search the premises for contraband liquor. In the course of the search, they came upon a great deal of whiskey and gin—not that they had seen unloaded—and various bottling equipment, and seized all they found.
In Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, the police entered and searched a house in hot pursuit of a fleeing armed robber. The Court pointed out that '(s)peed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.' 387 U.S., at 299, 87 S.Ct., at 1646. The Court then established with painstaking care that the various articles of clothing

seized were discovered during a search directed at the robber and his weapons. Id., at 299—300, 87 S.Ct., at 1646—1647.

In United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202, a Coast Guard patrol approached a boat on the high seas at night. A searchlight was turned on the boat and revealed cases of contraband. The liquor subsequently seized was never introduced in evidence, but the seizing officers were allowed to testify to what they had seen. As the Court put it: 'A later trespass by the officers, if any, did not render inadmissible in evidence knowledge legally obtained.' 274 U.S., at 563, 47 S.Ct., at 748.

In Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231, officers raided a speakeasy with a warrant to search for and seize contraband liquor. They arrested the bartender and seized a number of bills and other papers in plain view on the bar. While searching a closet for liquor they came across a ledger kept in the operation of the illegal business, which they also seized. There is no showing whatever that these seizures outside the warrant were planned in advance. The Marron Court upheld them as 'incident' to the arrest. The 'plain view' aspect of the case was later emphasized in order to avoid the implication that arresting officers are entitled to make an exploratory search of the premises where the arrest occurs. See Go-Bart Importing Co. v. United States, 282 U.S., at 358, 51 S.Ct., at 158; United States v. Lefkowitz, 285 U.S. 452, 465, 52 S.Ct. 420, 423, 76 L.Ed. 877; United States v. Rabinowitz, 339 U.S., at 78, 70 S.Ct., at 440 (Frankfurter, J., dissenting). Thus Marron, like Steele, Warden, supra, and Lee, supra, can hardly be cited for the proposition that the police may justify a planned warrantless seizure by maneuvering themselves within 'plain view' of the object they want.

Finally, Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, is fully discussed in n. 28, infra.

 **[28]**  If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirement of 'Warrants * * * particularly describing * * * (the) things to be seized.' The initial intrusion may, of course, be legitimated not by a warrant but by one  **\*\*2041**  of the exceptions to the warrant requirement, such as hot pursuit or search incident to lawful arrest. But to extend the scope of such an intrusion to the seizure of objects—not contraband nor stolen nor dangerous in themselves—which the police know in advance they will find in plain view and intend to seize, would fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure. [27]

27    Mr. Justice BLACK laments that the Court today 'abolishes seizure incident to arrest' (but see n. 24, supra), while Mr. Justice WHITE no less forcefully asserts that the Court's 'new rule' will 'accomplish nothing.' In assessing these claims, it is well to keep in mind that we deal here with a planned warrantless seizure. This Court has never permitted the legitimation of a planned warrantless seizure on plain-view grounds, see n. 26, supra, and to do so here would be flatly inconsistent with the existing body of Fourth Amendment law. A long line of cases, of which those cited in the text, at n. 25, supra, are only a sample, make it clear beyond doubt that the mere fact that the police have legitimately obtained a plain view of a piece of incriminating evidence is not enough to justify a warrantless seizure. Although Mr. Justice BLACK and Mr. Justice WHITE appear to hold contrasting views of the import of today's decision, they are in agreement that this warrant requirement should be ignored whenever the seizing officers are able to arrange to make an arrest within sight of the object they are after. 'The exceptions cannot be enthroned into the rule.' United States v. Rabinowitz, 339 U.S., at 80, 70 S.Ct., at 441 (Frankfurter, J., dissenting). We recognized the dangers of allowing the extent of Fourth Amendment protections to turn on the location of the arrestee in Chimel v. California, 395 U.S., at 767, 89 S.Ct., at 2042, noting that under the law of search incident to arrest as enunciated prior to Chimel, 'law enforcement officials (had) the opportunity to engage in searches not justified by probable cause, by the simple expedient of arranging to arrest suspects at home rather than elsewhere.' Cf. Trupiano v. United States, supra, n. 25, where the Court held:

'As we have seen, the existence of (the illegal still) and the desirability of seizing it were known to the agents long before the seizure and formed one of the main purposes of the raid. Likewise, the arrest of Antoniole (the person found in the shed with the still) * * * was a foreseeable event motivating the raid. But the precise location of the petitioners at the time of their arrest had no relation to the foreseeability or necessity of the seizure. The practicability of obtaining a search warrant did not turn upon whether Antoniole and the others were within the distillery building when arrested or upon whether they were then engaged in operating the illicit equipment. * * * Antoniole might well have been outside the building at that particular time. If that had been the case and he had been arrested in the farmyard, the entire argument advanced by the Government in support of the seizure without warrant would collapse. We do not believe that the applicability of the Fourth Amendment to the facts

of this case depends upon such a fortuitous factor as the precise location of Antoniole at the time of the raid.' 334 U.S., at 707—708, 68 S.Ct., at 1233. (Emphasis supplied.)

**\*472** **[29]**  In the light of what has been said, it is apparent that the 'plain view' exception cannot justify the police seizure of the Pontiac car in this case. The police had ample opportunity to obtain a valid warrant; they knew the automobile's exact description and location well in advance; they intended to seize it when they came upon Coolidge's property. And this is not a case involving contraband or stolen goods or objects dangerous in themselves. [28]

[28]  Ker v. California, 374 U.S., 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, is not to the contrary. In that case, the police had probable cause to enter Ker's apartment and arrest him, and they made an entry for that purpose. They did not have a search warrant, but the Court held that 'time * * *' was of the essence,' so that a warrant was unnecessary. As the police entered the living room, Ker's wife emerged from the adjacent kitchen. One of the officers moved to the door of the kitchen, looked in, and observed a brick of marihuana in plain view on a table. The officer brought Ker and his wife into the kitchen, questioned them, and, when they failed to explain the marihuana, arrested them, and seized the contraband. The police then searched the whole apartment and found various other incriminating evidence. The Court held that the general exploratory search of the whole apartment 'was well within the limits upheld in Harris v. United States (331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399)' for a search incident to a lawful arrest. The Court also rejected Ker's claim that the seizure of the brick of marihuana in the kitchen was illegal because the police had 'searched' for it (by going to the door of the kitchen and looking in) before making any arrest. The Court reasoned that when Mrs. Ker emerged from the kitchen it was reasonable for the officer to go to the door and look in, and that when he saw the brick of marihuana he was not engaged in any 'search' at all. Once he had arrested the Kers, the actual seizure of the brick was lawful because 'incident' to the arrest. 374 U.S., at 42—43, 83 S.Ct., at 1634—1635.
Ker is distinguishable from the present case on at least the following grounds: in Ker, the Court found that 'the officers entered the apartment for the purpose of arresting George Ker,' rather than for purposes of seizure or search, 374 U.S., at 42—43, 83 S.Ct., at 1634—1635; exigent circumstances justified the failure to obtain a search warrant; the discovery of the brick of marihuana was fortuitous; the marihuana was contraband easily destroyed; and it was in the immediate proximity of the

Kers at the moment of their arrest so that the seizure was unquestionably lawful under the search-incident law of the time, and might be lawful under the more restrictive standard of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. Not one of these elements was present in the case before us.

**\*\*2042** **\*473** **[30]**  The seizure was therefore unconstitutional, and so was the subsequent search at the station house. Since evidence obtained in the course of the search was admitted at Coolidge's trial, the judgment must be reversed and the case remanded to the New Hampshire Supreme Court. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

### D

In his dissenting opinion today, Mr. Justice WHITE marshals the arguments that can be made against our interpretation of the 'automobile' and 'plain view' exceptions to the warrant requirement. Beyond the **\*474** unstartling proposition that when a line is drawn there is often not a great deal of difference between the situations closest to it on either side, there is a single theme that runs through what he has to say about the two exceptions. Since that theme is a recurring one in controversies over the proper meaning and scope of the Fourth Amendment, it seems appropriate to treat his views in this separate section, rather than piecemeal.

Much the most important part of the conflict that has been so notable in this Court's attempts over a hundred years to develop a coherent body of Fourth Amendment law has been caused by disagreement over the importance of requiring law enforcement officers to secure warrants. Some have argued that a determination by a magistrate of probable cause as a precondition of any search or seizure is so essential that the Fourth Amendment is violated whenever the police might reasonably have obtained a warrant but failed to do so. Others have argued with equal force that a test of reasonableness, applied after the fact of search or seizure when the police attempt to introduce the fruits in evidence, affords ample safeguard for the rights in question, so that '(t)he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' [29]

[29]  United States v. Rabinowitz, supra, at 66, 70 S.C., at 435.

Both sides to the controversy appear to recognize a distinction between searches and seizures that take place on a man's property—his home or office—and those carried

out elsewhere. It is accepted, at least as a matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the **\*475** presence of 'exigent circumstances.' [30] As to other kinds of intrusions, however, there has been disagreement about the basic rules to be applied, as **\*\*2043** our cases concerning automobile searches, electronic surveillance, street searches and administrative searches make clear. [31]

[30]   See the cases cited in nn. 5—8, supra, and in the text at n. 25, supra.

[31]   See Carroll v. United States, supra, and cases discussed in Part II—B above (automobiles); Katz v. United States, supra (electronic surveillance); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 889; Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1912, 20 L.Ed.2d 917 (street searches); Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930; See v. Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (administrative searches).

With respect to searches and seizures carried out on a suspect's premises, the conflict has been over the question of what qualifies as an 'exigent circumstance.' It might appear that the difficult inquiry would be when it is that the police can enter upon a person's property to seize his 'person * * * papers, and effects,' without prior judicial approval. The question of the scope of search and seizure once the police are on the premises would appear to be subsidiary to the basic issue of when intrusion is permissible. But the law has not developed in this fashion.

The most common situation in which Fourth Amendment issues have arisen has been that in which the police enter the suspect's premises, arrest him, and then carry out a warrantless search and seizure of evidence. Where there is a warrant for the suspect's arrest, the evidence seized may later be challenged either on the ground that the warrant was improperly issued because there was not probable cause, [32] or on the ground that the police search and seizure went beyond that which they could carry out as an incident to the execution of the arrest warrant. [33] Where the police act without an **\*476** arrest warrant, the suspect may argue that an arrest warrant was necessary, that there was no probable cause to arrest, [34] or that even if the arrest was valid, the search and seizure went beyond permissible limits. [35] Perhaps because each of these lines of attack offers a plethora of litigable issues, the more fundamental question of when

the police may arrest a man in his house without a warrant has been little considered in the federal courts. This Court has chosen on a number of occasions to assume the validity of an arrest and decide the case before it on the issue of the scope of permissible warrantless search. E.g., Chimel v. California, supra. The more common inquiry has therefore been: 'Assuming a valid police entry for purposes of arrest, what searches and seizures may the police carry out without prior authorization by a magistrate?'

[32]   E.g., Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503.

[33]   E.g., Marron v. United States, supra; United States v. Rabinowitz, supra.

[34]   E.g., Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

[35]   E.g., Trupiano v. United States, supra; Warden v. Hayden, supra; Ker v. California, supra.

Two very broad, and sharply contrasting answers to this question have been assayed by this Court in the past. The answer of Trupiano v. United States, supra, was that no searches and seizures could be legitimated by the mere fact of valid entry for purposes of arrest, so long as there was no showing of special difficulties in obtaining a warrant for search and seizure. The contrasting answer in Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399, and United States v. Rabinowitz, supra, was that a valid entry for purposes of arrest served to legitimate warrantless searches and seizure throughout the premises where the arrest occurred, however spacious those premises might be.

The approach taken in Harris and Rabinowitz was open to the criticism that it made it so easy for the police to arrange to search a man's premises without a warrant **\*477** that the Constitution's protection of a man's 'effects' became a dead letter. The approach taken in Trupiano, on the other hand, was open to the criticism that it was absurd to permit the police to make an entry in the dead of night for purposes of seizing the 'person' by main force, and then refuse them permission to seize objects lying **\*\*2044** around in plain sight. It is arguable that if the very substantial intrusion implied in the entry and arrest are 'reasonable' in Fourth Amendment terms, then the less intrusive search incident to arrest must also be reasonable.

This argument against the Trupiano approach is of little force so long as it is assumed that the police must, in the absence of one of a number of defined exceptions based on 'exigent

circumstances,' obtain an arrest warrant before entering a man's house to seize his person. If the Fourth Amendment requires a warrant to enter and seize the person, then it makes sense as well to require a warrant to seize other items that may be on the premises. The situation is different, however, if the police are under no circumstances required to obtain an arrest warrant before entering to arrest a person they have probable cause to believe has committed a felony. If no warrant is ever required to legitimate the extremely serious intrusion of a midnight entry to seize the person, then it can be argued plausibly that a warrant should never be required to legitimate a very sweeping search incident to such an entry and arrest. If the arrest without a warrant is per se reasonable under the Fourth Amendment, then it is difficult to perceive way a search incident in the style of Harris and Rabinowitz is not per se reasonable as well.

It is clear, then, that the notion that the warrantless entry of a man's house in order to arrest him on probable cause is per se legitimate is in fundamental conflict with the basic principle of Fourth Amendment law that **\*478** searches and seizures inside a man's house without warrant are per se unreasonable in the absence of some one of a number of well defined 'exigent circumstances.' This conflict came to the fore in Chimel v. California, supra. The Court there applied the basic rule that the 'search incident to arrest' is an exception to the warrant requirement and that its scope must therefore be strictly defined in terms of the justifying 'exigent circumstances.' The exigency in question arises from the dangers of harm to the arresting officer and of destruction of evidence within the reach of the arrestee. Neither exigency can conceivably justify the far-ranging searches authorized under Harris and Rabinowitz. The answer of the dissenting opinion of Mr. Justice White in Chimel, supported by no decision of this Court, was that a warrantless entry for the purpose of arrest on probable cause is legitimate and reasonable no matter what the circumstances. 395 U.S., at 776—780, 89 S.Ct., at 2047—2049. From this it was said to follow that the full-scale search incident to arrest was also reasonable since it was a lesser intrusion. 395 U.S., at 772—775, 89 S.Ct., at 2045—2047.

**[31]** The same conflict arises in this case. Since the police knew of the presence of the automobile and planned all along to seize it, there was no 'exigent circumstance' to justify their failure to obtain a warrant. The application of the basic rule of Fourth Amendment law therefore requires that the fruits of the warrantless seizure be suppressed. Mr. Justice WHITE's dissenting opinion, however, argues once again that so long as the police could reasonably make a warrantless nighttime entry onto Coolidge's property in order to arrest him, with no

showing at all of an emergency, then it is absurd to prevent them from seizing his automobile as evidence of the crime.

Mr. Justice WHITE takes a basically similar approach to the question whether the search of the automobile in **\*479** this case can be justified under Carroll v. United States, supra, and Chambers v. Maroney, supra. Carroll, on its face, appears to be a classic example of the doctrine that warrantless searches are per se unreasonable in the absence of exigent circumstances. Every word in the opinion indicates the Court's adherence to the underlying rule and its care in delineating a limited exception. Read thus, the case quite evidently does not extend to the situation at bar. Yet if we take the viewpoint of a judge called on only to decide **\*\*2045** in the abstract, after the fact, whether the police have behaved 'reasonably' under all the circumstances—in short if we simply ignore the warrant requirement—Carroll comes to stand for something more. The stopping of a vehicle on the open highway and a subsequent search amount to a major interference in the lives of the occupants. Carroll held such an interference to be reasonable without a warrant, given probable cause. It may be thought to follow a fortiori that the seizure and search here—where there was no stopping and the vehicle was unoccupied—were also reasonable, since the intrusion was less substantial, although there were no exigent circumstances whatever. Using reasoning of this sort, it is but a short step to the position that it is never necessary for the police to obtain a warrant before searching and seizing an automobile, provided that they have probable cause. And Mr. Justice WHITE appears to adopt exactly this view when he proposes that the Court should 'treat searches of automobiles as we do the arrest of a person.'

If we were to accept Mr. Justice WHITE's view that warrantless entry for purposes of arrest and warrantless seizure and search of automobiles are per se reasonable, so long as the police have probable cause, it would be difficult to see the basis for distinguishing searches of houses and seizures of effects. If it is reasonable for the police to make a warrantless nighttime entry for the purpose **\*480** of arresting a person in his bed, then surely it must be reasonable as well to make a warrantless entry to search for and seize vital evidence of a serious crime. If the police may, without a warrant, seize and search an unoccupied vehicle parked on the owner's private property, not being used for any illegal purpose, then it is hard to see why they need a warrant to seize and search a suitcase, a trunk, a shopping bag, or any other portable container in a house, garage, or back yard.

The fundamental objection, then, to the line of argument adopted by Mr. Justice WHITE in his dissent in this case and in Chimel v. California, supra, is that it proves too much. If we were to agree with Mr. Justice WHITE that the police may, whenever they have probable cause, make a warrantless entry for the purpose a making an arrest, and that seizures and searches of automobiles are likewise per se reasonable given probable cause, then by the same logic any search or seizure could be carried out without a warrant, and we would simply have read the Fourth Amendment out of the Constitution. Indeed, if Mr. Justice WHITE is correct that it has generally been assumed that the Fourth Amendment is not violated by the warrantless entry of a man's house for purposes of arrest, it might be wise to re-examine the assumption. Such a re-examination 'would confront us with a grave constitutional question, namely, whether the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment.' Jones v. United States, 357 U.S., at 499—500, 78 S.Ct., at 1257.

None of the cases cited by Mr. Justice WHITE disposes of this 'grave constitutional question.' The case of Warden v. Hayden, supra, where the Court elaborated **\*481** a 'hot pursuit' justification for the police entry into the defendant's house without a warrant for his arrest, certainly stands by negative implication for the proposition that an arrest warrant is required in the absence of exigent circumstances. See also Davis v. Mississippi, 394 U.S. 721, 728, 89 S.Ct. 1394, 1398, 22 L.Ed.2d 676; Wong Sun v. United States, 371 U.S., at 481—482, 83 S.Ct., at 413—415. The Court of Appeals for the District of Columbia Circuit, sitting en banc, has unanimously reached the **\*\*2046** same conclusion.[36] But we find it unnecessary to decide the question in this case. The rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions,'[37] is not so frail that its continuing vitality depends on the fate of a supposed doctrine of warrantless arrest. The warrant requirement has been a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases in courts all over this country. It is not an inconvenience to be somehow 'weighed' against the claims of police efficiency. It is, or should be, an important working part of our machinery

of government, operating as a matter of course to check the 'well-intentioned but mistakenly over-zealous, executive officers'[38] who are a part of any system of law enforcement. If it is to be a true guide to constitutional police action, rather than just a pious phrase, then '(t)he exceptions cannot be enthroned into the rule.' United States v. Rabinowitz, supra, at 80, 70 S.Ct., at 441 (Frankfurter, J., dissenting). The confinement of the exceptions to their appropriate scope was the function of Chimel v. California, supra, where we dealt with the **\*482** assumption that a search 'incident' to a lawful arrest may encompass all of the premises where the arrest occurs, however spacious. The 'plain view' exception is intimately linked with the search-incident exception, as the cases discussed in Part C above have repeatedly shown. To permit warrantless plain-view seizures without limit would be to undo much of what was decided in Chimel, as the similar arguments put forward in dissent in the two cases indicate clearly enough.

36    Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970).

37    Katz v. United States, supra, at 357, 88 S.Ct., at 514.

38    Gouled v. United States, 255 U.S., at 304, 41 S.Ct., at 263.

**[32]** Finally, a word about Trupiano v. United States, supra. Our discussion of 'plain view' in Part C above corresponds with that given in Trupiano. Here, as in Trupiano, the determining factors are advance police knowledge of the existence and location of the evidence, police intention to seize it, and the ample opportunity for obtaining a warrant. See 334 U.S., at 707—708, 68 S.Ct., at 1233—1234 and n. 27, supra. However, we do not 'reinstate' Trupiano, since we cannot adopt all its implications. To begin with, in Chimel v. California, supra, we held that a search of the person of an arrestee and of the area under his immediate control could be carried out without a warrant. We did not indicate there, and do not suggest here, that the police must obtain a warrant if they anticipate that they will find specific evidence during the course of such a search. See n. 24, supra. And as to the automobile exception, we do not question the decisions of the Court in Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, and Chambers v. Maroney, supra, although both are arguably inconsistent with Trupiano.

Mr. Justice WHITE's dissent characterizes the coexistence of Chimel, Cooper, Chambers, and this case as 'punitive,' 'extravagant,' 'inconsistent,' 'without apparent reason,' 'unexplained,' and 'inexplicable.' Post, at 2063—2065. It is

urged upon us that we have here a 'ready opportunity, one way or another, **\*483** to bring clarity and certainty to a body of law that lower courts and law enforcement officials often find confusing.' Post, at 2065. Presumably one of the ways in which Mr. Justice WHITE believes we might achieve clarity and certainty would be the adoption of his proposal that we treat entry for purposes of arrest and seizure of an automobile alike as per se reasonable on probable cause. Such an approach might dispose of this case clearly and certainly enough, but, as we have tried to show above, it would cast into limbo the whole notion of a Fourth Amendment warrant **\*\*2047** requirement. And it is difficult to take seriously Mr. Justice WHITE's alternative suggestion that clarity and certainty, as well as coherence and credibility, might also be achieved by modifying Chimel and overruling Chambers and Cooper. Surely, quite apart from his strong disagreement on the merits, he would take vehement exception to any such cavalier treatment of this Court's decisions.

[33]    Of course, it would be nonsense to pretend that our decision today reduces Fourth Amendment law to complete order and harmony. The decisions of the Court over the years point in differing directions and differ in emphasis. No trick of logic will make them all perfectly consistent. But it is no less nonsense to suggest, as does Mr. Justice WHITE, post, at 2065, that we cease today 'to strive for clarity and consistency of analysis,' or that we have 'abandoned any attempt' to find reasoned distinctions in this area. The time is long past when men believed that development of the law must always proceed by the smooth incorporation of new situations into a single coherent analytical framework. We need accept neither the 'clarity and certainty' of a Fourth Amendment without a warrant requirement nor the facile consistency obtained by wholesale overruling of recently decided cases. A remark by **\*484** Mr. Justice Harlan concerning the Fifth Amendment is applicable as well to the Fourth:

'There are those, I suppose, who would put the 'liberal construction' approach of cases like Miranda (v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694,) and Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), side-by-side with the balancing approach of Schmerber (v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908,) and perceive nothing more subtle than a set of constructional antinomies to be utilized as convenient bootstraps to one result or another. But I perceive in these cases the essential tension that springs from the uncertain mandate which this provision of the Constitution gives to this Court.' California v. Byers, 402 U.S. 449—450, 91 S.Ct. 1535, 1548, 29 L.Ed.2d 9 (concurring in judgment).

We are convinced that the result reached in this case is correct, and that the principle it reflects—that the police must obtain a warrant when they intend to seize an object outside the scope of a valid search incident to arrest—can be easily understood and applied by courts and law enforcement officers alike. It is a principle that should work to protect the citizen without overburdening the police, and a principle that preserves and protects the guarantees of the Fourth Amendment.

### III

Because of the prospect of a new trial, the efficient administration of justice counsels consideration of the second substantial question under the Fourth and Fourteenth Amendments presented by this case. The petitioner contends that when the police obtained a rifle and articles of his clothing from his home on the night of Sunday, February 2, 1964, while he was being interrogated at the police station, they engaged in a search and seizure violative of the Constitution. In order to **\*485** understand this contention, it is necessary to review in some detail the circumstances of the February 2 episode.

### A

The lie-detector test administered to Coolidge in Concord on the afternoon of the 2d was inconclusive as to his activities on the night of Pamela Mason's disappearance, but during the course of the test Coolidge confessed to stealing $375 from his employer. After the group returned from Concord to Manchester, the interrogation about Coolidge's movements on the night of the disappearance continued, and Coolidge apparently made a number of statements which the police immediately checked out as best they could. The decision to send two officers to the Coolidge house to speak with Mrs. Coolidge was apparently motivated in **\*\*2048** part by a desire to check his story against whatever she might say, and in part by the need for some corroboration of his admission to the theft from his employer. The trial judge found as a fact, and the record supports him, that at the time of the visit the police knew very little about the weapon that had killed Pamela Mason. The bullet that had been retrieved was of small caliber, but the police were unsure whether the weapon was a rifle or a pistol. During the extensive investigation following the discovery of the body, the police had made it a practice to ask all those questioned whether they owned any guns, and to ask the owners for permission

to run tests on those that met the very general description of the murder weapon. The trial judge found as a fact that when the police visited Mrs. Coolidge on the night of the 2d, they were unaware of the previous visit during which Coolidge had shown other officers three guns, and that they were not motivated by a desire to find the murder weapon.

**\*486** The two plainclothesmen asked Mrs. Coolidge whether her husband had been at home on the night of the murder victim's disappearance, and she replied that he had not. They then asked her if her husband owned any guns. According to her testimony at the pretrial suppression hearing, she replied, 'Yes, I will get them in the bedroom.' One of the officers replied, 'We will come with you.' The three went into the bedroom where Mrs. Coolidge took all four guns out of the closet. Her account continued:

'A. I believe I asked if they wanted the guns. One gentleman said, 'No;' then the other gentleman turned around and said, 'We might as well take them.' I said, 'If you would like them, you may take them.'

'Q. Did you go further and say, 'We have nothing to hide.'?

'A. I can't recall if I said that then or before. I don't recall.

'Q. But at some time you indicated to them that as far as you were concerned you had nothing to hide, and they might take what they wanted?

'A. That was it.

'Q. Did you feel at that time that you had something to hide?

'A. No.'

The two policemen also asked Mrs. Coolidge what her husband had been wearing on the night of the disappearance. She then produced four pairs of trousers and indicated that her husband had probably worn either of two of them that evening. She also brought out a hunting jacket. The police gave her a receipt for the guns and the clothing, and, after a search of the Coolidge cars not here in issue, took the various articles to the police station.

### \*487 B

The first branch of the petitioner's argument is that when Mrs. Coolidge brought out the guns and clothing and then handed them over to the police, she was acting as an 'instrument'

of the officials, complying with a 'demand' made by them. Consequently, it is argued, Coolidge was the victim of a search and seizure within the constitutional meaning of those terms. Since we cannot accept this interpretation of the facts, we need not consider the petitioner's further argument that Mrs. Coolidge could not or did not 'waive' her husband's constitutional protection against unreasonable searches and seizures.

Had Mrs. Coolidge, wholly on her own initiative, sought out her husband's guns and clothing and then taken them to the police station to be used as evidence against him, there can be no doubt under existing law that the articles would later have been admissible in evidence. Cf. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048. The question presented here is whether the conduct of the police officers at the Coolidge house was such as to make her actions their actions for purposes of the Fourth and Fourteenth Amendments and their **\*\*2049** attendant exclusionary rules. The test, as the petitioner's argument suggests, is whether Mrs. Coolidge, in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the state when she produced her husband's belongings. Cf. United States v. Goldberg, 330 F.2d 30 (CA3), cert. denied, 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964); People v. Tarantino, 45 Cal.2d 590, 290 P.2d 505 (1955); see Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520; Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293.

 **[34]** **[35]** **[36]** In a situation like the one before us there no doubt always exist forces pushing the spouse to cooperate with **\*488** the police. Among these are the simple but often powerful convention of openness and honesty, the fear that secretive behavior will intensify suspicion, and uncertainty as to what course is most likely to be helpful to the absent spouse. But there is nothing constitutionally suspect in the existence, without more, of these incentives to full disclosure or active cooperation with the police. The exclusionary rules were fashioned 'to prevent, not to repair,' and their target is official misconduct. They are 'to compel respect for the constitutional guaranty in the only effectively available way —by removing the incentive to disregard it.' Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669. But it is not part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals. If, then, the exclusionary rule is properly applicable to the evidence taken from the Coolidge house on the night of February 2, it must be upon the basis that some type of unconstitutional police conduct occurred.

Yet it cannot be said that the police should have obtained a warrant for the guns and clothing before they set out to visit Mrs. Coolidge, since they had no intention of rummaging around among Coolidge's effects or of dispossessing him of any of his property. Nor can it be said that they should have obtained Coolidge's permission for a seizure they did not intend to make. There was nothing to compel them to announce to the suspect that they intended to question his wife about his movements on the night of the disappearance or about the theft from his employer. Once Mrs. Coolidge had admitted them, the policemen were surely acting normally and properly when they asked her, as they had asked those questioned earlier in the investigation, including Coolidge himself, about any guns there might be in the house. The question **\*489** concerning the clothes Coolidge had been wearing on the night of the disappearance was logical and in no way coercive. Indeed, one might doubt the competence of the officers involved had they not asked exactly the questions they did ask. And surely when Mrs. Coolidge of her own accord produced the guns and clothes for inspection, rather than simply describing them, it was not incumbent on the police to stop her or avert their eyes.

The crux of the petitioner's argument must be that when Mrs. Coolidge asked the policemen whether they wanted the guns, they should have replied that they could not take them, or have first telephoned Coolidge at the police station and asked his permission to take them, or have asked her whether she had been authorized by her husband to release them. Instead, after one policeman had declined the offer, the other turned and said, 'We might as well take them,' to which Mrs. Coolidge replied, 'If you would like them, you may take them.'

[37]    In assessing the claim that this course of conduct amounted to a search and seizure, it is well to keep in mind that Mrs. Coolidge described her own motive as that of clearing her husband, and that she believed that she had nothing to hide. She had seen her husband himself produce his guns for two other policemen earlier in the week, and there is nothing to indicate that she realized that he had offered only three of them for inspection on that occasion. The **\*\*2050** two officers who questioned her behaved, as her own testimony shows, with perfect courtesy. There is not the slightest implication of an attempt on their part to coerce or dominate her, or, for that matter, to direct her actions by the more subtle techniques of suggestion that are available to officials in circumstances like these. To hold that the conduct of the police here was a search and seizure would be to hold, in effect, that a criminal suspect has constitutional protection

against **\*490** the adverse consequences of a spontaneous, good-faith effort by his wife to clear him of suspicion. [39]

39      Cf. Recent Cases, 79 Harv.L.Rev. 1513, 1519 (1966); Note, Seizures by Private Parties: Exclusion in Criminal Cases, 19 Stan.L.Rev. 608 (1967).

The judgment is reversed and the case is remanded to the Supreme Court of New Hampshire for further proceedings not inconsistent with this opinion.

It is so ordered.

Judgment reversed and case remanded.

Mr. Justice HARLAN, concurring.

From the several opinions that have been filed in this case it is apparent that the law of search and seizure is due for an overhauling. State and federal law enforcement officers and prosecutorial authorities must find quite intolerable the present state of uncertainty, which extends even to such an everyday question as the circumstances under which police may enter a man's property to arrest him and seize a vehicle believed to have been used during the commission of a crime.

I would begin this process of re-evaluation by overruling Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The former of these cases made the federal 'exclusionary rule' applicable to the States. The latter forced the States to follow all the ins and outs of this Court's Fourth Amendment decisions, handed down in federal cases.

In combination Mapp and Ker have been primarily responsible for bringing about serious distortious and incongruities in this field of constitutional law. Basically these have had two aspects, as I believe an examination of our more recent opinions and certiorari docket will show. First, the States have been put in a federal mold with respect to this aspect of criminal law enforcement, thus depriving the country of the opportunity to observe **\*491** the effects of different procedures in similar settings. See, e.g., Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U.Chi.L.Rev. 665 (1970), suggesting that the assumed 'deterrent value' of the exclusionary rule has never been adequately demonstrated or disproved, and pointing out that because of Mapp all comparative statistics are 10 years old and no new ones can be obtained. Second, in order to leave some room for the States to cope with their own

diverse problems, there has been generated a tendency to relax federal requirements under the Fourth Amendment, which now govern state procedures as well. For an illustration of that tendency in another constitutional field, again resulting from the infelicitous 'incorporation' doctrine, see Williams v. Florida, 399 U.S. 78, 90 S.Ct., 1893, 26 L.Ed.2d 446 (1970). Until we face up to the basic constitutional mistakes of Mapp and Ker, no solid progress in setting things straight in search and seizure law will, in my opinion, occur.

But for Mapp and Ker, I would have little difficulty in voting to sustain this conviction, for I do not think that anything the State did in this case could be said to offend those values which are 'at the core of the Fourth Amendment.' Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949); cf. Irvine v. California, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954); Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

Because of Mapp and Ker, however, this case must be judged in terms of federal standards, and on that basis I concur, although not without difficulty, in **2051 Parts I, II—D, and III of the Court's opinion and in the judgment of the Court.[*] It must be recognized that the case is a close one. The reason I am tipped in favor of Mr. Justice *492 STEWART's position is that a contrary result in this case would, I fear, go far toward relegating the warrant requirement of the Fourth Amendment to a position of little consequence in federal search and seizure law, a course which seems to me opposite to the one we took in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), two Terms ago.

[*]    Because of my views as to the retroactivity of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), I do not believe the seizure of the Pontiac can be upheld as incident to Coolidge's arrest. See my separate opinion in Mackey v. United States, 401 U.S. 667, 675, 91 S.Ct. 1160, 1171, 28 L.Ed.2d 404 (1971).

Recent scholarship has suggested that in emphasizing the warrant requirement over the reasonableness of the search the Court has 'stood the fourth amendment on its head' from a historical standpoint. T. Taylor, Two Studies in Constitutional Interpretation 23—24 (1969). This issue is perhaps most clearly presented in the case of a warrantless entry into a man's home to arrest him on probable cause. The validity of such entry was left open in Jones v. United States, 357 U.S. 493, 499—500, 78 S.Ct. 1253, 1257—1258, 2 L.Ed.2d 514 (1958), and although my Brothers WHITE and STEWART both feel that their contrary assumptions on this point are at the root of their disagreement in this case, ante,

at 2044—2045; Post, at 2060—2061, 2065, the Court again leaves the issue open. Ante, at 2045. In my opinion it does well to do so. This matter should not be decided in a state case not squarely presenting the issue and where it was not fully briefed and argued. I intimate no view on this subject, but until it is ripe for decision, I hope in a federal case, I am unwilling to lend my support to setting back the trend of our recent decisions.

Mr. Chief Justice BURGER, dissenting in part and concurring in part.

I join the dissenting opinion of Mr. Justice WHITE and in Parts II and III of Mr. Justice BLACK's concurring and dissenting opinion. I also agree with most of what is said in Part I of Mr. Justice BLACK's opinion, but I am not prepared to accept the proposition that the Fifth Amendment requires the exclusion of evidence *493 seized in violation of the Fourth Amendment. I join in Part III of Mr. Justice STEWART's opinion.

This case illustrates graphically the monstrous price we pay for the exclusionary rule in which we seem to have imprisoned ourselves. See my dissent in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619.

On the merits of the case I find not the slightest basis in the record to reverse this conviction. Here again the Court reaches out, strains, and distorts rules that were showing some signs of stabilizing, and directs a new trial which will be held more than seven years after the criminal acts charged.

Mr. Justice Stone, of the Minnesota Supreme Court, called the kind of judicial functioning in which the Court indulges today 'bifurcating elements too infinitesimal to be split.'

Mr. Justice BLACK, concurring and dissenting.

After a jury trial in a New Hampshire state court, petitioner was convicted of murder and sentenced to life imprisonment. Holding that certain evidence introduced by the State was seized during an 'unreasonable' search and that the evidence was inadmissible under the judicially created exclusionary rule of the Fourth Amendment, the majority reverses that conviction. Believing that the search and seizure here was reasonable and that the Fourth Amendment properly construed contains no such exclusionary rule, I dissent.

**2052 The relevant facts are these. Pamela Mason, a 14-year-old school girl, lived with her mother and younger brother in Manchester, New Hampshire. She occasionally

worked after school as a baby sitter and sought such work by posting a notice on a bulletin board in a local laundromat. On January 13, 1964, she arrived home from school about 4:15 p.m. Pamela's mother told her **\*494** that a man had called seeking a babysitter for that evening and said that he would call again later. About 4:30 p.m. after Pamela's mother had left for her job as a waitress at a nearby restaurant, Pamela received a phone call. Her younger brother, who answered the call but did not overhear the conversation, later reported that the caller was a man. After the call, Pamela prepared dinner for her brother and herself, then left the house about 6 p.m. Her family never again saw her alive. Eight days later, on January 21, 1964, Pamela's frozen body was discovered in a snowdrift beside an interstate highway a few miles from her home. Her throat had been slashed and she had been shot in the head. Medical evidence showed that she died some time between 8 and 10 p.m. on January 13, the night she left home.

A manhunt ensued. The witnesses informed the police that about 9:30 p.m. on the night of the murder they had stopped to offer assistance to a man in a 1951 Pontiac automobile which was parked beside the interstate highway near the point where the little girl's dead body was later found. Petitioner came under suspicion seven days after the body was discovered when one of his neighbors reported to the police that petitioner had been absent from his home between 5 and 11 p.m. on January 13, the night of the murder. Petitioner owned a 1951 Pontiac automobile that matched the description of the car which the two witnesses reported seeing parked where the girl's body had been found. The police first talked with petitioner at his home on the evening of January 28, fifteen days after the girl was killed, and arranged for him to come to the police station the following Sunday, February 2, 1964. He went to the station that Sunday and answered questions concerning his activities on the night of the murder, telling the police that he had been shopping in a neighboring town at the **\*495** time the murder was committed. During questioning, petitioner confessed to having committed an unrelated larceny from his employer and was held overnight at the police station in connection with that offense. On the next day, he was permitted to go home.

While petitioner was being questioned at the police station on February 2, two policemen went to petitioner's home to talk with his wife. They asked what firearms the petitioner owned and his wife produced two shotguns and two rifles which she voluntarily offered to the police. Upon examination the University of Rhode Island Criminal Investigation Laboratory concluded that one of the firearms,

a Mossberg .22-caliber rifle, had fired the bullet found in the murdered girl's brain.

Petitioner admitted that he was a frequent visitor to the laundromat where Pamela posted her babysitting notice and that he had been there on the night of the murder. The following day a knife belonging to petitioner, which could have inflicted the murdered girl's knife wounds, was found near that laundromat. The police also learned that petitioner had unsuccessfully contacted four different persons before the girl's body had been discovered in an attempt to fabricate an alibi for the night of January 13.

On February 19, 1964, all this evidence was presented to the state attorney general who was authorized under New Hampshire law to issue arrest and search warrants. The attorney general considered the evidence and issued a warrant for petitioner's arrest and four search warrants including a warrant for the seizure and search of petitioner's Pontiac automobile.

On the day the warrants issued, the police went to the petitioner's residence and placed him under arrest. They took **\*\*2053** charge of his 1951 Pontiac which was parked in plain view in the driveway in front of the house, and two hours later, towed the car to the police station. **\*496** During the search of the automobile at the station, the police obtained vacuum sweepings of dirt and other fine particles which matched like sweepings taken from the clothes of the murdered girl. Based on the similarity between the sweepings taken from petitioner's automobile and those taken from the girl's clothes, experts who testified at trial concluded that Pamela had been in the petitioner's car. The rifle given to the police by petitioner's wife was also received in evidence.

Petitioner challenges his conviction on the ground that the rifle obtained from his wife and the vacuum sweepings taken from his car were seized in violation of the Fourth Amendment and were improperly admitted at trial. With respect to the rifle voluntarily given to the police by petitioner's wife, the majority holds that it was properly received in evidence. I agree. But the Court reverses petitioner's conviction on the ground that the sweepings taken from his car were seized during an illegal search and for this reason the admission of the sweepings into evidence violated the Fourth Amendment. I dissent.

**I**

The Fourth Amendment prohibits unreasonable searches and seizures. The Amendment says nothing about consequences. It certainly nowhere provides for the exclusion of evidence as the remedy for violation. The Amendment states: 'The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' No examination of that text can find an exclusionary rule by a mere process of construction. Apparently the first suggestion that the Fourth Amendment somehow embodied a rule of evidence came **\*497** in Justice Bradley's majority opinion in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). The holding in that case was that ordinarily a person may not be compelled to produce his private books and papers for use against him as proof of crime. That decision was a sound application of accepted principles of common law and the command of the Fifth Amendment that no person shall be compelled to be a witness against himself. But Justice Bradley apparently preferred to formulate a new exclusionary rule from the Fourth Amendment rather than rely on the already existing exclusionary rule contained in the language of the Fifth Amendment. His opinion indicated that compulsory production of such evidence at trial violated the Fourth Amendment. Mr. Justice Miller, with whom Chief Justice Waite joined, concurred solely on the basis of the Fifth Amendment, and explicitly refused to go along with Justice Bradley's novel reading of the Fourth Amendment. It was not until 1914, some 28 years after Boyd and when no member of the Boyd Court remained, that the Court in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, stated that the Fourth Amendment itself barred the admission of evidence seized in violation of the Fourth Amendment. The Weeks opinion made no express confession of a break with the past. But if it was merely a proper reading of the Fourth Amendment, it seems strange that it took this Court nearly 125 years to discover the true meaning of those words. The truth is that the source of the exclusionary rule simply cannot be found in the Fourth Amendment. That Amendment did not when adopted, and does not now, contain any constitutional rule barring the admission of illegally seized evidence.

In striking contrast to the Fourth Amendment, the Fifth Amendment states in express, unambiguous terms that no person 'shall be compelled in any criminal case **\*498** to be a witness against **\*\*2054** himself.' The Fifth Amendment in and of itself directly and explicitly commands its own

exclusionary rule—a defendant cannot be compelled to give evidence against himself. Absent congressional action taken pursuant to the Fourth Amendment, if evidence is to be excluded, it must be under the Fifth Amendment, not the Fourth. That was the point so ably made in the concurring opinion of Justice Miller, joined by Chief Justice Waite, in Boyd v. United States, supra, and that was the thrust of my concurring opinion in Mapp v. Ohio, 367 U.S. 643, 661, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961).

The evidence seized by breaking into Mrs. Mapp's house and the search of all her possessions, was excluded from evidence, not by the Fourth Amendment which contains no exclusionary rule, but by the Fifth Amendment which does. The introduction of such evidence compels a man to be a witness against himself, and evidence so compelled must be excluded under the Fifth Amendment, not because the Court says so, but because the Fifth Amendment commands it.

The Fourth Amendment provides a constitutional means by which the Government can act to obtain evidence to be used in criminal prosecutions. The people are obliged to yield to a proper exercise of authority under that Amendment.[1] Evidence properly seized under the Fourth Amendment, of course, is admissible at trial. But nothing in the Fourth Amendment provides that evidence seized in violation of that Amendment must be excluded.

[1]  There are of course certain searches which constitutionally cannot be authorized even with a search warrant or subpoena. See, e.g., Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); Rochin v. California, 342 U.S. 165, 174, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952) (Black, J., concurring); Schmerber v. California, 384 U.S. 757, 773, 86 S.Ct. 1826, 1837, 16 L.Ed.2d 908 (1966) (Black, J., dissenting).

The majority holds that evidence it views as improperly seized in violation of its ever changing concept of the Fourth Amendment is inadmissible. The majority **\*499** treats the exclusionary rule as a judge-made rule of evidence designed and utilized to enforce the majority's own notions of proper police conduct. The Court today announces its new rules of police procedure in the name of the Fourth Amendment, then holds that evidence seized in violation of the new 'guidelines' is automatically inadmissible at trial. The majority does not purport to rely on the Fifth Amendment to exclude the evidence in this case. Indeed it could not. The majority prefers instead to rely on 'changing times' and the Court's role as it sees it, as the administrator in charge of regulating the contacts of officials with citizens. The majority states that in

the absence of a better means of regulation, it applies a court-created rule of evidence.

I readily concede that there is much recent precedent for the majority's present announcement of yet another new set of police operating procedures. By invoking this rulemaking power found not in the words but somewhere in the 'spirit' of the Fourth Amendment, the Court has expanded that Amendment beyond recognition. And each new step is justified as merely a logical extension of the step before.

It is difficult for me to believe the Framers of the Bill of Rights intended that the police be required to prove a defendant's guilt in a 'little trial' before the issuance of a search warrant. But see Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). No such proceeding was required before or after the adoption of the Fourth Amendment, until this Court decided Aguilar and Spinelli. Likewise, eavesdroppers were deemed to be competent witnesses in both English and American courts up until this Court in its Fourth Amendment 'rulemaking' capacity undertook to lay down rules for **2055 electronic surveillance. Berger v. New York, 388 U.S. 41, 70, 87 S.Ct. 1873, 1889, 18 L.Ed.2d 1040 (1967) (Black, J., dissenting); Katz v. United States, 389 U.S. 347, 364, 88 S.Ct. 507, 518, 19 L.Ed.2d 576 (1967) (Black, J., dissenting). *500 The reasonableness of a search incident to an arrest, extending to areas under the control of the defendant and areas where evidence may be found, was an established tenet of English common law, and American constitutional law after adoption of the Fourth Amendment—that is, until Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The broad, abstract, and ambiguous concept of 'privacy' is now unjustifiably urged as a comprehensive substitute for the Fourth Amendment's guarantee against 'unreasonable searches and seizures.' Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

Our Government is founded upon a written Constitution. The draftsmen expressed themselves in careful and measured terms corresponding with the immense importance of the powers delegated to them. The Framers of the Constitution, and the people who adopted it, must be understood to have used words in their natural meaning, and to have intended what they said, the Constitution itself contains the standards by which the seizure of evidence challenged in the present case and the admissibility of that evidence at trial is to be measured in the absence of congressional legislation. It is my conclusion that both the seizure of the rifle offered by petitioner's wife and the seizure of the automobile at the time of petitioner's arrest were consistent with the Fourth Amendment and that the evidence so obtained under the circumstances shown in the record in this case could not be excluded under the Fifth Amendment.

## II

The majority holds that the warrant authorizing the seizure and search of petitioner's automobile was constitutionally defective and void. With respect to search warrants, the Fourth Amendment provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place *501 to be searched, and the persons or things to be seized.' The majority concedes that the police did show probable cause for the issuance of the warrant. The majority does not contest that the warrant particularly described the place to be searched, and the thing to be seized.

But compliance with state law and the requirements of the Fourth Amendment apparently is not enough. The majority holds that the state attorney general's connection with the investigation automatically rendered the search warrant invalid. In the first place, there is no language in the Fourth Amendment which provides any basis for the disqualification of the state attorney general to act as a magistrate. He is a state official of high office. The Fourth Amendment does not indicate that his position of authority over state law enforcement renders him ineligible to issue warrants upon a showing of probable cause supported by oath or affirmation. The majority's argument proceeds on the 'little trial' theory that the magistrate is to sit as a judge and weigh the evidence and practically determine guilt or innocence before issuing a warrant. There is nothing in the Fourth Amendment to support such a magnified view of the magistrate's authority. The state attorney general was not barred by the Fourth Amendment or any other constitutional provision from issuing the warrant.

In the second place, the New Hampshire Supreme Court held in effect that the state attorney general's participation in the investigation of the case at the time he issued the search warrant was 'harmless error' if it was error at all. I agree. It is difficult to imagine a clearer showing of probable cause. There was no possibility of prejudice because there was no room for discretion. Indeed, it could be said that a refusal to issue a warrant on the showing of probable **2056 cause made in this case would have been an abuse of discretion. In light *502 of the showing made by the police, there is no reasonable possibility that the state attorney general's own

knowledge of the investigation contributed to the issuance of the warrant. I see no error in the state attorney general's action. But even if there was error, it was harmless beyond reasonable doubt. See Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Therefore, it is my conclusion that the warrant authorizing the seizure and search of petitioner's automobile was constitutional under the Fourth Amendment, and that the evidence obtained during that search cannot be excluded under the Fifth Amendment. Moreover, I am of the view that, even if the search warrant had not issued, the search in this case nonetheless would have been constitutional under all three of the principles considered and rejected by the majority.

### III

It is important to point out that the automobile itself was evidence and was seized as such. Prior to the seizure the police had been informed by two witnesses that on the night of the murder they had seen an automobile parked near the point where the little girl's dead body was later discovered. Their description of the parked automobile matched petitioner's car. At the time of the seizure the identification of petitioner's automobile by the witnesses as the car they had seen on the night of the murder was yet to be made. The police had good reason to believe that the identification would be an important element of the case against the petitioner. Preservation of the automobile itself as evidence was a reasonable motivation for its seizure. Considered in light of the information in the hands of the New Hampshire police at the time of the seizure, I conclude that the seizure and search were constitutional, even had there been no search warrant, for the following among other reasons.

### *503 A

First, the seizure of petitioner's automobile was valid as incident to a lawful arrest. The majority concedes that there was probable cause for petitioner's arrest. Upon arriving at petitioner's residence to make that arrest, the police saw petitioner's automobile which they knew fitted the description of the car observed by two witnesses at the place where the murdered girl's body had been found. The police arrested the petitioner and seized the automobile. The majority holds that because the police had to go into petitioner's residence in order to place petitioner under arrest, the contemporaneous

seizure of the automobile outside the house was not incident to that arrest. I cannot accept this elevation of form over reason.

After stating that Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), is inapplicable to this case, the majority goes on to formulate and apply a per se rule reaching far beyond Chimel. To do so, the majority employs a classic non sequitur. Because this Court has held that police arresting a defendant on the street in front of his house cannot go into that house and make a general search, it follows, says the majority, that the police having entered a house to make an arrest cannot step outside the house to seize clearly visible evidence. Even though the police, upon entering a doorway to make a valid arrest, would be authorized under the pre-Chimel law the majority purports to apply, to make a five-hour search of a four-room apartment, see Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), the majority holds that the police could not step outside the doorway to seize evidence they passed on their way in. The majority reasons that as the doorway locks the policeman out, once entered, it must lock him in.

The test of reasonableness cannot be governed by such arbitrary rules. Each case must be judged on its **\*504** own particular facts. Here, there was no general exploration, **\*\*2057** only a direct seizure of important evidence in plain view from both inside as well as outside the house. On the facts of this case, it is my opinion that the seizure of petitioner's automobile was incident to his arrest and was reasonable under the terms of the Fourth Amendment.

### B

Moreover, under our decision last Term in Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the police were entitled not only to seize petitioner's car but also to search the car after it had been taken to the police station. The police had probable cause to believe that the car had been used in the commission of the murder and that it contained evidence of the crime. Under Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and Chambers v. Maroney, supra, such belief was sufficient justification for the seizure and the search of petitioner's automobile.

The majority reasons that the Chambers and Carroll rationale, based on the mobility of automobiles, is inapplicable here because the petitioner's car could have been placed under guard and, thereby, rendered immobile. But this

Court explicitly rejected such reasoning in Chambers: 'For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. * * * The probable-cause factor still obtained at the station house and so did the mobility of the car * * *.' 399 U.S., at 52, 90 S.Ct., at 1981. This Court held there that the delayed search at the station house, as well as an immediate search at the time of seizure, was reasonable under the Fourth Amendment.

As a second argument for holding that the Chambers decision does not apply to this case, the majority reasons that the evidence could not have been altered or the car **\*505** moved because petitioner was in custody and his wife was accompanied by police, at least until the police towed the car to the station. But the majority's reasoning depends on two assumptions: first, that the police should, or even could, continue to keep petitioner's wife effectively under house arrest; and, second, that no one else had any motivation to alter or remove the car. I cannot accept the first assumption, nor do I believe that the police acted unreasonably in refusing to accept the second. [2]

[2]    The majority attempts to rely on Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), to support its holding that the police could not search petitioner's automobile at the station house. But this case is not Preston, nor is it controlled by Preston. The police arrested Preston for vagrancy. No claim was made that the police had any authority to hold his car in connection with that charge. The fact that the police had custody of Preston's car was totally unrelated to the vagrancy charge for which they arrested him; so was their subsequent search of the car. Here the officers arrested petitioner for murder. They seized petitioner's car as evidence of the crime for which he was arrested. Their subsequent search of the car was directly related to the reason petitioner was arrested and the reason his car had been seized and, therefore, was valid under this Court's decision in Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

By Brother WHITE points out that the police in the present case not only searched the car immediately upon taking it to the station house, but also searched it 11 months and 14 months after seizure. We held in Cooper, where the search occurred one week after seizure, that the Fourth Amendment is not violated by the examination or search of a car validly held by officers for use as evidence in a pending trial. In my view the police are entitled to search a car whether detained for a week or for a year

where that car is being properly held as relevant evidence of the crime charged.

## C

I believe the seizure of petitioner's automobile was valid under the well-established right of the police to seize evidence **\*\*2058** in plain view at the time and place of arrest. The majority concedes that the police were rightfully at petitioner's residence to make a valid arrest at **\*506** the time of the seizure. To use the majority's words, the 'initial intrusion' which brought the police within plain view of the automobile was legitimate. The majority also concedes that the automobile was 'plainly visible both from the street and from inside the house where Coolidge was actually arrested,' ante, at 2028, and that the automobile itself was evidence which the police had probable cause to seize. Ante, at 2037. Indeed, the majority appears to concedes that the seizure of petitioner's automobile was valid under the doctrine upholding seizures of evidence in plain view at the scene of arrest, at least as it stood before today. Ante, at 2038 n. 24.

However, even after conceding that petitioner's automobile itself was evidence of the crime, that the police had probable cause to seize it as such, and that the automobile was in plain view at the time and place of arrest, the majority holds the seizure to be a violation of the Fourth Amendment because the discovery of the automobile was not 'inadvertent.' The majority confidently states: 'What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused.' But the prior holdings of this Court not only fail to support the majority statement they flatly contradict it. One need look no further than the cases cited in the majority opinion to discover the invalidity of that assertion.

In one of these cases, Ker v. California 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), the police observed the defendant's participation in an illegal marihuana transaction, then went to his apartment to arrest him. After entering the apartment, the police saw and seized a block of marihuana as they placed the defendant under arrest. This Court upheld that seizure on the ground that the police were justifiably **\*507** in the defendant's apartment to make a valid arrest, there was no search because the evidence was in plain view, and the seizure of such evidence was authorized when incident to a lawful arrest. The discovery of the marihuana there could hardly be described as 'inadvertent.' [3]

3

 The facts in Ker undermine the majority's attempt to distinguish it from the instant case. The arresting officer there learned from other policemen that Ker had been observed meeting with a known marihuana supplier. The arresting officer had received information at various times over an eight-month period that Ker was selling marihuana from his apartment and that he was securing this marihuana from the known supplier. The arresting officer had a 'mug' photograph of Ker at the time of the arrest and testified that for at least two months he had received information as to Ker's marihuana activities from a named informant who had previously given information leading to three other arrests and whose information was believed to be reliable. The arresting officer did not know whether Ker would be present at his apartment on the night of arrest. The officer had neither an arrest nor a search warrant. He entered Ker's apartment, placed Ker under arrest, and seized the block of marihuana in plain view in the adjoining room. This Court held that the seizure was reasonable and therefore valid under the Fourth Amendment.

In Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), also cited by the majority, the Court upheld the seizure of business records as being incident to a valid arrest for operating an illegal retail whiskey enterprise. The records were discovered in plain view. I cannot say that the seizure of business records from a place of business during the course of an arrest for operating an illegal business was 'inadvertent.' [4]

4

 The majority correctly notes, ante, at 2037, that this Court in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), flatly rejected the distinction for purposes of the Fourth Amendment between 'mere evidence' and contraband, a distinction which the majority appears to me to reinstate at another point in its opinion, ante, at 2040 and 2041.

**2059 The majority confuses the historically justified right of the police to seize visible evidence of the crime in open view at the scene of arrest with the 'plain view' exception *508 to the requirement of particular description in search warrants. The majority apparently reasons that unless the seizure made pursuant to authority conferred by a warrant is limited to the particularly described object of seizure, the warrant will become a general writ of assistance. Evidently, as a check on the requirement of particular description in search warrants, the majority announces a new rule that items not named in a warrant cannot be seized unless their discovery was unanticipated or 'inadvertent.' [5] The majority's concern is

with the *509 scope of the intrusion authorized by a warrant. But the power to seize items properly subject to seizure because in open view at the time of arrest is quite independent of any power to search for such items pursuant to a warrant. The entry in the present case did not depend for its authority on a search warrant but was concededly authorized by probable cause to effect a valid arrest. The intrusion did not exceed that authority. The intrusion was limited in scope to the circumstances which justified the entry in the first place— the arrest of petitioner. There was no general search; indeed, there was no search at all. The automobile itself was evidence properly subject to seizure and was in open view at the time and place of arrest. [6]

5

 The cases cited by the majority simply do not support the majority's new rule. For instance, when the police in Steele v. United States, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925), entered a warehouse under the authority of a search warrant issued on a showing of probable cause that the Prohibition Act was being violated and naming 'cases of whiskey' as the objects of search, it can scarcely be said that their discovery and seizure of barrels of whiskey and bottles and bottling equipment in plain view were 'inadvertent.'

 The majority states that the seizure in Warden v. Hayden, supra, was justified because the police 'inadvertently' came across the evidence while in hot pursuit of a fleeing suspect. In that case the police answered the call of two witnesses who stated that an armed robber had just held up a business. The witnesses described the robber and the clothes he was wearing. They had followed the robber to a particular house. The police searched the house and seized (1) a shotgun and a pistol found in a toilet on the second floor; (2) ammunition for the pistol and a cap like the one worn by the robber, both found beneath the mattress in the defendant's bedroom; and (3) a jacket and trousers of the type of the fleeing man was said to have worn, found in a washing machine in the basement. It is quite difficult for me to accept the majority's characterization of these discoveries as 'inadvertent.'

 See also United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927), another case cited by the majority, where Coast Guard officers, with probable cause to believe that a boat was being used to violate the Prohibition Act, shined a searchlight across the deck and discovered illicit whiskey. The admission of testimony regarding that discovery was upheld by this Court against a Fourth Amendment challenge, although the discovery could hardly be termed 'inadvertent.'

6

 Moreover, what a person knowingly exposes to the public is not a subject of Fourth Amendment protection.

See Lewis v. United States, 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966); United States v. Lee, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202 (1927); Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924).

Only rarely can it be said that evidence seized incident to an arrest is truly unexpected or inadvertent. Indeed, if the police officer had no expectation of discovering weapons, contraband, or other evidence, he would make no search. It appears to me that the rule adopted by the Court today, for all practical purposes, abolishes seizure incident to arrest. The majority rejects the test of reasonableness provided in the Fourth Amendment and substitutes a per se rule—if the police could have obtained a warrant and did not, the seizure, no matter how reasonable, is void. But the Fourth Amendment does not require that every search be made pursuant to a warrant. It prohibits only 'unreasonable searches and **\*\*2060** seizures.' The relevant test is not the reasonableness of the opportunity to procure a warrant, but the reasonableness of the seizure under all the circumstances. The **\*510** test of reasonableness cannot be fixed by per se rules; each case must be decided on its own facts.

For all the reasons stated above, I believe the seizure and search of petitioner's car was reasonable and, therefore, authorized by the Fourth Amendment. The evidence so obtained violated neither the Fifth Amendment which does contain an exclusionary rule, nor the Fourth Amendment which does not. The jury of petitioner's peers, as conscious as we of the awesome gravity of their decision, heard that evidence and found the petitioner guilty of murder. I cannot in good conscience upset that verdict.

Mr. Justice BLACKMUN joins Mr. Justice BLACK in Parts II and III of this opinion and in that portion of Part I thereof which is to the effect that the Fourth Amendment supports no exclusionary rule.

Mr. Justice WHITE, with whom THE CHIEF JUSTICE joins, concurring and dissenting.

I would affirm the judgment. In my view, Coolidge's Pontiac was lawfully seized as evidence of the crime in plain sight and thereafter was lawfully searched under Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). I am therefore in substantial disagreement with Parts II—C and II—D of the Court's opinion. Neither do I agree with Part II-B, and I can concur only in the result as to Part III.

## I

The Fourth Amendment commands that the public shall be secure in their 'persons, houses, papers, and effects, against unreasonable searches and seizures * * *.' As to persons, the overwhelming weight of authority is that a police officer may make an arrest without a warrant when he has probable cause to believe the suspect **\*511** has committed a felony.[1] The general rule also **\*\*2061** is that upon the lawful arrest of a person, he and the area under his immediate control may be searched and contraband or **\*512** evidence seized without a warrant. The right 'to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime * * * has been uniformly maintained in many cases.' Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914). Accord, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

[1] This was the common-law rule. 1 J. Stephen, A History of Criminal Law of England 193 (1883); 2 M. Hale, Historia Plactorum Coronae 72—104 (new ed. 1800). It is also the constitutional rule. In Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Court said that '(t)he usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony * * *.' Id., at 156, 45 S.Ct., at 286. There in September 1921, officers had probable cause to believe the two defendants were unlawfully transporting bootleg liquor, but they had neither effected an immediate arrest nor sought a warrant. Several months later they observed the two men driving on a public highway, stopped, and searched the car and arrested the men, and this Court sustained both the search and the arrest. So also in Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), officers were amply forewarned of criminal activities and had time to seek a warrant but did not do so. Instead, some time later they entered on property where Trupiano had a still and found exactly what they expected to find—one of the defendants engaged in the distillation of bootleg liquor. His arrest without a warrant was sustained, the Court saying that '(t)he absence of a warrant of arrest, even though there was sufficient time to obtain one, (did) not destroy the validity of an arrest' in the circumstances of the case. Id., at 705, 68 S.Ct., at 1232.

The judgment of Congress also is that federal law enforcement officers may reasonably make warrantless arrests upon probable cause. It has authorized such arrests by United States Marshals, agents of the Federal Bureau of Investigation and of the Secret Service, and

narcotics law enforcement officers. See Act of June 15, 1935, s 2, 49 Stat. 378, as amended, 18 U.S.C. s 3053; Act of June 18, 1934, 48 Stat. 1008, as amended, 18 U.S.C. s 3052; Act of Sept. 29, 1965, 79 Stat. 890, as amended, 18 U.S.C. s 3056 (1964 ed., Supp. V); Act of July 18, 1956, Tit. I, s 104(a), 70 Stat. 570, as amended, 26 U.S.C. s 7607(2). And, in 1951, Congress expressly deleted from the authority to make warrantless arrests a pre-existing statutory restriction barring them in the absence of a likelihood that the person would escape before a warrant could be obtained. See Act of Jan. 10, 1951, s 1, 64 Stat. 1239; S.Rep.No.2464, 81st Cong., 2d Sess., 2 (1950); H.R.Rep.No.3228, 81st Cong., 2d Sess., 2 (1950); Chimel v. California, 395 U.S. 752, 776—780, 89 S.Ct. 2034, 2047—2049, 23 L.Ed.2d 685 (1969) (dissenting opinion).

The majority now suggests that warrantless, probable-cause arrests may not be made in the home absent exigent circumstances. Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958), invalidated a forcible nighttime entry to effect a search without a warrant and suggested also that the particular circumstances of the entry would have posed a serious Fourth Amendment issue if the purpose of the entry had been to make an arrest. But, as a constitutional matter, the Court has never held or intimated that all probable-cause arrests without a warrant in the home must be justified by exigent circumstances other than the necessity for arresting a felon, or that, if the elapsed time between the accrual of probable cause and the making of the arrest proves sufficient to have obtained a warrant, the arrest is invalid. On the contrary, many cases in this Court have proceeded on the assumption that ordinarily warrantless arrests on probable cause may be effected even in the home. See Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); Miller v. United States, 357 U.S. 301, 305—308, 78 S.Ct. 1190, 1193—1195, 2 L.Ed.2d 1332 (1958); United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 432, 94 L.Ed. 653 (1950) (dictum); Trupiano v. United States, supra; Johnson v. United States, 333 U.S. 10, 15, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) (dictum). Of course, this is not to say that the time and method of entry could never pose serious constitutional questions under the Fourth Amendment.

With respect to houses and other private places, the general rule is otherwise: a search is invalid unless made on probable cause and under the authority of a warrant specifying the area to be searched and the objects to be seized. There are various exceptions to the rule, however, permitting warrantless entries and limited searches, the most recurring being the arrest without a warrant.

The case before us concerns the protection offered by the Fourth Amendment to 'effects' other than person **\*513** papers or documents. It is clear that effects may not be seized without probable cause but the law as to when a warrant is required to validate their seizure is confused and confusing. Part of the difficulty derives from the fact that effects enjoy derivative protection when located in a house or other area within reach of the Fourth Amendment. Under existing doctrine, effects seized in warrantless, illegal searches of houses are fruits of a constitutional violation and may not be received in evidence. But is a warrant required to seize contraband or criminal evidence when it is found by officers at a place where they are legally entitled to be at the time? Before a person is deprived of his possession or right to possession of his effects, must a magistrate confirm that what the officer has legally seen (and would be permitted to testify about, if relevant and material) is actually contraband or criminal evidence?

The issue arises in different contexts. First, the effects may be found on public property. Suppose police are informed that important evidence has been secreted in a public park. A search is made and the evidence found. Although the evidence was hidden rather than abandoned, I had not thought a search warrant was required for officers to make a seizure, see United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927) (boat seized on public waters); [2] Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924) (liquor seized in open field); any more than a **\*\*2062** warrant is needed to seize an automobile which is itself evidence of crime and which is found on a public street or in a parking lot. See Cooper v. California, supra.

2 Lee permitted the revenue officers who seized the boat to take and chemically analyze bootleg liquor found aboard it and then to testify as to the results of their analysis.

Second, the items may be found on the premises of a third party who gives consent for an official search **\*514** but who has no authority to consent to seizure of another person's effects. Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), would seem to settle the validity of the seizure without a warrant as long as the search itself involves no Fourth Amendment violation.

Third, the police may arrest a suspect in his home and in the course of a properly limited search discover evidence of crime. The line of cases from Weeks v. United States, supra, to Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), had recognized the rule that

upon arrest searches of the person and of adjacent areas were reasonable, and Harris had approved an incidental search of broad scope. In the next Term, however, Trupiano v. United States, 334 U.s. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), departed from the Harris approach. In Trupiano, officers, with probable cause to arrest, entered property and arrested the defendant while he was operating an illegal still. The still was seized. Time and circumstance would have permitted the officers to secure both arrest and search warrants, but they had obtained neither. The Court did not disturb seizure of the person without warrant but invalidated seizure of the still since the officers could have had a warrant but did not. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), however, returned to the rule that the validity of searches incident to arrest does not depend on the practicability of securing a warrant. And, while Chimel v. California, supra, narrowed the permissible scope of incident searches to the person and the immediate area within reach of the defendant, it did not purport to reestablish the Trupiano rule that searches accompanying arrests are invalid if there is opportunity to get a warrant.

Finally, officers may be on a suspect's premises executing a search warrant and in the course of the authorized search discover evidence of crime not covered by the warrant. **\*515** Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), flatly held that legal presence under a warrant did not itself justify the seizure of such evidence. However, seizure of the same evidence was permitted because it was found in plain sight in the course of making an arrest and an accompanying search. It is at least odd to me to permit plain-sight seizures arising in connection with warrantless arrests, as the long line of cases ending with Chimel has done, or arising in the course of a hot-pursuit search for a felon, Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Hester v. United States, supra; and yet forbid the warrantless seizure of evidence in plain sight when officers enter a house under a search warrant that is perfectly valid but does not cover the items actually seized. I have my doubts that this aspect of Marron can survive later cases in this Court, particularly Zap v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946), vacated on other grounds, 330 U.S. 800, 67 S.Ct. 857, 91 L.Ed. 1259 (1947), where federal investigators seized a cancelled check evidencing a crime that had been observed during the course of an otherwise lawful search. See also Stanley v. Georgia, 394 U.S. 557, 569, 89 S.Ct. 1243, 1250, 22 L.Ed.2d 542 (1969) (Stewart, J., concurring in result). Cf. Chimel v. California, supra; Warden v. Hayden, supra; Frazier v. Cupp, supra. Apparently the majority agrees, for it lumps plain-sight seizures in such circumstances along with other situations where seizures are made after a legal entry.

In all of these situations, it is apparent that seizure of evidence without a warrant is not itself an invasion either of personal privacy or of property rights beyond that already authorized by law. Only the possessory interest of a defendant **\*\*2063** in his effects is implicated. And in these various circumstances, at least where the discovery of evidence is 'inadvertent,' the Court would permit the seizure because, it is said, 'the minor peril to Fourth Amendment protections' is overridden by the 'major gain in effective law enforcement' inherent in **\*516** avoiding the 'needless inconvenience' of procuring a warrant. Ante, at 2039. I take this to mean that both the possessory interest of the defendant and the importance of having a magistrate confirm that what the officer saw with his own eyes is in fact contraband or evidence of crime are not substantial constitutional considerations. Officers in these circumstances need neither guard nor ignore the evidence while a warrant is sought. Immediate seizure is justified and reasonable under the Fourth Amendment.

The Court would interpose in some or all of these situations, however, a condition that the discovery of the disputed evidence be 'inadvertent.' If it is 'anticipated,' that is if 'the police know in advance the location of the evidence and intend to seize it,' the seizure is invalid. Id., at 2040.

I have great difficulty with this approach. Let us suppose officers secure a warrant to search a house for a rifle. While staying well within the range of a rifle search, they discover two photographs of the murder victim, both in plain sight in the bedroom. Assume also that the discovery of the one photograph was inadvertent but finding the other was anticipated. The Court would permit the seizure of only one of the photographs. But in terms of the 'minor' peril to Fourth Amendment values there is surely no difference between these two photographs: the interference with possession is the same in each case and the officers' appraisal of the photograph they expected to see is no less reliable than their judgment about the other. And in both situations the actual inconvenience and danger to evidence remain identical if the officers must depart and secure a warrant. The Court, however, states that the State will suffer no constitutionally cognizable inconvenience from invalidating anticipated seizures since it had probable cause to search **\*517** for the items seized and could have included them in a warrant.

This seems a punitive and extravagant application of the exclusionary rule. If the police have probable cause to search for a photograph as well as a rifle and they proceed to seek a warrant, they could have no possible motive for deliberately including the rifle but omitting the photograph. Quite the contrary is true. Only oversight or careless mistake would explain the omission in the warrant application if the police were convinced they had probable cause to search for the photograph. Of course, they may misjudge the facts and not realize they have probable cause for the picture, or the magistrate may find against them and not issue a warrant for it. In either event the officers may validly seize the photograph for which they had no probable cause to search but the other photograph is excluded from evidence when the Court subsequently determines that the officers, after all, had probable cause to search for it.

More important, the inadvertence rule is unnecessary to further any Fourth Amendment ends and will accomplish nothing. Police with a warrant for a rifle may search only places where rifles might be and must terminate the search once the rifle is found; the inadvertence rule will in no way reduce the number of places into which they may lawfully look. So, too, the areas of permissible search incident to arrest are strictly circumscribed by Chimel. Excluding evidence seen from within those areas can hardly be effective to operate to prevent wider, unauthorized searches. If the police stray outside the scope of an authorized Chimel search they are already in violation of the Fourth Amendment, and evidence so seized will be excluded; adding a second reason for excluding evidence hardly seems worth the candle. Perhaps the Court is concerned that officers, having the **\*518** right to intrude upon private property to make arrests, will use that right as a pretext to obtain entry **\*\*2064** to search for objects in plain sight, cf. Chimel v. California, supra, 395 U.S., at 767, 89 S.Ct., at 2042, but, if so, such a concern is unfounded. The reason is that under Chimel the police can enter only into those portions of the property into which entry is necessary to effect the arrest. Given the restrictions of Chimel, the police face a substantial risk that in effecting an arrest and a search incident thereto they will never enter into those portions of the property from which they can plainly see the objects for which they are searching and that, if they do not, those objects will be destroyed before they can return and conduct a search of the entire premises pursuant to a warrant. If the police in fact possess probable cause to believe that weapons, contraband, or evidence of crime is in plain view on the premises, it will be far safer to obtain a search warrant than to take a chance that in making an arrest they

will come into plain view of the object they are seeking. It is only when they lack probable cause for a search—when, that is, discovery of objects in plain view from a lawful vantage point is inadvertent—that entry to make an arrest might, as a practical matter, assist the police in discovering an object for which they could not have obtained a warrant. But the majority in that circumstance would uphold their authority to seize what they see. I thus doubt that the Court's new rule will have any measurable effect on police conduct. It will merely attach undue consequences to what will most often be an unintended mistake or a misapprehension of some of this Court's probable-cause decisions, a failing which, I am afraid, we all have.

By invalidating otherwise valid, plain-sight seizures where officers have probable cause and presumably, although the Court does not say so, opportunity to secure a warrant, the Court seems to turn in the direction of **\*519** the Trupiano rule, rejected in Rabinowitz and not revived in Chimel. But it seems unsure of its own rule.

It is careful to note that Coolidge's car is not contraband, stolen, or in itself dangerous. Apparently, contraband, stolen, or dangerous materials may be seized when discovered in the course of an otherwise authorized search even if the discovery is fully anticipated and a warrant could have been obtained. The distinction the Court draws between contraband and mere evidence of crime is reminiscent of the confusing and unworkable approach that I thought Warden v. Hayden, supra, had firmly put aside.

Neither does the Court in so many words limit Chimel; on the contrary, it indicates that warrantless Chimel-type searches will not be disturbed, even if the police 'anticipate that they will find specific evidence during the course of such a search.' Ante, at 2046. The Court also concedes that, when an arresting officer 'comes within plain view of a piece of evidence, not concealed, although outside of the area under the immediate control of the arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee.' Id., at 2038 n. 24. Yet today's decision is a limitation on Chimel, for in the latter example, the Court would permit seizure only if the plain view was inadvertently obtained. If the police, that is, fully anticipate that, when they arrest a suspect as he is entering the front door of his home, they will find a credit card in his pocket and a picture in plain sight on the wall opposite the door, both of which will implicate him in a crime, they may under today's decision seize the credit card but not the picture. This is a distinction that I find to be without basis and

which the Court makes no attempt to explain. I can therefore conclude only that Chimel and today's holding are squarely inconsistent and that the Court, unable to perceive **\*520** any reasoned distinction, has abandoned any attempt to find one.

The Court also fails to mention searches carried out with third-party consent. Assume for the moment that authorities are reliably informed that a suspect, subject to arrest, but not yet apprehended, has concealed specified evidence of his **\*\*2065** crime in the house of a friend. The friend freely consents to a search of his house and accompanies the officers in the process. The evidence is found precisely where the officers were told they would find it, and the officers proceed to seize it, aware, however, that the friend lacks authority from the suspect to confer possession on them. The suspect's interest in not having his possession forcibly interfered with in the absence of a warrant from a magistrate is identical to the interest of Coolidge, and one would accordingly expect the Court to deal with the question. Frazier v. Cupp, supra, indicates that a seizure in these circumstances would be lawful, and the Court today neither overrules nor distinguishes Frazier; in fact, Part III of the Court's opinion, which discusses the officers' receipt of Coolidge's clothing and weapons from Mrs. Coolidge, implicitly approves Frazier.

Neither does the Court indicate whether it would apply the inadvertence requirement to searches made in public places, although one might infer from this approval of United States v. Lee, supra, which held admissible a chemical analysis of bootleg liquor observed by revenue officers in plain sight, that it would not.

Aware of these inconsistencies, the Court admits that 'it would be nonsense to pretend that our decision today reduces Fourth Amendment law to complete order and harmony.' Ante, at 2047. But it concludes that logical consistency cannot be attained in constitutional law and ultimately comes to rest upon its belief 'that the result reached in this case is correct \* \* \*.' Id., at 2047. It **\*521** may be that constitutional law cannot be fully coherent and that constitutional principles ought not always be spun out to their logical limits, but this does not mean that we should cease to strive for clarity and consistency of analysis. Here the Court has a ready opportunity, one way or another, to bring clarity and certainty to a body of law that lower courts and law enforcement officials often find confusing. Instead, without apparent reason, it only increases their confusion by clinging to distinctions that are both unexplained and inexplicable.

## II

In the case before us, the officers had probable cause both to arrest Coolidge and to seize his car. In order to effect his arrest, they went to his home—perhaps the most obvious place in which to look for him. They also may have hoped to find his car at home and, in fact, when they arrived on the property to make the arrest, they did find the 1951 Pontiac there. Thus, even assuming that the Fourth Amendment protects against warrantless seizures outside the house, but see Hester v. United States, supra, 265 U.S., at 59, 44 S.Ct., at 446, the fact remains that the officers had legally entered Coolidge's property to effect an arrest and that they seized the car only after they observed it in plain view before them. The Court, however, would invalidate this seizure on the premise that officers should not be permitted to seize effects in plain sight when they have anticipated they will see them.

Even accepting this premise of the Court, seizure of the car was not invalid. The majority makes an assumption that, when the police went to Coolidge's house to arrest him, they anticipated that they would also find the 1951 Pontiac there. In my own reading of the record, however, I have found no evidence to support this assumption. For all the record shows, the police, although they may have hoped to find the Pontiac at **\*522** Coolidge's home, did not know its exact location when they went to make the arrest, and their observation of it in Coolidge's driveway was truly inadvertent. Of course, they did have probable cause to seize the car, and, if they had had a valid warrant as well, they would have been justified in looking for it in Coolidge's driveway—a likely place for it to be. But if the fact of probable cause bars this seizure, it would also bar seizures not only of cars found at a house, but also of cars parked in a parking lot, hidden in some secluded spot, or delivered to the police by a third party at **\*\*2066** the police station. This would simply be a rule that the existence of probable cause bars all warrantless seizures.

It is evident on the facts of this case that Coolidge's Pontiac was subject to seizure if proper procedures were employed. It is also apparent that the Pontiac was in plain view of the officers who had legally entered Coolidge's property to effect his arrest. I am satisfied that it was properly seized whether or not the officers expected that it would be found where it was. And, since the Pontiac was legally seized as evidence of the crime for which Coolidge was arrested, Cooper v. California, supra, authorizes its warrantless search while in lawful custody of the police. 'It would be unreasonable to hold that the police, having to retain the car in their custody

for such a length of time, had no right, even for their own protection, to search it. It is no answer to say that the police could have obtained a search warrant, for '(t)he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' * * * Under the circumstances of this case, we cannot hold unreasonable under the Fourth Amendment the examination or search of a car validly held by officers for use as evidence * * *.' Cooper v. California, supra, 386 U.S., at 61—62, 87 S.Ct., at 791.

### *523 III

Given the foregoing views, it is perhaps unnecessary to deal with the other grounds offered to sustain the search of Coolidge's car. Nonetheless, it may be helpful to explain my reasons for relying on the plain-sight rule rather than on Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), to validate this search.

Chambers upheld the seizure and subsequent search of automobiles at the station house rather than requiring the police to search cars immediately at the places where they are found. But Chambers did not authorize indefinite detention of automobiles so seized; it contemplated some expedition in completing the searches so that automobiles could be released and returned to their owners. In the present case, however, Coolidge's Pontiac was not released quickly but was retained in police custody for more than a year and was searched not only immediately after seizure but also on two other occasions: one of them 11 months and the other 14 months after seizure. Since fruits of the later searches as well as the earlier one were apparently introduced in evidence, I cannot look to Chambers and would invalidate the later searches but for the fact that the police had a right to seize and detain the car not because it was a car, but because it was itself evidence of crime. It is only because of the long detention of the car that I find Chambers inapplicable, however, and I disagree strongly with the majority's reasoning for refusing to apply it.

As recounted earlier, arrest and search of the person on probable cause but without a warrant is the prevailing constitutional and legislative rule, without regard to whether on the particular facts there was opportunity to secure a warrant. Apparently, exigent circumstances are so often present in arrest situations that it has been *524 deemed improvident to litigate the issue in every case.

In similar fashion, 'practically since the beginning of the Government,' Congress and the Court have recognized 'a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' Carroll v. United States, 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). As in the case of an arrest and accompanying search of a person, searches of vehicles on probable cause but without a warrant have been deemed reasonable within the meaning of the Fourth Amendment without requiring proof of exigent circumstances **2067 beyond the fact that a movable vehicle is involved. The rule has been consistently recognized, see Cooper v. California, supra; Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Harris v. United States, supra, 331 U.S., at 168, 67 S.Ct., at 1110 (dissenting opinion); Davis v. United States, 328 U.S. 582, 609, 66 S.Ct. 1256, 1269, 90 L.Ed. 1453 (1946) (dissenting opinion); Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1938); Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629 (1931); United States v. Lee, supra; and was reaffirmed less than a year ago in Chambers v. Maroney, supra, where a vehicle was stopped on the highway but was searched at the police station, there being probable cause but no warrant.

The majority now approves warrantless searches of vehicles in motion when seized. On the other hand, warrantless, probable-cause searches of parked but movable vehicles in some situations would be valid only upon proof of exigent circumstances justifying the search. Although I am not sure, it would seem that, when police discover a parked car that they have probable cause to search, they may not immediately search but must seek *525 a warrant. But if before the warrant arrives, the car is put in motion by its owner or others, it may be stopped and searched on the spot or elsewhere. In the case before us, Coolidge's car, parked at his house, could not be searched without a valid warrant, although if Coolidge had been arrested as he drove away from his home, immediate seizure and subsequent search of the car would have been reasonable under the Fourth Amendment.

I find nothing in the language or the underlying rationale of the line of cases from Carroll to Chambers limiting vehicle searches as the Court now limits them in situations such as the one before us. Although each of those cases may, as the Court argues, have involved vehicles or vessels in motion prior to their being stopped and searched, each of them approved the search of a vehicle that was no longer moving and, with the occupants in custody, no more likely to move

than the unattended but movable vehicle parked on the street or in the driveway of a person's house. In both situations the probability of movement at the instance of family or friends is equally real, and hence the result should be the same whether the car is at rest or in motion when it is discovered.

In Husty v. United States, supra, the police had learned from a reliable informant that Husty had two loads of liquor in automobiles of particular make and description parked at described locations. The officers found one of the cars parked and unattended at the indicated spot. Later, as officers watched, Husty and others entered and started to drive away. The car was stopped after having moved no more than a foot or two; immediate search of the car produced contraband. Husty was then arrested. The Court, in a unanimous opinion, sustained denial of a motion to suppress the fruits of the search, saying that '(t)he Fourth Amendment does not prohibit the search, without warrant, of an automobile, for liquor illegally **\*526** transported or possessed, if the search is upon probable cause * * *.' Id., at 700, 51 S.Ct., at 241. Further, '(t)he search was not unreasonable because, as petitioners argue, sufficient time elapsed between the receipt by the officer of the information and the search of the car to have enabled him to procure a search warrant. He could not know when Husty would come to the car or how soon it would be removed. In such circumstances we do not think the officers should be required to speculate upon the chances of successfully carrying out the search, after the delay and withdrawal from the scene of one or more officers which would have been necessary to procure a warrant. The search was, therefore, on probable cause, and not unreasonable * * *.' Id., at 701, 51 S.Ct., at 242.

The Court apparently cites Husty with approval as involving a car in motion on the highway. But it was obviously irrelevant **\*\*2068** to the Court that the officers could have obtained a warrant before Husty attempted to drive the car away. Equally immaterial was the fact that the car had moved one or two feet at the time it was stopped. The search would have been approved even if it had occurred before Husty's arrival or after his arrival but before he had put the car in motion. The Court's attempt to distinguish Husty on the basis of the car's negligible movement prior to its being stopped is without force.

The Court states flatly, however, that this case is not ruled by the Carroll-Chambers$ line of cases but by Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968). There the car was properly stopped and the occupants arrested for reckless driving, but the subsequent search at the station house could not be justified as incident to the arrest. See Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). Nor could the car itself be seized and later searched, as it was, absent probable cause to believe it contained evidence of crime. In Dyke, it was pointed out **\*527** that probable cause did not exist at the time of the search, and we expressly rested our holding on this fact, noting that, '(s)ince the search was not shown to have been based upon sufficient cause,' it was not necessary to reach other grounds urged for invalidating it. 391 U.S., at 222, 88 S.Ct., at 1476. Given probable cause, however, we would have upheld the search in Dyke.

For Fourth Amendment purposes, the difference between a moving and movable vehicle is tenuous at best. It is a metaphysical distinction without roots in the commonsense standard of reasonableness governing search and seizure cases. Distinguishing the case before us from the Carroll-Chambers line of cases further enmeshes Fourth Amendment law in litigation breeding refinements having little relation to reality. I suggest that in the interest of coherence and credibility we either overrule our prior cases and treat automobiles precisely as we do houses or apply those cases to readily movable as well as moving vehicles and thus treat searches of automobiles as we do the arrest of a person. By either course we might bring some modicum of certainty to Fourth Amendment law and give the law enforcement officers some slight guidance in how they are to conduct themselves.

I accordingly dissent from Parts II—B, II—C, and II—D of the Court's opinion. I concur, however, in the result reached in Part III of the opinion. I would therefore affirm the judgment of the New Hampshire Supreme Court.

**Parallel Citations**

91 S.Ct. 2022, 29 L.Ed.2d 564

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.